UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS, et al.,

     Plaintiffs,

v.

XAVIER BECERRA, Secretary of Health
and Human Services, et al.,

     Defendants.

No. 5:21-CV-300-H

## MEMORANDUM OPINION AND ORDER

In response to the President's plan to increase COVID-19 vaccinations, the Department of Health and Human Services created two unprecedented conditions on funding for Head Start programs, which provide education-related services to needy children. The agency's Rule requires Head Start staff to be vaccinated and near-universal masking of children and adults.

It is undisputed that an agency cannot act without Congressional authorization. Thus, the question here is whether Congress authorized HHS to impose these requirements. HHS claims that the mandates are authorized as "program performance standards" related to: "administrative and financial management," "the condition . . . of facilities," or "such other standards" the agency "finds to be appropriate." Texas and the Lubbock Independent School District argue that the Act does not authorize such mandates, that irreparable injury would result from them, that HHS failed to comply with the Administrative Procedure Act in adopting the conditions, and that the mandates violate various Constitutional doctrines. They seek an injunction to bar the mandates' enforcement. Because the Court concludes that there is a substantial likelihood that the mandates do not fit within the Head Start Act's authorizing text, that HHS failed to follow the APA in promulgating the mandates, and that the mandates are arbitrary and capricious, the Court preliminarily enjoins their enforcement in Texas.

1.      **Factual and Procedural Background**

The Department of Health and Human Services (HHS) offers grants to schools,

nonprofits, and other local organizations to run Head Start programs.  Those programs

"promote the school readiness of low-income children" by creating supportive learning

environments and by providing health, educational, nutritional, social, and other services to

young children and their families.  42 U.S.C. § 9831.  Many Head Start programs are

operated through local school districts, like Lubbock Independent School District (LISD), in

the form of pre-K classes.  *See, e.g.*, Dkt. No. 8-3 at 3.  Texas Tech operates an Early Head

Start program, which is offered for children under age three.  Dkt. No. 8-4 at 2; *see* 42

U.S.C. § 9840a.  In 2021, HHS awarded $842,280,184 in grants to Texas Head Start

programs.  Dkt. No. 8-2 at 35.  LISD and Texas Tech University received a portion of this

funding.  Dkt. Nos. 8-2 at 2, 9, 10, 30; 8-3 at 3; 8-4 at 2.

In response to the COVID-19 pandemic, the Office of Head Start (OHS) allowed

local providers to adjust their services as necessary depending community conditions and

needs.  Dkt. Nos. 8-5 at 2-3; 27 at 4 (listing the OHS May 2021 guidance in the

administrative record); 86 Fed. Reg. 68,058 n.66 (citing the guidance in the interim final

rule).  In its May 2021 guidance, the agency recognized that "[t]o date, OHS provided

needed flexibilities and guidance that allowed programs to adapt services based on the

changing health conditions in their communities."  Dkt. No. 8-5 at 2.  As a result, some

Head Start programs offered virtual and remote services, but "[m]any programs continued

to provide in-person services for children and families throughout the COVID-19

pandemic."  *Id*.  OHS knew, however, that "virtual and remote services . . . are not an

acceptable replacement for in-person comprehensive services."  *Id*. at 3.  In fact, OHS

reported that "[a]lmost one third of children served in Head Start programs before the pandemic—approximately 250,000—have not received services to date." *Id.* at 4.  Thus, OHS's May 2021 guidance instructed its in-person programs "to continue serving children in person, as local health conditions allow." *Id.* at 2.  OHS also made clear that the virtual programs "are expected to move to in-person services, as local health conditions allow." *Id.* at 3.  According to the CDC, OHS's flexible approach to early childhood education during the pandemic was successful: "Since the COVID-19 pandemic started, Head Start and Early Head Start programs successfully implemented CDC-recommended mitigation strategies and applied other innovative approaches to limit SARS-CoV-2 transmission among children, teachers, and other staff members by allowing maximum program flexibility and allocating financial and human resources."[1]

In the 2020–21 school year, LISD implemented a mask mandate in line with Governor Abbott's Executive Order and Texas Education Agency public-health guidance. Dkt. 39-4 at 3.  Masks were required for students in fourth grade and above.  *Id.*  In the 2021–22 school year, however, LISD decided that masks would be welcome and vaccinations encouraged, but neither would be mandatory.  *Id.* at ¶ 5–6.  Before the school year began, 84% of LISD's staff reported having received at least one vaccine dose.  *Id.* at ¶ 6.  Of 1,847 active cases since August 18, 2021, 26 were pre-K students and none were pre-K staff.  *Id.* at ¶ 5.

---

[1] CDC Morbidity and Mortality Weekly Report (Dec. 11, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6949e3.htm [https://perma.cc/LY6K-ZS7Y] (available at Dkt. No. 29-9).

On September 9, 2021, the President announced "a new plan to require more Americans to be vaccinated."[2]  He said that "our patience is wearing thin" with the unvaccinated, and "we must increase vaccinations among the unvaccinated with new vaccination requirements."  *Id.*  Those requirements would apply to employers with 100 or more employees, healthcare workers, executive branch federal employees, and "all of nearly 300,000 educators" in the Head Start program.  *Id.*  The President did not hide the fact that his school-related mandate "takes on elected officials and states that are undermining you and these lifesaving actions."  *Id.*  He said that "if these governors won't help us beat the pandemic, I'll use my power as President to get them out of the way."  *Id.*

On November 30, 2021, the Administration for Children and Families (ACF)—a division of HHS—issued an Interim Final Rule with Comment (Rule) imposing mask and COVID-19 vaccine mandates in Head Start programs.  *See* Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs, 86 Fed. Reg. 68,052 (Nov. 30, 2021) (to be codified at 45 C.F.R. pt. 1302).  As its name suggests, the Rule's purpose is "to protect the health and safety of Head Start staff, children, and families and to mitigate the spread of SARS–CoV–2 in Head Start programs."  *Id.* at 68,053.

ACF promulgated the Rule by adding the mandates to existing "Head Start Program Performance Standards."  *Id.* at 68,052.  Specifically, the Rule requires "universal masking

---

[2] Joseph Biden, Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ [https://perma.cc/VW2F-3Z47].

for all individuals aged 2 years and older," with limited exceptions,[3] in all indoor settings where Head Start services are provided and in Head Start vehicles. *Id.* at 68,060. And "for those not fully vaccinated," masks are required "outdoors in crowded settings or during activities that involve sustained close contact with other people." *Id.* For purposes of the Rule, "being outdoors with children inherently includes sustained close contact for the purposes of caring for and supervising children." *Id.*

The Rule also requires "all Head Start staff, certain contractors, and volunteers in classrooms or working directly with children to be fully vaccinated," with certain exemptions.[4] *Id.* For those granted an exemption from the vaccine requirement, weekly COVID-19 testing is required. *Id.* at 68,061.

The Rule took effect immediately—November 30, 2021—before public notice-and-comment procedures were followed. Given the threat posed by rising COVID-19 cases and the hope to return fully to in-person instruction in 2022, the Secretary found that there was "good cause" to waive the notice-and-comment procedures normally required when an agency promulgates a regulation. *See id.* at 68,059 (finding good cause to waive notice-and-comment procedures). The mask requirement was effective immediately, while the vaccine mandate requires compliance by January 31, 2022. *Id.* at 68,060–62. Under the Rule,

---

[3] "Exceptions are noted for when individuals are eating or drinking; for children when they are napping; for the narrow subset of persons who cannot wear a mask, or cannot safely wear a mask, because of a disability as defined by the Americans with Disabilities Act (ADA), consistent with CDC guidance on disability exemptions; and for children with special health care needs." 86 Fed. Reg. at 68,060 (footnotes omitted).

[4] Exemptions are available "for those (i) for whom a vaccine is medically contraindicated, (ii) for whom medical necessity requires a delay in vaccination, or (iii) who are legally entitled to an accommodation with regard to the COVID–19 vaccination requirement based on an applicable Federal law." *Id.* at 68,061 (footnotes omitted). Accommodations based on federal law may be granted for "a disability under the ADA, medical condition, or sincerely held religious beliefs, practice, or observance." *Id.*

individuals are deemed "fully vaccinated" two weeks after receiving the second dose in a

two-dose series (i.e. Moderna and Pfizer) or a single-dose vaccine (i.e. Johnson & Johnson).

*Id.* at 68,060.  But, to allow flexibility, staff and volunteers who have received their final

dose of a COVID-19 vaccine by January 31, 2022 are "considered to have met the

vaccination requirement, even if they have not yet completed the 14-day waiting period."

*Id.* at 68,062.  Because the Moderna vaccine requires four weeks in between doses, an

unvaccinated person who intends to comply with the Rule by receiving the Moderna

vaccine must receive his or her first dose by January 3, 2022.  Programs that refuse to

implement the Rule's dual mandates risk losing their Head Start funding entirely.  *See* 42

U.S.C. § 9836a(e)(1)(C); 45 C.F.R. § 1304.5 (2021) ("Termination and denial of

refunding").

  Plaintiffs—the State of Texas and the LISD—filed this action on December 10, 2021

seeking to enjoin the Rule's enforcement.  Dkt. No. 1.  They argue that several statutory and

constitutional defects render the Rule procedurally and substantively invalid.

  The plaintiffs filed a motion seeking a temporary restraining order and a preliminary

injunction on December 14.  Dkt. Nos. 6; 8.  Two days later, the defendants[5] appeared

through counsel.  Dkt. No. 14.  Aware of the January 3 deadline for those who would

obtain the Moderna vaccine, the Court set an expedited briefing schedule.  Dkt. No.  15.

---

[5] Defendants are Xavier Becerra, in his official capacity as Secretary of the United States
Department of Health and Human Services; the United States Department of Health and Human
Services; Jooyuen Chang, in her official capacity as Principal Deputy Assistant Secretary; the
Administration for Children and Families; Katie Hamm, in her official capacity as Deputy
Assistant Secretary for Early Childhood Development; the Office of Early Childhood
Development; Bernadine Futrell, in her official capacity as Director of the Office of Head Start; the
Office of the Head Start; and Joseph R. Biden, in his official capacity as President of the United
States.

On December 23, the defendants filed a response brief.  Dkt. Nos. 24; 25; 26.  Four days later, they filed the administrative record.  Dkt. Nos. 27–35.  The plaintiffs then filed their reply on December 28.  Dkt. No. 38.

The Court held a hearing to allow the parties to offer evidence and argument. Plaintiffs offered 18 exhibits into evidence, while the defendants offered none.  Tr. at 10. With two exceptions, the defendants stipulated to the admissibility of plaintiffs' exhibits.  *Id.* at 6; Dkt. No. 39.  Defendants objected to the use of the declarations attached to the plaintiff's filings (Dkt. Nos. 39-3; 39-4; 39-7; 39-8; 39-9; 39-15; 39-16; 39-17) for any reason other than to analyze irreparable harm and the public interest.  Dkt. No. 39; Tr. at 86.  They also objected in full to plaintiffs' proposed Exhibit 14, which is a sample of public comments.  Dkt. No. 39-14.  Thus, the Court admitted plaintiffs' Exhibits 1–13 and 15–18. Tr. at 6, 10.  It took the admissibility of plaintiffs' Exhibit 14 and the permissible use of the declarations under advisement.[6]  *Id.* at 10.

During oral argument, counsel for the defendants made multiple concessions relevant to the Court's analysis.  First, she noted that the vaccine and mask mandates are not "health services" within the meaning of the Head Start Act.  *Id.* at 40.  Second, she explained that the agency does not assert that the Rule was or could be authorized under 42 U.S.C. § 9836a(a)(1)(A), which are "performance standards with respect to services required to be provided, including health . . . services."  *Id.* at 40–41.  Third, while she continued to argue that the Rule could be authorized as an "administrative" standard under subsection (C), she admitted that it could not qualify as a "financial management standard."

---

[6] Because the Court does not rely on Exhibit 14 in its analysis, nor consider the declarations outside of the harm and public-interest issues, the Court denies the objections as moot.

*Id.* at 48. And finally, she admitted that, while other health services made available to children by Head Start are "strongly encouraged," this is the first time that Head Start has ever mandated a medical procedure as a precondition to new or ongoing employment. *Id.* at 46–47. The Rule is unprecedented, although counsel asserted that it is justified by an unprecedented pandemic. *Id.* at 52, 55–58.

Counsel for Texas likewise made an important clarification during argument. Regarding Texas's request for a nationwide injunction, he admitted that the Fifth Circuit recently limited a nationwide injunction and that relevant precedent on the topic appeared inconsistent. *Id.* at 90–91. He agreed that the great majority of evidence before the Court was limited to the mandate's effect on Texas and school districts in Texas. *Id.* at 91. He explained that Texas's request for nationwide relief was not based on case law, but rather the Administrative Procedure Act, which instructs courts to set aside unlawful agency actions. *Id.* at 90–91.

## 2.    Preliminary Injunction Standard

Federal Rule of Civil Procedure 65(a) authorizes federal courts to issue preliminary injunctions. The Court need not address Plaintiffs' Motion for Temporary Restraining Order under Rule 65(b) because defendants received notice, made an appearance, and the issues have been fully briefed and argued by the parties.

"A preliminary injunction is an extraordinary remedy," requiring a "clear showing" that plaintiffs are entitled to such relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). "In order to obtain a preliminary injunction, a movant must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will

result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *Moore v. Brown*, 868 F.3d 398, 402–03 (5th Cir. 2017) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). "Likelihood of success and irreparable injury to the movant are the most significant factors." *Louisiana v. Becerra*, --- F.4th ---, 2021 WL 5913302, at *1 (5th Cir. Dec. 15, 2021) (citing *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014)).

**3.    Analysis**

**A.    Likelihood of Success on the Merits**

The Court need not reach all of plaintiffs' arguments to resolve their motion. The Court finds that plaintiffs' have demonstrated a substantial likelihood of success on the merits of four of their claims.

**i.    Statutory Authority**

First, the Court finds that plaintiffs have demonstrated a substantial likelihood of success on their claim that the Secretary issued the Rule without statutory authority. A federal agency cannot act absent Congressional authorization. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). It cannot confer power upon itself. *Id.* "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Id.* at 374–75. Therefore, under the Administrative Procedure Act (APA), courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

When reviewing an agency's construction of a statute, courts must use the ordinary tools of statutory interpretation. First, under the *Chevron* two-step framework, a court must

consider "whether Congress has directly spoken to the precise question as issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  If Congress has directly spoken on the precise issue, the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.  But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

      **a.**    **The plain language of the statutory provisions on which the Secretary relies do not authorize mask and vaccine mandates.**

The Court begins with the text of defendants' cited authority.  HHS claims that subsections 641A(a)(1)(C), (D), and (E) of the Head Start Act[7] authorize the Rule.  86 Fed. Reg. at 68,053 (citing § 9836a(a)(1)(C)–(E)).  The relevant language appears as follows:

**§ 9836a. Standards; monitoring of Head Start agencies and programs**

    **(a) Standards**

        **(1) Content of standards**

> The Secretary shall modify, as necessary, program performance standards by regulation applicable to Head Start agencies and programs under this subchapter, including—
> . . .
>
> (C) administrative and financial management standards;
>
> (D) standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate)
> . . .
>
> (E) such other standards as the Secretary finds to be appropriate.

---

[7] Defendants cite 42 U.S.C. § 9836a(a)(1)(C)–(E), as amended by the Improving Head Start for School Readiness Act of 2007, Pub. L. No. 110–34, § 8, 121 Stat. 1385–96 (2007).  For simplicity, the Court refers to the current, amended version of this statute as the "Head Start Act."

42 U.S.C. § 9836a.

Plaintiffs argue that the Secretary's ability to "modify" these "program performance standards" does not authorize a vaccine mandate for all Head Start staff, contractors, and volunteers, nor universal masking for all individuals age two and older.  Dkt. No. 8 at 19 (citing § 9836a(a)(1)).  The Court agrees.

Applying *Chevron*'s first step, Congress has not spoken to the precise question at issue.  The statutory subsections on which defendants rely do not mention vaccination or masking.  To some degree, this is not surprising.  The "program performance standards" in the Head Start Act were last amended in 2007, when "masking" was not the common term it is today.  *See supra* note 7.  That "vaccination" or "immunization" are missing from the statute is more telling.  State laws and regulations have long required that at least children be vaccinated against many communicable diseases.  *See, e.g.*, 25 Tex. Admin. Code § 97.63(2)(A) (requiring that "[c]hildren enrolled in child-care facilities, pre-kindergarten, or early childhood programs" be immunized against a host of diseases).

Congress could have spoken directly to the issue of vaccination, masking, or other precautions in the last year when passing other COVID-19-related legislation, but it did not and has not.[8]  Rather than amend the Head Start Act, Congress only granted funds "for carrying out" the existing "Head Start Act."  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116–260, 134 Stat. 1181, 1583–84 (2020).  Moreover, the subsections on which the defendants rely do not mention broader health and safety precautions that Head Start

---

[8] As counsel for the defendants conceded at the hearing, Congress could not have foreseen the COVID-19 pandemic when it enacted the Head Start Act.  Tr. at 57–58.  That argument does not help the defendants, though.  Rather, it underscores the need to reach *Chevron*'s second step.

staff or children must take.  Subsections 641A(a)(1)(C), (D), and (E) are silent as to the "precise question at issue."  *Chevron*, 467 U.S. at 843.

And under subsection (A) of Section 641A(a)(1)—a provision the Secretary did not cite as authority for the Rule—Congress also did not speak to the precise question at issue, even though that subsection allows the Secretary to modify "program performance standards" for "services required to be provided, including health."  42 U.S.C. § 9836a(a)(1)(A).  Though this provision mentions the word "health," it concerns providing services to children—not conditioning participation or employment on mask or vaccine requirements.  *Id.*

Therefore, the Court must decide, under step two of the *Chevron* framework, whether "the agency's [interpretation] is based on a permissible construction of the statute."  467 U.S. at 843.  The plain language of defendants' cited authority, the statutory context, and the existing regulations all confirm that the Secretary's interpretation of "performance standards" is not a permissible construction of the statute.  The Court finds that plaintiffs are substantially likely to succeed on their claim that defendants exceeded their statutory authority.

As mentioned, the Secretary invokes subsections 641A(a)(1)(C), (D), and (E) of the Head Start Act to claim the broad authority for issuing this Rule.  86 Fed. Reg. at 68,053.  Those subsections authorize the Secretary to "modify, as necessary, program performance standards by regulation . . . including—(C) administrative and financial management standards; (D) standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate) . . . [and] (E) such other standards as the Secretary finds to be appropriate."  42 U.S.C. § 9836a(a)(1)(C)–(E).

– 12 –

At the outset, Congress appears to have limited the scope of the Secretary's power. The Secretary may only "modify" program performance standards.  *Id.*  This is not a broad grant of rulemaking power like defendants suggest.  Rather, by enabling the Secretary to only "modify" program performance standards, Congress conferred modest authority.  To "modify" means to "make somewhat different; to make small changes to (something) by way of improvement, suitability, or effectiveness . . . [t]o make more moderate or less sweeping; to reduce in degree or extent; to limit, qualify, or moderate."  *Modify*, Black's Law Dictionary (11th ed. 2019); *see also MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994) ("Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion").

With the power to "modify," the Secretary may only make moderate changes to Head Start performance standards.  Against this backdrop, the Court finds that enacting unprecedent mask and vaccine mandates are not moderate changes to the specific standards defendants try to leverage.  But even assuming "modify" does not cabin the Secretary's power, the identified sources of authority cannot fairly be construed so broadly as to include an unprecedented, nationwide requirement of a medical procedure or universal masking. The Court addresses each of defendants' cited provisions in turn.

First, the mask and vaccine mandates are not authorized by subsection (C), which allows the Secretary to modify "administrative and financial management standards." § 9836a(a)(1)(C).  "Financial management standards" plainly do not encompass mask and vaccine mandates—they relate to how money is handled.  Defendants admit that the mandates are not financial management standards.  Tr. at 48.

Likewise, the Secretary may not impose these mandates by purporting to modify administrative standards. "Administrative" is not defined by the statute but generally refers to "of or relating to administration," and "administration" is the "performance of executive duties: management." *Administrative*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014); *Administration*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014). By placing the vaccine mandate in the "Human Resources Management" section of the regulations, defendants seem to interpret "administrative" standards to include requiring its employees to undergo a mandatory offsite medical procedure or be fired if they are not granted an exemption. *See* 86 Fed. Reg. at 68,060 (noting that the Rule adds four new provisions to "part 1302, subpart I—Human Resources Management" in 45 C.F.R. §§ 1302.93–94). Such a requirement would not typically be characterized as relating to executive duties or management. If it were, there would be no limit to the scope of administrative standards. Defendants could then impose any requirement on Head Start staff, contractors, volunteers, and children by modifying "administrative standards."

Rather, the scope of "administrative standards" is informed by the term to which it is joined: "financial management standards." § 9836a(a)(1)(C). Congress grouped the two together—not only in the same list, but in the same subsection. *See id.* Statutory terms are often known by the "company they keep." *See Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018) (Breyer, J., writing for a unanimous Court) (citing *Yates v. United States*, 574 U.S. 528, 542 (2015)) (finding "both the presence of company that suggests limitation and the absence of company that suggests breadth"). The agency concedes that the company "administrative" keeps—"financial management"—obviously cannot authorize the Rule. Tr. at 48. Read together, the term "financial management standards" "suggests limitation"

on the scope of the term "administrative standards." *Id.* The terms appear to contemplate management standards like those found in 45 C.F.R. § 1302.101(a)(1)—requiring programs to use effective "fiscal[] and human resource management structure[s]"—not mandatory masking and vaccine requirements. Given that the masking and vaccine mandates aim to protect children's health, it defies logic to assert that such standards would be characterized as administrative or financial.

Second, the plain language of subsection (D) suggests that the Secretary may not impose the mask and vaccine mandates. Subsection (D) enables the Secretary to modify "standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate)." § 9836a(a)(1)(D). "Facility" is defined as "a structure, such as a building or modular unit, appropriate for use in carrying out a Head Start program and used primarily to provide Head Start services." 45 C.F.R. § 1305.2 (2021). Subsection (D) specifies that the condition and location of facilities must "meet or exceed State and local requirements concerning licensing for such facilities" and "be accessible by State and local authorities for purposes of monitoring and ensuring compliance." § 9836a(a)(1)(D)(i) & (ii). The "condition" of facilities—as the references to "indoor air quality assessment standards," licensing, and accessibility make clear—relate to physical conditions of buildings and equipment—not conditions on children's participation and adults' employment or volunteer eligibility. Mandating facility standards is a far cry from mandating a medical procedure for all staff under the threat of termination and what participants must wear. *See Texas v. Becerra*, 2021 WL 5964687, at *5 (N.D. Tex. Dec. 15, 2021) (Kacsmaryk, J.) ("Mandating facility standards is drastically different from mandating who a healthcare provider hires or fires.").

The Rule contains a lone sentence aimed at explaining how the mask and vaccine mandates are "standards relating to the condition . . . of facilities." § 9836a(a)(1)(D). "The Secretary finds it necessary and appropriate to set health and safety standards for the condition of Head Start facilities that ensure the reduction in transmission of the SARS–CoV–2 and to avoid severe illness, hospitalization, and death among program participants." 86 Fed. Reg. at 68,054. But the new Rule governs the conditions of people—not buildings. *See* Tr. at 49 (defendants acknowledging that "facilities" refer to buildings).

The last subsection—"such other standards as the Secretary finds to be appropriate"—cannot support the mask and vaccine mandates. § 9836a(a)(1)(E). Though seemingly expansive, "such other" standards fall under the banner of "performance standards" and must be defined in relation to subsections (A)–(D).[9] § 9836a(a)(1) (stating that "[t]he Secretary shall modify, as necessary program performance standards"). Generally, "performance standards" are criteria that measure the quality of Head Start programs. *See Standard*, Black's Law Dictionary (11th ed. 2019) ("A criterion for measuring acceptability, quality, or accuracy"). Here, "quality" corresponds to Head Start programs' ability to achieve their purpose. Under the Act, that purpose is to "promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development" through providing a host of services—including health services to the children and their families. 42 U.S.C. § 9831(2).

---

[9] Plaintiffs also argue that such a broad reading of "other standards" the Secretary deems "appropriate" would violate the nondelegation doctrine. Dkt. No. 8 at 25. "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019). But statutory delegations are permissible if "Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* at 2123. Because the Court finds defendants' broad reading impermissible, the Court need not address nondelegation issues arising from the catch-all provision.

The vaccine mandate does not measure staff and volunteers' ability to enhance children's development; it determines whether they will be kept on, hired, or fired in the first place.  Likewise, requiring all children ages two to five to wear masks is not a benchmark that measures the quality of services provided, health-related or not.  Rather, it defines whether children may receive Head Start services at all.  These mandates are prerequisites to performance, not performance standards themselves.  Both set conditions for participation and employment.  They do not measure quality.  Defendants' construction of their cited authorities is impermissible for this fundamental reason.

Furthermore, if "such other performance standards" could include mask and vaccine mandates, there would be no genuine limiting principle to the Secretary's authority to regulate in the name of "health and safety standards."  As recently as August 2021, the Supreme Court invalidated a federal agency's attempt to pass COVID-19 restrictions, and it did so, in part, due to the lack of any limit to the asserted authority.  *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021).  There, the Supreme Court held that it was "virtually certain" that the CDC did not have authority to issue an eviction moratorium based on the Surgeon General's statutory authority to make and enforce regulations to prevent the spread of communicable diseases.  *Id.* at 2486.  The statute at issue had a catch-all provision, similar to the one in this case—"other measures, as in his judgment may be necessary."  *Id.* at 2487 (quoting 42 U.S.C. § 264).  But the Court explained that "the sheer scope of the CDC's claimed authority . . . would counsel against" the CDC's interpretation, because it was "hard to see what measures [it] would place outside the CDC's reach."  *Id.* at 2489.

– 17 –

Although, this case, of course, deals with different statutory language, the agency's similar claim to expansive authority based on generalized and catch-all language undermines its position. Here, defendants argue that the Secretary can leverage "such other standards as the Secretary finds to be appropriate" to pass any health and safety regulation that furthers the general purpose of the statute—keeping Head Start programs open to promote the school readiness of children. Tr. at 51–52. This reading appears to allow the Secretary to pass any health-related mandate that would reduce staff and volunteer absenteeism. Even if the plain language of "program performance standards" authorized the Rule—which it does not—adopting the remote and manipulable reading urged by the Secretary counsels against the defendants' interpretation. *See Alabama Ass'n of Realtors*, 141 S. Ct. at 2489.

> **b.    Other statutory provisions and existing regulations confirm that the mask and vaccine mandates are unprecedented and unauthorized.**

Citing other provisions in the "standards" section, defendants urge a broader construction of "performance standards." *See* Dkt. No. 26 at 26–27. Congress authorized the Secretary to issue "deficiencies" when programs fail to follow "performance standards." § 9836a(e)(1)(A). The act defines a "deficiency" as "a systematic or substantial material failure of an agency in an area of performance that the Secretary determines involves—(i) a threat to the health, safety, or civil rights of children or staff; . . . [or] (iii) a failure to comply with standards related to early childhood development and health services . . . ." 42 U.S.C. § 9832(2)(A). So, defendants argue, the Secretary can establish "standards related to early childhood development and health services" and "the health . . . of children or staff" because he can issue deficiencies for failures to follow such standards. Dkt. No. 26 at 26–27

(quoting § 9832(2)(A) and citing § 9836a(e)(1)).  The argument falls short for multiple reasons.

First, there was never any doubt that the Secretary could establish certain performance standards related to "health services."  Subsection (A) of program performance standards specifically allows the Secretary to modify "performance standards with respect to services required to be provided, including health."  § 9836(a)(1)(A).  But the Secretary did not rely on this subsection as his statutory authority for the mask and vaccine mandates.  Subsection (A) does not appear in the Rule even once.  He instead cites subsections (C) ("administrative and financial"), (D) ("facilities"), and (E) ("other") of "program performance standards."  86 Fed. Reg. at 68,052–53 (citing § 9836(a)(1)(C)–(E)).  And defendants concede that mask and vaccine mandates are not health services.  Tr. at 40.

Indeed, they are not.  Head Start is not providing "health services" to children, nor establishing related "performance standards," by requiring universal masking and staff vaccination.  Current performance standards related to health services include examinations and screenings for children.  *See* 45 C.F.R. § 1302.42 (2021).  These standards even include assisting children in getting up to date on immunizations.  § 1302.42(b)(1).

But these existing regulations differ from the mask and vaccine requirements in three critical ways.  One, they do not operate as conditions to participation.  The provision of health services, like screenings and immunization assistance, for children already participating in Head Start programs promotes school readiness, but they are not required.  Mandatory vaccines and universal masking, in contrast, present barriers to entry unlike any other "performance standard."  Two, since the first of these regulations were promulgated, the health services offered have always required parental consent.  *See* Program Performance

Standards for Operation of Head Start Programs by Grantees and Delegate Agencies, 40 Fed. Reg. 27,562, 27,565 (June 30, 1975) (codified in 45 C.F.R. § 1304.3-3(a)) (requiring "advance parent or guardian authorization" for all screenings and examinations); 45 C.F.R. § 1302.41 (2021) (requiring Head Start programs to "collaborate with parents as partners in the health and well-being of their children" and "[a]t a minimum" to "[o]btain advance authorization from the parent or other person with legal authority for all health and developmental procedures administered through the program"); 45 C.F.R. § 1302.42(b)(ii) (2021) (authorizing Head Start staff to assist parents with scheduling immunizations but saying nothing about enforced masking or vaccinations).  And the defendants concede that the Rule at issue is the first time in Head Start's history that a health procedure was mandated as a prerequisite to participation or employment.  Tr. at 47.  Three, the regulations on which defendants rely only require that immunizations be made available to children; they say nothing regarding staff or volunteers.  45 C.F.R. § 1302.41 (2021) ("Child health status and care").  Here, by contrast, the vaccine and mask mandates condition employment on compliance, and this is the first-ever medical procedure required of Head Start staff under the threat of termination.  Tr. at 47.  These distinctions again highlight why the mandates are not "performance standards" in the first place.

Second, that the "deficiencies" for which the Secretary can impose sanctions contemplate threats to "health and safety" does not widen the scope of what "performance standards" comprises.  Based on the listed "performance standards" in section 9836a(a)(1), the Secretary has limited power to provide for the health and safety of Head Start programs.  That was never in doubt.  But again, it does not authorize the mask and vaccine mandates.  For instance, Congress expressly granted the Secretary power to regulate the conditions of

"facilities."  § 9836a(a)(1)(D).  And here, the Secretary's own explanation of his statutory authority focused on "facilities."  86 Fed. Reg. at 68,054.  Facility conditions, such as poor "ventilation" systems, directly impact the health and safety of children and staff.  *Id.* at 68,054, 68,066.  Thus, it is no surprise that the Secretary could issue deficiencies based on "threat[s] [to] the health or safety" of staff and children resulting from facility conditions. §§ 9836a(a)(1)(D) & (e)(1)(B)(i).  But, as explained above, the Act says nothing about conditioning participation and employment eligibility on health and safety requirements as vast as the mask and vaccine mandates here.

Furthermore, that Congress mentions standards related to "health" services in subsection (A), cuts against defendants' claim that the catch-all provision in subsection (E) includes any health-related standards.  Reading "other standards" as broadly as defendants suggest would render subsection (A) surplusage as it pertains to "health" related standards. The catch-all provision cannot be read so broadly as to eclipse the meaning of subsections (A)–(D).  The Court "must give effect to every word that Congress used in the statute." *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985).

> ### c.  Vaccination requirements for Head Start staff and volunteers are state government—not federal agency—matters.

Having already addressed the existing regulations governing children, the Court turns to the existing regulations governing Head Start staff and volunteers.  To the extent the regulations shed light on the scope of Secretary's authority under the statute, they do not authorize this Rule's mandates.  Rather, they imply that periodically screening or testing workers may be permissible when done in "accordance with state, tribal, and local requirements."  *See* 45 C.F.R. §§ 1302.93–94 (2021) (requiring staff and volunteers to test for

communicable diseases "in accordance with state, tribal, and local" laws and requirements).[10] These provisions suggest two ideas, neither of which help defendants.

First, testing employees for communicable diseases may, in some circumstances, be permissible. But this is not a periodic testing rule. This is a vaccine mandate. Nothing in the regulations contemplate that the federal government can require staff and volunteers to be periodically immunized.

Second, testing only occurs when conducted consistent with "state, tribal, and local" laws and requirements. *Id.* This confirms what the Supreme Court has recognized for over a century. Public health and safety regulation belongs, in the first instance, to the States. *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 38 (1905) (recognizing that the "safety and the health of the people of" states are for States to "guard and protect" through their general "police power[s]"). Moreover, defendants' argument that states can require employee vaccination does not support their argument that a federal agency can. Dkt. No. 26 at 36–37 ("Students and educators have long been subject to . . . *state* vaccination requirements.") (emphasis added). Rather, it supports finding that the Secretary cannot compel vaccination here.

In this respect, defendants cause their own undoing. They repeatedly affirm the notion that "vaccine requirements have existed for centuries as a commonplace feature of

---

[10] Defendants also rely on regulations that require staff to clean play areas and wash their hands after restroom use or changing diapers. Dkt. No. 26 at 35 (citing 45 C.F.R. § 1302.47(b)(6)(i) (2021) (hand hygiene); 45 C.F.R. § 1302.47(b)(2)(i) (cleaning and disinfecting play areas and equipment)). Such basic hygiene practices do not come close to showing that the Head Start Act authorizes universal masking requirements for 2-year-old children or mandatory vaccination for staff, which results in termination if they choose not to comply. And the staff-training provisions defendants cite also refer to state and local requirements, indicating that federal rules do not solely govern. Dkt. No. 26 at 35 (citing 45 C.F.R. § 1302.47(b)(4)).

American life, particularly in the education context." Dkt. No. 26 at 35 (citing *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) (upholding a state university's vaccination requirement)). Correct. And for "centuries," *states*—not federal agencies—have compelled vaccine requirements in the education context. *See, e.g.*, 25 Tex. Admin. Code § 97.63(2)(A) (requiring that "[c]hildren enrolled in child-care facilities, pre-kindergarten, or early childhood programs" be immunized against a host of diseases); Ark. Code Ann. § 6-18-702 (West) (outlining immunization requirements for school children).

The vaccine mandate at issue here comes from a federal agency, not a state. But Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1850 (2020) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). Congress's failure to use "exceedingly clear language" in any part of the statute further supports what the plain language of "performance standards" indicates: defendants do not have authority to issue the mask and vaccine mandates at issue here.

This conclusion is especially true if the "major questions doctrine" applied. The Supreme Court recently reaffirmed that it "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Alabama Association*, 141 S. Ct. at 2489 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Several factors favor applying this additional level of scrutiny. The Office of Management and Budget declared that the Rule is a "major rule" because it will "have an annual effect on the economy of $100 million or more." 86 Fed. Reg. at 68,063. In fact, ACF awards approximately "$10 billion in grants to Head Start programs." *Id.* at 68,100.

And the Rule will regulate 273,000 staff, a share of the one million volunteers who interact with children in-person, and a share of the 864,000 children participating in-person. *Id.* at 68,068–69. Plaintiffs rightly argue that these factors highlight the great economic significance of the Rule. *See* Dkt. No. 8 at 28. In addition, they argue that the federal government's power to require citizens to get vaccinated or wear masks is a question of great political significance. *See id.* at 28, 36.

But the Sixth and Eleventh Circuits recently held that the doctrine did not apply to rules with much larger economic effects and arguably equivalent political significance because the rules at issue were not "an enormous and transformative expansion in [the agencies'] regulatory authority." *See In re MCP No. 165*, --- F.4th ---, 2021 WL 5989357, at *7 (6th Cir. Dec. 17, 2021) (order dissolving the Fifth Circuit's stay of the OSHA ETS mandate) (quoting *Utility Air*, 573 U.S. at 324); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1287 (11th Cir. 2021) (order denying injunction pending appeal of the CMS mandate) (quoting *Utility Air*, 573 U.S. at 324). Delineating an "enormous and transformative" unlawful expansion of regulatory authority from a regular-sized unlawful expansion of regulatory authority is difficult. But the Court in this case need not resolve that question nor the more general issue of the major-questions doctrine. Under traditional principles of statutory interpretation, and even without the major-questions doctrine's more exacting standard, the defendants' construction is impermissible.[11]

---

[11] If the doctrine applied, plaintiffs would prevail even more easily because Congress has not spoken clearly in authorizing HHS to impose the expansive and unprecedented mandates on Head Start programs.

ii.        **Proper Rulemaking Procedures**

a.     **There is a substantial likelihood that the Secretary did not follow the procedures required to modify performance standards under the Head Start Act.**

Even if the Head Start Act allowed the Secretary to impose mask and vaccine mandates under the guise of modifying "performance standards"—which it does not—the Rule cannot stand for another fundamental reason.  Under the APA, the Court shall "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . limitations."  5 U.S.C. § 706(1)(A), (C).  Here, the statute requires the Secretary to comply with several requirements prior to modifying "any" performance standards.  42 U.S.C. § 9836a(a)(2)(A).

Under the statute, the Secretary must:

> [C]onsult with experts in the fields of child development, early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs.

*Id.*  "Here, the Secretary consulted with experts in child health, including pediatricians, a pediatric infectious disease specialist, and the recommendations of the CDC and FDA."  86 Fed. Reg. at 68,054.

The Secretary failed, however, to consult with many of the required stakeholders.  Notable absentees from his list include experts in the fields of (1) "early childhood education," (2) "family services (including linguistically and culturally appropriate services to non-English speaking children and their families)," and (3) "administration[] and financial management."  § 9836a(a)(2)(A).  The failure to consult with "persons with experience in the operation of Head Start programs" is even more striking.  *Id.*

And defendants do not argue that the Secretary actually consulted with these necessary stakeholders.  They only repeat the general assertion that the Secretary "included relevant *considerations*" under Section 9836a(a)(2) when issuing the Rule.  Dkt. No. 26 at 57 (quoting 86 Fed. Reg. at 68,053–54) (emphasis added).  But the Secretary went out of his way to list in the Rule the experts with whom he consulted and, in doing so, he omitted several required by the statute.  The inclusion of those listed implies the exclusion of those not.  *Cf. Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (finding that the expression of one thing implies the exclusion of others "when the items expressed are members of an 'associated group or series'") (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)).

These requirements exist for the Secretary's and the public's benefit.  They are not optional.  They are mandatory under the statute.  Therefore, the plaintiffs have shown a substantial likelihood that the Secretary did not follow the procedures required to modify performance standards.

> **b.** **There is a substantial likelihood that the Secretary did not have good cause to issue the Rule without notice and comment.**

There is a substantial likelihood that the Rule must be set aside for another reason: HHS did not have "good cause" to skip the notice-and-comment procedures required by the APA when it promulgated the Rule.  Courts must set aside agency action undertaken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Under the APA, an agency typically must first publish notice of a proposed rule and give the public opportunity to comment before adopting a final rule.  5 U.S.C. § 553(b), (c).  The agency also must publish such rules at least thirty days before its effective date.  § 553(d).  These procedures are "designed to assure due deliberation."  *Smiley v. Citibank (S.D.), N.A.*, 517

U.S. 735, 741 (1996) (citing 5 U.S.C. § 553 and *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984)).  But, on rare occasions, "both of these requirements may be bypassed if 'good cause' exists."  *United States v. Johnson*, 632 F.3d 912, 927 (5th Cir. 2011) (quoting 5 U.S.C. § 553(b)(3)(B)).

Notice-and-comment procedures do not apply "when the agency for good cause" finds those procedures are "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).  Typically, the government's "burden to show that good cause exists is a heavy one."  *United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009).  Indeed, the exception is to be "narrowly construed and only reluctantly countenanced."  *N.J., Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).  Nor can it provide agencies with an "'escape clause' from the requirements Congress prescribed."  *Johnson*, 632 F.3d at 928 (quoting *United States v. Garner*, 767 F.2d 104, 120 (5th Cir. 1985)).  "Its use 'should be limited to emergency situations.'"  *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting *Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)).  To determine whether "good cause" exists, the Court must "rely only on the 'basis articulated by the agency itself' at the time of the rulemaking."  *Johnson*, 632 F.3d at 928 (quoting *Garner*, 767 F.2d at 116–17).

Defendants first argue that the Court should not "narrowly construe" the good cause exception because HHS voluntarily adopted notice-and-comment procedures; Congress did not require it.  Dkt. No. 26 at 54.  The APA specifically exempts matters relating to "grants," and Head Start is a federal grant program.  5 U.S.C. § 553(a)(2); *see, e.g.*, 42 U.S.C. § 9835 (allotment of funds).  But, in 1971, HHS adopted a policy statement requiring it to follow notice-and-comment procedures.  Public Participation in Rule Making, 36 Fed. Reg.

2,532 (Jan. 28, 1971).  While defendants do not contest the binding nature of the policy statement, they argue that the Congressional policy to construe the good cause exception narrowly does not apply because Congress itself exempted HHS from APA procedures in the grant program context.  Dkt. No. 26 at 54 (quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984) (noting that agencies "should have more latitude in determining when to invoke 'good cause' when notice and comment requirements are self-imposed" so the exception should not be construed "extremely narrowly")).

Construed "extremely narrowly" or not, plaintiffs have established a substantial likelihood that the Secretary did not have "good cause" to waive the APA procedures.[12] Defendants argue that "good cause" existed to skip notice and comment, thereby delaying the effective date of the Rule, because it would be "impracticable and contrary to the public interest."  86 Fed. Reg. at 68,059.  The Secretary cites several concerning factors, including "failure to achieve sufficiently high levels of vaccination based on voluntary efforts and patchwork requirements, potential harm to children from unvaccinated staff, continuing strain on the health care system, and known efficacy and safety of available vaccines."  *Id.*

---

[12] Fifth Circuit "courts generally read exceptions from notice and comment narrowly." *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1058 (5th Cir. 1985) (citations omitted).  *Heckler* involved an HHS rule for Medicare allowances to certain providers. *Id.* at 1054–56.  The rule was promulgated before the HHS's 1971 waiver of 5 U.S.C. § 553(a)(2) exemptions but before Congress prescribed Medicare-specific notice-and-comment procedures. *Id.* at 1059 n.11; 42 U.S.C. § 1395hh(b)(1) (requiring 60 days' notice and comment).  Therefore, the *Heckler* court ultimately concluded that the 553(a)(2) "benefits" exemption applied. *Id.* at 1061.  However, the Fifth Circuit stated a general principle that *all* exceptions from notice and comment, including 553(b)(3)(B)'s "good cause" exception, will be construed "narrowly" even when faced with HHS's voluntary 1971 waiver of 5 U.S.C. § 553(a)(2) exemptions. *Id.* at 1058.  Given this, it is unclear whether the Fifth Circuit will choose to follow the position of the Ninth Circuit in *Alcaraz* by extending more latitude in construing "good cause" where the agency voluntarily waived 553(a)(2) exemptions.  746 F.2d 593.  Also, at the time the agency issued the Rule, it did not claim to be exempt from notice and comment under 5 U.S.C. § 553(a)(2).  Rather, it expressly attempted to justify why it had "good cause" under the APA.  86 Fed. Reg. at 68,058–59.

Specifically, delaying the vaccine mandate "would endanger the health and safety of staff, children, and families" as programs prepared to return to fully in-person services. *Id.* The Court does not question the authenticity of these concerns. But the only issue for the Court is whether HHS can show that notice and comment was "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).

As a threshold observation, the Secretary's specific explanation is limited to the vaccine mandate, which requires compliance by January 31, 2022—62 days after the Secretary published the Rule. The mask mandate—which required instantaneous compliance on November 30, 2021—is not mentioned. In the "Waiver of Proposed Rulemaking" section, the Secretary never explains why following notice-and-comment procedures for the mask mandate was impracticable or contrary to the public interest. *See* 86 Fed. Reg. 68,058–59 (Section III.C "Waiver of Proposed Rulemaking"). Because the Court must "rely only on the 'basis articulated by the agency itself' at the time of rulemaking," this omission favors finding that the Secretary likely did not have good cause to exclude public participation prior to issuing the Rule. *Johnson*, 632 F.3d at 928 (quoting *Garner*, 767 F.2d at 116–17).

Second, the Secretary gave staff and volunteers 62 days to get vaccinated after the Rule's effective date—more than enough time to receive the vaccine. This amount of time seems reasonable. Some might say practicable. So too, then, would notice and comment have been. Notice and comment would not have forced HHS to push back the vaccination-compliance date. Even if public participation did not affect the substance of the final rule, HHS could have received comment and not sacrificed even one day in addressing the real concerns it outlines.

– 29 –

Plaintiffs argue that notice and comment were not impracticable and contrary to the public interest because defendants "waited 82 days from the announcement of the rule on September 9, 2021, until publishing the rule on November 30, 2021." Dkt. No. 8 at 45. Therefore, defendants "waited longer to publish the rule without comment than if it had simply noticed the rule and allowed comment." *Id.* Defendants respond that during this period, "the Secretary completed a fifty-page rule, with an analysis of over 144 cited sources" thereby demonstrating "appropriate dispatch in the face of crisis." Dkt. No. 26 at 56.

The Court recognizes that "reasoned policy determination[s]" take time and do not necessarily "undermine the state of emergency." *See In re MCP*, 2021 WL 5989357, at *8–9 (citing 29 U.S.C. § 655(c)) (assessing "emergency" not under the APA's "good cause" standard, but under the Occupational Safety and Health Act's "emergency temporary standard"); *see also Florida*, 19 F.4th 1271 (holding that the district court did not abuse its discretion in finding that the Secretary of HHS set forth a sufficient basis of good cause for waiving notice and comment). But the Head Start Rule, substantially shorter and less complex, was issued 25 days after the OSHA vaccine-or-test rule and the CMS vaccine mandate were issued. *See* COVID–19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021) (154-page OSHA ETS mandate); Medicare and Medicaid Programs; Omnibus COVID–19 Health Care Staff Vaccination, 86 Fed. Reg. 61,555 (Nov. 5, 2021) (73-page CMS rule with an analysis of over 200 cited sources). The Court does not expect agencies to issue "emergency" rules in mere days, or even a few weeks, after the President announces his intent to impose new rules. But this 82-day timeline, when paired with the 62-day vaccination-compliance period, disfavors finding this

degree of federal involvement in pre-K programs to be an emergency that rendered notice and comment "impracticable."

And defendants' data arguably casts further doubt on the emergency nature of their concerns in this specific context. The Secretary found that "uptake of vaccination among Head Start staff has not been as robust as hoped for." 86 Fed. Reg. at 68,054. In defendants' cited survey, however, vaccination rates among childcare providers "significantly exceeded [rates among] the general population." *Id.* at 68,078. Defendants estimate that Head Start staff are 12% more likely to be vaccinated. *Id.* at 68,069.[13]

In light of the vaccine-compliance period, defendants' lengthy delay, and the relatively high vaccination rates of their instructors, the Court finds that notice and comment was not impracticable. *See Mid-Tex Elec. Coop., Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987) (recognizing that "the 'good cause' inquiry is inevitably fact- or context-dependent").

Rather than working against the public interest, notice and comment would have served the public interest, by ensuring "due deliberation" with the important stakeholders. *Smiley*, 517 U.S. at 741 (citing 5 U.S.C. § 553 and *Thompson*, 741 F.2d at 409). "The public interest prong of the good cause exception is met only in the rare circumstance when

---

[13] Plaintiffs' declarations suggest the same, but defendants object to the Court's consideration of them outside of the irreparable-harm and public interest analyses. Dkt. No. 39; Tr. at 6. Because the Court can resolve the notice-and-comment question without the declarations, it will not factor that evidence into its analysis, findings, and conclusion. In the interest of completeness, however, the Court will summarize the evidence here. According to the superintendent, LISD serves 540 pre-K students receiving Head Start grants, and it employs over 150 Head Start staff. Dkt. No. 39-4 ¶ 2 (Affidavit of LISD Superintendent, Dr. Kathy Rollo). In an anonymous survey conducted before the school year in August, 84% of LISD staff reported receiving at least one vaccine dose. *Id.* ¶ 6. Four months later, vaccination rates could be even higher. This school year, there have been zero COVID-19 cases among pre-K staff, even though most do not wear masks. *Id.* ¶¶ 5, 9.

ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012).  Notice and comment would have involved important stakeholders, many of whom were excluded from the rulemaking process in violation of the Head Start Act itself.  42 U.S.C. § 9836a(a)(2)(A); *see supra* Part 3.A.ii.a (outlining the Secretary's failure to consult with experts in the fields of early childhood education, family services, administration and financial management, and persons with experience operating Head Start programs).  The Secretary's decision silenced Head Start teachers, volunteers, and parents—the people who likely understand well the educational, linguistic, and social-development costs and benefits of masking toddlers and teachers in classrooms.

Furthermore, public feedback seems particularly important here given the diversity of local health conditions across the country and the wide reach of the mandate.  86 Fed. Reg. 68,058; *see American Federation*, 655 F.2d at 1156 ("The more expansive the regulatory reach . . . the greater the necessity for public comment.").  Rather than guessing that it would be burdensome for large agencies to administer different policies for areas with disparate COVID-19 transmission rates, HHS could have solicited their input through notice and comment.

To be sure, HHS is accepting comments until December 30, 2021.  86 Fed. Reg. 68,052.  But "accepting post-promulgation comments," after the Rule's effective date, does not "excuse compliance with APA procedures."  *Johnson*, 632 F.3d at 929.  This too is not an escape hatch.  "Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way."  *U.S. Steel Corp. v. EPA*, 595 F.2d

207, 214 (5th Cir. 1979) (quoting *City of New York v. Diamond*, 379 F. Supp. 503, 517

(S.D.N.Y. 1974)).  To allow otherwise, would make the provisions of Section 553 "virtually

unenforceable." *Id.* at 215.

"The essential purpose of according § 553 notice and comment opportunities is to

reintroduce public participation and fairness to affected parties after governmental authority

has been delegated to unrepresentative agencies." *Batterton v. Marshall*, 648 F.2d 694, 703

(D.C. Cir. 1980).  Here, the Secretary deprived the public and important stakeholders of this

opportunity.  Whether the Court construes the good cause exception "extremely narrowly"

or not, HHS likely did not have good cause to forgo the notice-and-comment period.

###            iii.        Arbitrary and Capricious

The Court finds that there is a substantial likelihood that the Rule is arbitrary and

capricious because it is unreasonably overbroad without a reasonable explanation.  It

imposes a one-size-fits-all approach with no end date, failing to establish a "rational

connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S.,

Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v.

United States*, 371 U.S. 156, 168 (1962)).  The lack of a reasoned explanation is especially

concerning given that the Rule constitutes a drastic change from Head Start's tradition of

local flexibility, CDC-reported success in navigating the pandemic through flexibility, and

the local programs' reliance interest on that flexibility.  *See* Dkt. No. 39-19 at 1–2.

A court must "hold unlawful and set aside agency action, findings and conclusions

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A).  The Supreme Court recently rearticulated what this

standard requires:

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.

*FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) and *State Farm*, 463 U.S. at 43). In applying this standard, the Court is limited to "the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. Accordingly, this Court's review is deferential and limited. But "it is by no means a rubber stamp." *Garner*, 767 F.2d at 116.

Plaintiffs argue that the Head Start Rule is arbitrary and capricious on more than a dozen grounds. Dkt. No. 8 at 34–43. Only a handful are particularly salient at this preliminary stage.

First, the Secretary made no distinctions in the Rule based on size, location, or transmission rates. The Head Start Rule's requirements are universal. *Contra In re MCP*, 2021 WL 5989357, at *2 (upholding OSHA standard applying only to employers of a certain size); *Alabama Association*, 141 S. Ct. at 2490 (vacating stay of CDC eviction moratorium, which applied only in counties with high transmission rates). The Secretary acknowledged regional differences in COVID-19 transmission[14] but did not "reasonably explain" his failure to accommodate such differences. *Prometheus Radio Project*, 141 S. Ct. at 1158. The Secretary found that "cases are trending downward" in some states. 86 Fed. Reg. at 68,058. But "there are emerging indications of potential increase in others—particularly northern states where the weather has begun to turn colder." *Id.*

---

[14] *See* 86 Fed. Reg. at 68,058.

An agency is "not required to identify the optimal threshold" of rule distinctions based on size, location, or transmission rates "with pinpoint precision." *In re MCP*, 2021 WL 5989357, at *15. And "[c]ourts are 'generally unwilling to review line-drawing performed by the [agency] unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem." *Id.* (alteration in original) (quoting *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998)). But the Rule does not account for any of the previously mentioned differences. Without reasonably considering the relevant issues or reasonably explaining the decision, it imposed a novel, universal approach.

Contrary to this approach, Head Start has a documented history of success from flexible practices depending on local needs. Dkt. Nos. 5-9 at 2-3; 27 at 4 (OHS May 2021 guidance listed in the administrative record); 29-9 (CDC report included in the administrative record). In its May 2021 guidance, the agency recognized that "[t]o date, OHS provided needed flexibilities and guidance that allowed programs to adapt services *based on the changing health conditions in their communities.*" *Id.* at 2 (emphasis added). As a result, some Head Start programs offered virtual and remote services, but "[m]any programs continued to provide in-person services for children and families throughout the COVID-19 pandemic." *Id.* The guidance instructed its in-person programs "to continue serving children in person, *as local health conditions allow*" and encouraged programs to "move to in-person services, *as local health conditions allow.*" *Id.* at 2 (emphasis added). During the pandemic, local programs decided to close, operate remotely or hybrid, or offer fully in-person services, depending on their circumstances. 86 Fed. Reg. at 68,058. In September 2021, 73% of centers were open for in-person services, 14% operated in a hybrid model, and

4% were virtual. *Id.* Only 2% were entirely closed due to COVID-19. *Id.* This history makes clear that defendants recognized the importance of tailoring COVID-19 policy for months and that local centers were able to navigate the pandemic successfully.

There is no doubt that Head Start's traditional local-flexibility approach worked and that the data was before the agency when it nevertheless imposed the one-size-fits-all Rule. A December 2020 report from the CDC studied the implementation of mitigation strategies in early childhood education settings. Dkt. No. 29-9 (administrative record). The CDC reported that, while "[m]ost states required all schools (K-12) to close or transition to virtual learning," the Office of Head Start "gave its local programs that remained open the flexibility to use CARES Act funds to implement CDC-recommended guidance." *Id.* at 1. The result? "Head Start programs successfully implemented CDC-recommended mitigation strategies and supported other practices that helped to prevent SARS-CoV-2 transmission among children and staff members." *Id.* The CDC stressed that the flexibility provided to local Head Start programs was key to the success: "Since the COVID-19 pandemic started, Head Start and Early Head Start programs successfully implemented CDC-recommended mitigation strategies and applied other innovative approaches to limit SARS-CoV-2 transmission among children, teachers, and other staff members *by allowing maximum program flexibility* and allocating financial and human resources." *Id.* at 3 (emphasis added). The report concludes that "[c]hild care settings should implement concurrent preventive measures and *adjust these strategies based on community transmission data*." *Id.* at 4.

Despite this tradition and success, defendants attempt to justify their new one-size-fits-all approach by stating that it would be "burdensome" for grant recipients that cover large geographic areas to issue different guidance to programs in different locations. 86 Fed.

Reg. at 68,066.  But such a conclusory allegation constitutes willful ignorance of the facts

and issues in a rushed attempt to achieve its goals.  Head Start agencies covered large areas

and adjusted as necessary prior to the Rule, and defendants cite no evidence indicating that

it was burdensome to do so then or now.[15]  To the contrary, ACF admits that it has "relied

on the importance of local health conditions in issuing guidance to Head Start programs"

before and acknowledges the diversity in transmission rates.  *Id*; *see also id.* at 68,058.

Moreover, the Rule ignores CDC guidance "that localities should monitor community

transmission in making decisions" and the CDC's report that Head Start had successfully

navigated the pandemic through "maximum program flexibility."  *Id.* at 68,066; Dkt. No.

29-9 at 3.

Rejecting or ignoring this guidance and data—and failing to articulate why local

conditions are no longer vital policy tools—ACF simply states that it is prioritizing an easy-

to-follow "clear and transparent policy" and that "children benefit from routine and

predictability."  *Id.*  Again, ACF cites no evidence supporting these conclusory statements in

relation to the Rule and does not provide any reasonable, meaningful explanation of the

Rule.  Instead, it implements a one-size-fits-all approach without articulating "a satisfactory

explanation for its action including a 'rational connection between the facts found and the

choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington*, 371 U.S. at 168).  Therefore,

the Court does "not defer to the agency's conclusory or unsupported suppositions." *United*

*Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562–63 (D.C. Cir. 2010) (quoting *McDonnell*

*Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

---

[15] Because defendants precluded pre-promulgation comment, they appear to be guessing at the exact "burden[]" this will cause local agencies.  *Id.* at 68,066.

The validity of this conclusion is especially apparent in light of the Rule's drastic change from past practice. Although an agency need not always provide a detailed explanation for a new policy, "[s]ometimes it must." *Fox Television Stations, Inc.*, 556 U.S. at 515. Supreme Court precedent makes clear that when a new policy "rests upon factual findings that contradict those which underlay its prior policy," or when an agency's "prior policy has engendered serious reliance interests," it is "arbitrary or capricious to ignore such matters." *Id.* As explained above, the Rule rests on a one-size-fits-all finding that contradicts its prior approach, and the agency's prior flexibility engendered serious reliance interests. Thus, "further justification [was] demanded" but not provided, likely rendering the Rule arbitrary and capricious.

Plaintiffs also argue that ACF's failure to establish an end date for the masking and testing requirements was arbitrary and capricious. In the Rule, ACF offered no explanation for its choice. *See* 86 Fed. Reg. at 68,066. Rather, it only "invites comment" on whether to establish a "finite end date." *Id.* Defendants argue that ACF decided to not include an end date because "children benefit from routine and predictability." Dkt. No. 26 at 31 (quoting 86 Fed. Reg. at 68,066). Under a fair reading of the Rule, ACF likely did not offer that reason to explain its choice. And even if it did, it would not support omitting an end date.

ACF asserts that "children benefit from routine and predictability" not to explain its choice to omit an end date, but to partially explain its decision to impose universal mandates without regard to regional transmission rates. Dkt. No. 26 at 44. And choosing not to tie "predictability" to the indeterminate duration of the Rule makes sense. If children benefit from predictability, then imposing an end would serve that purpose. They would be able to predict when they needed to wear a mask and when they did not. By failing to

include an end date, ACF made the Rule's duration entirely unpredictable.  Therefore, to the extent ACF actually included an explanation for this choice, it was not "reasonable." *See generally Prometheus Radio Project*, 141 S. Ct. at 1158.  Though this is not a stand-alone basis to invalidate the Rule, when viewed together with the Rule's overbreadth and change in policy, it takes the Secretary's decision outside "the zone of reasonableness." *Prometheus Radio Project*, 141 S. Ct. at 1158.

### B.    Substantial Threat of Irreparable Harm

The defendants argue that the plaintiffs cannot show the threat of irreparable harm necessary to entitle them to preliminary injunctive relief.  Dkt. No. 26 at 65.  *See Winter*, 555 U.S. at 20.  "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable*." Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).  Instead, plaintiffs need only show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).

The defendants assert that plaintiffs will not suffer irreparable harm absent an injunction, and due to the lack of injury, they argue in passing that Texas lacks standing. Dkt. No. 26 at 66–68 ("To the extent Texas seeks to litigate on its citizens' behalf, it cannot do so.").  Regardless of whether that argument has been adequately briefed, the Court has an ongoing independent obligation to ensure that the plaintiffs indeed have standing to invoke this Court's jurisdiction.  *E.g.*, *Collins v. Yellen*, 141 S. Ct. 1761, 1778–79 (2021); *Moler v. Wells*, 18 F.4th 162, 166 (2021).  And because the standing analysis and the irreparable-injury analysis—an issue both sides fully address—are largely overlapping, the Court will

– 39 –

consider together the questions of whether the plaintiffs have standing and whether they risk irreparable injury absent the preliminary injunctive relief they seek.

Federal courts have jurisdiction over cases or controversies only, and standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). To demonstrate that federal court is the proper forum for resolving a dispute, the party invoking the federal forum—here, the plaintiffs—must demonstrate that the plaintiff suffers an "injury in fact" that is both "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. That injury must be "fairly . . . trace[able] to the challenged action of the defendant." *Id.* (alterations in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). And it must be "likely"—not speculative or certain—that the injury will be "redressed by a favorable decision." *Id.* at 561. Necessarily then, a plaintiff who lacks standing cannot demonstrate an irreparable injury from the Court's failure to enjoin the challenged conduct.

The Court takes each aspect of standing in turn.

### i.      Injury

An injury is "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). A concrete injury is one that must "actually exist"—it must be "real, and not abstract." *Id.* at 340. Meanwhile, the

particularity aspect requires that the plaintiff be affected in a "personal and individual way". *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). "Tangible" and "concrete" are not synonyms; the former is broader than the latter, encompassing intangible injuries within "injuries in fact." *See TransUnion* 141 S. Ct. at 2204.

Similarly, "under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 2205. So a plaintiff who "is merely seeking to ensure a defendant's 'compliance with regulatory law'" does not have "grounds for Article III standing" absent some "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American Courts." *Id.* at 2206 (quoting *Spokeo*, 578 U.S. at 345). An increased regulatory burden typically satisfies the injury-in-fact-requirement. *See Ass'n of Am. R.R.s v. Dep't of Transp.,* 38 F.3d 582, 586 (D.C. Cir. 1994); *cf. Georgia v. Biden*, No. 1:21-CV-163, 2021 WL 5779939, *4, *11 (S.D. Ga. Dec. 7, 2021) (citing, as an irreparable injury, the administrative burden of merging human-resources and medical data necessitated by an obligation to collect vaccination statuses of covered employees).

Because states are not normal litigants, *see Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), the Court analyzes LISD's and Texas's injuries separately.

### a.    LISD

First, LISD argues that it faces two forms of irreparable harm: various financial and operational harms and the risk of violating state law. Dkt. No. 8 at 57–58. Because the Court concludes that the first is sufficient to justify a preliminary injunction to protect LISD, it declines to address the second.

LISD argues that it will lose staff and students if the Rule goes into effect.  *Id.*  It supports that argument with declarations from school administrators, parents, and staff.  *See id.* at 58 nn. 55–60.  Should LISD comply with the Rule, it will lose staff and students, impacting its ability to provide services to Head Start students and their families.  *Id.* at 58; Dkt. Nos. 8-7 (declaration of an LISD pre-K student's mother attesting that she will unenroll her child); 8-8 (declaration of an LISD employee who attests that he will leave his employment); 8-9 (declaration of LISD Head Start director disclosing that some staff remain unvaccinated).  Moreover, those losses will come at a time when the District has struggled to fill preexisting staff vacancies—creating new vacancies will exacerbate staff shortages and further strain resources to the detriment of students.  Dkt. Nos. 8 at 58; 8-9 (noting LISD "has already been challenged to secure the current staffing needs").  And LISD stands to lose other funds as well: at least one parent of a non-Head Start student has indicated that her child will be withdrawn from LISD's pre-K program if instructors—who teach mixed classrooms of Head Start and non-Head Start students—are required to wear masks, depriving the District of the tuition dollars paid by that child's parents.  Dkt. No. 8-7.  Losing up to 36 unvaccinated staff[16] would also jeopardize LISD's ability to comply with the staff-student ratios Head Start requires, so even if it chooses to comply with the Rule, it may still lose its Head Start funding.

All of this demonstrates a real and likely injury to LISD's early education programming should it comply with the Rule.  And, as a general rule, "a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance

---

[16] Of the 152 staff surveyed, 136 responded; 20 responded that they were not vaccinated.  Dkt. No. 8-9 at 3.  Assuming, for worst-case-scenario purposes, that all of those who failed to respond were unvaccinated yields 36 unvaccinated Head Start staff members.

costs," *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)), "because federal agencies generally enjoy sovereign immunity for any monetary damages," *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (citations omitted). So even though LISD might be able to avoid the harms it fears through monetary relief, such relief will never come. Just as in a situation where the defendant may be insolvent upon final judgment, thus precluding recovery of money damages, *see, e.g.*, *In re Fredeman Litig.*, 843 F.2d 821, 826–27 (5th Cir.1988) (citations omitted), injunctive relief is justified where a regulated entity can never recover its compliance costs. *See LabMD, Inc. v. Fed. Trade Comm'n,* 678 F. App'x 816, 821 (11th Cir. 2016) (finding irreparable harm by irrecoverable compliance costs pending appeal); *Georgia v. Biden*, 2021 WL 5779939 at *4, *11 (citing overhead of collecting vaccination data from covered employees); *but see Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("However, ordinary compliance costs are typically insufficient to constitute irreparable harm.").

The harm to LISD if it chooses not to comply with the Rule—if it chooses to reject Head Start funding altogether—would be even more serious. Funding for at least 400 eligible young children would be withdrawn. *See* 8-9 ¶ 4. The loss of that funding could result in the loss of up to approximately 40% of LISD's early education programming.[17] And if the loss of a handful of unvaccinated staff members would be harmful, the loss of dozens would be catastrophic. Indeed, the National Head Start Association sent a letter to Secretary Becerra on December 15—after the Rule's promulgation—indicating that the

---

[17] According to its superintendent, LISD currently serves 1,265 children in its pre-K programs, 540 of whom (42%) receive Head Start funding. Dkt. No. 8-3 at 3.

Rule's enforcement "could result in the closing of over 1,300 Head Start classrooms" and the loss of nearly "60,000 staff." Dkt. No 39-19 at 1, 3.

Regardless of what LISD chooses, then, the Rule imposes an injury on its ability to provide services to Head Start students. Either through attrition or the loss of funding, LISD will be forced to make do for its students with less. And, as explained above, any added costs it incurs in trying to do so will be unrecoverable given the immunity enjoyed by the implementing agencies. The District has therefore shown a likelihood of irreparable injury directly attributable to the Rule's promulgation.

### b.    Texas—Head Start Programs

Texas claims it will suffer two injuries—one to its Head Start programs and one to its sovereign interests. Dkt. No. 8 at 57–61. Texas Tech University receives funds directly from HHS for its Early Head Start program, Dkt. No. 8-2 at 2, and therefore stands to lose those funds if the Rule goes into effect and Texas Tech chooses not to comply. When the federal government's regulation imposes costs on a State, those costs constitute an irreparable injury. *See Texas v. Biden*, --- F.4th ---, 2021 WL 5882670, at *53 (5th Cir. Dec. 13, 2021). Here, the Rule imposes costs on Texas: Texas will be obliged to either lose funding for its Head Start programs or bear compliance costs. Just as LISD faces irreparable harm in unrecoverable costs or the loss of funding, so too does Texas.

### c.    Texas—Sovereign Interests

"[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'" *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they

– 44 –

believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where "the state statute at issue regulate[s] behavior or provide[s] for the administration of a state program" and does not "simply purport [ ] to immunize [state] citizens from federal law." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269–70 (4th Cir. 2011); *see, e.g.*, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443–44 (D.C. Cir. 1989); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985); *cf. Diamond v. Charles*, 476 U.S. 54, 62 (1986) (commenting that "a State has standing to defend the constitutionality of its statute" but not relying on that principle). Such intrusions amount to pressure to change state law.

   An injury to a state's sovereign interest is "necessarily" irreparable. *See, e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). And a state's interest "in not being pressured to change its law" is sufficiently "related to its sovereignty" for these purposes. *Texas v. United States*, 787 F.3d 733, 752 n.38 (5th Cir. 2015). Indeed, irreparable harm exists when a federal regulation prevents a state from enforcing its duly enacted laws. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)) ("[T]he inability to enforce its duly enacted plan clearly inflicts irreparable harm on the State."); *King*, 567 U.S. at 1303 (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers)) ("Any time [a state is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *New Motor*, 434 U.S. at 1351 ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of

irreparable injury."). The distinction between a statute and an executive order is, for today's purposes, immaterial. *See* Tex. Gov't Code § 418.012; *accord E.T. v. Paxton*, --- F.4th ---, 2021 WL 5629045, *6 (5th Cir. Dec. 1, 2021) ("While this case centers on an executive order issued by the Governor under his emergency authority rather than enforcement of a statute enacted by the plenary legislative authority of the people, the same reasoning applies.") (cleaned up).

Texas has elected to prohibit governmental entities from requiring masks or vaccines. The clear effect of the Rule is to inhibit Texas's sovereign policy-making and, importantly, enforcement powers. Texas officials who are obliged to enforce Texas law will be forced to decide whether to fine school districts and officials who choose to comply with the regulations simply to avoid losing Head Start funding. The net effect of the Rule is likely to be increased pressure to amend, or at least decline to enforce, Texas's laws. Texas therefore suffers an irreparable injury to its sovereign interests by dint of the Rule's enforcement.

### d.    Texas—*Parens Patriae*

Texas argues that it, as *parens patriae* for its citizens, suffers an irreparable injury from the Rule's enforcement. "To have [*parens patriae*], standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest, which is a judicial construct that does not lend itself to a simple or exact definition." *Alfred L. Snapp*, 458 U.S. at 601. Three cases guide the Court's understanding of a state's *parens patriae* interests.

First, in *Massachusetts v. Mellon*, the Supreme Court made clear that states do not have *parens patriae* standing to protect their citizens from the operation of federal law. 262 U.S. 447, 485 (1923). *Mellon* involved a challenge to the Shepphard-Towner Maternity and Infancy Act, a federal law enacted under President Harding to reduce infant and maternal

mortality. *Id.* at 479. The Act operated by providing funds—with strings—to state health agencies. *Id.* States that did not restructure their operations in accordance with the federal government's conditions lost federal funding. *Id.* at 479–82. Massachusetts sued then-Treasury Secretary Andrew Mellon, the official responsible for disbursing the funds, arguing that the act unconstitutionally legislated "for purposes not national, but local to the states." *Id.* at 479.

The court rejected Massachusetts's challenge. *Id.* at 488–89. The court concluded that Massachusetts sought the court's decision as to an "abstract question[] of political power"—not a case or controversy. *Id.* at 485. The court also concluded that Massachusetts could not bring suit "as the representative of its citizens"—as *parens patriae*. *Id.* Because "the citizens of Massachusetts are also citizens of the United States," Massachusetts had no "duty or power to enforce their rights in respect of their relations with the federal government." *Id.* at 485–86. Instead, it was the United States—whose laws are supreme under the Constitution—who was the citizens' *parens patriae*. *Id.* at 486.

Six decades later, in *Alfred L. Snapp*, the court refined the so-called *Mellon* bar. 458 U.S. 592. While reaffirming *Mellon*'s core rule, the court restricted it: a state *does* have standing to assert its "quasi-sovereign interests" against the federal government. *Id.* at 607–08, 610 n.16. Quasi-sovereign interests defy easy exemplification, but the Court defined them as a state's interests "in the health and well-being—both physical and economic—of its

residents in general," as well as a state's "interest in not being discriminatorily denied its rightful status within the federal system."[18]  *Id.* at 607.

In 2007, the court once again took up the question of *parens patriae* standing.  In *Massachusetts v. EPA*, the court held that Massachusetts had standing to challenge the EPA's failure to regulate greenhouse gasses under the authority granted to it by the Clean Air Act. 549 U.S. at 526.  The majority stated that *Mellon* did not adopt a broad bar on *parens patriae* standing because the *Mellon* court was not "called upon to adjudicate . . . *quasi-sovereign rights actually invaded or threatened*."  *Id.* at 520 n.17 (emphasis in original).  The majority continued that there was a "critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)."  *Id.* (citing *Georgia v. Pa. R. Co.*, 324 U.S. 439, 447 (1945)).  Accordingly, the Court concluded that since Massachusetts sought to invoke its own rights under the Clean Air Act rather than its citizens', it had standing.  *See id.* at 522–23, 526.

The law today is clear that a state has *parens patriae* standing when a state "assert[s] its rights under federal law" but lacks standing when it seeks only to "protect her citizens from the operation of federal statutes."  *Id.* at 520 n.17.  And the "rights" under federal law a state may protect encompass two general categories of "quasi-sovereign" interests: those "in the health and well-being—both physical and economic—of its residents in general,"

---

[18] The Court notes, as others have, that the language in *Alfred L. Snapp* that "[a] State does not have standing as *parens patriae* to bring an action against the federal government" is technically dictum but, like others, takes the statement at face value for the purposes of this analysis.  458 U.S. 592 at 610 n.16.

and those "in not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp*, 548 U.S. at 607.

With that understanding, the Court concludes that Texas has *parens patriae* standing. Texas alleges that the Rule's enforcement will lead to dramatic declines in Head Start offerings, adversely impacting students and their families. The plaintiffs have supported these allegations with declarations from school officials in metropolitan and rural areas alike, along with extensive evidence of the millions of dollars in funding that are at stake in the dispute. It is difficult to imagine what could qualify as interests "in the health and well-being—both physical and economic—of its residents in general" sufficient to confer *parens patriae* standing if not the adverse impact on needy children across the state. *Id.*

The defendants contends that the state lacks *parens patriae* standing to protect those who might be subject to the mask and vaccine requirements. Dkt. No. 26 at 66–68. That may be so. It is blackletter law that states lack standing to protect their citizens from the effects of federal laws. *Mellon*, 262 U.S. at 485. But because the Court concludes that Texas has a *parens patriae* interest in protecting the welfare of its neediest children, the Court need not resolve the thorny issue of whether Texas has standing as *parens patriae* for Head Start staff.

### e.     Texas—Statutory Interests

Although Texas does not raise its rights under the APA as a form of irreparable injury, given the Court's conclusions about notice and comment, the Court concludes that Texas suffers another form of irreparable injury by being denied its procedural right to comment on the Rule. *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) ("A violation of the APA's notice-and-comment requirements is one example of a deprivation of a

procedural right."). The Rule undercuts Texas's interest in ensuring compliance with its laws prohibiting state entities from requiring vaccines or masks; they affect Texas's ability to enforce its own laws. *See supra* Part 3.B.i.c. And only by enjoining the Rule's enforcement—with the expectation that the Secretary may try again, this time allowing for notice and comment before promulgation—will Texas's procedural rights under the APA be protected. Thus, the denial of Texas's opportunity to participate in the rulemaking process through notice and comment is another form of irreparable injury.

### ii.   Traceability

Where "a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (internal quotations omitted) (quoting *Lujan*, 504 U.S. at 562 and citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)). The plaintiffs therefore must "adduce facts showing that [the choices of the relevant third parties] have been or will be made in such manner as to produce causation." *Lujan*, 504 U.S. at 562.

That the plaintiffs have brought forth specific evidence and examples of how they *will* be harmed by the Rule's enforcement distinguishes this case from others where a third party's actions *might* have hurt the plaintiff. *See, e.g.*, *California*, 141 S. Ct. at 2118–19 ("The state plaintiffs have failed to show that the challenged minimum essential coverage provision, without any prospect of penalty, *will* harm them by leading more individuals to enroll in these programs.") (emphasis added); *Allen*, 468 U.S. at 738 ("[I]t is entirely speculative whether withdrawal of a particular school's tax exemption would lead the school to change its [racially discriminatory] policies. It is just as speculative whether any

given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status." (citation omitted)); *Clapper*, 568 U.S. at 413 ("[E]ven if respondents could show that the Government will seek [the Foreign Intelligence Surveillance Court's] authorization to acquire the communications of respondents' foreign contacts . . . respondents can only speculate as to whether [that court] *will* authorize such surveillance." (emphasis added)).

This case, then, is akin to *Department of Commerce v. New York*. 139 S. Ct. 2551 (2019). There, traceability turned on the guess that "third parties will likely react in predictable ways" to the challenged regulation. *Id.* at 2566. So too here. Head Start teachers at LISD have indicated that they do not want to be vaccinated against COVID-19. One has indicated—predictably—that if put to the choice of his profession or his decision to remain unvaccinated, he will choose the latter. The traceability demanded by the standing inquiry ask only whether an injury is "fairly traceable" to the defendant the plaintiff has chosen to sue. *Spokeo*, 578 U.S. at 338. That link "requires no more than *de facto* causality." *New York*, 139 S. Ct. at 2256. The defendant's actions need not be the "very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Thus, far from speculation about nebulous future harms, the harms LISD and Texas describe are "the predictable effect of Government action on the decisions of third parties." *New York*, 139 S. Ct. at 2256 (citing *Bennett*, 520 U.S. at 169–70). Notwithstanding the involvement of third parties in the equation, traceability is satisfied.

### iii.       Redressability

Redressability requires a simple enough inquiry:  if the Court enjoins the Rule's enforcement, is it likely that the harm the plaintiffs portend will come to pass?  The answer here is equally straightforward:  no.  So redressability, too, is satisfied.

To elaborate:  The plaintiff must show only that its injury is "likely to be redressed by a favorable decision."  *Vill. of Arlington Heights, v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977) (quoting *Simon*, 426 U.S. at 38).  And to redress an injury, the Court's remedy must "personally . . . benefit [the plaintiff] in a tangible way."  *Warth v. Seldin*, 422 U.S. 490, 508 (1975).  Here, both are true of the relief the plaintiffs seek—an injunction preventing the enforcement of the challenged regulations.  The Rule aims to add conditions to grants given to Head Start providers.  If the Rule were to go into effect, the government could terminate grants to providers who do not adopt the Rule's vaccine and mask requirements.  If the government cannot enforce the conditions, however, the participants are free to maintain the status quo without jeopardizing their Head Start funding.  That would allow LISD to continue to, for example, employ in Head Start classrooms teachers who are unmasked or unvaccinated, thus avoiding the need to reassign or terminate employees and find replacements.  An injunction barring enforcement of the challenged regulations would therefore remedy the plaintiffs' harms.

### C.       Balance of Harms and the Public Interest

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will serve the public interest— "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Therefore, the Court considers them together.  The Court "must balance the

competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 542 (1987)).

Here, the equities and public interest cut both ways, but ultimately favor plaintiffs. The Rule will likely cause further staff shortages to the existing hiring crisis, loss of funding, and program closures. Dkt. Nos. 8-3; 8-7; 8-8; 8-9. The Secretary recognizes these risks. 86 Fed. Reg. 68,091 ("There are already significant challenges in recruiting and retaining staff among early care and education providers including Head Start and the requirements in this rule could exacerbate this issue."). As a result, children who have previously received pre-K Head Start services and funding will be prevented from participating in "an essential part of preparing children, particularly children living in poverty, for success in school and life." Dkt. No. 8-3 ¶ 8; *see also* 86 Fed Reg. at 68,057 (outlining several other harms to children and families due to program closures).

Furthermore, local programs have serious reliance interests on preserving the status quo of local flexibility. The Rule constitutes a drastic change from this "precedent." *See* Dkt. No. 39-19 at 1. As the National Head Start Association explained in its recent letter to the Secretary, "Head Start's strength has come from the flexibility of local practices that enables programs to meet community and family needs." *Id.*

On the other hand, reducing the spread of COVID-19 is critical to public health. *See* 86 Fed. Reg. at 68,055. And COVID-19 transmission could also lead to program closures. *Id.* at 68,056–57. But given the relatively high vaccination rate of staff, the risk of program closures may be greater under the Rule than in its absence.

– 53 –

Additionally, the "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Wages & White Lion*, 16 F.4th at 1143 (quoting *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021)). Here, the Court finds that there is a substantial likelihood that the Secretary issued the Rule unlawfully. And generally, there is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citing *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016), and *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

In sum, the Court finds that the balance of equities and the public interest weigh in favor of granting plaintiffs' motion for preliminary injunction.

### 4.    Scope of Relief

Texas seeks a nationwide injunction. Dkt. No. 38 at 29. During the hearing, counsel for Texas argued that nationwide relief was necessary because the APA instructs courts to "set aside" unlawful agency action. Tr. at 90–91; *see generally* 5 U.S.C. § 706(2)(A), (C). In light of Fifth Circuit precedent and the record before it, the Court declines to issue a nationwide injunction. Instead, the Court will limit the scope of its injunction based on the parties and evidence. The Interim Final Rule's implementation and enforcement will be enjoined in Texas.

The Fifth Circuit recently addressed the proper scope of injunctions when reviewing a nationwide injunction. *Becerra*, 2021 WL 5913302 at *2–3. A district court enjoined nationwide the enforcement of the Secretary's vaccination mandate for Medicare- and Medicaid-certified providers. *Id.* The Fifth Circuit narrowed the injunction to the 14 plaintiff states, reiterating that an injunction's scope must be justified by the circumstances.

*Id.* at \*2–3 (citing *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), *aff'd by an equally divided court sub nom. United States v. Texas*, 136 S. Ct. 2271, 2272 (2016)).  The panel explained that "[p]rinciples of judicial restraint control here," and noted that "[o]ther courts are considering these same issues, with several courts already and inconsistently ruling."  *Id.* at \*2.  And while nationwide injunctions are permissible in the immigration context due to the constitutional command for uniform immigration laws and the concern that limited immigration injunctions would be ineffective, that does not mean that "nationwide injunctions are required or even the norm."  *Id.*; *see also Texas*, 809 F.3d at 187–88 (affirming nationwide injunction of DAPA in immigration context because the Constitution requires a uniform rule of naturalization).

Here, similar circumstances counsel against a nationwide injunction.  As in *Louisiana v. Becerra*, the Court faces an issue that, unlike immigration, does not have a constitutional command for nationwide uniformity.  Moreover, as in *Louisiana v. Becerra*, the same issues are considered in two other cases, both in the Western District of Louisiana:  *Louisiana v. Becerra*, No. 3:21-CV-04370 (W.D. La.); *Brick v. Biden*, No. 2: 21-CV-04386 (W.D. La.).  In the former case, over 20 states challenge the Head Start mandates, and the court has yet to issue its decision.  *Louisiana v. Becerra*, Dkt. No. 1, No. 3:21-CV-04370 (W.D. La.).  In contrast, this Court has only two plaintiffs before it—Texas and a Texas school district, LISD.  Dkt. No. 1 at 1.  Furthermore, the great majority of evidence before the Court is limited to harm caused to Head Start programs in Texas.  *See* Dkt. Nos. 8-2, 8-3, 8-4, 8-5, 8-6, 8-7, 8-8, and 8-9; *but see, e.g.*, Dkt. Nos. 39-15; 39-19.  Thus, the Court concludes that the circumstances do not justify or require a nationwide injunction; rather, it will follow Fifth Circuit precedent and limit the injunction based on the parties, issues, and evidence before

it.  *Louisiana v. Becerra*, 2021 WL 5913302 at *2-3; *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit.").  The Court's injunction is therefore limited to Texas.

5.    **Conclusion**

For all the above reasons, the Court grants the plaintiffs' motion for a preliminary injunction.  The Court orders that defendants are preliminarily enjoined from implementing and enforcing the Interim Final Rule with Comment Period, Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs, 86 Fed. Reg. 68,052 (Nov. 30, 2021), in the state of Texas pending a trial on the merits of this action or until further order of this Court.  Defendants shall immediately cease all implementation or enforcement of the Interim Final Rule with Comment Period as to any Head Start program within the State of Texas.  Because defendants have appeared and the Court conducted a hearing on plaintiffs' motion, Federal Rule of Civil Procedure 65(b) no longer applies.  *See e.g.*, *New England Health Care, Emps. Union, Dist. 1199, SEIU / AFL-CIO v. Rowland*, 170 F. Supp. 2d 199, 201 n.2 (D. Conn. 2001) (denying TRO as moot in light of the hearing on the preliminary motion).  Therefore, the Court denies plaintiffs' request for a temporary restraining order as moot.

The Court further orders that no security bond shall be required under Federal Rule of Civil Procedure 65(c).

So ordered on December 31, 2021

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE