# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

| | |
|---|---|
| STATE OF TEXAS and **§** | |
| LUBBOCK INDEPENDENT SCHOOL **§** | |
| DISTRICT, **§** | |
| *Plaintiffs*, **§** | |
| **§** | CIVIL ACTION NO. 5:21-CV-300 |
| v. **§** | |
| **§** | |
| XAVIER BECERRA, in his official **§** | |
| capacity as Secretary of Health and **§** | |
| Human Services, *et al.*, **§** | |
| *Defendants*. **§** | |

---

## APPENDIX TO PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

| | DOCUMENT NAME | APPX. PAGE NO. |
|---|---|---|
| 1 | Dkt.#27-1 – 86 Fed. Reg. 68,052 (Nov. 30, 2021) | **Appx. 1-50** |
| 2 | Dkt.#1-3 – Declaration of Dr. Kathy Rollo | **Appx. 51-55** |
| 3 | Dkt.#1-2 – TAGGS Grants | **Appx. 56-89** |
| 4 | Dkt.#5-9 – Log No. ACF-PI-HS-21-04 | **Appx. 90-93** |
| 5 | Dkt.#27 – Admin Record Table of Contents | **Appx. 94-99** |
| 6 | Dkt#29-9 - Implementing Mitigation Strategies in Early Care and Education Settings for Prevention of SARS-CoV-2 Transmission | **Appx. 100-104** |
| 7 | Dkt.#41 – Transcript of Hearing | **Appx. 105-199** |

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Administration for Children and Families

**45 CFR Part 1302**

**RIN 0970–AC90**

### Vaccine and Mask Requirements To Mitigate the Spread of COVID–19 in Head Start Programs

**AGENCY:** Office of Head Start (OHS), Administration for Children and Families (ACF), Department of Health and Human Services (HHS).

**ACTION:** Interim final rule with comment period.

**SUMMARY:** This interim final rule with comment (IFC) adds new provisions to the Head Start Program Performance Standards to mitigate the spread of the coronavirus disease 2019 (COVID–19) in Head Start programs. This IFC requires effective upon publication, universal masking for all individuals two years of age and older, with some noted exceptions, and all Head Start staff, contractors whose activities involve contact with or providing direct services to children and families, and volunteers working in classrooms or directly with children to be vaccinated for COVID–19 by January 31, 2022.

**DATES:**

*Effective date:* This IFC is effective on November 30, 2021.

*Compliance date:* The compliance date for the mask requirement is the date of publication of the rule, November 30, 2021. The compliance date for the vaccine requirement is January 31, 2022. For more information, *see* **SUPPLEMENTARY INFORMATION.**

*Comment date:* To be assured consideration, comments on this interim final rule must be received on or before December 30, 2021.

**ADDRESSES:** You may submit comments, identified by [docket number and/or RIN number], by any of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Office of Head Start, Attention: Director of Policy and Planning, 330 C Street SW, 4th Floor, Washington, DC 20201.

*Instructions:* All submissions received must include the agency name and docket number or RIN for this rulemaking. All comments received will be posted without change to *http://www.regulations.gov,* including any personal information provided.

**FOR FURTHER INFORMATION CONTACT:** Colleen Rathgeb, OHS, at *HeadStart@eclkc.info* or 1–866–763–6481. Deaf and hearing-impaired individuals may call the Federal Dual Party Relay Service at 1–800–877–8339 between 8 a.m. and 7 p.m. Eastern Standard Time.

**SUPPLEMENTARY INFORMATION:** The compliance date for the vaccine requirement is January 31, 2022. This means *staff, certain contractors and volunteers* must have their second dose in a two-dose series, or first dose in a single-dose by January 31, 2022. Full vaccination requires 14 days after a two-dose series such as Pfizer or Moderna or 14 days after a single-dose series like Johnson & Johnson, but for purposes of this regulation, staff, certain contracts and volunteers will meet the requirement even if they have not yet completed the 14-day waiting period required for full vaccination. This timing flexibility applies only to the initial implementation of this IFC and has no bearing on ongoing compliance.

### Table of Contents

I. Tribal Consultation Statement
II. Statutory Authority
III. Executive Summary
  A. Purpose of the Interim Final Rule
  B. Interim Final Rule Justification
  C. Waiver of Proposed Rulemaking
IV. Background
V. Provisions of the Interim Final Rule
VI. Regulatory Process Matters
  Treasury and General Government Appropriations Act of 1999
  Federalism Assessment Executive Order 13132
  Congressional Review
  Paperwork Reduction Act of 1995
VII. Economic Analysis of Impacts
VIII. Alternatives Considered

### I. Tribal Consultation Statement

ACF conducts an average of five tribal consultations each year for tribes operating Head Start and Early Head Start. The consultations are held in four geographic areas across the country: Southwest, Northwest, Midwest (Northern and Southern), and East. The consultations are often held in conjunction with other tribal meetings or conferences, to ensure the opportunity for most of the 150 tribes that operate Head Start and Early Head Start programs to attend and voice their concerns regarding service delivery. We complete a report after each consultation, and then we compile a final report that summarizes the consultations. We submit the report to the Secretary of Health and Human Services (the Secretary) at the end of the year. We invite public comment on this IFC if there are concerns specific to Native communities and programs.

### II. Statutory Authority

ACF publishes this interim final rule under the authority granted to the Secretary by sections 641A(a)(1)(C), (D) and (E) of the Head Start Act, 42 U.S.C. 9836a(a)(1)(C)–(E)), (D) and (,), as amended by the Improving Head Start for School Readiness Act of 2007 (Pub. L. 110–134).

### III. Executive Summary

#### A. Purpose of the Interim Final Rule

SARS–CoV–2, the infectious agent that causes COVID–19, is considered to be mainly transmissible through exposure to respiratory droplets when a person is in close contact with someone who has COVID–19. Correct and consistent facemask use has been critical in reducing the risk of droplet transmission of SARS–CoV–2.[1][2] Vaccination is the most important measure for reducing risk for SARS–CoV–2 transmission and in avoiding severe illness, hospitalization, and death.[3]

Four primary variants of SARS–CoV–2 have emerged to date. Of these, the Delta variant has been of particular concern as it causes more infections and spreads faster than other variants.[4] While the Delta variant has increased levels of transmissibility, COVID–19 vaccination remains highly effective against hospitalization and death. Although there are cases of SARS–CoV–2 infections among vaccinated individuals,[5] fully vaccinated adults were six times less likely to become infected, twelve times less likely to be hospitalized and eleven times less likely to die from COVID–19 compared to unvaccinated adults according to data from August 2021.[6][7] While studies are still ongoing, preliminary data suggest that vaccinated persons infected with the Delta variant are potentially less infectious, and infectious for shorter

---

[1] *https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html.*

[2] *https://www.osha.gov/coronavirus/safework.*

[3] *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html.*

[4] Centers for Disease Control and Prevention. "Delta Variant: What We Know About the Science." August 26, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.*

[5] Trends in COVID–19 Cases, Emergency Department Visits, and Hospital Admissions Among Children and Adolescents Aged 0–17 Years—United States, August 2020–August 2021 | MMWR.

[6] *https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status* MMWR Morb Mortal Wkly Rep 2021;70:1255–1260. DOI: *http://dx.doi.org/10.15585/mmwr.mm7036e2.*

[7] *https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination.*

Appx. 1
AR_00001

periods of time compared to infected unvaccinated persons.[8][9][10][11][12][13]

The purpose of this IFC is to protect the health and safety of Head Start staff, children, and families and to mitigate the spread of SARS–CoV–2 in Head Start programs. It requires: (1) Universal masking for all individuals two years of age and older, with some noted exceptions, effective immediately upon publication of this rule), (2) vaccination for COVID–19 by January 31, 2022, with some noted exemptions, for all Head Start program staff, inclusive of Head Start, Early Head Start, and Early Head Start-Child Care Partnerships, certain contractors, and volunteers in classrooms or working directly with children (hereafter referred to as ''Head Start staff''), and (3) for those granted an exemption to the requirement specified in (2), at least weekly testing for current SARS–CoV–2 infection. The requirements in this IFC will reduce the risk of transmission of SARS–CoV–2 in classrooms, which will protect the health and safety of children, reduce closures of Head Start programs, which can cause hardship for families, and support the Administration's priority of sustained in-person early care and education that is safe for children—with all of its known benefits to children and families.[14]

Greater understanding about the spread of SARS–CoV–2, the increased risk to certain populations, the benefits of masking, and the safety and efficacy of vaccines demonstrates the need for widespread masking and vaccination to reduce COVID–19 and its impacts. Although COVID–19 cases had begun to decline in parts of the country following the most recent COVID–19 surge, data indicate cases are beginning to rise in other parts—particular northern states where the weather has begun to turn colder,[15] and the future trajectory of the pandemic is unclear. The Delta variant is currently the predominant variant in the United States and has resulted in greater rates of cases and hospitalizations among children than from other variants.[16][17][18] Furthermore, there is potential for the rapid and unexpected development and spread of additional new and more transmissible variants. Experience with the Delta variant suggests that we must take adequate steps to prevent transmission and protect the workforce and children to avoid serious harm.[19] It is critical that all Head Start staff get fully vaccinated for COVID–19 and consistently wear masks to protect children, staff, and families from exposure to SARS–CoV–2 and to reduce the risk of transmission to families of Head Start children and staff who may be at risk for increased morbidity and mortality from COVID–19.

This IFC adds provisions to the Head Start Program Performance Standards to impose three requirements:

(1) Universal masking, with some noted exceptions, for all individuals two years of age and older when there are two or more individuals in a vehicle owned, leased, or arranged by the Head Start program; when they are indoors in a setting where Head Start services are provided; and, for those not fully vaccinated, outdoors in crowded settings or during activities that involve close contact with other people. This requirement is effective immediately.

(2) Vaccination for COVID–19 for Head Start program staff, certain contractors and volunteers by January 31, 2021.

(3) For those granted an exemption to the requirement specified in (2), at least weekly testing for current SARS–CoV–2 infection.

Being fully vaccinated for COVID–19 and using a mask are two of the most effective mitigation strategies available to reduce transmission of SARS–CoV–2.[20] Additionally, including a regular SARS–CoV–2 testing requirement for those approved for an exemption from the vaccination requirement is necessary to identify infected employees and separate them from the workplace to prevent transmission and to facilitate early medical intervention, when appropriate. Fully vaccinated staff are at much lower risk of infection and therefore, pose lower transmission risk to the young unvaccinated children in their care. The CDC recommends screening testing for current infection of unvaccinated asymptomatic workers as a useful tool to detect SARS–CoV–2 and stop transmission quickly.[21]

### B. Interim Final Rule Justification

Section 641A of the Head Start Act authorizes the Secretary to ''modify, as necessary, program performance standards by regulation applicable to Head Start agencies and programs,'' including ''administrative and financial management standards,'' ''standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate) for such agencies, and programs,'' and ''such other standards as the Secretary finds to be appropriate,'' 42 U.S.C. 9836a§ 9836a(a)(1)(C),(D), (E). In developing these modifications, the

[8] Chia PY, Ong SWX, Chiew C, et al. Virological and serological kinetics of SARS–CoV–2 Delta variant vaccine-breakthrough infections: a multi-center cohort study. medRxiv. 2021;*https://www.medrxiv.org/content/10.1101/2021.07.28.21261295v1*.

[9] Shamier MC, Tostmann A, Bogers S. Virological characteristics of SARS–CoV–2 vaccine breakthrough infections in health care workers. medRxiv. 2021;*https://www.medrxiv.org/content/10.1101/2021.08.20.21262158v1*.

[10] Kang M, Xin H, Yuan J. Transmission dynamics and epidemiological characteristics of Delta variant infections in China. medRxiv. 2021;*https://www.medrxiv.org/content/10.1101/2021.08.12.21261991v1*.

[11] Ong SWX, Chiew CJ, Ang LW, et al. Clinical and Virological Features of SARS-CoV–2 Variants of Concern: A Retrospective Cohort Study Comparing B.1.1.7 (Alpha), B.1.315 (Beta), and B.1.617.2 (Delta). Preprints With The Lancet. 2021;*https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3861566*.

[12] Mlcochova P KS, Dhar MS, et al. . SARS–CoV–2 B.1.617.2 Delta variant emergence and vaccine breakthrough. Research Square. 2021 *https://www.researchsquare.com/article/rs-637724/v1*.

[13] *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html*

[14] Barr, A.C., & Gibbs, C. (2019). *Breaking the Cycle? Intergenerational Effects of an Anti-Poverty Program in Early Childhood.* EdWorkingPaper: 19–141. Retrieved from Annenberg Institute at Brown University, *https://edworkingpapers.com/sites/default/files/ai19-141 pdf.*; Bauer, L., & Schanzenbach, D.W. (2016). *The Long-Term Impact of the Head Start Program.* Washington, DC: The Brookings Institute. Retrieved from: *https://www.hamiltonproject.org/assets/files/long_term_impact_of_head_start_program.pdf.*; Ludwig, J., & Phillips, D. (2007). The Benefits and Costs of Head

Start. *Social Policy Report, Vol. 21*(3), Society for Research in Child Development. Retrieved from: *https://files.eric.ed.gov/fulltext/ED521701.pdf.*; Garcia, J.L., Heckman, J.J., Leaf, D.E., & Prados M.J. (2019). Quantifying the Life-cycle Benefits of a Prototypical Early Childhood Program. National Bureau of Economic Research Working Paper No. 23479. Cambridge, MA: NBER. Retrieved from: *https://heckmanequation.org/www/assets/2017/01/w23479.pdf.*; Yoshikawa, H., Weiland, C., Brooks-Gunn, J., Burchinal, M.R., Espinosa, L.M., Gormley, W.T., Ludwig, J., Magnuson, K.A., Phillips, D., & Zaslow, M. (2013). *Investing in Our Future: The Evidence Base on Preschool Education.* Society for Research in Child Development and Foundation for Child Development. Retrieved from: *http://www.fcd-us.org/assets/2013/10/Evidence20Base20on20Preschool20Education20FINAL.pdf.*

[15] *https://covid.cdc.gov/covid-data-tracker/#trends_dailycases.*

[16] Delahoy, M., et al. Hospitalizations Associated with COVID–19 Among Children and Adolescents—COVID-Net, 14 States, March 1, 2020—August 14, 2021, *https://www.cdc.gov/mmwr/volumes/70/wr/mm7036e2.htm.*

[17] Siegel DA, Reses HE, Cool AJ, et al. Trends in COVID–19 Cases, Emergency Department Visits, and Hospital Admissions Among Children and Adolescents Aged 0–17 Years—United States, August 2020—August 2021.

[18] *https://covid.cdc.gov/covid-data-tracker/#demographicsovertime.*

[19] Centers for Disease Control and Prevention. ''Delta Variant: What We Know About the Science.'' August 26, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.*

[20] Centers for Disease Control and Prevention. ''Science Brief: COVID–19 Vaccines and Vaccination.'' September 15, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html#:~:text=Evidence%20suggests%20the%20US%20COVID,interrupting%20chains%20of%20transmission.*

[21] Centers for Disease Control. ''Overview of Testing for SARS–CoV–2 (COVID–19)'' October 22, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html.*

Appx. 2

Secretary included relevant considerations pursuant to section 641A(a)(2) of the Head Start Act, 42 U.S.C. 9836a(a)(2). The Secretary consulted with experts in child health, including pediatricians, a pediatric infectious disease specialist, and the recommendations of the CDC and FDA. The Secretary considered the Office of Head Start's past experience with the longstanding health and safety Head Start Program Performance Standards that have sought to protect Head Start staff and participants from communicable and contagious diseases. The Secretary also considered the circumstances and challenges typically facing children and families served by Head Start agencies including the disproportionate effect of COVID–19 on low-income communities served by Head Start agencies and the potential for devastating consequences for children and families of program closures and service interruptions due to SARS–CoV–2 exposures. The Secretary finds it necessary and appropriate to set health and safety standards for the condition of Head Start facilities that ensure the reduction in transmission of the SARS–CoV–2 and to avoid severe illness, hospitalization, and death among program participants.

ACF similarly chose, among other actions, to allow Head Start programs to decide whether or not to require staff vaccination rather than require vaccination, to provide information on the COVID–19 vaccine through its Early Childhood Learning and Knowledge Center,[22] the website used to share guidance and information with Head Start grant recipients, and to emphasize that grant recipients can use COVID–19 response funds and American Rescue Plan funds to support staff in getting the COVID–19 vaccine. However, despite all of these efforts, uptake of vaccination among Head Start staff has not been as robust as hoped for and has been insufficient to create a safe environment for children and families. This is particularly true given the advent of the Delta variant and the potential for new variants and as programs continue to return to fully in-person services as the Office of Head Start expects in January 2022. The Office of Head Start (OHS) issued guidance to programs on May 20, 2021 outlining its expectations for programs in the 2021–2022 program year. This guidance prepared programs for the resumption of in-person services and informed programs that they should

build toward full enrollment and provide comprehensive services for all enrolled children as soon as possible. It noted that beginning January 2022, OHS intends to reinstate pre-pandemic practices for tracking and monitoring enrollment. OHS will also resume evaluating which programs enter into the Full Enrollment Initiative in January 2022, which is a process by which OHS identifies programs that are not serving their full funded enrollment. This guidance followed a period since the onset of the pandemic of greater flexibility for programs with requirements related to enrollment, service duration, virtual/remote delivery of services, among others. These flexibilities were critical to programs' ability to continue providing services to children and families and to adapt services based on the changing health conditions in their communities during unprecedented times. As programs prepare for fully in-person services, it is imperative that we create conditions that support the health and safety of children and reduce program closures and service interruptions. The universal masking and vaccination requirements outlined in this IFC are critical to this effort.

The U.S. Centers for Disease Control and Prevention (CDC) issued guidance July 27, 2021.[23] The CDC stated that the rationale for this guidance was twofold: (1) An alarming rise in COVID–19 cases and hospitalization rates around the country—a reversal in what had been a steady decline since January 2021 [24] and (2) new data showing the Delta variant to be highly transmissible.[25] A study covering the period from June to mid-August 2021 showed that weekly COVID–19 associated hospitalization rates among children and adolescents rose nearly five-fold during the late June to mid-August 2021 period, which coincided with increased circulation of the Delta variant.[26] In this same study,

hospitalization rates were 10 times higher among unvaccinated than fully vaccinated adolescents. A separate study conducted in the United Kingdom showed that vaccination effectively reduces the risk of Delta variant infection [27] but that "vaccination alone is not sufficient to prevent all transmission of the delta variant in the household setting, where exposure is close and prolonged." The authors recommended nonpharmaceutical interventions, such as mask wearing, as an important complementary approach alongside vaccination to minimize spread of the Delta variant.

On November 10, 2021, the CDC issued updated guidance to early childhood education and child care (ECE) programs.[28] One of the key changes in the guidance is the recommendation for universal indoor masking for ECE programs for everyone aged 2 years and older regardless of vaccination status, with limited exceptions, see section V *Provisions of the Interim Final Rule*. It also notes that ECE program staff can model consistent and correct use for children aged 2 years or older in their care. Vaccinations and masks are key strategies for reducing the transmission of SARS–CoV–2 along with other risk reduction strategies, including staying home if sick; handwashing; improving ventilation; screening and diagnostic testing, cleaning, and disinfecting; keeping physical distance; and cohorting,[29] especially because physical distancing is not always feasible in early childhood settings.[30]

The COVID–19 vaccines are the safest and most effective way to protect individuals and the people with whom they live and work from infection and

---

[22] Office of Head Start. "OHS COVID–19 Updates." Available at: *https://eclkc.ohs.acf.hhs.gov/about-us/coronavirus/ohs-covid-19-updates.*

[23] Centers for Disease Control and Prevention. "Science Brief: COVID–19 Vaccines and Vaccination." September 15, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html#:~:text=Evidence%20suggests%20the%20US%20COVID,interrupting%20chains%20of%20transmission.*

[24] Centers for Disease Control and Prevention. "COVID Data Tracker." Available at: *https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalization-network.*

[25] Brown CM, Vostok J, Johnson H, et al. Outbreak of SARS–CoV–2 Infections, Including COVID–19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings—Barnstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly Rep. ePub: 30 July 2021; *https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm.*

[26] Delahoy MJ, Ujamaa D, Whitaker M, et al. Hospitalizations Associated with COVID–19 Among

Children and Adolescents—COVID–NET, 14 States, March 1, 2020–August 14, 2021. MMWR Morb Mortal Wkly Rep 2021;70:1255–1260. DOI: *http://dx.doi.org/10.15585/mmwr.mm7036e2.*

[27] Singanayagam, AnikaBadhan, Anjna et al. Community transmission and viral load kinetics of the SARS–CoV–2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study. *https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext.*

[28] Centers for Disease Control. "COVID–19 Guidance for Operating Early Care and Education/Child Care Programs." November 10, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/child-care-guidance.html.*

[29] Cohorting refers to placing children and child care providers into distinct groups who stay together throughout an entire day.

[30] Centers for Disease Control and Prevention. "COVID–19 Guidance for Operating Early Care and Education/Child Care Programs." August 25, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/child-care-guidance.html; https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/transmission_k_12_schools.html.*

<span style="color:red">Appx. 3</span>

from severe illness and hospitalization if they contract the virus. Data from August 2021 indicate that when compared with vaccinated adults, those who were not fully vaccinated were 6 times more likely to become infected, 12 times more likely to be hospitalized, and 11 times more likely to die of COVID–19.[31][32] In addition to preventing morbidity and mortality associated with COVID–19, currently available vaccines also demonstrate effectiveness against asymptomatic SARS–CoV–2 infection. A study of the period from December 14, 2020 to August 14, 2021, found that full vaccination for COVID–19 was 80 percent effective in preventing SARS–CoV–2 infection among health care workers.[33] While the scientific evidence for transmissibility of breakthrough cases (*i.e.,* cases in fully vaccinated individuals) is still developing, fully vaccinated individuals are less likely to spread COVID–19 because they are less likely to become infected in the first place. Studies have shown that vaccinations reduce the risk of COVID–19 among unvaccinated close contacts, including children. For example, one study found that vaccination of health care workers was associated with decreased COVID–19 cases among members of their household.[34] Additionally, a study during the early months of the COVID–19 vaccine rollout in Israel found that community vaccination rates were associated with declines in infections among unvaccinated children.[35] Vaccination was also shown to be effective in lowering the risk of severe disease if infected with the Delta variant, which has emerged as a more contagious strain of the SARS–CoV–2 with a higher impact on children than previous variants.[36]

Given that children under age 5 years are too young to be vaccinated at this time, requiring masking and vaccination among everyone who is eligible are the best defenses against COVID–19, especially cases arising from the more infectious Delta variant. These measures will also reduce program closures due to SARS–CoV–2 infection. When children or staff test positive for SARS–CoV–2 or have exposure to someone else who has tested positive for SARS–CoV–2, classrooms or entire programs close for a period of days or weeks to allow for test results and quarantining per local health department guidance. Additionally, as discussed later in this IFC, closures impose hardship on Head Start children and families by diminishing the ability to attend Head Start in person. The result is harm to early learning and development. Closures also diminish the ability of parents to work or participate in schooling.

Health and Safety

The Delta variant, which in the summer of 2021 became the predominant SARS–CoV–2 strain in the United States, is more contagious—spreading twice as fast—and results in more cases and hospitalizations for children.[37] The increase in hospitalization is more acute in states with lower vaccination rates. Studies released by CDC found that the rate of hospitalization for children was nearly four times higher in states with the lowest vaccination rates when compared to states with high vaccination rates.[38] Furthermore, hospitalization rates for children in

September and October 2021, while lower than other age groups, were elevated relative to other periods during the pandemic.[39] Vaccination remains the best line of defense against COVID–19. Data show fully vaccinated persons are less likely than unvaccinated persons to become infected with SARS–CoV–2, and infections with the Delta variant in fully vaccinated persons are associated with less severe clinical outcomes.[40] Being fully vaccinated reduces risk of the transmission of SARS–COV–2 from staff to children who are not yet eligible for the vaccine and must be protected to minimize their exposure. Reducing transmission from staff to children and between staff also reduces transmission from children and staff to their family members. Transmission of SARS–CoV–2 in child care settings has been linked to infections and hospitalizations in family members,[41] and some children and staff may return home to family members who are older or have underlying medical conditions that put them at greater risk for COVID–19-related morbidity and mortality. Studies have shown that COVID–19 has disproportionately affected some racial and ethnic minority groups such as Hispanic or Latino, Black or African American, American Indian or Alaskan Native (AIAN), and Native Hawaiian and other Pacific Islander people.[42] It is also estimated that these disparities may have long term implications for these populations: for example, it is estimated that COVID–19 morbidity and mortality impacts can reverse over 10 years of progress in reducing the gaps in life expectancy between Black and White populations.[43] Many families of Head

[31] Monitoring Incidence of COVID–19 Cases, Hospitalizations, and Deaths, by Vaccination Status—13 U.S. Jurisdictions, April 4–July 17, 2021 Early Release/September 10, 2021/70.

[32] Center for Disease Control and Prevention. ''COVID Data Tracker.'' Available at: *https://covid cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination.*

[33] Fowles, A., Gaglani, M., Groover, K., et al. Effectiveness of COVID–19 Vaccines in Preventing SARS–CoV–2 Infection among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance—Eight U.S. Locations, December 2020–August 2021, *Morbidity and Mortality Weekly Report,* August 27, 2021, Available at: *https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.htm?s_cid=mm7034e4_w.*

[34] Effect of Vaccination on Transmission of SARS–CoV–2. N Engl J Med 2021; 385:1718–1720 DOI: 10.1056/NEJMc2106757.

[35] Milman, O., Yelin, I., Aharony, N. et al. Community-level evidence for SARS–CoV–2 vaccine protection of unvaccinated individuals. Nat Med 27, 1367–1369 (2021). *https://doi.org/10.1038/s41591-021-01407-5.*

[36] Centers for Disease Control and Prevention. ''COVID Data Tracker. Pediatric Data.'' Available at: *https://covid.cdc.gov/covid-data-tracker/#pediatric-data*; Centers for Disease Control and Prevention. ''Delta Variant: What We Know About the Science.'' Available at: *https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.* Centers for Disease Control and Prevention. Trends in COVID–19 Cases, Emergency Department Visits, and Hospital Admissions Among Children and Adolescents Aged 0–17 Years—United States, August 2020–August 2021. Available at: *https://www.cdc.gov/mmwr/volumes/70/wr/mm7036e1.htm?s_cid=mm7036e1_w.*

[37] Centers for Disease Control and Prevention. ''Delta Variant: What We Know About the Science.'' August 26, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html*; *https://covid.cdc.gov/covid-data-tracker/#pediatric-data.*

[38] Siegel DA, Reses HE, Cool AJ, et al. Trends in COVID–19 Cases, Emergency Department Visits, and Hospital Admissions Among Children and Adolescents Aged 0–17 Years—United States, August 2020–August 2021. MMWR Morb Mortal Wkly Rep 2021; 70:1249–1254. DOI: *https://www.cdc.gov/mmwr/volumes/70/wr/mm7036e1.htm.*

[39] Centers for Disease Control and Prevention. ''COVID Tracker Weekly Review.'' Available at: *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html.*

[40] Centers for Disease Control and Prevention. ''Science Brief: COVID–19 Vaccines and Vaccination.'' September 15, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html#:~:text=Evidence%20suggests%20the%20US%20COVID,interrupting%20chains%20of%20transmission.*

[41] Lopez AS, Hill M, Antezano J, et al. Transmission Dynamics of COVID–19 Outbreaks Associated with Child Care Facilities — Salt Lake City, Utah, April–July 2020. MMWR Morb Mortal Wkly Rep 2020;69:1319–1323. DOI: *http://dx.doi.org/10.15585/mmwr.mm6937e3.*

[42] Centers for Disease Control and Prevention. ''Introduction to COVID–19 Racial and Ethnic Health Disparities.'' December 10, 2020. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/racial-ethnic-disparities/index.html.*

[43] Andrasfay, T., & Goldman, N. (2021). Reductions in 2020 US life expectancy due to COVID–19 and the disproportionate impact on the Black and Latino populations. Proceedings of the

Continued

Appx. 4

Start children and staff are members of minority communities; 71 percent of families, and 69 percent of staff, self-identify as Hispanic/Latino, Black/African American, American Indian, or Alaska Native,[44] who have been shown to be at increased risk of exposure to SARS–CoV–2. Given the disproportionate burden of COVID–19 deaths and lower vaccination rates among racial and ethnic minority groups, requiring vaccination among Head Start staff is not only an issue of personal health, but also promotes public and community health and health equity for children and staff in Head Start programs.[45]A recent CDC study showed that during the period from May 23 to June 12, 2021, 50 percent of the children in a classroom tested positive for SARS–COV–2 infection in a Marin County, California elementary school following exposure to one unvaccinated teacher.[46] This outbreak, which began with an unvaccinated teacher who attended school for two days with symptoms and took off her mask when reading to the class, demonstrates the importance of vaccinating staff members who work closely with young children. The rate of SARS–CoV–2 positivity in the two rows closest to the teacher's desk was 80 percent (8 of 10); in the three back rows, it was 29 percent (4 of 14). Four days after the teacher reported being symptomatic, when the teacher received a positive test, additional cases of COVID–19 were reported among other staff members, students, parents, and siblings connected to the school. In addition to highlighting the importance of vaccination and masking, this study points to the Delta variant's increased transmissibility and potential for rapid spread, especially in unvaccinated populations such as children too young for vaccination.[47]

Additionally, a study covering the period from July 15 to August 31, 2021, that included public K–12 schools in Maricopa and Pima Counties, Arizona, found that schools without mask requirements were 3.5 times more likely to have COVID–19 outbreaks compared with schools that started the year with mask requirements.[48] This finding is consistent with another study that included 520 counties across the United States during the period July 1 to September 4, 2021, reporting that counties without school mask requirements experienced larger increases in pediatric COVID–19 case rates after the start of school compared to counties that had school mask requirements.[49]

Prior to the availability of COVID–19 vaccines in the United States, during the period from September to October 2020, ACF collaborated with CDC to conduct a mixed-methods study in Head Start programs in eight states (Alaska, Georgia, Idaho, Maine, Missouri, Texas, Washington, and Wisconsin). The study found that implementing and monitoring adherence to recommended mitigation strategies, such as mask use, can reduce risk for SARS–COV–2 transmission in Head Start settings. It also showed that Head Start and Early Head Start programs that successfully implemented CDC-recommended guidance for childcare programs were able to continue offering safe in-person learning.[50]

A survey of the U.S. child care workforce conducted between May 26 and June 23, 2021, found that the overall COVID–19 vaccine uptake among child care providers was 78.2 percent, which was higher than the general U.S. adult population (65 percent).[51] The rate among Head Start and Early Head Start staff in center-based settings specifically was 73

percent, though lower in home-based programs. That 73 percent is a nationwide figure. It could be much less in certain areas. Also, it is 73 percent of adults, but none of the children in the programs can be vaccinated. While other teachers and staff members might be protected from an unvaccinated staff, the concern remains the protection of children and families. Depending on the role in the program of the 27 percent of Head Start staff that are unvaccinated, it could result in roughly 250,000 children who are in the care of an unvaccinated adult. This IFC is critical in order to increase that percentage, given the importance of protecting young children from exposure to SARS–CoV–2, including more transmissible variants.

Data show COVID–19 vaccination requirements are effective in increasing vaccination rates among employees. Other industries that have implemented vaccine requirements have seen substantial increases in the percent of their workforce receiving the vaccine.[52][53] Two weeks following the Governor of Washington's vaccine requirement for State workers, according to the Washington State Department of Health, the weekly vaccination rate increased 34 percent.[54]

Reduced Program Closures

Requiring staff to get fully vaccinated for COVID–19 is critical to reduce program closures due to SARS–CoV–2 exposures. Such closures may impose multiple hardships on Head Start children and families. The children and families served by Head Start are largely comprised of individuals who experience economic hardship and have been historically underserved and marginalized. In 2019, 80 percent of children served by Head Start were

National Academy of Sciences of the United States of America, 118(5), e2014746118. https://doi.org/10.1073/pnas.2014746118.

[44] United States Department of Health and Human Services. "Head Start Program Information Report." Available at: https://eclkc.ohs.acf.hhs.gov/data-ongoing-monitoring/article/program-information-report-pir.

[45] Patel KM, Malik AA, Lee A, et al. COVID–19 vaccine uptake among US child care providers. Pediatrics. 2021; doi: https://pubmed.ncbi.nlm.nih.gov/34452977/.

[46] Lam-Hine T, McCurdy SA, Santora L, et al. Outbreak Associated with SARS–CoV–2 B.1.617.2 (Delta) Variant in an Elementary School—Marin County, California, May–June 2021. MMWR Morb Mortal Wkly Rep 2021; 70:1214–1219. DOI: http://dx.doi.org/10.15585/mmwr.mm7035e2.

[47] Lam-Hine T, McCurdy SA, Santora L, et al. Outbreak Associated with SARS–CoV–2 B.1.617.2 (Delta) Variant in an Elementary School—Marin County, California, May–June 2021. MMWR Morb Mortal Wkly Rep 2021; 70:1214–1219. DOI: http://dx.doi.org/10.15585/mmwr.mm7035e2.

[48] Jehn M, McCullough JM, Dale AP, et al. Association Between K–12 School Mask Policies and School-Associated COVID–19 Outbreaks—Maricopa and Pima Counties, Arizona, July–August 2021. MMWR Morb Mortal Wkly Rep 2021;70:1372–1373. DOI: http://dx.doi.org/10.15585/mmwr.mm7039e1.

[49] Budzyn SE, Panaggio MJ, Parks SE, et al. Pediatric COVID–19 Cases in Counties With and Without School Mask Requirements—United States, July 1–September 4, 2021. MMWR Morb Mortal Wkly Rep 2021;70:1377–1378. DOI: http://dx.doi.org/10.15585/mmwr.mm7039e3.

[50] Coronado F, Blough S, Bergeron D, et al. Implementing Mitigation Strategies in Early Care and Education Settings for Prevention of SARS–CoV–2 Transmission—Eight States, September–October 2020. MMWR Morb Mortal Wkly Rep 2020; 69:1868–1872. DOI: http://dx.doi.org/10.15585/mmwr.mm6949e3.

[51] Patel KM, Malik AA, Lee A, et al. COVID–19 vaccine uptake among US child care providers. Pediatrics. 2021; doi: https://www.cdc.gov/mmwr/volumes/70/wr/mm7036e1.htm.

[52] Hirsch, L. (2021, September 30). After mandate, 91% of Tyson workers are vaccinated. The New York Times. Retrieved November 3, 2021, from https://www.nytimes.com/2021/09/30/business/tyson-foods-vaccine-mandate-rate.html; Josephs, L. (2021, September 29). Nearly 600 United Airlines employees face termination for failing to comply with Vaccine Mandate. CNBC. Retrieved November 3, 2021, from https://www.cnbc.com/2021/09/28/unvaccinated-united-airlines-staff-faces-termination-as-early-as-today.html.

[53] White House. "WHITE HOUSE REPORT: Vaccination Requirements Are Helping Vaccinate More People, Protect Americans from COVID–19, and Strengthen the Economy." Available at: https://www.whitehouse.gov/wp-content/uploads/2021/10/Vaccination-Requirements-Report.pdf.

[54] White House. "Path Out of the Pandemic." Available at: https://www.whitehouse.gov/covidplan/#schools; Mikkelsen, D. (2021, August 27). Covid–19 vaccinations increase in Washington following mandates, Spike in cases. king5.com. Retrieved November 3, 2021, from https://www.king5.com/article/news/local/covid-19-vaccinations-increase-in-washington/281-1af4cc43-2d7f-4e77-a2fd-0fad28d0c4f3.

Black, Indigenous, or persons of color.[55] Thirty-eight percent of children were dual language learners, with a language other than English spoken in the home (sometimes in addition to English). The mean annual household income for families was $26,000. Fifty-nine percent of children had a mother with a high school diploma or less, and the majority (77 percent) had a mother who was either working full-time, working part-time, or looking for work. Fifty-seven percent and 52 percent of children's families received SNAP benefits and WIC benefits, respectively. Thirty-one percent of children lived in a household where parents reported household food would often or sometimes run out and they did not have money to purchase more. Twenty-four percent of children's mothers had moderate or severe depressive symptoms, as measured by a clinical depression screening tool.

Head Start programs provide critical services to meet the health, nutrition, and early learning needs of these children and families. Programs provide healthy nutritious meals to children and provide diapers for babies and toddlers, every day they are at the program. Programs ensure children are brushing their teeth and provide critical mental health services. Programs also provide high-quality early education services to promote the overall learning and development of children and prepare them for entry into kindergarten. If a program must close its facilities for a designated period of time due to an outbreak of SARS–CoV–2 infections, children at-risk will not receive these critical in-person services. Further, program closures limit the ability of Head Start families to work or seek educational opportunities. As summarized previously, Head Start families earning low wages and very likely do not have sick leave to care for children while they are in quarantine. Staying home for intermittent closures, rather than working, imposes significant financial costs on Head Start families. It also places the families at risk of losing their employment if they must take unpaid leave to care for children in quarantine. Families rely on Head Start programs to provide stable and reliable early care and education services to their children, and the effects of intermittent closures are significant.

As alluded to previously, program closures also create instability and stress for children and families. They disrupt children's opportunities for learning, socialization, nutrition, and continuity and routine. In June 2020, the Defending the Early Years organization released a survey to better understand the impact COVID–19 has had on young children, their families, and their teachers. Balancing working from home and supporting children was the number one challenge for parents. This challenge was especially acute for families with multiple children in different grade levels or with one child under the age of four years. Fifty-five percent of parents of young children reported they were somewhat-to-very concerned about financial issues (*e.g.*, job loss) due to the COVID–19 pandemic.[56] Other issues of concern related to early childhood education program and school closures and/or virtual or remote learning have compounded to create uniquely difficult challenges for families. These compounding issues include missed opportunities for academic instruction, children falling behind, children missing out on social interaction and play with peers, challenges to safe reopening, and increase in children's stress.

Survey data from February 2021 indicates that a diminished ability to attend early childhood programs like Head Start in-person, is related to an increase in social and emotional difficulties for children, a decrease in support for children with disabilities, and an increase in parental stress due to lack of affordable child care including loss of jobs and wages.[57] The RAPID–EC Survey describes this as a "chain of hardship" where families loss of jobs results in difficulty paying for basic needs such as food and housing further negatively impacting family well-being including a rise in emotional distress for parents and children.[58] These disruptions can be particularly difficult for children and families experiencing homelessness, a population Head Start programs are required to prioritize (45

CFR 1302.15(c)). Of all families enrolled in Head Start programs, about 6.2 percent or 42,334 families experienced homelessness during the 2020–2021 program year.[59] Given the greater risks to the health and development of young children experiencing homelessness, stable Head Start services are critically important for these families.[60]

School closures, heightened stress, loss of income, and social isolation resulting from the COVID–19 pandemic are all stressors that have increased the risk for child abuse and neglect.[61] Head Start programs are required to prioritize foster children for enrollment, and there was an increase in the rate of children in foster care served in Head Start from 3.5 percent in 2019 to 3.8 percent in 2021. Program closures and remote learning during the pandemic contribute to disruption of service access for these children, who often experience trauma and are most in need of the consistent care, education and comprehensive services that Head Start provides.[62]

Supporting safe and sustained in-person services allows programs to return to fulfilling the critical functions they serve for children and families. All Head Start staff are mandated reporters and programs must have internal procedures in place for staff to report suspected cases of child abuse and neglect. Procedures also include notification to the program's Regional Office immediately if a staff member or volunteer suspects an incident. Agencies must provide training in methods for identifying and reporting suspected child abuse and neglect (45

---

[55] All descriptive statistics in this paragraph are from: Kopack Klein, A., Aikens, N., Li, A., Bernstein, S. Reid, N., Dang, M., Blesson, E. . . . Tarullo, L. (2021). Descriptive Data on Head Start Children and Families from FACES 2019: Fall 2019 Data Tables and Study Design, OPRE Report 2021– 77, Washington, DC: U.S. Department of Health and Human Services.

[56] Jones, Denisha. Education Resources Information Center. "The Impact of COVID–19 on Young Children, Families, and Teachers." *Defending the Early Years* (2020). Available at: *https://eric.ed.gov/?id=ED609168*.

[57] Barnett, W.S & Jung, K. Seven Impacts of the Pandemic on Young Children and their Parents: Initial Findings from NIEER's December 2020 Preschool Learning Activities Survey. February 2021. Available at: *NIEER_Seven_Impacts_of_the_Pandemic_on_Young_Children_and_their_Parents.pdf*.

[58] Fisher, P, Lombardi, J. & Kendall Taylor, N. A day in the life of a pandemic. *https://medium.com/rapid-ec-project/a-year-in-the-life-of-a-pandemic-4c8324dda56b*.

[59] United States Department of Health and Human Services. "Head Start Program Information Report." Available at: *https://eclkc.ohs.acf.hhs.gov/data-ongoing-monitoring/article/program-information-report-pir*.

[60] Kiersten: Coughlin, C.G., Sandel, M., & Stewart, A.M. (2020). Homelessness, Children, and COVID–19: A Looming Crisis. *Pediatrics*, 146(2). Available at: *https://doi.org/10.1542/peds.2020-1406*; Haskett, M.E., Armstrong, J.M., & Tisdale, J. (2016). Developmental Status and Social-Emotional Functioning of Young Children Experiencing Homelessness. Early Childhood Education Journal, 44(2), 119–125. Available at: *https://doi.org/ 10.1007/s10643-015-0691-8;* Weinreb; L., Goldberg, R., Bassuk, E., & Perloff, J. (1998). Determinants of Health and Service Use Patterns in Homeless and Low-income Housed Children. Pediatrics, 102(3), 554–562. Available at: *https://doi.org/10.1542/ peds.102.3.554.*

[61] Rodriguez, C.M, Lee, S.J., Ward, K.P., & Pu, D.F. (2021). The Perfect Storm: Hidden risk of child maltreatment during the Covid–19 pandemic. Child Maltreatment, 26(2), 139–151.

[62] Kiersten: Klain, E.J., & White, A.R. (2013). Implementing trauma-informed practices in child welfare. CITY: State Policy Advocacy Reform Center. Retrieved from *http:// www.centerforchildwelfare.org/kb/TraumaInformedCare/ImplementingTraumaInformedPractices Nov13.pdf.*

<span style="color:red">Appx. 6</span>

CFR 1304.52(l)(3)(i)).[63] Research also indicates that Early Head Start can serve as a child abuse and neglect prevention program.[64] The work Head Start programs do to strengthen family economic stability and decrease parental stressors is known to help prevent child abuse. Many programs also provide supports to families experiencing domestic violence (2.5 percent or 24,000 families in 2019 OHS data [65]). This IFC is an important step in decreasing serious risks to very young children and their families.

OHS has been tracking data on the operating status of programs since the onset of the pandemic. In March and April of 2020, more than 90 percent of programs closed all in-person operations for varying lengths of time. By August of 2020, 21 percent of programs had reopened for in-person services, 26 percent remained closed for in-person services due to COVID–19, and the remainder of programs were closed for summer months as regularly scheduled. In December 2020, data show the highest combined percentage (67 percent) of Head Start centers operating as solely virtual/remote or as hybrid, with an additional five percent, or 878, of centers closed. Together, these virtual/remote, hybrid, and closed centers account for over 13,500 centers nationwide. Each center represents many families for whom unpredictable closures and transitions to virtual learning come at a cost, may present difficult decisions between employment and child care responsibilities, and could result in major financial impacts on their household.

July 2021 data show that two percent of centers (393) were closed due to COVID–19, 14 percent of centers were operating in a virtual/remote service delivery model (2,861), and 45 percent of centers were operating in a hybrid service delivery model (9,181). Only 35 percent of centers (7,240) were operating fully in person.

September 2021 center operating status data shows 73 percent (14,917) of the centers are open for in-person only

services, 14 percent (2,892) are operating in a hybrid model of in-person and virtual/remote services, and 4 percent (835) are open for virtual/remote only. Two percent (324) of centers remain entirely closed due to COVID–19 and the remaining 7 percent of centers are unreported, closed for the season, or closed due to a natural disaster. The increase in the number of programs delivering services in-person only is consistent with the expectations OHS outlined in May 2021 that programs move toward fully in-person services as soon as possible by January 2022, factoring in local health conditions.[66] This data also show that while closures declined, at least 20 percent of programs are closed, operating a virtual/remote service delivery model only, or in a hybrid model. Programs need to be able to resume fully in-person services to meet the needs of children and families, for all the reasons discussed in this section of the IFC.

A vaccination requirement and consistent and correct mask use are critical in mitigating SARS-CoV–2 transmission and keeping Head Start programs open. Program closures impede Head Start families from participating in the workforce, impose financial hardship on low wage workers who may not have paid time off to care for children who are in quarantine, create instability for children and families who depend on the Head Start program, and delay a full economic recovery for the nation.

### HHS Secretary's Extension of Public Health Emergency

On January 31, 2020, Health and Human Services Secretary Alex M. Azar II determined that a public health emergency (PHE) exists retroactive to January 27, 2020,[67] under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID–19. This declaration has been extended every 90 days since then and most recently on October 18, 2021. The current PHE declaration extends until mid-January 2022.

### C. Waiver of Proposed Rulemaking

In accordance with the Administrative Procedure Act (APA), 5 U.S.C. 553, ACF ordinarily publishes a

notice of proposed rulemaking in the **Federal Register** and invite public comment on the proposed rule before the provisions of the rule take effect. Specifically, 5 U.S.C. 553(b) generally requires the agency to publish a notice of the proposed rule in the **Federal Register** that includes a reference to the legal authority under which the rule is proposed, and the terms and substance of the proposed rule or a description of the subjects and issues involved. Section 553(c) further requires the agency to give interested parties the opportunity to participate in the rulemaking through public comment before the provisions of the rule take effect. Section 553(b)(B) authorizes the agency to waive these procedures, however, if the agency finds good cause that notice and comment procedures are impracticable, unnecessary, or contrary to the public interest and incorporates a statement of the finding and its reasons in the rule issued.

The 2021 outbreaks associated with the SARS-Cov-2 Delta variant have shown that current levels of COVID–19 vaccination coverage up until now have been inadequate to protect Head Start staff, children, and families. The data showing the effectiveness of vaccination indicate to us that we cannot delay taking this action in order to protect the health and safety of children and families, and the staff providing care.

We recognize that newly reported COVID–19 cases, hospitalizations, and deaths have begun to trend downward at a national level; nonetheless, they remain substantially elevated relative to numbers seen in May and June 2021, just before the Delta variant became the predominant strain circulating in the U.S.[68] And while cases are trending downward in some states, there are emerging indications of potential increases in others—particularly northern states where the weather has begun to turn colder.[69] The United States experienced a large COVID–19 wave in the winter of 2020. As of November 18, 2021, over 30 percent of people aged 12 years and older in the United States remain not fully vaccinated—and this situation could pose a threat to the country's progress on the COVID–19 pandemic, potentially incurring a fifth wave of COVID–19 cases.[70]

---

[63] Office of Head Start Information Memorandum. Mandated Reporting of Child Abuse and Neglect ACF–IM–HS–15–04. September 18, 2015. Available at: https://eclkc.ohs.acf.hhs.gov/policy/im/acf-im-hs-15048~:text=Staff%20who%20need%20help%20identifying,800%2D422%2D4453).&text=All%20Head%20Start%20programs%20must,of%20child%20abuse%20and%20neglect.

[64] Child Trends. "How Early Head Start Prevents Child Maltreatment." November 1, 2018. Available at: https://www.childtrends.org/publications/how-early-head-start-prevents-child-maltreatment.

[65] United States Department of Health and Human Services. "Head Start Program Information Report." Available at: https://eclkc.ohs.acf.hhs.gov/data-ongoing-monitoring/article/program-information-report-pir.

[66] Office of Head Start. Office of Head Start (OHS) Expectations for Head Start Programs in Program Year (PY) 2021–2022. May 20, 2021. Available at: https://eclkc.ohs.acf.hhs.gov/policy/pi/acf-pi-hs-21-04.

[67] United States Department of Health and Human Services. "Public Health Emergency." January 31, 2020. Available at: https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVDI-15Oct21.aspx.

[68] https://covid.cdc.gov/covid-data-tracker/#datatracker-home.

[69] https://www.cdc.gov/flu/professionals/acip/background-epidemiology.htm.

[70] Centers for Disease Control. "COVID Data Tracker." November 18, 2021. Available at: https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total.

<span style="color:red">Appx. 7</span>

The efficacy of COVID–19 vaccinations has been demonstrated.[71] An ASPE report published on October 5, 2021, found that COVID–19 vaccines are a key component in controlling the COVID–19 pandemic. Clinical data show vaccines are highly effective in preventing COVID–19 cases and severe outcomes including hospitalization and death. Vaccines continue to be effective in preventing COVID–19 associated with the now-dominant Delta variant.[72 73]

In addition to preventing morbidity and mortality associated with COVID–19, the vaccines also appear to be effective against asymptomatic SARS–CoV–2 infection. A recent study of health care workers in 8 states found that, from December 14, 2020, through August 14, 2021, full vaccination with COVID–19 vaccines was 80 percent effective in preventing RT–PCR–confirmed SARS–CoV–2 infection among frontline workers.[74] Emerging evidence also suggests that vaccinated people who become infected with Delta have the potential to be less infectious than infected unvaccinated people, thus decreasing transmission risk.[75] For example, in a study of breakthrough infections among health care workers in the Netherlands, SARS-CoV–2 infectious virus shedding was lower among vaccinated individuals with breakthrough infections than among unvaccinated individuals with primary infections.[76]

As noted earlier in this section, a combination of factors, including but not limited to failure to achieve sufficiently high levels of vaccination based on voluntary efforts and patchwork requirements, potential harm to children from unvaccinated staff, continuing strain on the health care system, and known efficacy and safety of available vaccines, have persuaded us that a vaccine requirement for Head Start staff, certain contractors, and volunteers is an essential component of the nation's COVID–19 response. Further, it would endanger the health and safety of staff, children and families, and be contrary to the public interest to delay imposing the vaccine mandate. Therefore, we believe it would

be impracticable and contrary to the public interest for us to undertake normal notice and comment procedures and to thereby delay the effective date of this IFC. We find good cause to waive notice of proposed rulemaking under the APA, 5 U.S.C. 552(d), 553(b)(B). For those same reasons, as authorized by subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (the Congressional Review Act or CRA), 5 U.S.C. 808(2), we find it is impracticable and contrary to the public interest not to waive the delay in effective date of this IFC under the CRA. Therefore, we find there is good cause to waive the CRA's delay in effective date pursuant to 5 U.S.C. 808(2).

## IV. Background

Since its inception in 1965, Head Start has been a leader in supporting children from low-income families in reaching kindergarten healthy and ready to thrive in school and life. The program was founded on research showing that health and wellbeing are pre-requisites to maximum learning and improved short- and long-term outcomes. In fact, OHS identifies health as the foundation of school readiness.

The Head Start Program Performance Standards require children to be up to date on immunizations and their state's Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) schedule (45 CFR 1302.42(b)(1)(i)). When children are behind on immunizations or other care, Head Start programs are required to ensure they get on a schedule to catch up. Additionally, education, family service, nutrition, and health staff help children learn healthy habits, monitor each child's growth and development, and help parents access needed health care. It is vitally important that enrolled pregnant women and children from birth to five years can access in-person services. When children are able to participate in their regular, in-person program options, they form a secure attachment to and relationship with their Head Start teachers. A large body of research demonstrates that a secure attachment with caregivers is a critical foundation for children to learn and explore their environment.[77] Furthermore, education staff who see children in person are better able to monitor their progress and individualize

teaching and learning. The youngest children, children from birth to five years, need physical interaction with materials and in-person support for optimal learning. Screen based learning is much less effective and necessarily limited in the number of hours. Finally, as many parents return to work, they need the assurance that their children are in a safe and high-quality learning environment.

It is equally important that the Head Start program itself is safe for all children, families, and staff. For this reason, the Head Start Program Performance Standards specify that the program must ensure staff do not pose a significant risk of communicable disease (45 CFR 1302.93(a)). Ensuring that children and families can benefit from program services as safely as possible is OHS' highest priority. While this is always important, the COVID–19 pandemic highlights the need to ensure staff are as protected as possible so that children under age 5 years, who cannot yet be vaccinated, are also protected. Fully vaccinated staff are at much lower risk of infection and therefore, pose lower transmission risk to the young unvaccinated children in their care.[78] Young children who get the virus can also spread it to others in their homes and communities. Ensuring Head Start staff are fully vaccinated significantly reduces the possibility of the program playing an unwitting part in community spread of SARS-CoV–2.

On October 29, 2021 the U.S. Food and Drug Administration authorized the Pfizer-BioNTech mRNA vaccine for COVID–19 for use in children ages five to 11. On November 2, 2021, CDC adopted the CDC Advisory Committee on Immunization Practices' (ACIP) recommendation that children 5 to 11 years old be vaccinated for COVID–19 with the Pfizer-BioNTech pediatric vaccine. While Head Start does serve some children who are currently eligible for a vaccine, children five and older only represented 1.11 percent of children enrolled in Head Start programs during the 2020–2021 program year (Office of Head Start—Program Information Report [PIR] Enrollment Statistics Report—2021—National Level). As of November 11, 2021, there is no pediatric COVID–19 vaccine available for children younger than age five years in the United States.

To the extent a court may enjoin any part of the rule, the Department intends

[71] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html.

[72] https://www.nejm.org/doi/full/10.1056/nejmoa2108891.

[73] https://www.mayoclinic.org/coronavirus-covid-19/covid-variant-vaccine.

[74] https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.htm?s_cid=mm7034e4_w.

[75] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html#ref43.

[76] https://www.medrxiv.org/content/10.1101/2021.08.20.21262158v1.full.pdf.

[77] Bergin, C., & Bergin, D. (2009). Attachment in the classroom. *Educational Psychology Review, 21*(2), 141–170.; Rees, C. (2007). Childhood attachment. *British Journal of General Practice, 57*(544), 920–922.; Sierra, P. G. (2012). Attachment and preschool teacher: An opportunity to develop a secure base. *International Journal of Early Childhood Special Education (INT–JECSE), 4*(1), 1–16.

[78] Centers for Disease Control and Prevention. "COVID–19 Guidance for Operating Early Care and Education/Child Care Programs." November 10, 2021. Available at: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/child-care-guidance.html.

<span style="color:red">Appx. 8</span>

that other provisions or parts of provisions should remain in effect. Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## V. Provisions of the Interim Final Rule

This interim final rule (IFR) adds new provisions to the Head Start Program Performance Standards to require: (1) Effective immediately, and with exceptions discussed below, universal masking for all individuals two years of age and older regardless of program option, (2) all Head Start staff, certain contractors, and volunteers in classrooms or working directly with children to be fully vaccinated for COVID–19, with exemptions discussed below, and (3) for those granted an exemption to the requirement specified in (2) at least weekly testing for current SARS–CoV–2 infection.

The definition of *staff* in § 1305.2 is "paid adults who have responsibilities related to children and their families who are enrolled in programs." Consistent with that definition, "all staff" as noted in this IFC, refers to all staff who work with enrolled Head Start children and families in any capacity regardless of funding source. The term "Head Start" is inclusive of Head Start, Early Head Start, and Early Head Start-Child Care Partnerships.

*Consistent with CDC's guidance, in general, fully vaccinated*[79] means

(i) a person's status 2 weeks after completing primary vaccination for COVID–19 vaccine with, if applicable, at least the minimum recommended interval between doses in accordance with the approval, authorization, or listing that is:

(A) Approved or authorized for emergency use by the Food and Drug Administration (FDA);

(B) Listed for emergency use by the World Health Organization (WHO); or

(C) Administered as part of a clinical trial at a U.S. site, if the recipient is documented to have primary vaccination with the "active" (not placebo) COVID–19 vaccine candidate,

for which vaccine efficacy has been independently confirmed (*e.g.,* by a data and safety monitoring board) or if the clinical trial participant at U.S. sites had received a COVID–19 vaccine that is neither approved nor authorized for use by FDA but is listed for emergency use by WHO; or

(ii) A person's status 2 weeks after receiving the second dose of any combination of two doses of a COVID–19 vaccine that is approved or authorized by the FDA, or listed as a two-dose series by WHO (*i.e.,* a heterologous primary series of such vaccines, receiving doses of different COVID–19 vaccines as part of one primary series). The second dose of the series must not be received earlier than 17 days (21 days with a 4-day grace period) after the first dose.

### A. Masking Requirement

This IFC adds a new provision to part 1302, subpart D—Health Program Services in § 1302.47, Safety practices. Section 1302.47(b)(5), Safety practices, specifies the appropriate practices all staff and consultants follow to keep children safe during all activities. This IFC creates a new paragraph (vi) that requires universal masking for all individuals aged 2 years and older when there are two or more individuals in a vehicle owned, leased, or arranged by the Head Start program; indoors in a setting when Head Start services are provided; and for those not fully vaccinated, outdoors in crowded settings or during activities that involve sustained close contact with other people. The Office of Head Start notes that being outdoors with children inherently includes sustained close contact for the purposes of caring for and supervising children.

There are different types of masks. Head Start staff should choose a mask that is comfortable to wear and fits snugly. It must cover one's mouth, nose, and chin. It can fasten around the ears or the back of the head, as long as it stays in place when one talks and moves. Masks with vents or exhalation valves are not allowed because they allow unfiltered breath to escape the mask. For more information on masks, programs can consult Your Guide to Masks | CDC.

Purchasing masks needed for staff to fulfill their duties and responsibilities and for children is considered an allowable use of Head Start program funds, as well as the COVID–19 response funds and the American Rescue Plan funds.[80] Programs should

have masks available to provide to children when they do not have their own mask.

This requirement is effective immediately upon publication of this IFC. Exceptions are noted for when individuals are eating or drinking; for children when they are napping; for the narrow subset of persons who cannot wear a mask, or cannot safely wear a mask, because of a disability as defined by the Americans with Disabilities Act (ADA), consistent with CDC guidance on disability exemptions;[81] and for children with special health care needs, for whom programs should work together with parents and follow the advice of the child's health care provider for the best type of face covering. It should be noted that like all new skills, children will need to be taught the proper way to put a mask on and keep a mask on. While children are adaptable, they are still in the early stages of development and may need reminders and reinforcements to comply with this new practice. It is imperative that Head Start staff abide by the Standards of Conduct outlined in 1302.90 Personnel Policies in the Head Start Program Performance Standards namely that staff, consultants, contractors, and volunteers implement positive strategies to support children's well-being and do not use harsh disciplinary practices that could endanger the health or safety of children.

### B. Vaccination Requirement

This IFC adds four new provisions to part 1302, subpart I—Human Resources Management in § 1302.93, Staff health and wellness, and § 1302.94, Volunteers. Section 1302.93(a), Staff health and wellness, states that "the program must ensure staff do not, because of communicable diseases, pose a significant risk to the health or safety of others in the program that cannot be eliminated or reduced by reasonable accommodation, in accordance with the Americans with Disabilities Act and section 504 of the Rehabilitation Act." This IFC adds a new paragraph (a)(1) to § 1302.93 requiring all staff, and those contractors whose activities involve contact with or providing direct services to children and families, to be fully vaccinated for COVID–19, except for those (i) for whom a vaccine is medically contraindicated, (ii) for whom

[79] Centers for Disease Control and Prevention. "When You've Been Fully Vaccinated." October 15, 2021. *https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html.*

[80] Office of Head Start. "FY 2021 American Rescue Plan Funding Increase for Head Start

Programs." May 4, 2021. Available at: *https://eclkc.ohs.acf.hhs.gov/policy/pi/acf-pi-hs-21-03.*

[81] Centers for Disease Control. Order: Wearing of face masks while on conveyances and at transportation hubs. January 21, 2021. Available at: Order: Wearing of face masks while on conveyances and at transportation hubs | Quarantine | CDC.

Appx. 9

medical necessity requires a delay in vaccination,[82] or (iii) who are legally entitled to an accommodation with regard to the COVID–19 vaccination requirement based on an applicable Federal law. It also adds a new paragraph (a)(2) indicating that those who are granted an exemption outlined in (a)(1)(i) through (iii) must undergo testing at least weekly for current SARS COV–2 infection.

The additions made to § 1302.94, Volunteers, mirrors that of § 1302.93, Staff health and wellness. This IFC also adds a new paragraph (a)(1) to § 1302.94, Volunteers, that requires all volunteers who are in classrooms or working directly with children other than their own must be fully vaccinated for COVID–19, except for those (i) for whom a vaccine is medically contraindicated, (ii) for whom medical necessity requires a delay in vaccination,[83] or (iii) who are legally entitled to an accommodation with regard to the COVID–19 vaccination requirement based on an applicable Federal law. It also adds a new paragraph (a)(2) indicating that those who are granted an exemption outlined in paragraphs (a)(1)(i) through (iii) must undergo testing at least weekly for current SARS-CoV–2 infection. The costs associated with regular testing for those granted an exemption are an allowable use of Head Start funds so long as it is included in a program's policies and procedures. While paying for the costs associated with regular testing is allowable use of Head Start funds, it is not a requirement. Programs should consider whether they can sustain continued funding for testing if/when the COVID–19 funds are exhausted. Finally, we have also revised § 1302.94 to remove the word ''regular'' from paragraph (a). We believe it is important for all volunteers to adhere to these requirements not just those who regularly volunteer in the program.

Programs may use SARS–CoV–2 testing for all staff, regardless of vaccination status, as an additional mitigation strategy with the COVID–19 vaccines, and those granted exemptions are required to undergo testing, but testing alone is not an alternative to the COVID–19 vaccination requirement specified in § 1302.93 and § 1302.94.

---

[82] As defined by CDC's informational document, Summary Document for Interim Clinical Considerations for Use of COVID–19 Vaccines Currently Authorized in the United States (CDC, September 29, 2021).

[83] As defined by CDC's informational document, Summary Document for Interim Clinical Considerations for Use of COVID–19 Vaccines Currently Authorized in the United States (CDC, September 29, 2021).

This is a key difference between this IFC and the COVID–19 Vaccination and Testing; Emergency Temporary Standard, published, by the Occupational Safety and Health Administration (OSHA) on November 5, 2021, which requires employers with 100 or more employees to develop, implement, and enforce a mandatory COVID–19 vaccination policy, unless they adopt a policy requiring employees to choose to either be vaccinated or undergo regular SARS–Cov–2 testing and wear a face covering. Whereas OSHA allows employers to offer an option for testing and face coverings, this IFC does not permit a testing and face coverings option for individuals without an approved vaccine exemption. The rationale for the difference is that ACF is acting under statutory and regulatory standards that are different from OSHA's. In general, the Head Start Act requires standards for a safe environment for staff, children, and other participants.

Documentation of Vaccination Status

The Head Start Act at section 647 (42 U.S.C. 9842) has a provision on record-keeping, which allows the Secretary to require certain records be kept and to support OHS in conducting its oversight of programs through monitoring. Pursuant to the statutory recordkeeping requirement in section 647 of the Head Start Act (42 U.S.C. 9842) and in order to ensure programs are complying with the vaccination requirements of this IFC, we are requiring that they track and securely document the vaccination status of each staff member, including those for whom there is a temporary delay in vaccination, such as recent receipt of monoclonal antibodies or convalescent plasma. Vaccination exemption requests and outcomes must also be documented, discussed further in section II.A.5. of this IFC. This documentation will be an ongoing process as new staff are onboarded.

While program staff may not have personal medical records on file with their employer, all staff COVID–19 vaccines must be appropriately documented by the provider or supplier. All medical records, including vaccine documentation, must be kept confidential and stored separately from an employer's personnel files, pursuant to the ADA and the Rehabilitation Act.

Examples of acceptable forms of proof of vaccination include:
• CDC COVID–19 vaccination record card (or a legible photo of the card),
• Documentation of vaccination from a health care provider or electronic health record, or

• State immunization information system record.

If vaccinated outside of the United States, a reasonable equivalent of any of the previous examples would suffice.

Programs have the flexibility to use the appropriate tracking tools of their choice. For those who would like to use it, CDC provides a staff vaccination tracking tool that is available on the NHSN website (*https://www.cdc.gov/nhsn/hps/weekly-covid-vac/index.html*). This is a generic Excel-based tool available for free to anyone, not just NHSN participants, that facilities can use to track COVID–19 vaccinations for staff members.

Exemption Process

Under Federal law, including the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act of 1964, staff, contractors, and volunteers who cannot be vaccinated because of a disability under the ADA, medical condition, or sincerely held religious beliefs, practice, or observance may in some circumstances be granted an exemption, as discussed in II.B of this IFC. Head Start staff included in this IFC must be able to request an exemption from these COVID–19 vaccination requirements. Additionally, programs following CDC guidelines and the new requirements in this IFC may also be required to provide reasonable accommodations, to the extent required by federal law, for employees who request and receive exemption from vaccination because of a disability, medical condition, or sincerely held religious belief, practice, or observance.

In support of the new requirements in §§ 1302.93 and 1302.94, it is the responsibility of Head Start programs to establish a process for reviewing and reaching determinations regarding exemption requests (*e.g.,* disability, medical conditions, sincerely held religious beliefs, practices, or observances). Programs must have a process for collecting and evaluating such requests, including the tracking and secure documentation of information provided by those staff who have requested exemption, the program's decision on the request, and any accommodations that are provided. Requests for exemptions based on an applicable federal law must be documented and evaluated in accordance with applicable Federal law and each program's policies and procedures. As is relevant here, this IFC preempts the applicability of any state or local law providing for exemptions to the extent such law provides broader exemptions than provided for by federal law and are inconsistent with this IFC.

Appx. 10

For staff members, contractors, and volunteers who request a medical exemption from vaccination, all documentation confirming recognized clinical contraindications to COVID–19 vaccines or medical need for delay, and which supports the request, must be signed and dated by a licensed practitioner, who is not the individual requesting the exemption, and who is acting within their respective scope of practice as defined by, and in accordance with, all applicable state and local laws. Such documentation must contain all information specifying which of the authorized or approved COVID–19 vaccines are clinically contraindicated for the staff member to receive and the recognized clinical reasons for the contraindications or the recognized clinical reasons necessitating delay in vaccination; and a statement by the authenticating practitioner recommending that the staff member be exempted from the program's COVID–19 vaccination requirements based on the recognized clinical contraindications or allowed to delay vaccination.

For more information, Head Start programs can refer to a resource produced by the Equal Employment Opportunity Commission (EEOC), which is responsible for enforcing federal laws that prohibit employment-related discrimination based on a person's race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (40 or older), disability, or genetic information. The EEOC resource, What You Should Know About COVID–19 and the ADA, the Rehabilitation Act, and Other EEO Laws, available at What You Should Know About COVID–19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment Opportunity Commission (*eeoc.gov*), should be helpful in navigating employees' requests for accommodations (EEOC, October 25, 2021).

In granting such exemptions or accommodations, programs must ensure that they minimize the risk of transmission of SARS–CoV–2 to at-risk individuals, in keeping with their obligation to protect the health and safety of staff, children and families. To that end, it is a reasonable alternative that staff, contractors, and volunteers granted an accommodation be required to undergo testing at least weekly for current SARS–CoV–2 infection. Because unvaccinated employees are at higher risk of SARS–CoV–2 infection, and SARS–CoV–2 transmission among individuals without symptoms is a significant driver of COVID–19, ACF has determined it is necessary to prevent the

pre-symptomatic and asymptomatic transmission of SARS–CoV–2 from unvaccinated staff, contractors and volunteers, through a requirement for a weekly screening test.[84] Although more regular screening testing (*e.g.,* twice weekly) may identify even more cases, ACF has decided to require a minimum testing of only on a weekly basis, which is in line with CDC recommendations.

In support of this requirement, programs should develop and implement a written SARS–CoV–2 testing protocol for those staff, contractors, and volunteers granted vaccine exemptions. Programs should consult with their Health Services Advisory Committee (HSAC) and local public health officials, along with recommendations from their agency's legal counsel and Human Resources department in the development of a SARS–CoV–2 testing protocol. Programs are encouraged to review guidance from CDC and FDA about selecting SARS–CoV–2 tests and developing related protocols. The costs of regular testing for those granted an exemption are an allowable use of Head Start funds so long as it is included in a program's policies and procedures. While using Head Start funds is allowable, it is not a requirement. It is at the program's discretion to decide if they will pay for the cost of testing, considering such factors as the number of approved exemptions, whether they can sustain continued funding for testing if/when the COVID–19 funds are exhausted, any incentives associated with allowing the use of funds for testing, and whether employees can cover the expenses of testing.

*D. Implementation Dates*

Due to the urgent nature of the vaccination requirements established in this IFC, we have not issued a proposed rule, as discussed in section C of this IFC. While some IFCs, or provisions within IFCs, are effective immediately upon publication, such as the mask requirement, we understand that instantaneous compliance, or compliance within days, with the vaccine requirement is not possible. Vaccination requires time, especially vaccines delivered in a series. Programs' updates to their policies and procedures also take time to develop. However, in order to provide protection to staff, children, and families, we believe it is necessary to begin staff vaccinations as

quickly as reasonably possible. Therefore, we have set the January 31, 2022 as the compliance date for staff to be vaccinated. Although an individual is not considered fully vaccinated until 14 days (2 weeks) after the final dose, staff, certain contractors and volunteers who have received the final dose of a primary vaccination series by January 31, 2022 are considered to have met the vaccination requirement, even if they have not yet completed the 14-day waiting period. This timing flexibility applies only to the initial implementation of this IFC and has no bearing on ongoing compliance.

The rationale for a different timeline for compliance with the vaccine requirement in this rule relative to the CMS or the OSHA rule is because this timeline in this rule is coordinated with OHS's expectation, communicated through guidance in May 2021, for programs' return to full in-person services. Beginning January 2022, Head Start programs are expected to resume fully in-person services after a period of increased flexibility with virtual and remote services during the pandemic. At this time, OHS will reinstate pre-pandemic practices for tracking and monitoring enrollment as part of the Full Enrollment Initiative. This means that during the first week of February, OHS will evaluate reported enrollment on the last day of January for purposes of the under-enrollment process. Requiring that staff receive their second dose in a two-dose vaccine series, or a single dose in a one-dose vaccine series, by January 31 is consistent with this return to fully in-person services.

**VI. Regulatory Process Matters**

*Treasury and General Government Appropriations Act of 1999*

Section 654 of the Treasury and General Government Appropriations Act of 1999 requires federal agencies to determine whether a policy or regulation may negatively affect family well-being. If the agency determines a policy or regulation negatively affects family well-being, then the agency must prepare an impact assessment addressing seven criteria specified in the law. ACF believes it is not necessary to prepare a family policymaking assessment, *see* Public Law 105–277, because the action it takes in this interim final rule will not have any impact on the autonomy or integrity of the family as an institution. However, ACF invites public comment on whether the actions set forth in this interim final rule would have a negative effect on family well-being.

---

[84] OSHA. "COVID–19 Vaccination and Testing; Emergency Temporary Standard." November 5, 2021. Available at: *https://www.federalregister.gov/documents/2021/11/05/2021-23643/covid-19-vaccination-and-testing-emergency-temporary-standard.*

<span style="color:red">Appx. 11</span>

*Federalism Assessment Executive Order 13132*

Executive Order 13132 establishes certain requirements that an agency must meet when it promulgates a proposed rule (and subsequent final rule) that imposes substantial direct requirement costs on State and local governments, preempts State law, or otherwise has Federalism implications. This rule would preempt some State laws that prohibit employers from requiring their employees to be vaccinated for COVID–19. Consistent with the Executive Order, we find that State and local laws that forbid employers in the State or locality from imposing vaccine requirements on employees directly conflict with this exercise of our statutory authority to protect the health and safety of Head Start participants and their families and ensure the continuation of services by requiring vaccinations for staff, certain contractors, and volunteers and universal masking. As is relevant here, this IFC preempts the applicability of any State or local law providing for exemptions to the extent such law provides broader grounds for exemptions than provided for by Federal law and are inconsistent with this IFC. In these cases, consistent with the Supremacy Clause of the Constitution, the agency intends that this rule preempts State and local laws to the extent the State and local laws conflict with this rule. The agency has considered other alternatives (for example, relying entirely on measures such as voluntary vaccination, source control alone, and physical distancing) and has concluded that the mandate established by this rule is the minimum regulatory action necessary to achieve the objectives of the statute. Given the transmission rates of the existing strains of coronavirus and their disproportionate impacts on low-income communities served by Head Start programs, we believe that vaccination of almost all staff, certain contractors, and volunteers is necessary to promote and protect program participants and ensure program continuity. The agency has examined case studies from other employers and concludes that vaccine mandates are vastly more effective than other measures at achieving ideal vaccination rates and the resulting protections. Given the emergency situation with respect to the Delta variant detailed more fully above, time did not permit usual consultation procedures. We are, however, inviting comments on the substance as well as legal issues presented by this rule.

*Congressional Review Act*

Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (also known as the Congressional Review Act or CRA) allows Congress to review ''major'' rules issued by federal agencies before the rules take effect, *see* 5 U.S.C. 801(a). The CRA defines a major rule as one that has resulted, or is likely to result, in (1) an annual effect on the economy of $100 million or more; (2) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or (3) significant adverse effects on competition, employment, investment, productivity, or innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets, see 5 U.S.C. 804(2). The Office of Information and Regulatory Affairs in the Office of Management and Budget has determined that this action is a major rule because it will have an annual effect on the economy of $100 million or more.

*Paperwork Reduction Act of 1995*

The Paperwork Reduction Act (PRA) of 1995, 44 U.S.C. 3501 *et seq.,* minimizes government-imposed burden on the public. In keeping with the notion that government information is a valuable asset, it also is intended to improve the practical utility, quality, and clarity of information collected, maintained, and disclosed.

The PRA requires that agencies obtain OMB approval, which includes issuing an OMB number and expiration date, before requesting most types of information from the public. Regulations at 5 CFR part 1320 implemented the provisions of the PRA and § 1320.3 of this part defines a ''collection of information,'' ''information,'' and ''burden.'' PRA defines ''information'' as any statement or estimate of fact or opinion, regardless of form or format, whether numerical, graphic, or narrative form, and whether oral or maintained on paper, electronic, or other media (5 CFR 1320.3(h)). This includes requests for information to be sent to the government, such as forms, written reports and surveys, recordkeeping requirements, and third-party or public disclosures (5 CFR 1320.3(c)). ''Burden'' means the total time, effort, or financial resources expended by persons to collect, maintain, or disclose information.

This IFC establishes new recordkeeping requirements under the PRA. Head Start grant recipients are required as part of this IFC to maintain

records on staff vaccination rates. Additionally, Head Start programs are required to develop their own written SARS–CoV–2 testing protocol for current infection for individuals granted vaccine exemptions. To promote flexibility for local programs, there is no standardized instrument associated with the new recordkeeping requirement. As required under the PRA, ACF will submit a request for approval of these recordkeeping requirements. We will initially request approval through an emergency clearance process, allowing for 6 months of approval under the PRA. We will follow the initial approval with a full request, including two public comment periods, to extend approval of the recordkeeping requirement. A separate notice inviting comments on these new recordkeeping requirements will be published in the **Federal Register**.

In addition to these new recordkeeping requirements, Head Start grant recipients are expected to update their program policies and procedures to ensure costs associated with regular testing for those granted an exemption are an allowable use of Head Start funds. The recordkeeping activity of maintaining program policies and procedures including the associated burden with updating them on an annual basis is already approved under an existing OMB information collection (Control Number 0970–0148). The separate **Federal Register** notice will also invite comments on this existing recordkeeping requirement.

**VII. Economic Analysis of Impacts**

*Introduction*

We have examined the impacts of this interim final rule under Executive Order 12866, Executive Order 13563, and the Regulatory Flexibility Act (5 U.S.C. 601–612). Executive Orders 12866 and 13563 direct us to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). We believe, and OIRA determined, that this interim final rule is an economically significant regulatory action as defined by Executive Order 12866. Thus, this rule has been reviewed by the Office of Information and Regulatory Affairs.

The Regulatory Flexibility Act requires us to analyze regulatory options that would minimize any significant impact of a rule on small entities. Because the impacts to small entities

Appx. 12

attributable to the interim final rule are limited in nature, we certify that the interim final rule will not have a significant economic impact on a substantial number of small entities. These impacts are discussed in detail in the Final Small Entity Analysis.

*Summary of Costs and Benefits*

This interim final rule establishes vaccine, record keeping, and mask requirements to mitigate the spread of SARS–CoV–2 in Head Start programs. We have evaluated the likely impacts of the interim final rule in comparison to a baseline scenario of no new regulation that incorporates projections of COVID–19 vaccine coverage, cases, deaths, and hospital admissions. We anticipate that the requirement that all Head Start staff get fully vaccinated for COVID–19 will induce a substantial portion of unvaccinated staff to get fully vaccinated. We also estimate that the regulation will induce a similar number, but smaller share, of unvaccinated Head Start volunteers to get fully vaccinated in response to the interim final rule. Some Head Start volunteers are likely also covered by other regulatory actions, which complicates attributing changes in vaccine coverage to any particular regulatory action. We discuss this in greater detail in the Baseline Section and Benefits Section.

The increase in vaccine coverage attributable to the interim final rule will result in substantial health benefits from reductions in COVID–19 mortality and morbidity. We monetize these impacts using a Value per Statistical Life (VSL) for fatal cases, and estimates of the Value per Statistical Case (VSC) that vary by case severity for non-fatal cases. We also predict that reductions in COVID–19 cases among Head Start staff will result in lower absenteeism,

including fewer missed days of work for staff infected with SARS–CoV–2 or recovering from COVID–19 and unvaccinated staff quarantining after a close contact tested positive for SARS–CoV–2. We monetize these impacts using a value of time that accounts for time savings for parents and other caregivers for children enrolled at Head Start centers. We estimate a range of total monetized benefits between $200 million and $296 million under a 7% discount rate, and a range between $196 million and $288 million under a 3% discount rate. These monetized benefits cover a time period between the publication date of the interim final rule and March 1, 2022, when our underlying COVID–19 projections end. For our main analysis, we assume that the requirements will be effective for this time horizon, but also consider a scenario in which the requirements are lifted at an earlier date, such as by the COVID–19 Public Health Emergency expiring. The choice of discount rate impacts the benefit estimates through the VSC, which is based on estimates of the Value per Quality-Adjusted Life Year that vary by discount rate.

In addition to the impacts that we monetize in this analysis, we anticipate that the increase in vaccine coverage attributable to the interim final rule will result in indirect health benefits from reduced transmission of SARS–COV–2, the virus that causes COVID–19. These impacts include reductions in secondary infections from Head Start staff and volunteers to other staff and volunteers, children, and families. We anticipate that the masking requirement will also reduce transmission SARS–COV–2 from individuals covered by the requirement. This impact includes a reduction in transmission from children to Head Start teachers, staff, and other

children. We also discuss a mechanism and valuation approach for monetizing benefits from Head Start centers reopening. We discuss these impacts in greater detail in the Benefits Section, and note that they are embedded in a quantitative approach in the Net Benefits section.

We have identified several costs that are attributable to the interim final rule. We monetize the costs of vaccination, which incorporates a value of time for staff and volunteers, and the cost of doses and administration; the costs of the masking requirement; the costs of testing unvaccinated staff and volunteers; and the costs of recordkeeping associated with the interim final rule. We also consider a scenario where a share of unvaccinated Head Start staff quit rather than get fully vaccinated. Under this scenario, these costs would include training replacement staff, and the costs to parents and other caregivers for children enrolled at Head Start center resulting from staff vacancies. We estimate a range of costs between $16 million and $83 million, which cover a time period between the publication of the interim final rule and March 1, 2022, which is consistent with the time horizon adopted for our benefits estimates. These cost estimates do not vary with the discount rate. We also discuss potential additional costs of masking and testing associated with Head Start centers reopening as a result of the interim final rule.

Table 1 presents a summary of the monetized impacts attributable to the interim final rule. All dollar estimates are presented in millions of 2020 dollars. We request comments on these benefit and cost estimates.

**BILLING CODE 4184-01-P**

**Table 1. Summary of Benefits, Costs and Distributional Effects of Interim final rule**

| Category | | Primary Estimate | Low Estimate | High Estimate | Units | | | Notes |
|---|---|---|---|---|---|---|---|---|
| | | | | | Year Dollars | Discount Rate | Period Covered | |
| Benefits | Annualized Monetized $millions/year | $247,964,991 | $200,294,622 | $295,635,335 | 2020 | 7% | 3 months | |
| | | $242,185,591 | $195,986,161 | $288,384,996 | 2020 | 3% | 3 months | |
| | Annualized Quantified | | | | | 7% | | |
| | | | | | | 3% | | |
| | Qualitative | | | | | | | |
| Costs | Annualized Monetized $millions/year | $49,456,037 | $15,612,352 | $83,299,721 | 2020 | 7% | 3 months | |
| | | $49,456,037 | $15,612,352 | $83,299,721 | 2020 | 3% | 3 months | |
| | Annualized Quantified | | | | | 7% | | |
| | | | | | | 3% | | |
| | Qualitative | | | | | | | |
| Transfers | Federal Annualized Monetized $millions/year | | | | | 7% | | |
| | | | | | | 3% | | |
| | From/To | From: | | | To: | | | |
| | Other Annualized Monetized $millions/year | | | | | 7% | | |
| | | | | | | 3% | | |
| | From/To | From: | | | To: | | | |
| Effects | State, Local or Tribal Government: | | | | | | | |
| | Small Business: | | | | | | | |
| | Wages: | | | | | | | |
| | Growth: | | | | | | | |

Appx. 14

We have developed a comprehensive Economic Analysis of Impacts that assesses the impacts of the final rule. The full analysis of economic impacts is available in the docket for this final rule (Ref. [insert reference number]). We request comments on this analysis.

## VIII. Alternatives Considered

In making the decision to require vaccination and mask use, ACF considered whether to require other mitigation strategies or combinations of mitigation strategies. The CDC's recently issued guidance on November 10, 2021 reiterates the importance of using multiple prevention strategies in ECE programs.[85] In addition to vaccinations and masks, other strategies noted in this IFC include staying home if sick; handwashing; improving ventilation; screening and diagnostic testing; cleaning and disinfecting; keeping physical distance; and cohorting.

There are two primary reasons that ACF decided to mandate vaccination and mask use. First, Head Start programs have a broad set of program performance standards that already include requirements for infection control, exclusion policies, cleaning, sanitizing and disinfecting. The requirement for staying home when sick is part of § 1302.47(b)(4)(i)(A); hand hygiene (handwashing) is included at § 1302.47(b)(6)(i); cleaning, sanitizing, and disinfecting is at § 1302.47(b)(2)(i); and physical distancing is part of § 1302.47(b)(4)(i)(A), which OHS sees as a strategy for a program's infection control practices). In addition, § 1302.47(b)(1)(iii) states that facilities need to be "free from pollutants, hazards and toxins that are accessible to children and could endanger children's safety," though it is difficult to be overly prescriptive about ventilation given the range of facilities and spaces used by center-based and family child care programs.

Second, as discussed in this IFC, being fully vaccinated for COVID–19 and using a mask are two of the most effective mitigation strategies available to reduce transmission of COVID–19.[86] With this in mind, ACF determined a

federal requirement is necessary. While some agencies and localities have implemented vaccine and masking requirements, many have not. Additionally, vaccine uptake among Head Start staff has not been as robust as hoped for and has been insufficient to protect the health and safety of children and families receiving Head Start services. Combined, these factors leave certain children and families with fewer mitigation strategies in place to protect them than others. It is ACF's responsibility to make sure the environment is as safe as possible for Head Start programs uniformly across all 1,600 grant recipients.

Additionally, although less effective and efficient than vaccination, the CDC has recognized regularly testing unvaccinated individuals for SARS–CoV–2 as a useful tool for identifying asymptomatic and/or pre-symptomatic infected individuals so that they can be isolated,[87] which informed the decision to include in this IFC a testing policy for those granted an exemption. It is also consistent with the CDC's guidance on November 11, 2021, which added screening testing information to its prevention strategies. This guidance notes that in ECE programs, screening testing can help promptly identify and isolate cases, quarantine those who may have been exposed to SARS–CoV–2 and are not fully vaccinated, and identify clusters to reduce the risk to in-person education. The inclusion of a requirement for masking, vaccination and testing, for those staff, contractors and volunteers granted an exemption, ensures the Head Start Program Performance Standards reflect the current science with respect to reducing the spread of SARS–CoV–2 and reducing COVID–19.

ACF also deliberated on the question of whether to require Head Start programs to cover the cost of testing for those granted an exemption or to shift those costs to staff. Head Start staff are not high wage earners, and we recognize it could create hardship for staff granted an exemption to absorb the cost of weekly testing. That said, if programs have many staff who are approved for exemptions, it could be difficult for the program to bear the cost of weekly testing, particularly when their COVID–19 response funds are exhausted. Given these various factors, ACF determined that it is important to make it allowable to use funds at this time, including both COVID–19 response funds and ongoing

program funds, for the purpose of testing but allow programs the discretion to make the decision based on budgetary factors, the number of staff approved for an exemption, incentives or other factors. We invite comment on this decision.

ACF also considered whether to tie the universal masking requirement and the testing requirement to SARS–CoV–2 transmission rates. For example, the requirement could make masking voluntary once community transmission drops below a certain level, consistent with CDC guidance. There are more than 1600 Head Start grant recipients, many of which serve multiple communities, cross state lines or serve an entire state. Transmission rates could be significantly different across service areas. For example, one grant recipient in Michigan covers 21 different counties. It would be burdensome for this program to issue separate guidance across its service area to account for changing transmission levels across those counties. Another grant recipient, Alabama Department of Resources, has a partnership that covers the entire state of Alabama. Again, it would be burdensome for this grant recipient to change its mask guidance for different centers through the state as transmission rates change. ACF values CDC guidance that localities should monitor community transmission in making decisions and has relied on the importance of local health conditions in issuing guidance to Head Start programs. However, in the case of mask use, ACF is prioritizing a clear and transparent policy that is easy for grantees to follow across their service areas. Additionally, children benefit from routine and predictability. ACF determined that the best course of action was not to provide an end date on the universal masking and testing requirement. ACF invites comment on this decision to leave an undetermined end date or whether we should set a finite end date, such as 6 months from the effective date of the rule.

---

[85] Centers for Disease Control and Prevention. "COVID–19 Guidance for Operating Early Care and Education/Child Care Programs." November 10, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/child-care-guidance.html*.

[86] Centers for Disease Control and Prevention. "Science Brief: COVID–19 Vaccines and Vaccination." September 15, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html#:~:text=Evidence%20suggests%20the%20US%20COVID,interrupting%20chains%20of%20transmission*.

[87] Centers for Disease Control and Prevention. "Overview of Testing for SARS–CoV–2 (COVID–19). October 22, 2021. Available at: *https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html*.

Appendix to Section VII of Supplementary Information: Economic Analysis of Impacts

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Administration for Children and Families

### Vaccine and Mask Requirements To Mitigate the Spread of COVID–19 in Head Start Programs

### Final Regulatory Impact Analysis; Final Regulatory Flexibility Analysis; Unfunded Mandates Reform Act Analysis; Office of Head Start, Administration for Children and Families, Department of Health and Human Services

Prepared by

### Office of Science and Data Policy

### Office of the Assistant Secretary for Planning and Evaluation

### Office of the Secretary

### Department of Health and Human Services

### I. Introduction and Summary

*A. Introduction*

We have examined the impacts of this interim final rule under Executive Order 12866, Executive Order 13563, and the Regulatory Flexibility Act (5 U.S.C. 601–612). Executive Orders 12866 and 13563 direct us to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). We believe, and OIRA has determined, that this interim final rule is an economically significant regulatory action as defined by Executive Order 12866. Thus, this rule has been reviewed by the Office of Information and Regulatory Affairs.

The Regulatory Flexibility Act requires us to analyze regulatory options that would minimize any significant impact of a rule on small entities. Because the impacts to small entities attributable to the interim final rule are limited in nature, we certify that the interim final rule will not have a significant economic impact on a substantial number of small entities. These impacts are discussed in detail in the Final Small Entity Analysis.

*B. Summary of Costs and Benefits*

This interim final rule establishes vaccine, record keeping, and mask requirements to mitigate the spread of COVID–19 in Head Start programs. We have evaluated the likely impacts of the interim final rule in comparison to a baseline scenario of no new regulation that incorporates projections of COVID–19 vaccine coverage, cases, deaths, and hospital admissions. We anticipate that the requirement that all Head Start staff get fully vaccinated against COVID–19 will induce a substantial portion of unvaccinated staff to get fully vaccinated. We also estimate that the regulation will induce a similar number, but smaller share, of unvaccinated Head Start volunteers to get fully vaccinated in response to the interim final rule. Some Head Start volunteers are likely also covered by other regulatory actions, which complicates attributing changes in vaccine coverage to any particular regulatory action. We discuss this in greater detail in the Baseline Section and Benefits Section.

The increase in vaccine coverage attributable to the interim final rule will result in substantial health benefits from reductions in COVID–19 mortality and morbidity. We monetize these impacts using a Value per Statistical Life (VSL) for fatal cases, and estimates of the Value per Statistical Case (VSC) that vary by case severity for non-fatal cases. We also predict that reductions in COVID–19 cases among Head Start staff will result in lower absenteeism, including fewer missed days of work for staff infected or recovering from COVID–19 and unvaccinated staff quarantining after a close contact tested positive for COVID–19. We monetize these impacts using a value of time that accounts for time savings for parents and other caregivers for children enrolled at Head Start centers. We estimate a range of total monetized benefits between $200 million and $296 million under a 7% discount rate, and a range between $196 million and $288 million under a 3% discount rate. These monetized benefits cover a time period between the publication date of the interim final rule and March 1, 2022, when our underlying COVID–19 projections end. For our main analysis, we assume that the requirements will be effective for this time horizon, but also consider a scenario in which the requirements are lifted at an earlier date, such as by the COVID–19 Public Health Emergency expiring. The choice of discount rate impacts the benefit estimates through the VSC, which is based on estimates of the Value per Quality-Adjusted Life Year that vary by discount rate.

In addition to the impacts that we monetize in this analysis, we anticipate that the increase in vaccine coverage attributable to the interim final rule will result in indirect health benefits from reduced transmission of SARS–COV–2, the virus that causes COVID–19. These impacts include reductions in secondary infections from Head Start staff and volunteers to other staff and volunteers, children, and families. We anticipate that the masking requirement will also reduce transmission SARS–COV–2 from individuals covered by the requirement. This impact includes a reduction in transmission from children to Head Start teachers, staff, and other children. We also discuss a mechanism and valuation approach for monetizing benefits from Head Start centers reopening. We discuss these impacts in greater detail in the Benefits Section, and note that they are embedded in a quantitative approach in the Net Benefits section.

We have identified several costs that are attributable to the interim final rule. We monetize the costs of vaccination, which incorporates a value of time for staff and volunteers, and the cost of doses and administration; the costs of the masking requirement; the costs of testing unvaccinated staff and volunteers; and the costs of recordkeeping associated with the interim final rule. We also consider a scenario where a share of unvaccinated Head Start staff quit rather than get fully vaccinated. Under this scenario, these costs would include training replacement staff, and the costs to parents and other caregivers for children enrolled at Head Start center resulting from staff vacancies. We estimate a range of costs between $16 million and $83 million, which cover a time period between the publication of the interim final rule and March 1, 2022, which is consistent with the time horizon adopted for our benefits estimates. These cost estimates do not vary with the discount rate. We also discuss potential additional costs of masking and testing associated with Head Start centers reopening as a result of the interim final rule.

Table 1 presents a summary of the monetized impacts attributable to the interim final rule. All dollar estimates are presented in millions of 2020 dollars. We request comments on these benefit and cost estimates.

## Table 1. Summary of Benefits, Costs and Distributional Effects of Interim final rule

| Category | | Primary Estimate | Low Estimate | High Estimate | Units | | | Notes |
|---|---|---|---|---|---|---|---|---|
| | | | | | Year Dollars | Discount Rate | Period Covered | |
| Benefits | Annualized Monetized $millions/year | $247,964,991 | $200,294,622 | $295,635,335 | 2020 | 7% | 3 months | |
| | | $242,185,591 | $195,986,161 | $288,384,996 | 2020 | 3% | 3 months | |
| | Annualized Quantified | | | | | 7% | | |
| | | | | | | 3% | | |
| | Qualitative | | | | | | | |
| Costs | Annualized Monetized $millions/year | $49,456,037 | $15,612,352 | $83,299,721 | 2020 | 7% | 3 months | |
| | | $49,456,037 | $15,612,352 | $83,299,721 | 2020 | 3% | 3 months | |
| | Annualized Quantified | | | | | 7% | | |
| | | | | | | 3% | | |
| | Qualitative | | | | | | | |
| Transfers | Federal Annualized Monetized $millions/year | | | | | 7% | | |
| | | | | | | 3% | | |
| | From/To | From: | | | To: | | | |
| | Other Annualized Monetized $millions/year | | | | | 7% | | |
| | | | | | | 3% | | |
| | From/To | From: | | | To: | | | |
| Effects | State, Local or Tribal Government: Small Business: Wages: Growth: | | | | | | | |

## II. Economic Analysis of Impacts

### A. Background

Since its inception in 1965, Head Start has been a leader in helping children from low-income families reach kindergarten healthy and ready to thrive in school and life. The program was founded on research showing that health and wellbeing are pre-requisites to maximum learning and improved short- and long-term outcomes. In fact, the Office of Head Start identifies health as the foundation of school readiness.

The Head Start Program Performance Standards require children to be up to date on immunizations and their state's Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) schedule. When children are behind on immunizations or other care, Head Start programs are required to ensure they get on a schedule to catch up. Additionally, education, family service, nutrition, and health staff help children learn healthy habits, monitor each child's growth and development, and help parents access needed health care. It is vitally important that enrolled pregnant women and children from birth to 5 can access in person services, especially after so many children spent a year or more away from in-person Head Start services.

It is equally important that the Head Start program itself is safe for all children, families, and staff. For this reason, the Head Start Program Performance Standards specify that the program must ensure staff do not

pose a significant risk of communicable disease that cannot be eliminated or reduced by reasonable accommodation, in accordance with the Americans with Disabilities Act and section 504 of the Rehabilitation Act. Ensuring that children and families can benefit from program services as safely as possible is the Office of Head Start's highest priority.

COVID–19 has resulted in substantial reductions in in-person Head Start services available to children and their families. As described in greater detail in the Baseline Section, a majority of Head Start centers have moved from fully in-person services to a virtual/remote or a hybrid operating status, while other centers remain closed as a result of a COVID–19 case or outbreak in a program. Without the vaccination and masking requirements of this regulatory action, there is a higher likelihood of transmission of SARS–COV–2 at in-person Head Start settings, which would result in more people at greater risk for COVID–19-related morbidity and mortality, including children returning home and exposing family members. This interim final rule is needed to address the health risks from COVID–19 and to increase the likelihood that Head Start centers are able to reopen or return to in-person services safely.

### C. Purpose of the Rule

This regulatory action requires COVID–19 vaccination among all staff employed in Head Start programs, as well as for

volunteers that interact with children. The interim final rule also requires mask wearing for all adults and children aged 2 years and older in certain in-person Head Start settings. This regulation also requires recordkeeping of vaccination status for both volunteers and staff. This regulation is necessary to ensure healthy, safe conditions for in-person early care and education services to children and their families enrolled in Head Start programs nationwide. Being fully vaccinated against COVID–19, combined with wearing a mask, are the safest and most effective ways for Head Start programs to mitigate the spread of COVID–19 among the children and families they serve, as well as among staff and volunteers. This action will help more early childhood centers safely remain open and provide needed services to Head Start children and families.

### D. Baseline Conditions

This section describes the baseline scenario of no new regulatory action from which the incremental changes to these outcomes from the policy options considered are measured. The scope of this economic analysis is limited to the impacts that are attributable to this regulatory action, which covers more than 20,000 Head Start Centers. The requirements of this interim final rule will cover about 273,000 staff, and a share of the 1 million Head Start volunteers who interact with children in certain in-person Head Start settings. It will also impact a share

Appx. 17

of the 864,000 children in certain in-person Head Start settings.

On September 9, 2021, President Biden announced the "Path Out of the Pandemic" COVID–19 Action Plan,[88] which announced the development of a Head Start vaccination requirement, and other elements of a national strategy to combat COVID–19. In our primary analysis, we exclude impacts attributable to other elements of this comprehensive national strategy. For example, the COVID–19 Action Plan announced the development of the Emergency Temporary Standard (ETS) recently issued by the Department of Labor's Occupational Safety and Health Administration (OSHA). Among other provisions, the OSHA ETS requires employers with 100 or more employees to develop, implement, and enforce a mandatory COVID–19 vaccination policy, unless they adopt a policy requiring employees to choose to either be vaccinated or undergo regular COVID–19 testing and wear a face covering. Centers for Medicare & Medicaid Services (CMS) also recently issued an interim final rule with comment period that requires COVID–19 vaccinations for workers in most health care settings that receive Medicare or Medicaid reimbursement.[89] The OSHA action covers over 80 million workers, while the CMS action will apply to approximately 76,000 providers and cover more than 17 million health care workers across the country. Additionally, through Executive Orders 14042, "Ensuring Adequate COVID Safety Protocols for Federal Contractors" [90] and 14043, "Requiring Coronavirus Disease 2019 Vaccination for Federal Employees," [91] and other actions, all federal executive branch employees, including the military, and all federal contractors will be required to be fully vaccinated. In total, the vaccination requirements associated with the Action Plan apply to about 100 million Americans.

These actions (if implemented, despite ongoing litigation) would likely have significant impacts on the measured outcomes described in this baseline scenario. For example, a recent White House report [92] discusses existing vaccination requirements and summarizes several potential impacts of widespread adoption of such requirements, such as those envisioned in the Action Plan:

"[V]accination requirements have repeatedly been shown to increase vaccination rates among workers by 20 to 25 percentage points more, and in some cases by significantly more. More than three out of four (75.5%) working-aged adult Americans are currently in the labor force, so increasing the share of workers who are fully vaccinated by 20 to 25 percentage points could vaccinate an additional 30 to 38 million working-age Americans, cutting the total share of unvaccinated Americans roughly in half. This could have a major effect on case rates, hospitalization rates, and death rates— preventing future waves of the virus from having as significant an effect as occurred during the spread of the Delta variant. At an individual level, unvaccinated people are more than five times as likely to get a symptomatic case of COVID–19 and more than 10 times as likely to be hospitalized or to die from COVID–19."

There are challenges in extrapolating from private-sector or smaller jurisdiction mandates to broader action by the federal government, especially in regards to the effectiveness of the mandates; however, the estimates contained in the White House Report are broadly consistent with DOL's estimate "that approximately 75.3 million (89.4 percent) of covered employees will be vaccinated when the ETS is in full effect." [93] We exclude these potential spill-over impacts in characterizing our baseline, adopting a regulatory scenario that does not account for other elements of the COVID–19 Action Plan.

The scope of the COVID–19 vaccine requirement is limited to staff at Head Start programs and volunteers that interact with children at Head Start programs. To characterize the baseline scenario, we present forecasts that are specific to the 273,000 staff employed or contracted by Head Start programs,[94] and thus volunteers separately. We provide quantitative projections of COVID–19 vaccine coverage, and for each of the COVID–19 outcomes described above. Our forecasts are based on COVID–19 Projections maintained by the Institute for Health Metrics and Evaluation (IHME).[95] IHME summarizes its projections in a Data Release Information Sheet:

"IHME has developed projections for total and daily deaths, daily infections and testing, hospital resource use, and social distancing due to COVID–19 for a number of countries. Forecasts at the subnational level are included for select countries. The projections for total deaths, daily deaths, and daily infections and testing each include a reference scenario: Current projection, which assumes social distancing mandates are re-imposed for 6 weeks whenever daily deaths reach 8 per million (0.8 per 100k). They also include two additional scenarios: Mandates easing, which reflects continued easing of social distancing mandates, and mandates are not re-imposed; and Universal Masks, which reflects 95% mask usage in public in every location. Hospital resource use forecasts are based on the Current projection scenario.

Social distancing forecasts are based on the Mandates easing scenario. These projections are produced with a model that incorporates data on observed COVID–19 deaths, hospitalizations, and cases, information about social distancing and other protective measures, mobility, and other factors. They include uncertainty intervals and are being updated daily with new data. These forecasts were developed in order to provide hospitals, policy makers, and the public with crucial information about how expected need aligns with existing resources, so that cities and countries can best prepare."

We adopt the IHME reference scenario as the source of our baseline forecasts. Since the IHME estimates are "produced with a model that incorporates data on observed COVID–19 deaths, hospitalizations, and cases, information about social distancing and other protective measures, mobility, and other factors," this significantly narrows the wide range of analytic choices that would otherwise be necessary to characterize the baseline scenario. Since the IHME projections cover the entire United States population, we adjust these projections to align with data specific to Head Start. We discuss the specific adjustments in the following narrative.

Vaccine Coverage

A recent study measured "COVID–19 Vaccine Uptake Among U.S. Child Care Providers," with 21,663 respondents, including 1,456 individuals providing services through Head Start or Early Head Start. Among Head Start survey respondents, 73.0% reported receiving a COVID–19 vaccine. We interpret this to mean that respondents had received at least one dose. This interpretation is consistent with the study's comparison to the general adult population. The authors note that "[t]he survey was active between May 26, 2021 and June 23, 2021," and compare the overall findings to vaccine uptake for the U.S. general adult population of 65%.[96] Since Head Start staff are more likely to be vaccinated than the general adult population, our baseline forecast will reflect this difference. Specifically, we extend this point-in-time estimate to the vaccine coverage forecasts by adopting an assumption that Head Start staff are about 12% more likely to be vaccinated than the general adult population,[97] and that this relationship will persist under the time horizon of the baseline scenario of this analysis. As a sample calculation, if the general adult population vaccine coverage rate increases to 67.1%, we would infer a corresponding increase in the Head Start vaccine coverage rate to 74.6%.[98]

The Center for Disease Control and Prevention (CDC) maintains a COVID Data

---

[88] *https://www.whitehouse.gov/covidplan/.*

[89] *https://www.federalregister.gov/documents/ 2021/11/05/2021-23831/medicare-and-medicaid-programs-omnibus-covid-19-health-care-staff-vaccination.*

[90] *https://www.federalregister.gov/documents/ 2021/09/14/2021-19924/ensuring-adequate-covid-safety-protocols-for-federal-contractors.*

[91] *https://www.federalregister.gov/documents/ 2021/09/14/2021-19927/requiring-coronavirus-disease-2019-vaccination-for-federal-employees.*

[92] *https://www.whitehouse.gov/wp-content/ uploads/2021/10/Vaccination-Requirements-Report.pdf.*

[93] *https://www.govinfo.gov/content/pkg/FR-2021- 11-05/pdf/2021-23643.pdf.*

[94] *https://eclkc.ohs.acf.hhs.gov/about-us/article/ head-start-program-facts-fiscal-year-2019.*

[95] Institute for Health Metrics and Evaluation (IHME). COVID–19 Mortality, Infection, Testing, Hospital Resource Use, and Social Distancing Projections. Seattle, United States of America: Institute for Health Metrics and Evaluation (IHME), University of Washington, 2020. *http:// www.healthdata.org/covid/data-downloads.* Accessed on November 10, 2022.

[96] Patel KM, Malik AA, Lee A, et al. (2021). "COVID–19 vaccine uptake among US child care providers." *Pediatrics;* doi: 10.1542/peds.2021– 053813.

[97] $0.73/0.65 = 1.12$. We perform calculations in the model based on the share of individuals who are unvaccinated. The comparable calculation is $1 - [(1 - 0.73)/(1 - 0.65)] = 0.23$, which indicates that Head Start staff are about 23% less likely to be unvaccinated than the general adult population.

[98] $1 - [(1 - 0.671) * (1 - 0.23)] = 0.75.$

<span style="color:red">Appx. 18</span>

Tracker on its website, which includes a summary of COVID–19 vaccinations in the United States. On November 10, 2021, CDC reports that 58.5% of the total U.S. population are fully vaccinated, and reports 70.3% for a subset of the population that are 18 years of age or older (hereafter, "adults").[99] The IHME COVID–19 projections are reported at a population level, and do not contain separate projections that are limited to the adult population. Therefore, generating a baseline forecast of vaccine coverage among Head Start staff from the IHME projections first requires an intermediate step of estimating vaccine coverage for the adult population. We follow the same approach for this adjustment as we discussed to translate adult vaccine coverage estimates to Head

Start staff vaccine coverage estimates. Specifically, we calculate a point-in-time relationship using November 10, 2021 CDC data, and assume that this relationship will persist over the time horizon of the analysis. We assume that adults are about 20.1% more likely to be vaccinated than the total population.[100] Combining the adjustments, a population vaccine coverage rate on November 10, 2021 for the total U.S. population of 58.5% would correspond to a 77.1% Head Start vaccine coverage rate.[101]

We assume that vaccination coverage will continue to increase over time and incorporate this into our baseline. For example, the IHME projections indicate U.S. vaccine coverage of 60.0% on November 18, 2021. This estimate increases to 63.4% on

March 1, 2022, the last date covered in the most recent IHME projections available at the time of the analysis. We assume that vaccine coverage for Head Start will follow a similar trajectory, after accounting for the adjustments described above, and incorporate this into our baseline. Figure 1 presents forecasts of vaccine uptake under the baseline scenario. These forecasts include the unadjusted IHME projections for the total population, our adjustments to project adult vaccination coverage, and adult vaccination coverage specific to Head Start staff. For Head Start, we anticipate the vaccine coverage rate will increase from 77.9% on November 18, 2021 to 79.8% on March 1, 2022 under the baseline scenario of no further regulatory action.



Figure 1: Share Fully Vaccinated (Baseline Scenario)

### COVID–19 Cases, Deaths, and Hospitalizations Among U.S. Adults

The IHME projections include estimates for infections, new hospital admissions, and deaths at a population level. Several adjustments are necessary to convert these population-level estimates to estimates appropriate for the Head Start staff population characteristics. Specifically, we adjust for the age distribution and vaccine coverage rates of Head Start staff. We discuss these adjustments in the narrative contained in the next two sections.

We generate projections of daily cases by multiplying IHME's projections of daily infections with its daily estimates of the infection detection ratio.[102] Over the period covering November 19, 2021 to March 1,

2022, the estimated infection detection ratio varies between 0.4693 and 0.4993, suggesting that, on any particular day, measured COVID–19 cases likely represent between 47% and 49% of the total COVID–19 infections. We assume that this measure is consistent with the CDC's case definition.[103] We acknowledge the importance of these additional infections that are not confirmed cases but focus on the metric of confirmed COVID–19 cases, which is more comparable with other sources of data used in this analysis.

We make several initial adjustments of the IHME projections, which cover the entire U.S. population, to generate forecasts that are limited to the adult population. Using CDC COVID–19 line-level case surveillance data

that cover July 1–September 30, 2021, we estimate that 21% of COVID–19 cases were individuals aged <18 years.[104] We adjust the total population case projections by this percentage to capture only adult cases. We follow the same procedure for mortality: CDC case surveillance data indicate that 0.1% of COVID–19 deaths were individuals aged <18 years. We adjust the total population death projections by this percentage to capture only adult deaths.[105] We follow the same procedure for hospitalizations: CDC COVID–NET data on laboratory-confirmed COVID–19 associated hospitalizations indicate that 1.9% of COVID–19 hospitalizations were

---

[99] *https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total.*

[100] 0.703/0.585 = 1.20. Calculated in the model as 1 − [(1 − 0.703)/(1 − 0.585)] = 0.284, with the interpretation is adults are about 28.4% less likely to be unvaccinated than the total population.

[101] 1 − [(1 − .585) * (1 − .284) * (1 − .23)] = 0.771.

[102] *http://www.healthdata.org/special-analysis/covid-19-estimating-historical-infections-time-series.*

[103] *https://ndc.services.cdc.gov/case-definitions/coronavirus-disease-2019-2021/.*

[104] Calculation based on CDC COVID–19 Line level case surveillance data, HHS Protect. 1,414,206/6,589,127 = 0.21. This share is somewhat

higher in recent months than in earlier periods. For all documented COVID–19 cases through September 30, 2021, the share is 14% (4,461,790/31,537,748 = 0.14). Accessed October 8, 2021.

[105] Calculation based on data extracted from *https://covid.cdc.gov/covid-data-tracker/#demographics.* 637/567,704 = 0.001. Accessed October 3, 2021.

Appx. 19

individuals aged <18 years.[106] We adjust the total population hospital admission projections by this percentage to capture only adult hospital admissions. We note that the hospitalization data provide more limited coverage than data on cases and deaths. This adjustment assumes that the distribution of hospitalizations by age nationally are similar to the underlying data. We believe this assumption is more justified, in the context of this analysis, than not performing an adjustment.

Figure 2 presents the IHME projections of daily infections, cases, and our estimates of adult cases. Figure 3 presents the IHME projection of daily excess deaths and reported deaths. This analysis focuses on the projections of reported deaths, which are more comparable with other data sources used in this analysis. Figure 4 presents the IHME projections of daily new hospital admissions and adjusted estimates for adult cases.

**BILLING CODE 4184–01–P**





---

[106] Calculation based on COVID–19–Associated Hospitalization Surveillance Network, Centers for Disease Control and Prevention. *https://gis.cdc.gov/ grasp/covidnet/COVID19_5.html.* 4,228/220,539 ≈ 0.019. Accessed on October 3, 2021.

Appx. 20



Figure 4: Daily COVID-19 Hospital Admissions (Baseline Scenario)

BILLING CODE 4184–01–C

### COVID–19 Cases, Deaths, and Hospital Admissions Among Head Start Staff

Head Start staff differ from the general U.S. adult population level in several ways. First, the size of the population is much smaller. Using the IHME total population estimate of about 328 million, and a Census estimate of the population share of adults of about 78%,[107] we compute a total of 255 million adults. The 273,000 Head Start staff represent about 0.1% of total adults. As an initial adjustment, we adjust the baseline scenario estimates of daily cases, deaths, and hospital admissions downward to reflect the population under the scope of the interim final rule.

If Head Start staff had a COVID–19 risk profile that matched the adult population, no further adjustments would be necessary; however, as described above, a higher share of Head Start staff are fully vaccinated than the adult population as a whole, and we expect this trend to continue through the time horizon of the baseline scenario of this analysis. To properly account for the risk reductions to Head Start staff attributable to higher vaccination rates, we perform an adjustment based on published estimates of the incidence rate ratios (IRRs) that compare outcomes for unvaccinated and vaccinated persons at a population level, which provide a measure of vaccine effectiveness.[108]

This CDC study reports averaged weekly, age-standardized IRRs for cases, hospitalizations, and deaths, among persons who were not fully vaccinated (simplified

later by describing these as "unvaccinated") compared with those among fully vaccinated persons. The IRRs suggest that vaccinated individuals experienced a significantly reduced risk of infection, hospitalization, and death, including during a period when Delta became the most common variant. For the June 20–July 17, 2021 period, the point estimates of the average weekly IRRs for all ages were 4.6 for cases, 10.4 for hospitalizations, and 11.3 for deaths. For individuals between ages 18 and 49 years, these estimates are 4.5 for cases, 15.2 for hospitalizations, and 17.2 for deaths. For individuals between ages 50 and 64 years, these estimates are 4.9 for cases, 10.9 for hospitalizations, and 17.9 for deaths. For individuals aged ≥65 years, these estimates are 4.6 for cases, 7.6 for hospitalizations, and 9.6 for deaths.

The IRR of 4.6 for cases means that vaccination offers strong protection against COVID–19 and that fully vaccinated people had about a five-fold reduction in risk of infection compared with people not fully vaccinated. These IRR estimates cover adults and are standardized to match the U.S. adult population. They are calculated by dividing average weekly incidence on a per capita basis among unvaccinated individuals by the incidence among fully vaccinated individuals. For example, the study calculates the IRR for cases by dividing 89.1 cases per 100,000 unvaccinated individuals by 19.4 cases per 100,000 vaccinated individuals.[109]

For comparison, the CDC study underlying these estimates also reports higher measurements of the IRR during an earlier time period, covering April 4–June 19, 2021. Specifically, the comparable IRR estimates were 11.1 for cases, 13.3 for hospitalizations, and 16.6 for deaths. The study does not disentangle the changes in the IRR measurements across these time periods that

that are attributable to the highly transmissible Delta variant or other factors, such as the potential decline in vaccine effectiveness as the time since vaccination increases. Although the IRRs are unlikely to remain constant over time, the estimates corresponding to the June 20–July 17, 2021 period represent the best available estimates of the IRR for the time horizon of this analysis.

We also generate IRR estimates specific to the Head Start teacher population. These estimates reflect differences in the age distribution of Head Start teachers rather than observational data on COVID–19 cases, since ACF does not collect this information. To generate these estimates, we pair the age-specific IRR estimates with the corresponding age range for Head Start teachers. ACF data indicates that 10.4% of Head Start teachers are ages 18–29 years; ages 30–39 years, 29.6%; ages 40–49 years, 26.7%; ages 50–59 years, 21.7%; and ages >60 years, 11.6%.[110] For the purposes of this analysis, we assume that half of Head Start teachers 60 years and older are ages 60–64 years, and half are ages >65 years. Table 2 presents the central estimates of the age-standardized IRRs for cases, hospitalizations and deaths for the adult population, as reported in the CDC study, and IRRs for the same outcomes, but standardized for the age profile of Head Start teachers. We later apply these estimates, which reflect the Head Start teacher age

[107] https://www.census.gov/popclock/data_tables.php?component=pyramid.

[108] Scobie HM, Johnson AG, Suthar AB, et al. (2021). "Monitoring Incidence of COVID–19 Cases, Hospitalizations, and Deaths, by Vaccination Status—13 U.S. Jurisdictions, April 4–July 17, 2021." Morbidity and Mortality Weekly Report 2021;70:12841290. DOI: http://dx.doi.org/10.15585/mmwr.mm7037e1.

[109] 89.1/19.4 ≈ 4.6.

[110] Doran, Elizabeth, Natalie Reid, Sara Bernstein, Tutrang Nguyen, Myley Dang, Ann Li, Ashley Kopack Klein, Sharika Rakibullah, Myah Scott, Judy Cannon, Jeff Harrington, Addison Larson, Louisa Tarullo, and Lizabeth Malone (2021). A Portrait of Head Start Classrooms and Programs in Spring 2020: FACES 2019 Descriptive Data Tables and Study Design, OPRE Report #2021–215, Washington, DC: Office of Planning, Research, and Evaluation, Administration for Children and Families, U.S. Department of Health and Human Services. Pending Publication.

profile, for a broader population of Head Start staff.

BILLING CODE 4184–01–P

Table 2. Incidence Rate Ratios for Adults and Head Start Teachers

| Age Range (years) | Share of Teachers | Case IRR | Hospitalization IRR | Death IRR |
|---|---|---|---|---|
| 18-29 | 10.4% | 4.5 | 15.2 | 17.2 |
| 30-39 | 29.6% | 4.5 | 15.2 | 17.2 |
| 40-49 | 26.7% | 4.5 | 15.2 | 17.2 |
| 50-59 | 21.7% | 4.9 | 10.9 | 17.9 |
| 60-64 | 5.8% | 4.9 | 10.9 | 17.9 |
| 65+ | 5.8% | 4.6 | 7.6 | 9.6 |
| Adults | | 4.6 | 10.4 | 11.3 |
| Head Start | | 4.6 | 13.6 | 17.0 |

By adopting the adult age-standardized IRR estimates, we are able to disaggregate COVID–19 cases among unvaccinated individuals from cases among vaccinated individuals. Figure 5 presents these estimates for the adult population.



Figure 5: Daily Cases by Vaccination Status (Baseline Scenario)

We combine estimates of the daily adult cases among unvaccinated individuals and daily estimates of the unvaccinated adult population to generate daily incidence rates among unvaccinated individuals on a per capita basis. We perform similar calculations to generate daily incidence rates among vaccinated individuals on a per capita basis.

Figure 6 reports the daily incidence over time and by vaccination status. These estimates are reported as cases per 100,000 individuals. For the last week in our projections, covering February 23, 2022 to March 1, 2022, the weekly incidence rate for unvaccinated adults is about 446 cases per 100,000, while the weekly incidence rate for vaccinated

adults is about 97 cases per 100,000, which is consistent with a 4.6 IRR. This time period corresponds to an adult vaccination rate of 73.8%, for a total adult weekly incidence rate of about 188 cases per 100,000, and a total weekly adult case count of 480,523.



To generate estimates of cases among Head Start staff, we combine the estimates of vaccine uptake from Figure 1, estimates of the daily incidence by vaccination status, applying the IRR measure specific to Head Start staff, with outcomes scaled by the number of Head Start staff. This approach assumes, for the purpose of developing quantitative projections, that daily exposure to COVID–19 among Head Start staff is largely driven by interactions with the public as a whole and that Head Start staff face similar exposure to these risks as other

adults. If Head Start staff face greater exposure to these risks than the adult population, such as through routine contact with children who are generally not eligible for a COVID–19 vaccination, this will cause our baseline estimates of cases, hospitalizations, and deaths among Head Start staff to be downward biased. This would similarly result in our estimates of the health benefits from increases in vaccine coverage to be downward biased. We project that Head Start staff will experience lower per-capita case counts than the general adult

population due to higher rates of vaccination, and a higher IRR rate consistent with the age profile of Head Start staff compared to all adults. Figure 7 presents daily Head Start cases. For the last week in our projections, covering February 23, 2022 to March 1, 2022, we estimate about 457 total cases, with 246 cases from unvaccinated, and 211 cases from vaccinated Head Start staff. These cases translate to a baseline Head Start weekly incidence rate of about 167 cases per 100,000.

Appx. 23



We generate estimates of the Head Start deaths and hospital admissions using the same approach as we describe for cases. We adopt IRR estimates specific to the Head Start staff population of 17.0 for deaths and an IRR of 13.6 for hospitalizations. These IRRs indicate that the COVID–19 vaccines provide even stronger protection against COVID–19 associated hospitalization and death than against infections. We perform adjustments to the adult incidence rates that are intended to control for deaths and hospital admissions that are concentrated in older age groups than we observe among Head Start staff.

Using CDC surveillance data through October 3, 2021, we observe that, among the 567,704 COVID–19 deaths in the United States for which age data are available, 319,311 deaths are among individuals ≥75 years. While the Head Start workforce includes a number of older individuals, very few are ≥75 years. Head Start data indicate that 11.6% of teachers are age 60 years or

older, compared to the general population share of 22.7%. We anticipate that almost all of the Head Start teachers age 60 years or older are between age 60 and 74 years, and assume this is also true for the broader Head Start staff population. Therefore, we adjust the adult death incidence rate to exclude deaths among individuals ≥75 years. This adjustment reduces the baseline forecast for Head Start deaths downwards by about 56%.[111] Older individuals are also hospitalized at higher rates than younger peers, but this difference is less pronounced than for deaths. Among laboratory-confirmed COVID–19-associated hospitalizations for which age data are available, about 43% are individuals ≥65 years,[112] an age subgroup representing about 16.5% of the total population. Since only 5.8% of Head Start staff are individuals ≥65 years, we reduce the total population baseline forecasts for hospitalizations by about two thirds[113] of 43%, or about 28%,[114] since we expect a

significant share of these hospitalizations to be among individuals older than most Head Start staff.

Figure 8 reports daily Head Start deaths attributable to COVID–19 under the baseline scenario. For the entire period of the baseline scenario, we anticipate fewer than one COVID–19 related death per day among Head Start staff. For the last week in our projections, covering February 23, 2022 to March 1, 2022, we estimate 2.9 weekly deaths out of the total Head Start staff population of 273,000. To provide additional context, this is a weekly incidence rate of 1.06 deaths per 100,000 individuals. The comparable adult weekly incidence rate is about 3.18 deaths per 100,000 individuals. Figure 9 reports daily Head Start hospital admissions. For the last week in our projections, we estimate 29 hospital admissions for a weekly incidence rate of 10.8 per 100,000.

---

[111] 319,311/(567,704 − 637) = 0.56.
[112] 92,960/(220,539 − 4,228) = 0.43.
[113] 0.058/0.165 ≈ 0.35. 1 − 0.35 = 0.65.
[114] 0.43 * 0.65 = 0.28.

Appx. 24





**Head Start Program Operating Status and Staffing**

The Office of Head Start has tracked the operating status of programs since the onset of the pandemic. In March and April of 2020, more than 90% of programs closed all in-person operations. By August of 2020, 21% of programs had reopened for in-person services, 26% remained closed for in-person services due to COVID–19, and the remainder of programs were closed for summer months as regularly scheduled. In December 2020, data show the highest combined percentage (67%) of Head Start centers operating as solely virtual/remote or as hybrid, with an additional 5% of centers closed. Together, these centers account for over 13,500 centers

nationwide. This represents many working parents for whom unpredictable closures and transitions to virtual learning come at a cost, present difficult decisions between employment and child care responsibilities, and major financial impacts on their household.

Most recently, July 2021 data show that 2% of centers were closed due to COVID–19, 14% of centers were operating virtual/remote, and 44% of centers were operating in a hybrid status, which includes programs that are alternating between in-person services, virtual or remote services, or some combination of the two. Only 35% of centers were operating fully in-person. We do not have comparable data for about 5% of

centers.[115] While closures have declined, the majority of Head Start centers are still operating in virtual/remote or a hybrid status. We adopt these estimates as providing a reasonable representation of the operating status of Head Start centers under the baseline scenario of no regulatory action. These estimates are intended to represent a steady state of overall operating status under the baseline scenario rather than indicating that any particular center will remain in its current status without regulatory action. Table 3 presents the in-person days per week

---

[115] We are missing data on about 5% of centers. For the purposes of this analysis, we assign an operating status to these centers in proportion with the centers for which we have complete data.

by center status. For these estimates, we adopt several assumptions: (1) The average number of staff and children served by each center does not vary by center status; (2) that centers in hybrid operating status meet in person 2.5 days per week, on average; and (3) that centers in fully in-person status meet in

person 5.0 days per week, on average. For the purpose of this analysis, we also assume that the centers with unknown operating status are distributed evenly across each center status category. For our estimate of the total number of children, we use "funded enrollment," which refers to the number of

children and pregnant people that are supported by federal Head Start funds in a program at any one time during the program year, but reduce this estimate by 1% to account for pregnant people enrolled in Early Head Start.[116]

### Table 3. In-Person Days Per Week by Center Status

| Center Status | Centers | Staff | Children | In-Person Days Per Week | In-Person Days Per Week | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | **Staff** | **Children** |
| Closed | 414 | 5,453 | 17,264 | 0.0 | 0 | 0 |
| Virtual/Remote | 3,013 | 39,698 | 125,679 | 0.0 | 0 | 0 |
| Hybrid | 9,667 | 127,391 | 403,305 | 2.5 | 318,477 | 1,008,264 |
| Fully In-Person | 7,623 | 100,458 | 318,041 | 5.0 | 502,292 | 1,590,204 |
| Total | 20,717 | 273,000 | 864,289 | N/A | 820,769 | 2,598,467 |

BILLING CODE 4184–01–C

Early care and education providers, including Head Start programs, are currently experiencing significant challenges in recruiting and retaining staff that are attributable to the COVID–19 pandemic and general trends in early care and education labor markets. These ongoing challenges, which represent the baseline scenario and are not attributable to the interim final rule, are difficult to quantify; however, the section on Costs expands on this discussion. This discussion includes a range of estimates to inform how the requirements in this rule could exacerbate this issue for certain programs, which could include programs not being able to fully staff their classrooms.

*E. Impact on Vaccine Coverage*

The key parameter underlying the estimated benefits and costs of the interim final rule is the incremental impact on vaccine uptake, which is the difference between the share of individuals who are unvaccinated under the baseline scenario and who are induced to get fully vaccinated under the interim final rule. As we discuss further in the Benefits and Costs sections, higher rates of incremental vaccine uptake are associated with higher benefit estimates, but also lower overall costs. Given the importance of this parameter and its uncertain nature, we perform an analysis of

several scenarios for vaccine uptake, and present estimates of the benefits and costs of the interim final rule for each scenario. Each of the scenarios adopt the following timing and simplifying assumptions:

(1) For the purposes of this analysis, we adopt November 22, 2021 as the public announcement date of the interim final rule.

(2) The effective date of the vaccination requirement is January 31, 2022. We anticipate that some Head Start staff will wait until January 31, 2022 to receive their final vaccination dose.

(3) We do not attribute any impact on the rate of fully vaccinated Head Start staff until at least December 6, 2021. The earliest impacts would be among Head Start staff who have received one COVID–19 dose as part of a two-dose series at the time of the public announcement of the interim final rule who are induced by the interim final rule to complete their two-dose series. The latest impacts would be among Head Start staff who receive their final dose on January 31, 2022, who will be considered fully vaccinated two weeks later, on February 14, 2022.

(4) The interim final rule describes exemptions from the vaccination requirement. For the purposes of this analysis, we assume that 5% of total Head Start staff will seek and be granted an exemption from the vaccination

requirement.[117] These individuals will not be induced to get fully vaccinated under the interim final rule. This assumption translates to at least 13,650 [118] Head Start staff who will remain unvaccinated under all vaccine coverage scenarios.

Our upper-bound scenario is based on an observation contained in the HHS *Guidelines for Regulatory Impact Analysis*, which notes that "[i]n most cases, the analysis focuses on estimating the incremental compliance costs incurred by the regulated entities, assuming full compliance with the regulation, and government costs."[119] For the purpose of this analysis, we maintain the assumption that 5% of Head Start staff will seek and be granted an exemption, while the remaining 95% will be fully vaccinated. These represent two of the routes that Head Start staff can demonstrate full compliance with the interim final rule. We note that the HHS *Guidelines for Regulatory Impact Analysis* further recommend that "[a]nalysts should consider the uncertainty associated with an assumption of full compliance and provide analysis of alternative assumptions, as appropriate."

Our lower-bound scenario adopts an estimate drawn from an Issue Brief published by the HHS's Office of the Assistant Secretary for Planning and Evaluation (ASPE), which finds that "[a]s of August 2021, approximately 30% of U.S. adults are

---

[116] *https://eclkc.ohs.acf.hhs.gov/sites/default/files/pdf/no-search/hs-program-fact-sheet-2019.pdf.*

[117] This estimate is consistent with an assumption discussed in the Preamble of the Emergency Temporary Standard recently issued by the Department of Labor's Occupational Safety and

Health Administration. "OSHA estimates that some 5% of employees may have a medical contraindication or request an accommodation from the rule's requirements for disability or sincerely held religious belief reasons." *https://www.federalregister.gov/documents/2021/11/05/*

*2021-23643/covid-19-vaccination-and-testing-emergency-temporary-standard.*

[118] 0.05 * 273,000 = 13,650.

[119] *https://aspe.hhs.gov/reports/guidelines-regulatory-impact-analysis.*

Appx. 26

unvaccinated; among these, approximately 44% may be willing to get vaccinated against COVID–19."[120] This published finding is based on an analysis using survey data for Week 33 of the Household Pulse Survey (June 23–July 5, 2021). We perform an identical calculation using Week 39 (September 29–October 11) survey responses, which results in a lower estimate of 33.4%. We assume that 33.4% of the unvaccinated individuals will be induced to get fully vaccinated by this time under the policy scenario. Under this scenario, about 86.6% of Head Start staff are fully vaccinated by February 14, 2022.

These estimates are from a nationally representative survey of households, but are broadly consistent with responses from another survey specific to U.S. child care providers.[121] In this survey, which informs our baseline forecast of Head Start staff vaccine coverage, overall vaccine uptake among U.S. child care providers was 78.2%. Among unvaccinated survey respondents,

including child care providers not affiliated with Head Start, the authors note that "only 5.0% were 'absolutely certain' that they would get vaccinated in the future, 6.9% were 'very likely,' 28.2% were 'somewhat likely.'" These percentages, which sum to 40.1%, suggest substantial room for additional vaccine uptake among child care providers, even though rates significantly exceeded the general population at the time of the survey. As a sample calculation, if 40.1% of the 21.8% of unvaccinated survey respondents get vaccinated, this would increase the overall vaccine uptake among U.S. child care providers from 78.2% to 86.9%. This estimate is slightly above our lower-bound estimate of vaccine coverage for Head Start staff under the interim final rule.

We anticipate that the vaccination requirement will induce more unvaccinated Head Start staff to get fully vaccinated than the lower-bound vaccine-uptake estimates suggest. For our primary scenario, we adopt the midpoint vaccine coverage rate between

our lower- and upper-bound scenarios, and project overall vaccine coverage of 90.8% among Head Start staff by February 14, 2022.

Figure 10 presents our forecasts of the share of Head Start staff who are fully vaccinated under the baseline scenario, and our range of policy scenarios. For our baseline scenario, we estimate the share who are fully vaccinated of 79.8%, or 217,879 fully vaccinated Head Start staff out of 273,000 total staff. We estimate a range of estimates under of our policy scenario between 86.6% and 95.0%, for an incremental vaccine uptake of between 6.8% and 15.2%. For our primary policy scenario, we estimate overall vaccine coverage of 90.8%, for an incremental vaccine uptake of 11.0%. Under the primary scenario, we estimate 247,833 fully vaccinated Head Start staff, and an incremental 29,953 staff fully vaccinated attributable to the interim final rule.

**BILLING CODE 4184–01–P**



**Figure 10: Share of Head Start Fully Vaccinated**

### E. Benefits of the Rule

We follow identical procedures outlined in the baseline section to generate forecasts of COVID–19 cases, deaths, and hospitalizations that are consistent with a range of vaccine coverage estimates under the policy scenarios. We estimate the likely impacts of the interim final rule by calculating the difference between the measurable COVID–

19 outcomes under the policy scenarios against the baseline scenario described in the previous section.

### Reduction in Cases Among Head Start Staff

Figure 11A presents our estimates of the daily COVID–19 cases among Head Start Staff under each scenario. The baseline scenario corresponds to the estimates presented in

Figure 7 in the previous section. Figure 11B presents the cumulative reduction in cases over time that are attributable to the interim final rule under the vaccine coverage scenarios. Through March 1, 2022, the impact of the interim final rule is cumulative COVID–19 case reductions between 510 and 1,198, which correspond to the range of vaccine coverage scenarios.

[120] https://aspe.hhs.gov/reports/unvaccinated-willing-ib.

[121] Patel KM, Malik AA, Lee A, et al. (2021). "COVID–19 vaccine uptake among US child care

providers." *Pediatrics;* doi: 10.1542/peds.2021–053813.

Appx. 27



Reduction in Deaths Among Head Start Staff

Figure 12A presents our estimates of the daily COVID–19 deaths among Head Start Staff under each scenario. The baseline scenario corresponds to the estimates presented in Figure 8 in the previous section. Figure 12B presents the cumulative reduction in deaths over time that are attributable to the interim final rule under the vaccine coverage scenarios. Through March 1, 2022, the impact of the interim final rule is cumulative COVID–19 mortality reductions between 4.8 and 11.2, which correspond to the range of vaccine coverage scenarios.

**68080**  **Federal Register** / Vol. 86, No. 227 / Tuesday, November 30, 2021 / Rules and Regulations





## Reduction in Hospital Admissions Among Head Start Staff

Figure 13A presents our estimates of the daily COVID–19 hospital admissions among Head Start Staff under each scenario. The baseline scenario corresponds to the estimates presented in Figure 9 in the previous section. Figure 13B presents the cumulative reduction in hospital admissions over time that are attributable to the interim final rule under the vaccine coverage scenarios. Through March 1, 2022, the impact of the interim final rule is cumulative COVID–19 hospital admission reductions between 51 and 118, which correspond to the range of vaccine coverage scenarios.



BILLING CODE 4184–01–C

Valuing Health Benefits Among Head Start Staff

Table 3 summarizes several measurable improvements in COVID–19 outcomes for Head Start staff that are attributable to the interim final rule. For the baseline scenario of no new regulatory action, and for each of the vaccine coverage scenarios, we report the share of Head Start staff that are fully vaccinated by March 1, 2022, and the corresponding cumulative cases, deaths, and hospital admissions averted over the time horizon of the analysis.

IHME's daily projections for U.S. hospital admissions include about 35% that result in intensive care unit (ICU) admissions. Head Start hospital admissions estimates are adjusted downwards to reflect a lower rate of hospitalization among younger individuals. We similarly expect the share of hospitalizations that include an ICU admission to be lower for Head Start staff compared to the general adult population; however, we are not aware of an estimate that is directly transferable, and adjust this estimate of the share of hospital admissions that result in an ICU admission down by half.

*We believe this assumption is more justified, in the context of this analysis, than not performing an adjustment.* Assuming about 17.5% of the cumulative hospital admissions result in an ICU admission, we estimate 76 ICU admissions under the baseline scenario, and between 55 and 67 ICU admissions under the interim final rule, depending on the vaccine coverage scenario. Therefore, we measure a reduction of between 9 and 21 ICU admissions under the interim final rule. We follow the same approach to calculate non-ICU hospital admissions for the remaining 82.5% of total hospital admissions.

Table 4. Cumulative Impacts Among Staff by Vaccine Coverage Scenario

| Outcome | Baseline Scenario | Vaccine Coverage Scenario | | | Difference | | |
|---|---|---|---|---|---|---|---|
| | | Low | Primary | High | Low | Primary | High |
| Fully Vaccinated Rate | 79.8% | 86.6% | 90.8% | 95.0% | 6.8% | 11.0% | 15.2% |
| Cases | 7,724 | 7,214 | 6,870 | 6,526 | -510 | -854 | -1,198 |
| Deaths | 37.3 | 32.4 | 29.3 | 26.1 | -4.8 | -8.0 | -11.2 |
| Hospital Admissions | 428 | 377 | 343 | 309 | -51 | -84 | -118 |
| Non-ICU | 352 | 310 | 282 | 255 | -42 | -69 | -97 |
| ICU | 76 | 67 | 61 | 55 | -9 | -15 | -21 |

Valuing risk reductions associated with regulations that address the COVID–19 presents major challenges. We adopt an approach to monetize the cumulative cases, deaths, and hospitalizations averted under the interim final rule by closely following the methodology described in an ASPE report on "Valuing COVID–19 Mortality and Morbidity Risk Reductions in U.S. Department of Health and Human Services Regulatory Impact Analyses."[122] This paper addresses these challenges by summarizing the impacts of COVID–19 on health and longevity, describing the conceptual framework for valuation, investigating some of the available valuation research (as of March, 2021), and discussing the implications.[123] We note that the impact of the virus is rapidly evolving, and new data are continually emerging. We have reviewed the assumptions and evidence contained in this report and conclude that the quantitative estimates remain useful for assessing the impacts of this interim final rule.

Valuing these risk reductions using the estimates contained in the ASPE report requires assumptions that map the non-fatal risk reductions quantified in Table 4 into "mild," "severe," and "critical" case-severity categories. These categories are characterized by common symptoms experienced for an acute phase and post-acute phase. Below, we reference the description of each case-severity category from Table 3.2 Common

Symptoms of Nonfatal COVID–19 Cases by Severity Level of the ASPE Report.[124]

For the acute phase of a critical case, "[i]ndividuals will have early symptoms similar to those of mild and severe disease. Individuals may quickly progress to respiratory failure and may also have septic shock, encephalopathy (brain disease), heart disease or failure, coagulation dysfunction (inability of blood to clot normally), and acute kidney injury. Organ dysfunction can be life-threatening. Individuals with critical disease often receive prolonged mechanical ventilation." For the post-acute phase, "[i]ndividuals are likely to have long-term physical and cognitive impairment similar to other critical illnesses." We initially assign the 9 to 21 averted ICU admissions to the critical case category, but we reduce these estimates by the number of deaths averted. This approach avoids the potential for double counting, since the underlying VSL estimates likely include the willingness-to-pay to avoid some morbidity prior to death.

The ASPE Report discusses these considerations in greater detail, noting that "COVID–19 deaths are generally preceded by about two weeks of symptoms, including fever, shortness of breath, high respiratory rate, and cough. They may also involve being placed on mechanical ventilation in a medically induced coma." This is in contrast to "[t]he studies that underlie the HHS VSL estimates, [which] focus largely on occupational risks that lead to relatively immediate death from injury." Therefore, we explore the sensitivity of the overall results to this approach. Including the value of a critical case to the value of the mortality reductions for these individuals prior to death would increase the total monetized

health benefits by between $8.7 million and $20.3 million, depending on the vaccine coverage scenario. We do not include these estimates in the summary of monetized benefits.

For the acute phase of a severe case, "[i]ndividuals will have early symptoms similar to those of mild disease, such as fever and cough, which may be accompanied by gastrointestinal symptoms, such as diarrhea. The disease continues to progress for over a week. Dyspnea (shortness of breath), high respiratory rate, and/or blood oxygen saturation of ≤93 percent occur. Individuals typically have pneumonia and require supplementary oxygen. Individuals with severe disease should be hospitalized." For the post-acute phase, "[i]ndividuals may have post-acute symptoms, such as cough, shortness of breath, fatigue, and pain." We assign the 42 to 97 non-ICU hospital admissions averted to the severe case category.

For the acute phase of a mild case, "[i]ndividuals will have symptoms of acute upper respiratory tract infection, which may include fever, fatigue, myalgia (muscle aches), cough, and sore throat. Some cases may have digestive symptoms, such as nausea, abdominal pain, and diarrhea. Loss of taste and smell are common symptoms. Individuals may have mild pneumonia (infection of the lungs), and some may have wheezing or dyspnea (shortness of breath) but blood oxygen saturation remains above 93 percent." For the post-acute phase, "[i]ndividuals may have post-acute symptoms, such as cough, shortness of breath, fatigue, and pain." We initially assign the 510 to 1,198 cumulative cases averted to the mild case category, but we reduce these estimates by the corresponding estimates of critical and severe cases to avoid double counting. This yields an estimate of between 460 to 1,080 mild cases averted.

[122] https://aspe.hhs.gov/reports/valuing-covid-19-risk-reductions-hhs-rias.

[123] Additional relevant citations not contained in the report include Viscusi, W.K. Pricing the global health risks of the COVID–19 pandemic. J Risk Uncertain 61, 101–128 (2020). https://doi.org/10.1007/s11166-020-09337-2 and Viscusi W.K. Economic lessons for COVID–19 pandemic policies [published online ahead of print, 2021 Mar 4]. South Econ J. 2021;10.1002/soej.12492. doi:10.1002/soej.12492.

[124] https://aspe.hhs.gov/reports/valuing-covid-19-risk-reductions-hhs-rias. Table 3.2 appears on page 35.

We considered a further adjustment to the estimate range for mild cases to account for the share of cases that are asymptomatic. As noted above, these estimates are derived from projections of *measured COVID–19 cases, rather than total COVID–19 infections.* Over the period of the analysis, these represent slightly less than half of the total projected infections, including those not confirmed through testing. This means that, while our measure of mild cases likely includes some confirmed cases that are asymptomatic, it does not include some symptomatic COVID–19 infections that are not confirmed through testing. The ASPE report also discusses the potential for ''cases that are initially asymptomatic or mildly symptomatic may ultimately lead to impaired health over the longer run,'' suggesting that the VSC estimates for mild cases may underestimate the full long-run health-related quality of life consequences of an infection. Given the multiple sources and potential direction of the bias, we have determined that it is appropriate to not make an explicit adjustment. However, we have incorporated

uncertainty into the main analysis, which includes a range of total cases averted. We also perform a sensitivity analysis for all health benefits monetized in this analysis by applying a range of VSC and VSL estimates.

The mortality and morbidity risk reductions we identify in this regulatory impact analysis accrue to a working-age Head Start staff population. We have taken care to ensure that our estimates of the cumulative cases, deaths, and hospital admissions averted would not be biased upwards due to an overrepresentation of deaths and hospital admissions among individuals older than the typical Head Start staff. Thus, we adopt the population-average VSL and VSC estimates contained in the ASPE report, with a minor adjustment of 0.8% to account for real income growth, since the mortality and morbidity risk reductions occur in 2021 and the underlying estimates are from a 2020 base year.

Table 5A reports the mortality risk reductions attributable to the interim final rule, and the morbidity risk reductions, categorized by case-severity category. We

monetize these impacts using a VSL of about $11.5 million, and VSC estimates that vary by case severity. We multiply the risk reductions by the appropriate VSL or VSC estimate to generate estimates of the value of these risk reductions. We sum these to generate a monetized benefit of the health benefits to Head Start staff attributable to the interim final rule under the vaccine coverage scenarios. Using a 3% discount rate, which affects the underlying value per quality-adjusted life year estimate used in the ASPE report to generate the VSC estimates, we report a total value of risk reduction of between $66.0 million and $154.1 million. Table 5B reports the same estimates using a 7% discount rate. Under this discount rate, we report a total value of risk reduction of between $68.2 million and $159.2 million. All estimates are reported using 2020 dollars. These impacts cover the period between the publication date of the interim final rule and March 1, 2022, the last day reported in the IHME projections.

**BILLING CODE 4184–01–P**

## Table 5A. Value of COVID-19 Risk Reductions Among Staff, 3% Discount Rate

| Risk Reduction | Vaccine Coverage Scenario | | | VSL or VSC | Value of Risk Reduction ($ millions) | | |
|---|---|---|---|---|---|---|---|
| | Low | Primary | High | | Low | Primary | High |
| Mortality Reductions | 4.8 | 8.0 | 11.2 | $11,501,365 | $55.2 | $92.0 | $128.8 |
| Morbidity Reductions | | | | | | | |
| Mild Cases | 459.8 | 769.8 | 1,079.7 | $5,846 | $2.7 | $4.5 | $6.3 |
| Severe Cases | 41.6 | 69.4 | 97.2 | $13,104 | $0.5 | $0.9 | $1.3 |
| Critical Cases | 4.2 | 7.0 | 9.8 | $1,814,400 | $7.6 | $12.7 | $17.7 |
| Total Value of Risk Reductions | | | | | $66.0 | $110.1 | $154.1 |

Table 5B. Value of COVID-19 Risk Reductions Among Staff, 7% Discount Rate

| Risk Reduction | Vaccine Coverage Scenario | | | VSL or VSC | Value of Risk Reduction ($ millions) | | |
|---|---|---|---|---|---|---|---|
| | Low | Primary | High | | Low | Primary | High |
| Mortality Reductions | 4.8 | 8.0 | 11.2 | $11,501,365 | $55.2 | $92.0 | $128.8 |
| Morbidity Reductions | | | | | | | |
|    Mild Cases | 459.8 | 769.8 | 1,079.7 | $9,778 | $4.5 | $7.5 | $10.6 |
|    Severe Cases | 41.6 | 69.4 | 97.2 | $22,176 | $0.9 | $1.5 | $2.2 |
|    Critical Cases | 4.2 | 7.0 | 9.8 | $1,814,400 | $7.6 | $12.7 | $17.7 |
| Total Value of Risk Reductions | | | | | $68.2 | $113.7 | $159.2 |

BILLING CODE 4184–01–C

**Valuing Time Savings for Head Start Families From Reductions in Absenteeism**

We also anticipate reductions in time spent by parents or other caretakers providing needed support for children due to COVID–19 infections among Head Start staff. Several assumptions are necessary to quantify this impact. Since 273,000 Head Start staff provide services for 864,289 children, a 1:3.2 ratio, we assume that each staff missing work due to a COVID–19 infection means that an average of 3.2 children will need support from parents or other caretakers during this absence. We assume that a typical COVID–19 case results in two weeks of missed work, which corresponds to an average of 5 days a week, with 6 hours per day of providing Head Start services. Combining these assumptions, we estimate that cases of COVID–19 among Head Start staff results in an average of 190 hours of support for children that will be provided by a parent or other caretaker. *As discussed earlier, the interim final rule is anticipated to reduce COVID–19 cases among Head Start staff by a cumulative 510 to 1,198 cases over the time horizon of the analysis. Each of these cases averted corresponds to 190 hours of time saved by parents or other caregivers.*

We also anticipate that a COVID–19 case at a center operating fully in-person can result in missed work for other Head Start staff who were in close contact and potentially exposed. This impact is limited to unvaccinated staff, since CDC guidance indicates that "[p]eople who are fully vaccinated do not need to quarantine if they come into close contact with someone diagnosed with COVID–19." [125] We assume that all unvaccinated staff will be considered close contacts and need to quarantine. For simplicity, we adopt 20.2% as the share of Head Start staff unvaccinated on the last day of our baseline projections. We anticipate that Head Start staff at fully in-person centers represent 37% of the total staff cases, which is in line with the share of centers that are operating fully in-person, and that each center has about 13 staff, which is in line with the average number of staff per center. Among these 13 staff, about 3 are unvaccinated. To avoid double counting, we reduce this estimate by 1 to account for the initial COVID–19 case.

To monetize these impacts, we adopt a value of time based on after-tax wages. Our approach matches the default assumptions for valuing changes in time use for individuals undertaking administrative and other tasks on their own time, which are outlined in an ASPE report on "Valuing Time in U.S. Department of Health and Human Services Regulatory Impact Analyses: Conceptual Framework and Best Practices." [126] We start with a measurement of the usual weekly earnings of wage and salary workers of $990.[127] We divide this weekly rate by 40 hours to calculate an hourly pre-tax wage rate of $24.75. We adjust this hourly rate downwards by an effective tax rate of about 17%, resulting in a post-tax hourly wage rate of $20.55. We report a range for the total value of time saved of between $3.3 million and $7.5 million, depending on the vaccine coverage scenario.

[125] https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-contact-tracing/about-quarantine.html.

[126] https://aspe.hhs.gov/reports/valuing-time-us-department-health-human-services-regulatory-impact-analyses-conceptual-framework.

[127] https://www.bls.gov/news.release/pdf/wkyeng.pdf, second quarter of 2021.

Table 6. Value of Time Savings from Reduced Absenteeism

| Impact | Low | Primary | High |
|---|---|---|---|
| Cases Averted | 510 | 854 | 1,198 |
| Cases Averted at In-Person Centers | 188 | 314 | 441 |
| Unvaccinated Close Contacts | 1.7 | 1.7 | 1.7 |
| Additional Quarantines Averted | 312 | 522 | 732 |
| Total Absences Averted | 822 | 1,376 | 1,930 |
| Hours Saved Per Absentee | 190 | 190 | 190 |
| Total Hours Saved | 156,198 | 261,406 | 366,614 |
| Value of Time in Hours | $20.55 | $20.55 | $20.55 |
| Value of Reduced Absenteeism | $3,210,121 | $5,372,304 | $7,534,486 |

As a sensitivity analysis, we augmented the post-tax wage rate to account for non-wage benefits. To capture non-wage benefits, we apply an estimate of the share of compensation from employer supplements to wages and salaries of about 18%, or $4.55 per hour using a pre-tax hourly wage as the base.[128] This results in a value of time of $25.10 per hour. Using this alternative value of time, the value of time savings from reduced absenteeism would range from $3.9 million to $9.2 million, with a primary estimate of $6.6 million.

Benefits Related to Head Start Program Operating Status

We consider it probable that the substantial reduction in COVID–19 cases per day among Head Start staff and volunteers will result in fewer center closures due to COVID–19. For a number of reasons, the interim final rule will not eliminate the risk of COVID–19 among Head Start staff, volunteers, and children. Among these reasons, we do not expect that all staff and volunteers will be fully vaccinated under the interim final rule. We also do not expect many children to be fully vaccinated under either the baseline or any of the vaccine coverage scenarios under the policy for the time horizon of the analysis. As described in our discussion of the baseline scenario, being fully vaccinated is associated with a substantial reduction in the risk of a COVID–19 infection; however, it does not eliminate this risk. Thus, since the interim final rule will not eliminate the risk of COVID–19, we cannot reasonably conclude that all currently closed Head Start

centers will reopen and remain open for the time horizon of the analysis. We do not estimate the reduction in closures anticipated due to the interim final rule; however, we present a calculation of how we would value this impact on a per-center basis.

As discussed in the Baseline section, the most recent data available at the time of this analysis indicates that 393 Head Start centers were closed due to COVID–19, representing about 2% of centers. We also presented an estimate of 17,264 children potentially unable to access Head Start services due to these closures, which is about 42 children per center. We restate the assumption that each child not served by these centers requires 30 hours of support per week from family and caregivers that would normally be provided by Head Start staff and volunteers. This means each center closure results in 1,318 hours of support per week that would typically be provided by Head Start staff. Combined with the approach to valuing time described earlier, this means each center closure averted by the interim final rule could result in time saved for parents and caregivers valued at $25,722 per week. If 1% of total Head Start centers reopen as a result of the interim final rule, we would monetize these benefits at $5.3 million per week.

We also anticipate that the reduction in COVID–19 infection risks among Head Start staff, paired with the mask requirement, will result in a larger share of centers operating fully in person. As discussed in the Baseline section, 3,013 centers are operating in a virtual/remote status and 9,667 centers are operating in a hybrid status. We estimate that 125,679 children are receiving services in centers operating in a virtual/remote status

and that 403,305 children are receiving services in centers operating in a hybrid status. We anticipate that centers transitioning from virtual/remote status to hybrid status, or from hybrid status to fully in-person status could result in time saved for parents and caregivers. We do not provide an estimate, but we expect the value of time saved for these impacts would be less than the value of time saved from reopening closed centers.

The value of time saved for families due to Head Start centers reopening, centers transitioning from virtual/remote status to hybrid status, and centers transitioning from hybrid status to fully in-person status are likely to be substantial. However, these time savings are only part of the anticipated benefits to children and families as the result of fewer closures, and more in-person services. *Head Start* promotes school readiness for children in low-income families by offering educational, nutritional, health, social, and other services. We expect that Head Start centers that are able to reopen or move towards more in-person services under the interim final rule will be more effective in meeting these goals and the needs of Head Start families.

Valuing Health Benefits Among Head Start Volunteers

The interim final rule requires volunteers that interact with children at Head Start programs to be fully vaccinated. In 2019, approximately 1,061,000 adults volunteered in their local Head Start program. Of these, 749,000 were parents of current Head Start

[128] https://fredblog.stlouisfed.org/2018/10/employer-contributions/.

Appx. 34

children.[129] We have less information about these adults than for Head Start staff. For the purposes of providing estimates under the baseline and interim final rule, we make the following assumptions:

1. The baseline vaccine coverage rate for Head Start volunteers matches the overall adult vaccine coverage rate.

2. The mortality and morbidity risks for adult Head Start volunteers match the risks for Head Start staff, except through differences in vaccine coverage.

3. The requirement under the interim final rule will be less salient to unvaccinated volunteers than for staff since it is not linked to employment. We start with the lower-bound incremental vaccine-uptake estimate that, among unvaccinated adults, approximately 33.4% will be induced to get fully vaccinated. As discussed earlier, this estimate is based on an analysis of the Household Pulse Survey. We reduce this estimate by half, which is similar to excluding adults who are "unsure about getting a vaccine," and results in an incremental vaccine-uptake estimate of about 16.7%.

4. The volunteers most likely to be impacted by the policy are the volunteers associated with centers operating under a hybrid or fully in-person status. For volunteers at centers that are closed or in a virtual/remote operating status, we adopt an incremental vaccine-uptake of 0%.

5. We assume that the requirement will be even less salient for volunteers associated with centers operating in hybrid status. For these volunteers, we further reduce the incremental vaccine estimate by half, which is similar to excluding adults who "will probably get a vaccine." This results in an incremental-vaccine uptake of about 8.4%.

6. We do not estimate a second incremental vaccine-uptake scenario, such as the upper-bound full-compliance scenario for staff, since volunteers can comply with the requirement by choosing to not interact with children in an in-person Head Start setting. We also note that some of these volunteers may be induced to get vaccinated due to another COVID–19 vaccination requirement.

7. For the purposes of this analysis, we assume that volunteers are distributed evenly across Head Start centers, regardless of operating status.

Table 7 summarizes these assumptions for the number of volunteers, and the incremental vaccine-uptake assumptions that vary by center operating status.

Table 7. Vaccine Uptake Among Head Start Volunteers by Center Status

| Center Status | Centers | Volunteers | Vaccine-Uptake Assumption |
|---|---|---|---|
| Closed | 414 | 21,193 | 0.0% |
| Virtual/Remote | 3,013 | 154,283 | 0.0% |
| Hybrid | 9,667 | 495,097 | 8.4% |
| Fully In-Person | 7,623 | 390,426 | 16.7% |
| Total | 20,717 | 1,061,000 | N/A |

We follow identical steps for estimating the baseline and policy scenario for Head Start staff, except to substitute the number of volunteers and vaccine-uptake assumptions for each center operating status category. As noted above, we also assume that the baseline vaccination coverage among volunteers matches the adult vaccination coverage, rather than the higher Head Start staff vaccination coverage.

Table 8 summarizes several measurable improvements in COVID–19 outcomes for Head Start volunteers at centers operating fully-in person that we attribute to the interim final rule. We estimate a total increase of 28,163 volunteers who are fully vaccinated, or about 2.7% of the total volunteers. To put this into the context of other vaccine requirements and to continue the discussion of attribution of impacts, we consider the Head Start volunteers under the baseline scenario who are also covered by the DOL ETS as employees of covered employers. DOL recently estimated 27.0% of covered employees would be vaccinated under the ETS, not including the 62.4% of covered employees vaccinated in the baseline, pre-ETS.[130] If every Head Start volunteer was covered by this interim final rule, the DOL ETS as an employee of a covered employer, and no other vaccine requirements, our 2.6% estimate would attribute about 10% of the incremental vaccine coverage to this interim final rule and about 90% to the DOL ETS. As a sensitivity analysis on the appropriate attribution of impacts, we also report the net benefits of the interim final rule, excluding all benefits and costs associated with volunteers. These estimates are identical to the policy alternative of not including volunteers in the scope of the policy, which appears in Table 26.

For the baseline scenario of no new regulatory action, and for interim final rule scenario, we report the share of these volunteers that are fully vaccinated by March 1, 2022, and the corresponding cumulative cases, deaths, and hospital admissions averted over the time horizon of the analysis. Table 9 presents the same estimates for Head Start volunteers associated with centers in hybrid operating status. Table 10 presents the same estimates that combine Head Start volunteers associated with centers in virtual/remote and closed operating statuses. Table 11 presents the estimates for all Head Start volunteers.

**BILLING CODE 4184–01–P**

---

[129] https://eclkc.ohs.acf.hhs.gov/sites/default/files/pdf/no-search/hs-program-fact-sheet-2019.pdf.

[130] https://www.govinfo.gov/content/pkg/FR-2021-11-05/pdf/2021-23643.pdf. Table IV.B.8.

Table 8. Impacts Among Volunteers at In-Person Centers

| Outcome | Baseline | Interim Final Rule | Difference |
|---|---|---|---|
| Fully Vaccinated Rate | 73.8% | 78.2% | 4.4% |
| Cumulative Cases | 10,368 | 10,035 | -333 |
| Cumulative Deaths | 130.1 | 122.9 | -7.2 |
| Cumulative Hospital Admissions | | | |
| Non-ICU | 731 | 693 | -37 |
| ICU | 158 | 150 | -8 |
| Total | 888 | 843 | -45 |

Table 9. Impacts Among Volunteers at Hybrid Centers

| Outcome | Baseline | Interim Final Rule | Difference |
|---|---|---|---|
| Fully Vaccinated Rate | 73.8% | 76.0% | 2.2% |
| Cumulative Cases | 13,421 | 13,273 | -148 |
| Cumulative Deaths | 170.6 | 167.2 | -3.4 |
| Cumulative Hospital Admissions | | | |
| Non-ICU | 957 | 940 | -17 |
| ICU | 206 | 203 | -4 |
| Total | 1,163 | 1,142 | -21 |

Table 10. Impacts Among Volunteers at Virtual/Remote and Closed Centers

| Outcome | Baseline | Interim Final Rule | Difference |
|---|---|---|---|
| Fully Vaccinated Rate | 73.8% | 73.8% | 0.0% |
| Cumulative Cases | 5,599 | 5,599 | 0 |
| Cumulative Deaths | 71.9 | 71.9 | 0 |
| Cumulative Hospital Admissions | | | |
| Non-ICU | 400 | 400 | 0 |
| ICU | 86 | 86 | 0 |
| Total | 486 | 486 | 0 |

Table 11. Impacts Among All Head Start Volunteers

| Outcome | Baseline | Interim Final Rule | Difference |
|---|---|---|---|
| Cumulative Cases | 29,388 | 28,907 | -481 |
| Cumulative Deaths | 372.6 | 362.1 | -10.6 |
| Cumulative Hospital Admissions | | | |
| Non-ICU | 2,087 | 2,033 | -55 |
| ICU | 450 | 438 | -12 |
| Total | 2,538 | 2,471 | -66 |

We value the mortality and morbidity risk reductions experienced by Head Start volunteers following an identical methodology described above for Head Start staff. This includes the process for categorizing morbidity reductions by case-severity category, and the adjustments to prevent double counting. Table 12 presents the total value of COVID–19 mortality and morbidity risk reductions for Head Start volunteers across all centers, for a 3% discount rate, *which affects the value per quality-adjusted life year estimates underlying the VSC estimates. Table 13 presents the same estimates for a 7% discount rate.*

Table 12. Value of COVID-19 Risk Reductions Among Volunteers, 3% Discount Rate

| Risk Reduction | Impact | VSL or VSC (3%) | Value of Risk Reduction |
|---|---|---|---|
| Mortality Reductions | 10.6 | $11,501,365 | $121,440,804 |
| Morbidity Reductions | | | |
|     Mild Cases | 414 | $5,846 | $2,422,527 |
|     Severe Cases) | 54.5 | $13,104 | $714,294 |
|     Critical Cases | 1.2 | $1,814,400 | $2,176,442 |
| Total Value of Risk Reductions | | | $126,754,066 |

Table 13. Value of COVID-19 Risk Reductions Among Volunteers, 7% Discount Rate

| Risk Reduction | Impact | VSL or VSC (7%) | Value of Risk Reduction |
|---|---|---|---|
| Mortality Reductions | 10.6 | $11,501,365 | $121,440,804 |
| Morbidity Reductions | | | |
|     Mild Cases | 414 | $9,778 | $4,051,467 |
|     Severe Cases | 54.5 | $22,176 | $1,208,805 |
|     Critical Cases | 1.2 | $1,814,400 | $2,176,442 |
| Total Value of Risk Reductions | | | $128,877,518 |

Summary of Monetized Benefits

We identify several sources of monetized benefits that are attributable to the interim final rule. Table 14 reports the monetized benefits from mortality and morbidity risk reductions to Head Start staff, mortality and morbidity risk reductions to Head Start volunteers, and time savings for parents and caregivers. These estimates cover both Head Start staff vaccination coverage scenarios, and correspond to VSC estimates using a 3% discount rate. All estimates cover the time period between the publication of the interim final rule and March 1, 2022, and are reported in 2020 dollars. Table 15 reports the same estimates using a 7% discount rate.

Table 14. Monetized Benefits Attributable to the Interim Final Rule, 3% Discount Rate

| Value of Impact | Low | Primary | High |
|---|---|---|---|
| COVID-19 Risk Reductions, Staff | $66,021,974 | $110,059,221 | $154,096,444 |
| COVID-19 Risk Reductions, Volunteers | $126,754,066 | $126,754,066 | $126,754,066 |
| Absenteeism Reductions | $3,210,121 | $5,372,304 | $7,534,486 |
| Total Monetized Benefits | $195,986,161 | $242,185,591 | $288,384,996 |

Table 15. Monetized Benefits Attributable to the Interim Final Rule, 7% Discount Rate

| Value of Impact | Low | Primary | High |
|---|---|---|---|
| COVID-19 Risk Reductions, Staff | $68,206,983 | $113,715,169 | $159,223,331 |
| COVID-19 Risk Reductions, Volunteers | $128,877,518 | $128,877,518 | $128,877,518 |
| Absenteeism Reductions | $3,210,121 | $5,372,304 | $7,534,486 |
| Total Monetized Benefits | $200,294,622 | $247,964,991 | $295,635,335 |

BILLING CODE 4184–01–C

In addition to the impacts that we monetize in this analysis, we anticipate that the increase in vaccine coverage attributable to the interim final rule will result in indirect health benefits from reduced transmission of SARS–COV–2. These impacts include reductions in secondary infections from vaccinated Head Start staff and volunteers to other staff and volunteers, children, and families. We anticipate that the masking requirement will also reduce transmission at in-person Head Start settings from individuals covered by the requirement. This impact includes a reduction in COVID–19 transmission from children to Head Start teachers, staff, and other children. The reductions in transmission attributable to the interim final rule will result in additional, unquantified reductions in mortality and morbidity risks to Head Start children and families, and to the general public.

We request comment on potential quantitative estimation of benefits for Head Start staff who receive exemptions (associated with ancillary provisions and reduced exposure when colleagues are vaccinated) using a study by Chen, Glymour, et al. (2021).[131] In this paper, estimates of excess mortality among 18- to 65-year-olds in

California during the eight months from March to October, 2020, are summarized across various industry categories, including teacher assistants, for whom the estimated ratio is 1.28.[132] The "unemployed or missing [employment data]" category has an excess mortality risk ratio of 1.23—which may yield a reasonable estimate of the new risk level in cases of rule-induced staff turnover. During most of the eight months covered by the Chen et al. study, California imposed stay-at-home requirements, but these policies were relaxed somewhat during the early and mid-summer, the result being an increase in COVID–19 mortality. Visual inspection of Chen et al.'s Figure 2 allows for estimation analogous to that described above, using the excess mortality risk ratios for August 1, and yielding a result that the scope for workplace safety improvements is lesser in the context of relatively free movement and activity, as compared with a situation of broader non-workplace mitigation measures. In other words, whatever the overall effectiveness of Cal/OSHA's workplace health and safety requirements—presumably similar to this IFR's ancillary provisions—it should be

reduced substantially when extrapolated to a context without widespread stay-at-home policies. An additional tendency toward overstatement in the potential estimation approach exists because it does not incorporate a netting off of the impacts of other jurisdictions'—including California's own—mitigation activities. (In other words, it would be necessary to use the correct baseline before attributing benefits to this IFR.) By contrast, this suggested quantification method has a tendency toward underestimation in that it does not account for reduction in exposure due to exemption-receiving Head Start staff being surrounded by colleagues who are more widely vaccinated. In addition to seeking comment on how to address these challenges in a potential quantitative estimate of benefits for exemption recipients, we request feedback on the potential to use literature such as Chen, Glymour et al. to proxy the new risk level for non-turnover cases.

*F. Costs of the Rule*

The most significant cost of the interim final rule stems from the potential for Head Start staff to decline COVID-19 vaccination. This would result in a number of potential consequences, each of which is likely to represent a substantial social cost. Table 16 presents the number of Head Start staff anticipated to be fully vaccinated under the vaccine coverage scenarios, under a shared assumption that 5% of Head Start staff will seek and receive an exemption from the vaccination requirement. Under the lower-bound vaccine coverage scenario, as many as

[131] Chen, Yea-Hung, Maria Glymour, Alicia Riley, John Balmes, Kate Duchowny, Robert Harrison, Ellicott Matthay, Kirsten Bibbins-Domingo. "Excess mortality associated with the COVID–19 pandemic among Californians 18–65 years of age, by occupational sector and occupation: March through October 2020." medRxiv 2021.01.21.21250266; doi: *https://doi.org/10.1101/2021.01.21.21250266*.

[132] The list of occupations with specific estimates differs, omitting teacher assistants, in a subsequent version of the paper. Chen, Yea-Hung, Maria Glymour, Alicia Riley, John Balmes, Kate Duchowny, Robert Harrison, Ellicott Matthay, Kirsten Bibbins-Domingo. "Excess mortality associated with the COVID–19 pandemic among Californians 18–65 years of age, by occupational sector and occupation: March through December 2020." *PLoS One*, June 4, 2021 *https://doi.org/10.1371/journal.pone.0252454*.

23,035 Head Start staff will not meet the vaccination requirement and also not receive an exemption. The upper-bound vaccine coverage scenario reflects all Head Start staff

that do not meet the vaccination requirement receiving an exemption. Under our primary scenario, 11,517 Head Start Staff will not meet the vaccination requirement and also

not receive an exemption from the vaccination requirement.

### Table 16. Head Start Staff COVID-19 Vaccine Requirement Response Possibilities

| Outcome Under Policy Scenario | Low | Primary | High |
|---|---|---|---|
| Fully Vaccinated Rate | 86.6% | 90.8% | 95.0% |
| Exemption Rate | 5.0% | 5.0% | 5.0% |
| Compliance Rate, Pre-Turnover | 91.6% | 95.8% | 100.0% |
| Head Start Staff in Compliance, Pre-Turnover | 249,965 | 261,483 | 273,000 |
| Potential Head Start Staff Turnover | 23,035 | 11,517 | 0 |

We anticipate some staff employed by Head Start programs will choose to leave the program due to vaccination and mask mandates. There are already significant challenges in recruiting and retaining staff among early care and education providers including Head Start and the requirements in this rule could exacerbate this issue for certain programs, resulting in programs not being able to fully staff their classrooms. This could also result in costs to programs to recruit new qualified staff to replace those staff that leave the program and may result in interruption of services for children and families.

Costs Associated With Head Start Staff Vacancies

In this section, we describe our approach for valuing the costs associated with Head Start staff vacancies associated with quitters that are attributable to the interim final rule. We follow many of the assumptions contained in the Benefits section that outline the value of time savings for parents and caretakers of children attributable to the

interim final rule through vaccine coverage and reduced COVID–19 cases among Head Start teachers. For each COVID–19 case averted, parents and caretakers experienced 190 hours of time savings, assuming each COVID–19 case lasts two weeks. To value the countervailing risk of staff vacancies, we adopt an assumption that each Head Start staff that quits in response to the interim final rule will leave a vacancy that lasts an average of two weeks. This assumption is intended to reflect an average duration among vacancies that are filled faster and vacancies that are filled slower than two weeks. It is also intended to be inclusive of any efforts by Head Start centers that anticipate resignations on the effective date of the policy to identify replacements when the vaccine requirement takes effect. We also anticipate that Head Start centers will be able to prepare in advance for these vacancies and reduce the impact on families through increased caseloads per staff. This preparation would not be possible for absenteeism due to a COVID–19 case or outbreak. We reduce the average number of

families affected by half, which results in an overall estimate of about 95 hours of time costs for parents and caretakers of children receiving Head Start services per vacancy from resignations. We are not aware of another estimate of how long a typical vacancy of this nature lasts; however, given that we anticipate this to be a significant cost attributable to the interim final rule, we have determined that these assumptions are more justified, in the context of this analysis, than not monetizing this cost. We acknowledge significant uncertainty in several of these estimates and discuss the nature of and implications of each source.

We also include a cost of training the replacement Head Start staff. We assume that new-employee training takes an average of 40 hours, and we adopt a value of time based on the median wage rage of preschool and kindergarten teachers of $14.36 per hour.[133] We double this wage to generate a fully loaded wage that accounts for benefits and other indirect costs. Table 17 reports the costs of vacancies and costs of training under the vaccine coverage scenarios.

---

[133] https://www.bls.gov/oes/current/naics4_624400.htm.

Table 17. Costs of Staff Vacancies

| Impact | Low | Primary | High |
|---|---|---|---|
| Vacancies | 23,035 | 11,517 | 0 |
| Hours per Vacancy | 95 | 95 | 95 |
| Total Hours | 2,187,747 | 1,093,873 | 0 |
| Value of Time | $20.55 | $20.55 | $20.55 |
| Subtotal, Vacancy Costs | $44,961,638 | $22,480,819 | $0 |
| Hours Training | | | |
| Replacements | 40 | 40 | 40 |
| Value of Time | $28.72 | $28.72 | $28.72 |
| Subtotal, Training Costs | $26,462,078 | $13,231,039 | $0 |
| Total | $71,423,717 | $35,711,858 | $0 |

Table 17 presents cost estimates that vary by the vaccine coverage scenarios, which directly impact the number of vacancies that we attribute to the interim final rule. For these calculations, we adopt a common estimate of two weeks for Head Start centers to fill these vacancies. As noted in the baseline section, early care and education providers are currently experiencing significant challenges in recruiting and retaining staff that are attributable to the COVID–19 pandemic and general trends in early care and education labor markets. The general trends in early care and education labor markets suggest that filling these vacancies could take longer than two weeks. However, the interim final rule directly addresses the risk of SARS–COV–2 transmission at Head Start centers. The vaccination and masking requirements might lead to new hiring of employees who would not feel safe working in these environments absent these rules. This effect would reduce the average time to fill each vacancy. Alternatively, this could represent an additional source of benefits not captured in the main analysis elsewhere.

These cost estimates reflect one approach to account for the cost of staff vacancies. Other approaches may be reasonable. For example, in the context of its interim final rule with comment period that requires COVID–19 vaccinations for workers in most

health care settings that receive Medicare and Medicaid reimbursement, CMS calculates the likely magnitude of hiring costs by applying an analysis of the direct hiring costs for workers in the long-term care sector.[134] After updating for inflation, CMS reports a direct hiring cost of $4,000 per worker.[135] The total cost estimates in Table 17 amount to $3,100 per worker. Substituting CMS's per-worker estimate would result in a range of total cost estimates from $0 to $92 million, with a central estimate of $46 million.

The cost of staff vacancies estimates also reflect an estimate of the value of time of $20.55 per hour, which we also use to estimate the benefits from reduced absenteeism. In a sensitivity analysis for those benefits, we applied a higher value of time of $25.10. Performing an identical sensitivity analysis for these costs yield a higher central estimate of vacancy costs of $27.5 million, which is a $5.0 million increase compared to the estimate in Table 17. This value of time would also yield a higher estimate of vacancy costs under the low-coverage scenario of $54.9 million, which is a $10.0 million increase compared to the estimate in Table 17.

In addition to the costs we identify and monetize related to staff vacancies, we also note the potential costs associated with reduced support from volunteers. However, as with staff, it is also conceivable that some

individuals who do not currently feel safe volunteering at in-person Head Start settings will feel comfortable volunteering under the interim final rule. On net, this could increase the support Head Start centers receive from volunteers.

Cost to Head Start Staff and Volunteers to Get Fully Vaccinated

We identify a second cost related to Head Start staff and volunteers getting fully vaccinated. We adopt an estimate of 2 hours as the time necessary to receive one COVID–19 vaccine dose, and adopt a simplifying assumption that each individual induced to get fully vaccinated under the interim final rule will receive two vaccine doses. This estimate is intended to be inclusive of scheduling time; commuting time; time receiving a vaccine dose; waiting time, including after receiving a vaccine dose to watch for any reactions; and recovery time. We value the time spent to get fully vaccinated using a $20.55 per hour value of time, described above, for a total value of time per person of about $82. We also include costs associated with the vaccine doses and costs of administration. Using an estimated $20 cost per dose of vaccine, $20 as the cost per vaccine administration, we compute the cost of vaccine doses and administration of $80 per person. Table 18 reports the total costs related to vaccination.

[134] Dorie Seavey, ''The Cost of Frontline Turnover in Long-Term Care,'' Better Jobs Better Care Report, Washington, DC: Institute for the Future of Aging

Services, American Association of Homes and Services for the Aging. 2004

[135] *https://www.govinfo.gov/content/pkg/FR-2021-11-05/pdf/2021-23831.pdf.*

Table 18. Costs Related to Vaccination

| Cost Element | Low | Primary | High |
|---|---|---|---|
| Additional Staff Vaccinated | 18,436 | 29,953 | 41,470 |
| Additional Volunteers Vaccinated | 28,163 | 28,163 | 28,163 |
| Hours to Receive One Dose | 2 | 2 | 2 |
| Doses per Person | 2 | 2 | 2 |
| Value of Time in Hours | $20.55 | $20.55 | $20.55 |
| Value of Time per Person | $82 | $82 | $82 |
| Subtotal, Value of Time for Staff | $1,515,532 | $2,462,324 | $3,409,116 |
| Subtotal, Value of Time for Volunteers | $2,315,203 | $2,315,203 | $2,315,203 |
| Cost per Dose of Vaccine | $20 | $20 | $20 |
| Cost per Vaccine Administration | $20 | $20 | $20 |
| Doses per Person | 2 | 2 | 2 |
| Cost of Vaccine Doses and Administration per Person | $80 | $80 | $80 |
| Subtotal, Vaccine Doses and Administration | $3,727,923 | $4,649,305 | $5,570,686 |
| Total Costs of Vaccination | $7,558,658 | $9,426,831 | $11,295,005 |

The costs related to vaccination reflect an estimate of the value of time, $20.55 per hour, used elsewhere in this analysis. In other cases where this value of time is applied, we have also performed a sensitivity analysis that applies a higher value of time of $25.10. Performing an identical sensitivity analysis for these costs yields a value of time per person to get vaccinated of about $100. This higher value of time results in total costs of between $8.4 million and $12.6 million, with a central estimate of $10.5 million, which is an increase of between $0.8 million and $1.3 million. Regardless of the chosen value of time, the costs in Table 18 may be underestimated, since they do not include costs associated with adverse events reported after COVID–19 vaccination.[136]

**Cost of Masking**

This regulation also requires mask wearing for all adults and children age 2 and older in certain in-person Head Start settings. As

an intermediate step, we estimate the total in-person days per week for staff, children, and volunteers. We replicate the in-person days per week for staff and children using the estimates reported in Table 3, but we reduce the estimate for children by 14% to account for children younger than age 2 that are not subject to the requirement. To estimate the in-person days per week for volunteers, we assume they are evenly distributed across center by operating status, such that 390,426 are associated with fully in-person centers, and 495,0975 are associated with centers in hybrid operating status. For purposes of this calculation, we assume that volunteers associated with in-person centers will volunteer in person an average of once per week, and that volunteers at centers in hybrid operating status will volunteer in person an average of once every other week. We expect that the 175,476 combined volunteers associated with closed or virtual/remote centers will not volunteer in-person.

These assumptions and data indicate that Head Start volunteers will average 637,975 in-person days per week.

We assume that each staff, child, and volunteer will use one mask per day, and adopt an estimate of the cost per surgical mask of $0.14.[137] We anticipate that staff, children, and volunteers will combine for a total of 3,693,426 masks per week, with the total weekly cost of these masks of $517,080. We anticipate that a substantial portion of these individuals would wear masks when in-person at Head Start programs without this requirement, and adopt an estimate of 25% for the share of these costs that are attributable to the interim final rule. Finally, we calculate that the masking requirement will be effective for the entire time horizon of this analysis. Table 19 reports the costs of masking that are attributable to the interim final rule.

**BILLING CODE 4184–01–P**

---

[136] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html

[137] https://www.regulations.gov/document/OSHA-2020-0004-1033, Table VI.B.14.

Appx. 42

Table 19. Costs of Masking Attributable to the Interim Final Rule

| Cost Element | Estimate |
|---|---|
| In-Person Days per Week, Staff | 820,769 |
| In-Person Days per Week, Children | 2,598,467 |
| In Person Days per Week, Children (2+) | 2,234,682 |
| In Person Days per Week, Volunteers | 637,975 |
| Masks per Person per Day | 1 |
| Total Masks per Week | 3,693,426 |
| Cost per Mask | $0.14 |
| Total Cost of Masks per Week | $517,080 |
| Attributable Share | 25% |
| Weekly Attributable Costs | $129,270 |
| Weeks Effective | 13 |
| Total Masking Costs | $1,680,509 |

Cost of Testing

We also identified a cost of testing Head Start staff and volunteers that receive an exemption from the vaccine requirement. Across all scenarios, we anticipate that 5% of Head Start Staff will receive an exemption, so 13,650 staff will be unvaccinated under the interim final rule. We further assume that 5% of Head Start volunteers, or about 53,050, will also receive an exemption. We assume that only staff and volunteers associated with Head Start centers that are fully in-person or in hybrid status will be tested. We assume that Head Start staff and volunteers will be tested weekly, and that this requirement will be effective for about 4 weeks of the time horizon of the analysis, from January 31, to March 1, 2022. This effective period is shorter than for the masking provision, which is effective immediately. We calculate that about 230,627 tests will be performed, and adopt an estimate of $10 per test. Table 20 presents these estimates and the total cost estimate of about $2.3 million. For the purpose of this analysis, we assume that the costs of testing are borne by the Head Start centers.

Table 20. Cost of Testing Unvaccinated Staff

| Cost Element | Estimate |
|---|---|
| Exempted Staff | 13,650 |
| Exempted Volunteers | 53,050 |
| Total Exemptions | 66,700 |
| Share of Exemptions at In-Person/Hybrid Centers | 83% |
| Head Start Staff and Volunteers Requiring Testing | 55,669 |
| Tests Per Week | 1 |
| Weeks Effective | 4 |
| Total Tests | 230,627 |
| Cost Per Test | $10 |
| Total Cost of Testing | $2,306,273 |

Recordkeeping Costs

We anticipate that the interim final rule will result in recordkeeping activities. The Paperwork Reduction Act analysis estimates the total burden of 6,670 hours. To monetize this impact, we apply an estimate of the hourly wage of Education and Childcare Administrators, Preschool and Daycare, for individuals working in the Child Day Care Services industry. According to the U.S. Bureau of Labor Statistics, the hourly mean wage for these individuals is $24.78 per hour.[138] We adjust this hourly rate to account for benefits and other indirect costs by multiplying by two, for a fully loaded hourly wage rate of $49.56. Multiplying the fully loaded wage rate by the number of hours results in a total cost of $330,565.20.

Total Costs

We identify several sources of costs that are attributable to the interim final rule.

Table 21 reports the monetized costs related to staff vacancies, costs of vaccination, costs of masking, costs of testing, and costs of recordkeeping. These estimates cover the Head Start staff vaccination coverage scenarios, and do not differ by discount rate. All estimates cover the same time horizon and are reported in 2020 dollars.

---

[138] *https://www.bls.gov/oes/current/ oes119031.htm.* Wage rage for job code 11–9031.

Table 21. Monetized Costs Attributable to the Interim Final Rule

| Value of Impact | Low | Primary | High |
|---|---|---|---|
| Staff Vacancies | $44,961,638 | $22,480,819 | $0 |
| Training | $26,462,078 | $13,231,039 | $0 |
| Vaccination | $7,558,658 | $9,426,831 | $11,295,005 |
| Masking | $1,680,509 | $1,680,509 | $1,680,509 |
| Testing | $2,306,273 | $2,306,273 | $2,306,273 |
| Recordkeeping | $330,565 | $330,565 | $330,565 |
| Total Monetized Costs | $83,299,721 | $49,456,037 | $15,612,352 |

BILLING CODE 4184–01–C

*We consider it probable that the substantial reduction in COVID–19 cases per day among Head Start staff will result in fewer center closures due to COVID–19. We do not estimate the reduction in closures anticipated due to the interim final rule; however, we presented a calculation of how we would value the benefit of reopening on a per-center basis. For comparison, we also estimate the additional cost of masking, and additional cost of testing exempted staff and volunteers for centers that reopen.*

If 1% of total Head Start centers reopen as a result of the interim final rule, this would result in 207 centers reopening. For the purposes of this cost analysis, we calculate the number of masks required under for a center operating fully in-person. This would result in 2,730 staff, 8,643 children, 10,610 volunteers wearing masks at in-person Head Start settings. They would require 67,474 masks on a weekly basis, 16,869 of which we attribute to the interim final rule. The total cost of these additional masks would be $2,362 per week. For testing, the same number of centers reopening would result in 667 additional exempted staff and volunteers requiring testing every week, which corresponds to $6,670 in testing costs per week. These costs sum to $9,031 per week. To continue the comparison, if 1% of closed centers reopen, we would monetize the benefits in time saved for parents and caregivers at $5.3 million per week. This comparison only includes impacts we are able to monetize, and does not account for changes in COVID–19 risks associated with reopening. As discussed elsewhere, these risks will be reduced as a result of the vaccination and masking requirements.

*G. Net Benefits*

We have analyzed the major impacts of the interim final rule under several scenarios of incremental vaccine-uptake among Head Start staff that are unvaccinated in the baseline scenario of no new regulatory action. In previous sections, we have indicated that the benefits are higher and that the costs are lower under the high vaccine coverage scenario than the low vaccine coverage scenario. In this section, we demonstrate the magnitudes. Table 22 presents the total costs, benefits, and net benefits that are attributable to the interim final rule under a 3% discount rate. Table 23 presents these same estimates using a 7% discount rate. Both sets of estimates cover the same time horizon.

Table 22. Net Benefits, 3% Discount Rate, 2020 dollars

| Total Impacts | Low | Primary | High |
|---|---|---|---|
| Benefits | $195,986,161 | $242,185,591 | $288,384,996 |
| Costs | $83,299,721 | $49,456,037 | $15,612,352 |
| Net Benefits | $112,686,440 | $192,729,554 | $272,772,644 |

Table 23. Net Benefits, 7% Discount Rate, 2020 dollars

| Total Impacts | Low | Primary | High |
|---|---|---|---|
| Benefits | $200,294,622 | $247,964,991 | $295,635,335 |
| Costs | $83,299,721 | $49,456,037 | $15,612,352 |
| Net Benefits | $116,994,900 | $198,508,954 | $280,022,983 |

An analytic issue not addressed in the assessment underlying these results is the question of how to interpret individuals' hesitation or unwillingness, in the absence of regulation, to accept an intervention that achieves extensive health protection for themselves, with little or no out-of-pocket cost, and ever-lessening time or inconvenience cost; a simplistic revealed-preference monetization of the rule's effect would be that it yields minimal or negative benefits for such staff members, even the ones for whom it prevents or reduces severity of COVID–19 infection. Given the dynamic nature of the pandemic—including scientific innovations and other human responses—it may be that long-run equilibrium for COVID–19 vaccines has not been reached, in which case the above use of VSL-related estimates for staff-member risk valuation may be appropriate at this time. On the other hand, other valuation approaches may also be worth exploring.

Toward that end, we use Herzog and Schlottmann (1990) to estimate a cap on how much the benefits of an employment-based health or safety regulation could exceed its costs.[139] Under this model, benefits accrue partially to workers in the form of health and longevity improvements (net of lost wage premiums) and partially to employers in the form of wage reductions, and the sum of worker and employer portions equals the monetized value of health and longevity improvements. Herzog and Schlottmann find that the wage reduction portion of total benefits is somewhere between 42.9% (=$4.29/$10.01) and 74.3% (=$3.67/$4.94). Put another way, the total benefits of a rule should be no more than 1.3 (=$4.94/$3.67) to 2.3 (=$10.01/$4.29) times the regulatory costs incurred by employers; otherwise, the wage reductions experienced by those employers would make it profit-maximizing (or surplus-maximizing, for non-profit entities) for them to mandate vaccination or perform the other risk-abatement activities without a regulation forcing them to do so.

The first several rows of Table 24 show upper bounds on staff benefits estimated by applying the Herzog and Schlottmann ratios to the estimated costs of the IFR (assuming for simplicity, as elsewhere in this analysis, that employers incur the costs).[140] Unlike in Tables 22 and 23, and the analysis that feeds into them, the quantified staff benefits in Table 24 are not necessarily limited to individuals who are newly vaccinated. Another, even more fundamental difference, is that Table 24 demonstrates an approach in which low costs are correlated with low staff benefits and high costs with high staff benefits.

**BILLING CODE 4184–01–P**

[139] Herzog, Henry W. and Alan M. Schlottmann. ''Valuing Risk in the Workplace: Market Price, Willingness to Pay, and the Optimal Provision of Safety,'' *The Review of Economics and Statistics* 72(3): August 1990, pp. 463–470.

[140] Herzog and Schlottmann use an old data set (1965–1970) and focus on work settings quite different from child care centers. We request comment on whether more recent or better-tailored inputs are available.

Table 24. Net Benefits Upper Bounds, Alternative Approach, 2020 dollars

| Total Impacts * | Low | Middle | High |
|---|---|---|---|
| Costs | $15,612,352 | $49,456,037 | $83,299,721 |
| Upper Bound Staff Benefits, Using 1.3 Ratio | $21,014,991 | $66,570,251 | $112,125,510 |
| Upper Bound Staff Benefits, Using 2.3 Ratio | $36,428,821 | $115,397,419 | $194,366,016 |
| Upper Bound Total Benefits, Using 1.3 Ratio | $157,426,995 | $200,820,072 | $244,213,149 |
| Upper Bound Total Benefits, Using 2.3 Ratio | $172,840,824 | $249,647,240 | $326,453,655 |
| Upper Bound Net Benefits, Using 1.3 Ratio | $141,814,643 | $151,364,036 | $160,913,428 |
| Upper Bound Net Benefits, Using 2.3 Ratio | $157,228,473 | $200,191,203 | $243,153,934 |

* Non-staff benefits per Table 15.

BILLING CODE 4184-01-C

*H. Distributional Effects*

Executive Order 13985 on *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government* includes consideration of agency policies and actions that create or exacerbate barriers to full and equal participation by all eligible individuals. As noted previously, a large share of children served by Head Start programs are from culturally and linguistically diverse families. And the majority of Head Start children are also from families experiencing poverty. In FY 2019, OHS administrative data indicate that 37% of Head Start children were Hispanic or Latino and the remaining 63% were of non-Hispanic or Latino origin. Further, 44% were White, 30% were Black or African American, 10% were biracial or multi-racial, 4% were American Indian or Alaska Native, and 2% were Asian.[141] As is evident with these data, the indirect beneficiaries of this IFR—the children and families served by Head Start programs—are disproportionately from diverse racial and ethnic groups, as well as from low-income families, and they will benefit greatly from reduced exposure to COVID–19 from teachers who are newly vaccinated.

*I. Uncertainty and Sensitivity Analysis*

In the main analysis, we report the value of COVID–19 mortality risk reductions using the central HHS estimate of the VSL of $11.5 million, and value of morbidity risk reductions using estimates of the VSC that are derived from the central VSL. As a sensitivity analysis, we recalculate these benefits using the low and high estimates of the VSL, which range from $5.3 million to $17.5 million. Table 25 reports the value of these risk reductions using the full range of VSL estimates.

---

[141] Source: Head Start Program Information Report; the remaining 10% of children were reported as "Other or Unspecified."

Table 25. Value of COVID-19 Risk Reductions Using Range of VSL Estimates, 3% Discount Rate

| Risk Reduction | VSL or VSC Estimate | | | Value of Risk Reduction ($ millions) | | |
|---|---|---|---|---|---|---|
| | Low | Central | High | Low | Central | High |
| Mortality Reductions | $5,367,303 | $11,501,365 | $17,507,633 | $99.6 | $213.4 | $324.9 |
| Morbidity Reductions | | | | | | |
| Mild Cases | $2,728 | $5,846 | $8,900 | $3.2 | $6.9 | $10.5 |
| Severe Cases | $6,115 | $13,104 | $19,947 | $0.8 | $1.6 | $2.5 |
| Critical Cases | $846,720 | $1,814,400 | $2,761,920 | $6.9 | $14.8 | $22.6 |
| Total Value of Risk Reductions | | | | $110.5 | $236.8 | $360.5 |

In our main analysis, we assume that the vaccination, masking, and other requirements will be in effect for the entire time horizon of the analysis. We also considered a scenario that these requirements will end at an earlier point in time. Specifically, we evaluated a scenario that the requirements would be repealed through subsequent rulemaking or expire on January 16, 2022, which corresponds to the last day of the most recent renewal of the COVID–19 public health emergency.[142] For this scenario, we assume that Head Start staff are surprised on January 16, 2022 by the announcement, and that unvaccinated staff discontinue efforts to get fully vaccinated. This results in a lower vaccine coverage rate of between 84.9% and

91.5%, compared to a vaccine coverage rate of between 86.6% and 95.0% under the scenario of the requirement in effect through at least January 31, 2022. This would result in smaller reductions in mortality and morbidity risks, and smaller reductions in absenteeism. It would also eliminate the costs from staff vacancies and training attributable to the interim final rule, substantially reduce the costs of masking and testing; and reduce the total costs of vaccinations.

*J. Analysis of Regulatory Alternatives to the Rule*

We evaluated several regulatory alternatives to the interim final rule. First, we

assessed the impact of not including volunteers in the scope of the vaccine requirement of the interim final rule. Under this regulatory alternative, the reductions in mortality and morbidity for volunteers induced to get fully vaccinated outlined in Tables 12 and 13 would not occur. We also anticipate a reduction in costs attributable to the rule related to the costs related to vaccination described in in Table 18. Table 26 reports the net benefits of this policy alternative, using a 3% discount rate. Compared to our analysis of the interim final rule, this option would result in lower net benefits under the vaccine coverage scenarios that we analyzed.

Table 26. Net Benefits of Policy Alternative, 3% Discount Rate, 2020 dollars

| Total Impacts | Low | Primary | High |
|---|---|---|---|
| Benefits | $69,232,095 | $115,431,524 | $161,630,929 |
| Costs | $78,731,453 | $44,887,768 | $11,044,084 |
| Net Benefits | -$9,499,358 | $70,543,756 | $150,586,846 |

We also considered two alternatives to the masking requirement. One alternative includes eliminating the masking requirement entirely. This policy alternative would reduce the cost estimates of the interim final rule by $1.7 million in line with

the calculations presented in Table 19. A second alternative would limit the masking requirement to unvaccinated individuals. Under this policy alternative, the weekly masks needed for Head Start staff and volunteers would be reduced significantly, in

line with the vaccine coverage rates. When the vaccination requirement takes effect, only the 5% of Head Start staff and volunteers who receive an exemption would be expected to wear a mask. This reduces the weekly masks for Staff and volunteers

---

[142] *https://www.phe.gov/emergency/news/ healthactions/phe/Pages/COVDI-15Oct21.aspx.*

attributable to the rule by about 95%. This policy alternative would also result in small reduction in the number of masks needed for children. About 1% of Head Start children are age 5 years and older, and some of these children may get vaccinated in response to CDC's ''recommendation that children 5 to 11 years old be vaccinated against COVID–19 with the Pfizer-BioNTech pediatric vaccine.'' [143] We estimate that the cost of masking under this policy alternative would be about $1.0 million, which is about $0.6 million lower than the masking requirement under the interim final rule.

While we do not include a monetized benefit for the masking requirement, we anticipate that it will reduce transmission of SARS–COV–2 at in-person Head Start settings from individuals covered by the requirement. This impact includes a reduction in transmission from children to Head Start teachers, staff, and other children. The reductions in transmission attributable to the interim final rule will result in additional, unquantified reductions in mortality and morbidity to Head Start children and families, and to the general public. Compared to the analysis of the interim final rule, the two masking policy alternatives would result in fewer averted COVID–19 cases, hospitalizations, and deaths.

Finally, we considered a policy alternative of linking the vaccination, masking, and other requirements of the interim final rule to the COVID–19 public health emergency. Evaluating this policy alternative requires an additional assumption about the duration of the public health emergency. In the Uncertainty and Sensitivity Analysis, we explore a scenario in which the requirements would be repealed through subsequent rulemaking or expire on January 16, 2022, which corresponds to the last day of the most recent renewal of the COVID–19 public health emergency. That sensitivity analysis represents one possible outcome for this policy alternative. The main analysis, which assumes that the requirements will remain in effect through the time horizon of this analysis, represents another possible outcome for this policy alternative.

### III. Final Small Entity Analysis

We have examined the economic implications of this interim final rule as required by the Regulatory Flexibility Act. This analysis, as well as other sections in this Regulatory Impact Analysis, serves as the Initial Regulatory Flexibility Analysis, as required under the Regulatory Flexibility Act.

#### A. Description and Number of Affected Small Entities

The U.S. Small Business Administration (SBA) maintains a Table of Small Business Size Standards Matched to North American Industry Classification System Codes (NAICS).[144] We replicate the SBA's description of this table:

This table lists small business size standards matched to industries described in the North American Industry Classification System (NAICS), as modified by the Office of Management and Budget, effective January 1, 2017. The latest NAICS codes are referred to as NAICS 2017.

The size standards are for the most part expressed in either millions of dollars (those preceded by ''$'') or number of employees (those without the ''$''). A size standard is the largest that a concern can be and still qualify as a small business for Federal Government programs. For the most part, size standards are the average annual receipts or the average employment of a firm.

This interim final rule will impact small entities in NAICS category 624410, Child Day Care Services, which has a size standard of $8.0 million dollars. We assume that all 20,717 Head Start centers are below this threshold and are considered small entities.

#### B. Description of the Impacts of the Rule on Small Entities

We identify three categories of costs of the interim final rule that could impact small entities. Specifically, we expect that small entities will need to train Head Start staff to replace those who resign, and monetize these costs at about $13.2 million. For the purposes of this calculation, we assume that Head Start centers will purchase masks sufficient to cover every in-person staff, child, and volunteer, at a cost of about $1.7 million. We also assume that Head Start centers will incur the costs of testing for staff, at a cost of about $2.3 million. Finally, we attribute the costs of recordkeeping to small entities, at a cost of about $0.3 million. These combine for a total cost to small entities of $17.5 million. Dividing by the 20,717 Head Start centers, these costs are about $847 per small entity. As an alternative calculation, we estimate these costs are $864 per small entity, excluding closed Head Start centers.

Table 27. Costs Per Small Entity

| Impact | Costs to Small Entities | Cost Per Small Entity |
|---|---|---|
| Training | $13,231,039 | $638.66 |
| Masking | $1,680,509 | $81.12 |
| Testing | $2,306,273 | $111.32 |
| Recordkeeping | $330,565 | $15.96 |
| Total | $17,548,386 | $847.05 |

The Department considers a rule to have a significant impact on a substantial number of small entities if it has at least a 3% impact on revenue on at least 5% of small entities. Therefore, we perform a threshold analysis to determine whether these costs are likely to result in a significant impact on a substantial number of small entities. For $847 to exceed the impact threshold, a small entity would need to have revenue below $28,235 over the time horizon of the analysis, or annual revenue of less than about $113,000.

The Administration for Children and Families awards about $10 billion in grants to Head Start programs, including Early Head

---

[143] https://www.cdc.gov/media/releases/2021/s1102-PediatricCOVID-19Vaccine.html.

[144] U.S. Small Business Administration (2019). ''Table of Size Standards.'' August 19, 2019. https://www.sba.gov/document/support-table-size-standards.

Start-Child Care Partnerships.[145] Across 20,717 centers, this averages to $466,192, which is well above the $113,000 threshold. Thus, we conclude that the interim final rule is not likely to result in a significant impact on a substantial number of small entities.

## List of Subjects in 45 CFR Part 1302

COVID–19, Education of disadvantaged, Grant programs—social programs, Head Start, Health care, Mask use, Monitoring, Safety, Vaccination.

**JooYeun Chang,**

*Principal Deputy Assistant Secretary for Children and Families.*

Approved:

**Xavier Becerra,**

*Secretary.*

For the reasons discussed in the preamble, we amend 45 CFR part 1302 as follows:

## PART 1302—PROGRAM OPERATIONS

■ 1. The authority citation for part 1302 continues to read as:

**Authority:** 42 U.S.C. 9801 *et seq.*

■ 2. In § 1302.47, revise paragraphs (b)(5)(iv) and (v) and add paragraph (b)(5)(vi) to read as follows:

### § 1302.47    Safety practices.

\*    \*    \*    \*    \*

(b) \* \* \*

(5) \* \* \*

(iv) Only releasing children to an authorized adult;

(v) All standards of conduct described in § 1302.90(c); and

(vi) Masking, using masks recommended by CDC, for all individuals 2 years of age or older when there are two or more individuals on a vehicle owned, leased, or arranged by

---

[145] *https://eclkc ohs.acf.hhs.gov/sites/default/files/pdf/no-search/hs-program-fact-sheet-2019.pdf.*

the Head Start program; indoors in a setting when Head Start services are provided; and for those not fully vaccinated, outdoors in crowded settings or during activities that involve sustained close contact with other people, except:

(A) Children or adults when they are either eating or drinking;

(B) Children when they are napping;

(C) When a person cannot wear a mask, or cannot safely wear a mask, because of a disability as defined by the Americans with Disabilities Act; or

(D) When a child's health care provider advises an alternative face covering to accommodate the child's special health care needs.

\*    \*    \*    \*    \*

■ 3. In § 1302.93, add paragraphs (a)(1) and (2) to read as follows:

## Subpart I—Human Resources Management

### § 1302.93    Staff health and wellness.

(a) \* \* \*

(1) All staff, and those contractors whose activities involve contact with or providing direct services to children and families, must be fully vaccinated for COVID–19, other than those employees:

(i) For whom a vaccine is medically contraindicated;

(ii) For whom medical necessity requires a delay in vaccination; or

(iii) Who are legally entitled to an accommodation with regard to the COVID–19 vaccination requirements based on an applicable Federal law.

(2) Those granted an accommodation outlined in paragraph (a)(1) of this section must undergo SARS–COV–2 testing for current infection at least weekly with those who have negative test results to remain in the classroom or working directly with children.

Those with positive test results must be immediately excluded from the facility, so they are away from children and staff until they are determined to no longer be infectious.

\*    \*    \*    \*    \*

■ 4. In § 1302.94, revise paragraph (a) to read as follows:

### § 1302.94    Volunteers.

(a) A program must ensure volunteers have been screened for appropriate communicable diseases in accordance with state, tribal or local laws. In the absence of state, tribal, or local law, the Health Services Advisory Committee must be consulted regarding the need for such screenings.

(1) All volunteers in classrooms or working directly with children other than their own must be fully vaccinated for COVID–19, other than those volunteers:

(i) For whom a vaccine is medically contraindicated;

(ii) For whom medical necessity requires a delay in vaccination; or

(iii) Who are legally entitled to an accommodation with regard to the COVID–19 vaccination requirements based on an applicable Federal law.

(2) Those granted an accommodation outlined in paragraph (a)(1) of this section must undergo SARS-CoV–2 testing for current infection at least weekly with those who have negative test results to remain in the classroom or work directly with children. Those with positive test results must be immediately excluded from the facility, so they are away from children and staff until they are determined to no longer be infectious.

\*    \*    \*    \*    \*

[FR Doc. 2021–25869 Filed 11–29–21; 8:45 am]

**BILLING CODE 4184–01–P**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS and | § | |
| LUBBOCK INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
|     *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| XAVIER BECERRA, in his official | § | |
| capacity as Secretary of Health and | § | |
| Human Services; UNITED STATES | § | |
| DEPARTMENT OF HEALTH AND | § | |
| HUMAN SERVICES; JOOYUEN CHANG, | § | |
| in her official capacity as Principal | § | |
| Deputy Assistant Secretary; | § | |
| ADMINISTRATION FOR CHILDREN AND | § | |
| FAMILIES; KATIE HAMM, in her official | § | |
| capacity as Deputy Assistant Secretary | § | |
| for Early Childhood Development; | § | |
| OFFICE OF EARLY CHILDHOOD | § | |
| DEVELOPMENT; BERNADINE FUTRELL, | § | |
| in her official capacity as Director of the | § | |
| Office of Head Start; OFFICE OF HEAD | § | |
| START; and JOSEPH R. BIDEN, in his | § | |
| official capacity as President of the | § | |
| United States, | § | |
|     *Defendants*. | § | |
| | § | |

DECLARATION OF DR. KATHY ROLLO

My name is Dr. Kathy Rollo, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1. I am the Superintendent of the Lubbock Independent School District (LISD) and have been in my current position since February of 2018. In this capacity, I oversee the management and operations of LISD, which serves approximately 26,000 students and

employs approximately 3,000 people.  LISD is comprised of 29 elementary schools, 10 middle schools, and 5 high schools.  71.96 percent of LISD's students are living in poverty as defined by the State of Texas.

2.  LISD is currently serving 1,265 children in Pre K 3 and 4 year old programs.  This number includes 556 students who qualify for federal Head Start funding through a grant.  Based on the parameters of the grant, LISD will receive actual funding for 540 of the 556 qualifying students.  LISD Head Start students are served in 26 of our 29 elementary campuses in 70 classrooms.  LISD Head Start staff include 70 teachers, 70 teaching assistants, 1 Lead Head Start specialist, 12 Head Start specialists, 2 Instructional coaches, 1 data specialist, 1 secretary, 1 Head Start manager, and 1 Head Start Director. LISD Head Start teachers are certified and teaching assistants hold a Child Development Associates or college certification in order to be employed in the program. The program caps enrollment at  20 students per 2 adults in the 4 year old classrooms and 17 students per 2 adults in the 3 year old classrooms.  In LISD, students qualifying for Head Start funds are integrated with students who qualify for State Pre K funding and tuition-based students.

3.  On Monday, November 29, 2021, LISD was notified through a Head Start webinar and subsequent written notice of an "Interim Final Rule with Comment Period" (IFR), which added two provisions to the Head Start Program Performance Standards to mitigate the spread of Covid 19 in Head Start programs.  First, the IFR required universal masking for all individuals two years of age and older, with some noted exceptions, effective upon publication and beginning November 30, 2021.  The requirement was stated with less than 24 hours of notice for planning and communication.   The second addition requires all Head Start staff, contractors whose activities involve contact with or providing direct services to children and families, and volunteers working in classrooms or directly with children to be vaccinated for Covid 19 by January 31, 2022.

4. After our school buildings were closed in the Spring of 2020, LISD safely welcomed students back into its buildings for the 2020-2021 school year. In line with Governor Abbott's Executive Order and TEA Public Health Guidance, LISD implemented a mask mandate for all staff and for students in 4th grade and above. While younger students had the option to wear masks, LISD did not require them for multiple reasons. First and foremost, masks inhibit a young child's ability to effectively learn language and social skills. Secondly, the management of enforcing a mask mandate with young children is challenging in that young children are more apt to drop them, play with them, sneeze and cough in them. Lastly, the science we read indicated that younger children were at far less risk of contracting Covid 19 or getting extremely sick with Covid 19. Overall, LISD believed that the negative effects of wearing masks in Pre K through 3rd grades were far greater than what protection they provided. While LISD's mask mandate remained in effect for the entirety of the school year, at no time did LISD require students below the 4th grade to wear masks.

5. As we began to prepare for the 2021-2022 school year, LISD determined that our stance would be that masks are welcome, and vaccinations are encouraged. The word "welcome" with regard to masks was strategically selected because LISD wanted staff, students, and families to make the decision that best met their needs. At no point during the current school year has our Covid 19 positivity rate gone above 2%. Most of the semester it has been below 0.5%. The majority of student cases have been in our secondary schools.   Of our 1,847 active cases since August 18, 2021, only 26 have been Pre K students and none have been Pre K staff.

6. LISD has encouraged vaccinations since they were first made available in January of 2021. Working very closely with the City of Lubbock Health Department, LISD has partnered in hosting vaccination clinics at the City of Lubbock Civic Center and at our campuses throughout the spring, summer, and fall of 2021. In an anonymous survey

conducted in August before school started, 84% of LISD's staff reported having received at least one vaccine dose. This high rate of staff vaccination has been achieved without a mandate. Having a mandate for a subset of employees creates inequity in staff expectations,

7. In order for children to develop the ability to read clues for language and social situations it is crucial they can see an adult or other children's faces. Masks can dampen sounds from 3-12 decibels. This can result in difficulty understanding high frequency sound differences both at the word level (fan vs van) and with basic grammatical markers (stops vs stopped) , disrupting language learning across areas such as vocabulary, phonology and syntax. Phonological acquisition is a primary predictor of later reading ability. Optimal learning for phonology occurs when children are able to both see and hear sounds. A solid phonological representation of what the sound looks like as it is produced and what it sounds like as it is spoken becomes the foundation for the orthographic representation of the sound during literacy development. This is true with typically developing learners but becomes critical for children with speech and language deficits where multimodal instruction (auditory, visual and kinesthetic) becomes an imperative teaching tool. During the Pre K years students are also learning to incorporate facial expressions and oral motor movements as additional communication clues. Masks can make it more difficult for children to assimilate all of the various unspoken communication cues used by others.

8. As a result of Covid 19, LISD experienced a decline in enrollment in its Pre K programs last year. Enrollment was 1,072 students in 2020 and 1,011 students in 2021. However, as the result of an active recruitment campaign, LISD is currently serving 1,265 students, and that recruitment continues today. Parents made the choice to send their children to Pre K knowing that masks were welcome, but not required. Many parents have stated

that they do not want their children to wear masks. If LISD were to comply with the mask requirement, we could potentially lose many of the students who are currently enrolled in the program, disrupting the progress that has been made. Pre K is an essential part of preparing children, particularly children living in poverty, for success in school and life.

9. The new IFR requirements have the potential of dramatically impacting LISD's Pre K staffing. Very few early childhood staff are currently choosing to wear masks. They understand the importance of children seeing their facial expressions and fully hearing their voices as they model language, read to them, and interact with them. The few staff members who are not vaccinated have chosen not to do so. If LISD complies with these new requirements, it has the potential for a mass exodus of Pre K staff. Staff members may choose to resign, or they may ask to be reassigned to a non Head Start position. Both of these create a lack of continuity for the students and tremendous staffing challenges for LISD in a time when the district, like districts across the country, is already having a difficult time filling vacancies and retaining employees. These mandates exacerbate the staffing issues schools are facing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 10, 2021 in Lubbock, Texas.

Dr. Kathy Rollo

| | | TAGGS Grants By Location Metro Nonmetro Export | | | | |
|------|------|------|------|------|------|------|
| Year | Recipient Name | Recipient Address | Recipient City | County | Award Action Type | Award Sum |
| 2021 | ALABAMA-COUSHATTA TRIBE OF TEXAS, THE | 571 STATE PARK RD 56 | LIVINGSTON | POLK | NEW | $30,097 |
| 2021 | ALABAMA-COUSHATTA TRIBE OF TEXAS, THE | 571 STATE PARK RD 56 | LIVINGSTON | POLK | NON-COMPETING CONTINUATION | $412,007 |
| 2021 | ALABAMA-COUSHATTA TRIBE OF TEXAS, THE | 571 STATE PARK RD 56 | LIVINGSTON | POLK | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $119,650 |
| 2021 | Kickapoo Traditional Tribe Of Texas | 2212 Rosita Valley Rd | Eagle Pass | MAVERICK | NON-COMPETING CONTINUATION | $251,572 |
| 2021 | AVANCE, INC. | 118 N MEDINA ST | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $950,514 |
| 2021 | Parent/child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $2,530,243 |
| 2021 | Kickapoo Traditional Tribe Of Texas | 2212 Rosita Valley Rd | Eagle Pass | MAVERICK | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $251,571 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | University of Texas Rio Grande Valley, The | 1201 West University Dr | Edinburg | HIDALGO | NON-COMPETING CONTINUATION | $7,727,166 |
| 2021 | TEXAS TECH UNIVERSITY SYSTEM | 2500 BROADWAY | LUBBOCK | LUBBOCK | NON-COMPETING CONTINUATION | $604,724 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,701,093 |
| 2021 | Region XVI Education Service Center | 5800 Bell St | Amarillo | RANDALL | NEW | $530,609 |
| 2021 | PORT ARTHUR INDEPENDENT SCHOOL DISTRICT | 4801 9TH AVE | PORT ARTHUR | JEFFERSON | NEW | $100,223 |
| 2021 | DENTON INDEPENDENT SCHOOL DISTRICT | 1307 N Locust St | Denton | DENTON | NEW | $58,087 |
| 2021 | University of Texas Rio Grande Valley, The | 1201 West University Dr | Edinburg | HIDALGO | NEW | $111,961 |
| 2021 | HARRIS COUNTY DEPARTMENT OF EDUCATION | 6300 IRVINGTON BLVD | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $6,261,401 |

| TAGGS Grants By Location Metro Nonmetro Export | | | | | |
|---|---|---|---|---|---|
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | NON-COMPETING CONTINUATION | $3,246,898 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | NON-COMPETING CONTINUATION | $3,628,446 |
| 2021 | Parent/Child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $951,099 |
| 2021 | Childcaregroup | 20 West Mockingbird Ln Ste 3( | Dallas | DALLAS | NON-COMPETING CONTINUATION | $548,219 |
| 2021 | REGION XIX EDUCATION SERVICE CENTER | 6611 BOEING DR | EL PASO | EL PASO | NON-COMPETING CONTINUATION | $43,017,731 |
| 2021 | TRI-COUNTY COMMUNITY ACTION, INC. | 214 NACOGDOCHES ST | CENTER | SHELBY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | ECONOMIC OPPORTUNITIES ADVANCEMENT CORPORATION OF PLANNING REGION XI | 500 FRANKLIN AVE | WACO | MCLENNAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $98,864 |
| 2021 | CHILD INC. | 818 E 53RD ST | AUSTIN | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $188,343 |
| 2021 | GULF COAST COMMUNITY SERVICES ASSOCIATION, INC. | 9320 Kirby Dr | Houston | HARRIS | NON-COMPETING CONTINUATION | $19,197,707 |
| 2021 | GULF COAST COMMUNITY SERVICES ASSOCIATION, INC. | 9320 Kirby Dr | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | COLLEGE STATION INDEPENDENT SCHOOL DISTRICT | 1812 WELSH | COLLEGE STATION | BRAZOS | NON-COMPETING CONTINUATION | $2,298,654 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Cen-Tex Family Services, Inc. | 2402 N Main St | Bastrop | BASTROP | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | SOUTH SAN ANTONIO INDEPENDENT SCHOOL DISTRICT | 1450 GILLETTE BLVD | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $30,549 |
| 2021 | ASCENSION DEPAUL SERVICES | 7607 Somerset Rd | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $15,319 |

| | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|
| 2021 | ABILENE INDEPENDENT SCHOOL DISTRICT | 241 PINE ST | ABILENE | TAYLOR | NON-COMPETING CONTINUATION | $5,271,886 |
| 2021 | REGION VII EDUCATION SERVICE CENTER | 1909 N LONGVIEW ST | KILGORE | GREGG | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $457,458 |
| 2021 | WEST TEXAS OPPORTUNITIES, INCORPORATED | 603 N 4TH | LAMESA | DAWSON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,399,597 |
| 2021 | Community Action Corporation Of South Texas | 204 E 1st St | Alice | JIM WELLS | NON-COMPETING CONTINUATION | $3,077,100 |
| 2021 | University Of Texas Health Science Center At Houston, The | 7000 Fannin St | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | KERRVILLE INDEPENDENT SCHOOL DISTRICT | 1009 BARNETT ST | KERRVILLE | KERR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Rolling Plains Management Corporation | 118 North 1st St | Crowell | FOARD | NEW | $907,091 |
| 2021 | Center For Transforming Lives | 512 W 4th St | Fort Worth | TARRANT | NON-COMPETING CONTINUATION | $981,333 |
| 2021 | HARRIS COUNTY DEPARTMENT OF EDUCATION | 6300 IRVINGTON BLVD | HOUSTON | HARRIS | NON-COMPETING CONTINUATION | $4,792,502 |
| 2021 | Family Service Association Of San Antonio, Inc. | 702 San Pedro Ave | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $22,888 |
| 2021 | AVANCE - HOUSTON, INC. | 4281 DACOMA ST | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $51,111 |
| 2021 | Central Texas Opportunities, Inc. | 114 Needham St | Coleman | COLEMAN | NEW | $121,592 |
| 2021 | SAN ANTONIO, CITY OF | 111 Soledad St Ste 500 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $4,025,026 |
| 2021 | HARRIS COUNTY DEPARTMENT OF EDUCATION | 6300 IRVINGTON BLVD | HOUSTON | HARRIS | NEW | $350,328 |
| 2021 | GREENVILLE INDEPENDENT SCHOOL DISTRICT | 2504 CARVER ST | GREENVILLE | HUNT | NEW | $48,456 |
| 2021 | COLLEGE STATION INDEPENDENT SCHOOL DISTRICT | 1812 WELSH | COLLEGE STATION | BRAZOS | NEW | $87,582 |

| | | | | TAGGS Grants By Location Metro Nonmetro Export | | |
|---|---|---|---|---|---|
| 2021 | REGION VII EDUCATION SERVICE CENTER | 1909 N LONGVIEW ST | KILGORE | GREGG | NEW | $678,685 |
| 2021 | KERRVILLE INDEPENDENT SCHOOL DISTRICT | 1009 BARNETT ST | KERRVILLE | KERR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $104,096 |
| 2021 | PARIS INDEPENDENT SCHOOL DISTRICT | 1920 CLARKSVILLE ST | PARIS | LAMAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $248,872 |
| 2021 | ABILENE INDEPENDENT SCHOOL DISTRICT | 241 PINE ST | ABILENE | TAYLOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $623,377 |
| 2021 | MOUNT PLEASANT INDEPENDENT SCHOOL DISTRICT | 1602 W Ferguson Rd | Mount Pleasant | TITUS | NEW | $100,825 |
| 2021 | Bonham Independent School District | 1005 Chestnut St | Bonham | FANNIN | NEW | $41,835 |
| 2021 | PLANO INDEPENDENT SCHOOL DISTRICT | 2700 W 15TH ST | PLANO | COLLIN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $174,689 |
| 2021 | Motivation, Education & Training, Inc. | 22551 Gene Campbell Blvd | New Caney | MONTGOMERY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $5,006,218 |
| 2021 | KIDS ARE FIRST, INC. | 2208 N 1ST ST | CARRIZO SPRINGS | DIMMIT | NEW | $3,450,409 |
| 2021 | COMMUNITY COUNCIL OF SOUTH CENTRAL TEXAS, INC. | 801 N HIGHWAY 123 BYP | SEGUIN | GUADALUPE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | AVANCE - Houston, Inc. | 4281 Dacoma St | Houston | HARRIS | NON-COMPETING CONTINUATION | $10,771,401 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $39,166 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | PLANO INDEPENDENT SCHOOL DISTRICT | 2700 W 15TH ST | PLANO | COLLIN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $14,047 |

| | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|
| 2021 | Lumin Education | 924 Wayne St | Dallas | DALLAS | NON-COMPETING CONTINUATION | $931,290 |
| 2021 | HEAD START OF GREATER DALLAS INC | 3954 GANNON LN | DALLAS | DALLAS | NON-COMPETING CONTINUATION | $33,551,283 |
| 2021 | Childcaregroup | 320 West Mockingbird Ln Ste 30 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | MOUNT PLEASANT INDEPENDENT SCHOOL DISTRICT | 1602 W Ferguson Rd | Mount Pleasant | TITUS | NON-COMPETING CONTINUATION | $3,044,616 |
| 2021 | GULF COAST COMMUNITY SERVICES ASSOCIATION, INC. | 9320 Kirby Dr | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $231,471 |
| 2021 | COLLEGE STATION INDEPENDENT SCHOOL DISTRICT | 1812 WELSH | COLLEGE STATION | BRAZOS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $267,608 |
| 2021 | Central Texas Opportunities, Inc. | 114 Needham St | Coleman | COLEMAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Education Service Center Region 20 | 1314 Hines Ave | San Antonio | BEXAR | NON-COMPETING CONTINUATION | $1,989,759 |
| 2021 | SAN ANTONIO, CITY OF | 111 SOLEDAD ST STE 500 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $12,820,917 |
| 2021 | Family Service Association of San Antonio, Inc. | 702 San Pedro Ave | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $4,295,167 |
| 2021 | Family Service Association Of San Antonio, Inc. | 702 San Pedro Ave | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $103,647 |
| 2021 | ChildCareGroup | 320 West Mockingbird Ln Ste 30 | Dallas | DALLAS | NON-COMPETING CONTINUATION | $2,879,782 |
| 2021 | NUECES COUNTY COMMUNITY ACTION AGENCY | 101 SOUTH PADRE ISLAND DR | CORPUS CHRISTI | NUECES | NON-COMPETING CONTINUATION | $12,667,944 |
| 2021 | TEXARKANA SPECIAL EDUCATION CENTER, INC. | 6101 N STATE LINE AVE | TEXARKANA | BOWIE | NON-COMPETING CONTINUATION | $976,825 |
| 2021 | KAUFMAN INDEPENDENT SCHOOL DISTRICT | 1000 S HOUSTON ST | KAUFMAN | KAUFMAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$709 |

| | | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|---|
| 2021 | WEBB, COUNTY OF | 1308 SAN AGUSTIN AVE | LAREDO | WEBB | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$43,451 |
| 2021 | Cen-Tex Family Services, Inc. | 2402 N Main St | Bastrop | BASTROP | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Rolling Plains Management Corporation | 118 North 1st St | Crowell | FOARD | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Family Service Association of San Antonio, Inc. | 702 San Pedro Ave | San Antonio | BEXAR | NON-COMPETING CONTINUATION | $1,917,659 |
| 2021 | Child Care Associates | 3000 E Belknap St | Fort Worth | TARRANT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Central Texas 4c, Inc | 504 N 5th St | Temple | BELL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | NEW | $295,551 |
| 2021 | Hill Country Community Action Association, Inc. | 2905 W Wallace | San Saba | SAN SABA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $870,539 |
| 2021 | Texas City Independent School District | 1700 9th Ave N | Texas City | GALVESTON | NEW | $46,349 |
| 2021 | REGION 9 ED SERVICE CENTER | 301 LOOP 11 | WICHITA FALLS | WICHITA | NEW | $189,611 |
| 2021 | BRAZORIA COUNTY HEAD START EARLY LEARNING SCHOOLS, INC. | 651 W Miller St. | ANGLETON | BRAZORIA | NEW | $61,699 |
| 2021 | Lumin Education | 924 Wayne St | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $167,510 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | NEW | $446,939 |
| 2021 | Motivation, Education & Training, Inc. | 22551 Gene Campbell Blvd | New Caney | MONTGOMERY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,575,791 |
| 2021 | Austin Independent School District (Inc) | 4000 S IH 35 Frontage Rd | Austin | TRAVIS | NEW | $61,398 |
| 2021 | Community Action, Inc. Of Central Texas | 215 REIMER AVE STE 130 | SAN MARCOS | HAYS | NEW | $160,417 |
| 2021 | Community Action Corporation Of South Texas | 204 E 1st St | Alice | JIM WELLS | NEW | $8,615,877 |

| | | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|---|
| 2021 | Community Council Of South Central Texas, Inc. | 801N. State Hwy 123 Bypass | SEGUIN | GUADALUPE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | AVANCE, INC. | 118 N MEDINA ST | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $93,271 |
| 2021 | COMMUNITY SERVICES OF N E TEXAS INC | 304 E Houston St | Linden | CASS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,072,911 |
| 2021 | REGION 9 ED SERVICE CENTER | 301 LOOP 11 | WICHITA FALLS | WICHITA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,336,679 |
| 2021 | CHILD INC. | 818 E 53RD ST | AUSTIN | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | ChildCareGroup | 20 West Mockingbird Ln Ste 30 | Dallas | DALLAS | NON-COMPETING CONTINUATION | $1,755,817 |
| 2021 | PARENT/CHILD INCORPORATED OF SAN ANTONIO AND BEXAR | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $47,612 |
| 2021 | SOUTH SAN ANTONIO INDEPENDENT SCHOOL DISTRICT | 5622 RAY ELLISON BLVD | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,266,060 |
| 2021 | Texas City Independent School District | 1700 9th Ave N | Texas City | GALVESTON | NON-COMPETING CONTINUATION | $665,040 |
| 2021 | Childcaregroup | 20 West Mockingbird Ln Ste 30 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | PARIS INDEPENDENT SCHOOL DISTRICT | 1920 CLARKSVILLE ST | PARIS | LAMAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Community Action Corporation Of South Texas | 204 E 1st St | Alice | JIM WELLS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,807,336 |

| | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$73,073 |
| 2021 | Parent/Child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Center For Transforming Lives | 512 W 4th St | Fort Worth | TARRANT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $17,906 |
| 2021 | Community Action Corporation Of South Texas | 204 E 1st St | Alice | JIM WELLS | NEW | $409,619 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | NEW | $256,426 |
| 2021 | TEXARKANA SPECIAL EDUCATION CENTER, INC. | 6101 N STATE LINE AVE | TEXARKANA | BOWIE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $86,148 |
| 2021 | WEST ORANGE-COVE CONSOLIDATED INDEPENDENT SCHOOL | 801 CORDREY ST | ORANGE | ORANGE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $285,964 |
| 2021 | Cen-Tex Family Services, Inc. | 2402 N Main St | Bastrop | BASTROP | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $580,303 |
| 2021 | CONCHO VALLEY COUNCIL OF GOVERNMENTS | 2801 W LOOP 306 STE A | SAN ANGELO | TOM GREEN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $676,023 |
| 2021 | REGION XIX EDUCATION SERVICE CENTER | 6611 BOEING DR | EL PASO | EL PASO | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $5,234,688 |
| 2021 | Williamson Burnet County Opportunities | 604 High Tech Dr | Georgetown | WILLIAMSON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $820,799 |
| 2021 | Hidalgo County Headstart Program Inc | 1901 W STATE HIGHWAY 107 | MCALLEN | HIDALGO | NEW | $1,110,576 |
| 2021 | Brazos Valley Community Action Programs | 3991 E 29th St | Bryan | BRAZOS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $638,931 |
| 2021 | TEXAS TECH UNIVERSITY SYSTEM | 2500 BROADWAY | LUBBOCK | LUBBOCK | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $114,864 |

| TAGGS Grants By Location Metro Nonmetro Export | | | | | |
|---|---|---|---|---|---|
| 2021 | TEXAS TECH UNIVERSITY SYSTEM | 2500 BROADWAY | LUBBOCK | LUBBOCK | NEW | $28,893 |
| 2021 | Hill Country Community Action Association, Inc. | 2905 W Wallace | San Saba | SAN SABA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $3,266,266 |
| 2021 | DETROIT HEAD START | 3rd St SE | DETROIT | RED RIVER | NEW | $536,613 |
| 2021 | Lubbock Independent School District | 1628 19th St | Lubbock | LUBBOCK | NON-COMPETING CONTINUATION | $3,946,570 |
| 2021 | Williamson Burnet County Opportunities | 604 High Tech Dr | Georgetown | WILLIAMSON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $4,166,109 |
| 2021 | Central Texas 4c, Inc | 504 N 5th St | Temple | BELL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$1,738,763 |
| 2021 | Central Texas 4c, Inc | 504 N 5th St | Temple | BELL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $45,443 |
| 2021 | Lumin Education | 924 Wayne St | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $953,535 |
| 2021 | San Felipe Del Rio Consolidated Independent School District | 315 Griner St | Del Rio | VAL VERDE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | BRAZORIA COUNTY HEAD START EARLY LEARNING SCHOOLS, INC. | 651 W Miller St. | ANGLETON | BRAZORIA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $27,528 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $37,809 |
| 2021 | MOUNT PLEASANT INDEPENDENT SCHOOL DISTRICT | 1602 W Ferguson Rd | Mount Pleasant | TITUS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Central Texas Opportunities, Inc. | 114 Needham St | Coleman | COLEMAN | NON-COMPETING CONTINUATION | $4,605,095 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,997,853 |

Appx. 64

| | | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|---|
| 2021 | KIDS ARE FIRST, INC. | 2208 N 1ST ST | CARRIZO SPRINGS | DIMMIT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | North Texas Parent And Child Development, Inc. | 500 Flood St | Wichita Falls | WICHITA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | HEAD START OF GREATER DALLAS INC | 3954 GANNON LN | DALLAS | DALLAS | NEW | $787,034 |
| 2021 | BRAZORIA COUNTY HEAD START EARLY LEARNING SCHOOLS, INC. | 651 W Miller St. | ANGLETON | BRAZORIA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $245,283 |
| 2021 | Pecos County Community Action Agency | 101 N Jackson St | Fort Stockton | PECOS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $139,991 |
| 2021 | ECONOMIC OPPORTUNITIES ADVANCEMENT CORPORATION OF PLANNING REGION XI | 500 FRANKLIN AVE | WACO | MCLENNAN | NEW | $269,969 |
| 2021 | Terrell Independent School District | 700 N Catherine St | Terrell | KAUFMAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $178,279 |
| 2021 | Terrell Independent School District | 700 N Catherine St | Terrell | KAUFMAN | NEW | $44,844 |
| 2021 | REGION XIX EDUCATION SERVICE CENTER | 6611 BOEING DR | EL PASO | EL PASO | NEW | $1,316,740 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $81,615 |
| 2021 | Jumpstart Enrichment For Tomorrow's Students, Incorporated | 4301 Avenue U | Snyder | SCURRY | NEW | $37,320 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $6,802,829 |
| 2021 | Child Care Associates | 3000 E Belknap St | Fort Worth | TARRANT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $249,248 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | NON-COMPETING CONTINUATION | $929,124 |

| TAGGS Grants By Location Metro Nonmetro Export | | | | | |
|---|---|---|---|---|---|
| 2021 | HARRIS COUNTY DEPARTMENT OF EDUCATION | 6300 IRVINGTON BLVD | HOUSTON | HARRIS | NON-COMPETING CONTINUATION | $6,113,791 |
| 2021 | REGION XIX EDUCATION SERVICE CENTER | 6611 BOEING DR | EL PASO | EL PASO | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $519,110 |
| 2021 | Tri-County Community Action, Inc. | 214 Nacogdoches St | Center | SHELBY | NON-COMPETING CONTINUATION | $6,024,306 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Parent/child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $1,973,207 |
| 2021 | Education Service Center Region 20 | 1314 Hines Ave | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,037,771 |
| 2021 | SAN ANTONIO, CITY OF | 111 SOLEDAD ST STE 500 | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $12,518,841 |
| 2021 | Community Action, Inc. Of Central Texas | 215 REIMER AVE STE 130 | SAN MARCOS | HAYS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $3,400,464 |
| 2021 | Childcaregroup | 320 West Mockingbird Ln Ste 30 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $99,847 |
| 2021 | Hidalgo County Headstart Program Inc | 1901 W STATE HIGHWAY 107 | MCALLEN | HIDALGO | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Community Action Corporation Of South Texas | 204 E 1st St | Alice | JIM WELLS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | DETROIT HEAD START | 3rd St SE | DETROIT | RED RIVER | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$22,001 |
| 2021 | Family Service Association of San Antonio, Inc. | 702 San Pedro Ave | San Antonio | BEXAR | NEW | $2,985,990 |
| 2021 | Rolling Plains Management Corporation | 118 North 1st St | Crowell | FOARD | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $521,674 |

| | | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|---|
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,776,803 |
| 2021 | EDUCATION SERVICE CENTER REGION 10 | 400 E SPRING VALLEY RD | RICHARDSON | DALLAS | NEW | $337,085 |
| 2021 | PARIS INDEPENDENT SCHOOL DISTRICT | 1920 CLARKSVILLE ST | PARIS | LAMAR | NEW | $62,602 |
| 2021 | GALENA PARK INDEPENDENT SCHOOL DISTRICT | 14705 WOODFOREST BLVD | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $76,576 |
| 2021 | DENTON INDEPENDENT SCHOOL DISTRICT | 1307 N LOCUST ST | DENTON | DENTON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $230,925 |
| 2021 | WEBB, COUNTY OF | 1308 SAN AGUSTIN AVE | LAREDO | WEBB | NEW | $409,920 |
| 2021 | Ascension DePaul Services | 7607 Somerset Rd | San Antonio | BEXAR | NEW | $29,796 |
| 2021 | Center For Transforming Lives | 512 W 4th St | Fort Worth | TARRANT | NEW | $196,834 |
| 2021 | Sulphur Springs Independent School District | 631 Connally St | Sulphur Springs | HOPKINS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $214,174 |
| 2021 | Bonham Independent School District | 1005 Chestnut St | Bonham | FANNIN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $166,314 |
| 2021 | NUECES COUNTY COMMUNITY ACTION AGENCY | 101 SOUTH PADRE ISLAND DR | CORPUS CHRISTI | NUECES | NEW | $278,396 |
| 2021 | Jumpstart Enrichment For Tomorrow's Students, Incorporated | 4301 Avenue U | Snyder | SCURRY | NEW | $1,386,913 |
| 2021 | NEIGHBORS IN NEED OF SERVICES, INC., (NINOS) | 22887 State Highway 345 | Rio Hondo | CAMERON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | NON-COMPETING CONTINUATION | $3,595,049 |
| 2021 | Tyler Independent School District | 1319 Earl Campbell Pkwy | Tyler | SMITH | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | NON-COMPETING CONTINUATION | $3,144,787 |

| TAGGS Grants By Location Metro Nonmetro Export | | | | | |
|---|---|---|---|---|---|
| 2021 | CONCHO VALLEY COUNCIL OF GOVERNMENTS | 2801 W LOOP 306 STE A | SAN ANGELO | TOM GREEN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Childcaregroup | 220 West Mockingbird Ln Ste 3( | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Parent/child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,110,757 |
| 2021 | Family Service Association of San Antonio, Inc. | 702 San Pedro Ave | San Antonio | BEXAR | NON-COMPETING CONTINUATION | $4,295,167 |
| 2021 | ABILENE INDEPENDENT SCHOOL DISTRICT | 241 PINE ST | ABILENE | TAYLOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $63,237 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $135,619 |
| 2021 | Kickapoo Traditional Tribe Of Texas | 2212 Rosita Valley Rd | Eagle Pass | MAVERICK | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $40,681 |
| 2021 | SER-JOBS FOR PROGRESS NATIONAL, INC. | 100 EAST ROYAL LANE STE 130 | IRVING | DALLAS | NON-COMPETING CONTINUATION | $1,405,668 |
| 2021 | HARRIS COUNTY DEPARTMENT OF EDUCATION | 6300 IRVINGTON BLVD | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $3,345,017 |
| 2021 | Hill Country Community Action Association, Inc. | 2905 W Wallace | San Saba | SAN SABA | NEW | $162,222 |
| 2021 | Lumin Education | 924 Wayne St | Dallas | DALLAS | NEW | $42,136 |
| 2021 | EDUCATION SERVICE CENTER REGION 10 | 400 E SPRING VALLEY RD | RICHARDSON | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,340,080 |
| 2021 | PORT ARTHUR INDEPENDENT SCHOOL DISTRICT | 4801 9TH AVE | PORT ARTHUR | JEFFERSON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $398,435 |
| 2021 | BAKERRIPLEY | 450 HARRISBURG BLVD STE 20 | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $3,494,977 |
| 2021 | Williamson Burnet County Opportunities | 604 High Tech Dr | Georgetown | WILLIAMSON | NEW | $206,465 |

Appx. 68

| | | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|---|
| 2021 | Hidalgo County Headstart Program Inc | 1901 W STATE HIGHWAY 107 | MCALLEN | HIDALGO | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $4,415,085 |
| 2021 | LUTHERAN SOCIAL SERVICES OF THE SOUTH, INC. | 8305 CROSS PARK DR | AUSTIN | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,214,722 |
| 2021 | SER-JOBS FOR PROGRESS NATIONAL, INC. | 100 EAST ROYAL LANE STE 130 | IRVING | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $86,148 |
| 2021 | Education Service Center Region 20 | 1314 Hines Ave | San Antonio | BEXAR | NEW | $2,606,492 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 SOUTH ST | NACOGDOCHES | NACOGDOCHES | NEW | $2,786,998 |
| 2021 | Community Council of South Central Texas, Inc. | 801N. State Hwy 123 Bypass | SEGUIN | GUADALUPE | NON-COMPETING CONTINUATION | $1,295,685 |
| 2021 | REGION VII EDUCATION SERVICE CENTER | 1909 N LONGVIEW ST | KILGORE | GREGG | NON-COMPETING CONTINUATION | $16,253,413 |
| 2021 | REGION VII EDUCATION SERVICE CENTER | 1909 N LONGVIEW ST | KILGORE | GREGG | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $43,243 |
| 2021 | Tyler Independent School District | 1319 Earl Campbell Pkwy | Tyler | SMITH | NON-COMPETING CONTINUATION | $1,559,259 |
| 2021 | Terrell Independent School District | 700 N Catherine St | Terrell | KAUFMAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | GALENA PARK INDEPENDENT SCHOOL DISTRICT | 14705 WOODFOREST BLVD | HOUSTON | HARRIS | NON-COMPETING CONTINUATION | $900,007 |
| 2021 | San Felipe Del Rio Consolidated Independent School District | 315 Griner St | Del Rio | VAL VERDE | NON-COMPETING CONTINUATION | $2,527,857 |
| 2021 | Tri-County Community Action, Inc. | 214 Nacogdoches St | Center | SHELBY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | HEAD START OF GREATER DALLAS INC | 3954 GANNON LN | DALLAS | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |

| **TAGGS Grants By Location Metro Nonmetro Export** | | | | | |
|---|---|---|---|---|---|
| 2021 | PARENT/CHILD INCORPORATED OF SAN ANTONIO AND BEXAR | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $50,927 |
| 2021 | Parent/child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $2,110,758 |
| 2021 | TYLER INDEPENDENT SCHOOL DISTRICT | 1319 EARL CAMPBELL PKWY | TYLER | SMITH | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$87,161 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | NEW | $7,928,580 |
| 2021 | Motivation, Education & Training, Inc. | 22551 Gene Campbell Blvd | New Caney | MONTGOMERY | NON-COMPETING CONTINUATION | $2,910,398 |
| 2021 | Childcaregroup | 20 West Mockingbird Ln Ste 3 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Avance - Houston, Inc. | 4281 Dacoma St | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | North Texas Parent And Child Development, Inc. | 500 Flood St | Wichita Falls | WICHITA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $208,704 |
| 2021 | South San Antonio Independent School District | 1450 Gillette Blvd | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $344,592 |
| 2021 | HEAD START OF GREATER DALLAS INC | 3954 GANNON LN | DALLAS | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $3,214,996 |
| 2021 | Pecos County Community Action Agency | 101 N Jackson St | Fort Stockton | PECOS | NEW | $35,213 |
| 2021 | GREENVILLE INDEPENDENT SCHOOL DISTRICT | 2504 CARVER ST | GREENVILLE | HUNT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $192,637 |
| 2021 | ChildCareGroup | 20 West Mockingbird Ln Ste 3 | Dallas | DALLAS | NEW | $386,143 |
| 2021 | REGION VII EDUCATION SERVICE CENTER | 1909 N LONGVIEW ST | KILGORE | GREGG | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,698,108 |
| 2021 | AVANCE - Houston, Inc. | 4281 Dacoma St | Houston | HARRIS | NEW | $599,531 |
| 2021 | PARENT/CHILD INCORPORATED OF SAN ANTONIO AND BEXAR | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,474,088 |

| | | TAGGS Grants By Location Metro Nonmetro Export | | | | |
|---|---|---|---|---|---|---|
| 2021 | TYLER INDEPENDENT SCHOOL DISTRICT | 1319 EARL CAMPBELL PKWY | TYLER | SMITH | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $239,300 |
| 2021 | BEAUMONT INDEPENDENT SCHOOL DISTRICT | 3395 HARRISON AVE | BEAUMONT | JEFFERSON | NEW | $153,494 |
| 2021 | WEBB, COUNTY OF | 1308 SAN AGUSTIN AVE | LAREDO | WEBB | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,629,633 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | NEW | $557,094 |
| 2021 | Lubbock Independent School District | 1628 19th St | Lubbock | LUBBOCK | NEW | $162,523 |
| 2021 | Motivation, Education & Training, Inc. | 22551 Gene Campbell Blvd | New Caney | MONTGOMERY | NEW | $4,888,619 |
| 2021 | Williamson Burnet County Opportunities | 604 High Tech Dr | Georgetown | WILLIAMSON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Child Care Associates | 3000 E Belknap St | Fort Worth | TARRANT | NON-COMPETING CONTINUATION | $20,701,385 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | KERRVILLE INDEPENDENT SCHOOL DISTRICT | 1009 BARNETT ST | KERRVILLE | KERR | NON-COMPETING CONTINUATION | $814,544 |
| 2021 | PLANO INDEPENDENT SCHOOL DISTRICT | 2700 W 15TH ST | PLANO | COLLIN | NON-COMPETING CONTINUATION | $1,169,138 |
| 2021 | Central Texas 4C, Inc | 504 N 5th St | Temple | BELL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $4,687,480 |
| 2021 | COMMUNITY SERVICES OF N E TEXAS INC | 304 E HOUSTON ST | LINDEN | CASS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $50,022 |
| 2021 | REGION XIX EDUCATION SERVICE CENTER | 6611 BOEING DR | EL PASO | EL PASO | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | DENTON INDEPENDENT SCHOOL DISTRICT | 1307 N LOCUST ST | DENTON | DENTON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $17,754 |

| | | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|---|
| 2021 | Bakerripley | 4450 Harrisburg Blvd Ste 200 | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $272,970 |
| 2021 | Bonham Independent School District | 1005 Chestnut St | Bonham | FANNIN | NON-COMPETING CONTINUATION | $1,094,206 |
| 2021 | Ascension Depaul Services | 7607 Somerset Rd | San Antonio | BEXAR | NON-COMPETING CONTINUATION | $634,548 |
| 2021 | NUECES COUNTY COMMUNITY ACTION AGENCY | 101 SOUTH PADRE ISLAND DR | CORPUS CHRISTI | NUECES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | NON-COMPETING CONTINUATION | $5,708,028 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | NON-COMPETING CONTINUATION | $11,259,773 |
| 2021 | Hidalgo County Headstart Program Inc | 1901 W STATE HIGHWAY 107 | MCALLEN | HIDALGO | NON-COMPETING CONTINUATION | $14,620,859 |
| 2021 | Education Service Center Region 20 | 1314 Hines Ave | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$3,692 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$81,615 |
| 2021 | WEBB, COUNTY OF | 1308 SAN AGUSTIN AVE | LAREDO | WEBB | NON-COMPETING CONTINUATION | $864,237 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $131,890 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $478,335 |
| 2021 | Rolling Plains Management Corporation | 118 North 1st St | Crowell | FOARD | NON-COMPETING CONTINUATION | $1,315,085 |
| 2021 | ChildCareGroup | 20 West Mockingbird Ln Ste 3( | Dallas | DALLAS | NON-COMPETING CONTINUATION | $1,661,059 |
| 2021 | North Texas Parent and Child Development, Inc. | 500 Flood St | Wichita Falls | WICHITA | NEW | $28,893 |
| 2021 | COMMUNITY SERVICES OF N E TEXAS INC | 304 E HOUSTON ST | LINDEN | CASS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $575,517 |

| TAGGS Grants By Location Metro Nonmetro Export | | | | | |
|---|---|---|---|---|---|
| 2021 | CHILD INC. | 818 E 53RD ST | AUSTIN | TRAVIS | NEW | $449,648 |
| 2021 | GULF COAST COMMUNITY SERVICES ASSOCIATION, INC. | 9320 Kirby Dr | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,294,887 |
| 2021 | HITCHCOCK INDEPENDENT SCHOOL DISTRICT | 7801 Neville Ave Bldg B | Hitchcock | GALVESTON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $263,230 |
| 2021 | HITCHCOCK INDEPENDENT SCHOOL DISTRICT | 7801 Neville Ave Bldg B | Hitchcock | GALVESTON | NEW | $66,213 |
| 2021 | Center For Transforming Lives | 512 W 4th St | Fort Worth | TARRANT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $845,785 |
| 2021 | SER-JOBS FOR PROGRESS NATIONAL, INC. | 100 EAST ROYAL LANE STE 130 | IRVING | DALLAS | NEW | $21,670 |
| 2021 | Central Texas 4c, Inc | 504 N 5th St | Temple | BELL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $655,682 |
| 2021 | ALABAMA-COUSHATTA TRIBE OF TEXAS, THE | 571 STATE PARK RD 56 | LIVINGSTON | POLK | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $421,884 |
| 2021 | HARRIS COUNTY DEPARTMENT OF EDUCATION | 6300 IRVINGTON BLVD | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | SAN ANTONIO, CITY OF | 111 SOLEDAD ST STE 500 | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $3,017,836 |
| 2021 | Child Care Associates | 3000 E Belknap St | Fort Worth | TARRANT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $18,453 |
| 2021 | PLANO INDEPENDENT SCHOOL DISTRICT | 2700 W 15TH ST | PLANO | COLLIN | NEW | $43,941 |
| 2021 | Cooper Independent School District | 440 SW 3rd St | Cooper | DELTA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $64,611 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | NEW | $3,613,699 |
| 2021 | Bakerripley | 4450 Harrisburg Blvd Ste 200 | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $117,350 |
| 2021 | BakerRipley | 4450 Harrisburg Blvd Ste 200 | Houston | HARRIS | NEW | $9,764,391 |

| | | TAGGS Grants By Location Metro Nonmetro Export | | | | |
|---|---|---|---|---|---|---|
| 2021 | Lubbock Independent School District | 1628 19th St | Lubbock | LUBBOCK | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $47,584 |
| 2021 | Williamson Burnet County Opportunities | 604 High Tech Dr | Georgetown | WILLIAMSON | NON-COMPETING CONTINUATION | $4,068,419 |
| 2021 | GREATER OPPORTUNITIES OF THE PERMIAN BASIN INC | 206 W 5TH ST | ODESSA | ECTOR | NON-COMPETING CONTINUATION | $7,219,543 |
| 2021 | SAN ANTONIO, CITY OF | 111 SOLEDAD ST STE 500 | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $1,058,948 |
| 2021 | Central Texas 4c, Inc | 504 N 5th St | Temple | BELL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,082,160 |
| 2021 | COMMUNITY SERVICES OF N E TEXAS INC | 304 E Houston St | Linden | CASS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | WEBB, COUNTY OF | 1308 SAN AGUSTIN AVE | LAREDO | WEBB | NON-COMPETING CONTINUATION | $11,215,902 |
| 2021 | Sulphur Springs Independent School District | 631 Connally St | Sulphur Springs | HOPKINS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $17,348 |
| 2021 | Sulphur Springs Independent School District | 631 Connally St | Sulphur Springs | HOPKINS | NON-COMPETING CONTINUATION | $1,442,101 |
| 2021 | ChildCareGroup | 420 West Mockingbird Ln Ste 3 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $105,620 |
| 2021 | MOUNT PLEASANT INDEPENDENT SCHOOL DISTRICT | 1602 W Ferguson Rd | Mount Pleasant | TITUS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $36,524 |
| 2021 | Austin Independent School District (Inc) | 4000 S IH 35 Frontage Rd | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $19,977 |
| 2021 | ECONOMIC OPPORTUNITIES ADVANCEMENT CORPORATION OF PLANNING REGION XI | 500 FRANKLIN AVE | WACO | MCLENNAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | CONCHO VALLEY COUNCIL OF GOVERNMENTS | 2801 W LOOP 306 STE A | SAN ANGELO | TOM GREEN | NON-COMPETING CONTINUATION | $6,448,244 |
| 2021 | Bonham Independent School District | 1005 Chestnut St | Bonham | FANNIN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $13,139 |

Appx. 74

| | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|
| 2021 | Cen-Tex Family Services, Inc. | 2402 N Main St | Bastrop | BASTROP | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $3,224,851 |
| 2021 | Parent/child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,973,206 |
| 2021 | Rolling Plains Management Corporation | 118 North 1st St | Crowell | FOARD | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,122,655 |
| 2021 | Rolling Plains Management Corporation | 118 North 1st St | Crowell | FOARD | NON-COMPETING CONTINUATION | $1,096,256 |
| 2021 | NUECES COUNTY COMMUNITY ACTION AGENCY | 101 SOUTH PADRE ISLAND DR | CORPUS CHRISTI | NUECES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | PARIS INDEPENDENT SCHOOL DISTRICT | 1920 CLARKSVILLE ST | PARIS | LAMAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $19,248 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,404,932 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$597,589 |
| 2021 | Education Service Center Region 20 | 1314 Hines Ave | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | HEAD START OF GREATER DALLAS INC | 3954 GANNON LN | DALLAS | DALLAS | NON-COMPETING CONTINUATION | $2,839,309 |
| 2021 | Parent/Child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $30,200 |
| 2021 | Center For Transforming Lives | 512 W 4th St | Fort Worth | TARRANT | NON-COMPETING CONTINUATION | $1,502,332 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,601,400 |

| | | TAGGS Grants By Location Metro Nonmetro Export | | | | |
|---|---|---|---|---|---|---|
| 2021 | Region XVI Education Service Center | 5800 Bell St | Amarillo | RANDALL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,109,430 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | NEW | $241,077 |
| 2021 | COMMUNITY COUNCIL OF SOUTH CENTRAL TEXAS, INC. | 801 N HIGHWAY 123 BYP | SEGUIN | GUADALUPE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $314,680 |
| 2021 | AVANCE, INC. | 118 N MEDINA ST | SAN ANTONIO | BEXAR | NEW | $229,941 |
| 2021 | Brazos Valley Community Action Programs | 3991 E 29th St | Bryan | BRAZOS | NEW | $160,718 |
| 2021 | North Texas Parent and Child Development, Inc. | 500 Flood St | Wichita Falls | WICHITA | NEW | $541,247 |
| 2021 | Hill Country Community Action Association, Inc. | 2905 W Wallace | San Saba | SAN SABA | NEW | $3,189,411 |
| 2021 | Child Care Associates | 3000 E Belknap St | Fort Worth | TARRANT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Community Council of South Central Texas, Inc. | 801 N Highway 123 Byp | Seguin | GUADALUPE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,295,684 |
| 2021 | COMMUNITY COUNCIL OF SOUTH CENTRAL TEXAS, INC. | 801 N HIGHWAY 123 BYP | SEGUIN | GUADALUPE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $31,238 |
| 2021 | AVANCE, INC. | 118 N MEDINA ST | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $7,749,039 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | NON-COMPETING CONTINUATION | $3,777,581 |
| 2021 | Central Texas 4C, Inc | 504 N 5th St | Temple | BELL | NON-COMPETING CONTINUATION | $1,209,959 |
| 2021 | Brazos Valley Community Action Programs | 3991 E 29th St | Bryan | BRAZOS | NON-COMPETING CONTINUATION | $2,503,776 |
| 2021 | Tri-County Community Action, Inc. | 214 Nacogdoches St | Center | SHELBY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $72,354 |
| 2021 | ChildCareGroup | 20 West Mockingbird Ln Ste 3( | Dallas | DALLAS | NON-COMPETING CONTINUATION | $8,781,694 |
| 2021 | Central Texas Opportunities, Inc. | 114 Needham St | Coleman | COLEMAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |

| TAGGS Grants By Location Metro Nonmetro Export | | | | | |
|---|---|---|---|---|---|
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | NON-COMPETING CONTINUATION | $2,392,414 |
| 2021 | Hidalgo County Headstart Program Inc | 1901 W STATE HIGHWAY 107 | MCALLEN | HIDALGO | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $14,973,672 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | HEAD START OF GREATER DALLAS INC | 3954 GANNON LN | DALLAS | DALLAS | NEW | $1,700,645 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Child Care Associates | 3000 E Belknap St | Fort Worth | TARRANT | NON-COMPETING CONTINUATION | $1,548,295 |
| 2021 | WEST TEXAS OPPORTUNITIES, INCORPORATED | 603 N 4TH | LAMESA | DAWSON | NEW | $125,504 |
| 2021 | Family Service Association of San Antonio, Inc. | 702 San Pedro Ave | San Antonio | BEXAR | NEW | $338,892 |
| 2021 | Tri-County Community Action, Inc. | 214 Nacogdoches St | Center | SHELBY | NEW | $188,407 |
| 2021 | COLLEGE STATION INDEPENDENT SCHOOL DISTRICT | 1812 WELSH | COLLEGE STATION | BRAZOS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $348,182 |
| 2021 | ECONOMIC OPPORTUNITIES ADVANCEMENT CORPORATION OF PLANNING REGION XI | 500 FRANKLIN AVE | WACO | MCLENNAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,073,261 |
| 2021 | Tyler Independent School District | 1319 Earl Campbell Pkwy | Tyler | SMITH | NEW | $60,194 |
| 2021 | GULF COAST COMMUNITY SERVICES ASSOCIATION, INC. | 9320 Kirby Dr | Houston | HARRIS | NEW | $577,259 |
| 2021 | SAN FELIPE DEL RIO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT | 315 GRINER ST | DEL RIO | VAL VERDE | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $413,989 |
| 2021 | COUNTY OF SWISHER | 130 N ARMSTRONG AVE | TULIA | SWISHER | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $112,471 |

| | | **TAGGS Grants By Location Metro Nonmetro Export** | | | | |
|---|---|---|---|---|---|---|
| 2021 | Child Care Associates | 3000 E Belknap St | Fort Worth | TARRANT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,172,844 |
| 2021 | Cooper Independent School District | 440 SW 3rd St | Cooper | DELTA | NEW | $16,252 |
| 2021 | COUNTY OF SWISHER | 130 N ARMSTRONG AVE | TULIA | SWISHER | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $385,318 |
| 2021 | DETROIT HEAD START | 3rd St SE | DETROIT | RED RIVER | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $549,499 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,142,136 |
| 2021 | Region XVI Education Service Center | 5800 Bell St | Amarillo | RANDALL | NON-COMPETING CONTINUATION | $14,062,580 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 SOUTH ST | NACOGDOCHES | NACOGDOCHES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $22,411 |
| 2021 | AVANCE - HOUSTON, INC. | 4281 DACOMA ST | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $259,394 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | SULPHUR SPRINGS INDEPENDENT SCHOOL DISTRICT | 631 CONNALLY ST | SULPHUR SPRINGS | HOPKINS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | BakerRipley | 4450 Harrisburg Blvd Ste 200 | Houston | HARRIS | NON-COMPETING CONTINUATION | $11,329,762 |
| 2021 | Pecos County Community Action Agency | 101 N Jackson St | Fort Stockton | PECOS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $11,085 |
| 2021 | Parent/Child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Community Action, Inc. Of Central Texas | 215 REIMER AVE STE 130 | SAN MARCOS | HAYS | NON-COMPETING CONTINUATION | $3,320,685 |

| | | TAGGS Grants By Location Metro Nonmetro Export | | | | |
|---|---|---|---|---|---|---|
| 2021 | Community Action, Inc. Of Central Texas | 215 REIMER AVE STE 130 | SAN MARCOS | HAYS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | REGION VII EDUCATION SERVICE CENTER | 1909 N LONGVIEW ST | KILGORE | GREGG | NON-COMPETING CONTINUATION | $457,459 |
| 2021 | Hill Country Community Action Association, Inc. | 2905 W Wallace | San Saba | SAN SABA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$225,625 |
| 2021 | University Of Texas Health Science Center At Houston, The | 7000 Fannin St | Houston | HARRIS | NEW | $250,000 |
| 2021 | Center For Transforming Lives | 512 W 4th St | Fort Worth | TARRANT | NEW | $1,216,333 |
| 2021 | Motivation, Education & Training, Inc. | 22551 Gene Campbell Blvd | New Caney | MONTGOMERY | NEW | $2,896,900 |
| 2021 | AVANCE - Houston, Inc. | 4281 Dacoma St | Houston | HARRIS | NON-COMPETING CONTINUATION | $1,755,796 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | NON-COMPETING CONTINUATION | $1,952,682 |
| 2021 | CHILD INC. | 818 E 53RD ST | AUSTIN | TRAVIS | NON-COMPETING CONTINUATION | $769,778 |
| 2021 | WEST TEXAS OPPORTUNITIES, INCORPORATED | 603 N 4TH | LAMESA | DAWSON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $498,941 |
| 2021 | Family Service Association of San Antonio, Inc. | 702 San Pedro Ave | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,509,983 |
| 2021 | DETROIT HEAD START | 3rd St SE | DETROIT | RED RIVER | NEW | $39,728 |
| 2021 | REGION 9 ED SERVICE CENTER | 301 LOOP 11 | WICHITA FALLS | WICHITA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $753,795 |
| 2021 | NEIGHBORS IN NEED OF SERVICES, INC., (NINOS) | 22887 State Highway 345 | Rio Hondo | CAMERON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,900,316 |
| 2021 | Tri-County Community Action, Inc. | 214 Nacogdoches St | Center | SHELBY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $749,009 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,633,223 |

| | **TAGGS Grants By Location Metro Nonmetro Export** | | | | | |
|---|---|---|---|---|---|---|
| 2021 | GREATER OPPORTUNITIES OF THE PERMIAN BASIN INC | 206 W 5TH ST | ODESSA | ECTOR | NEW | $253,416 |
| 2021 | CHILD INC. | 818 E 53RD ST | AUSTIN | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,787,571 |
| 2021 | KIDS ARE FIRST, INC. | 2208 N 1ST ST | CARRIZO SPRINGS | DIMMIT | NEW | $211,280 |
| 2021 | Sulphur Springs Independent School District | 631 Connally St | Sulphur Springs | HOPKINS | NEW | $53,873 |
| 2021 | COUNTY OF SWISHER | 130 N ARMSTRONG AVE | TULIA | SWISHER | NEW | $28,291 |
| 2021 | Jumpstart Enrichment For Tomorrow's Students, Incorporated | 4301 Avenue U | Snyder | SCURRY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $16,562 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $1,251,900 |
| 2021 | Center For Transforming Lives | 512 W 4th St | Fort Worth | TARRANT | NON-COMPETING CONTINUATION | $4,690,364 |
| 2021 | SAN ANTONIO, CITY OF | 111 Soledad St Ste 500 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $25,282 |
| 2021 | TEXAS TECH UNIVERSITY SYSTEM | 2500 BROADWAY | LUBBOCK | LUBBOCK | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $9,598 |
| 2021 | TERRELL INDEPENDENT SCHOOL DISTRICT | 700 N CATHERINE ST | TERRELL | KAUFMAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $13,486 |
| 2021 | PARENT/CHILD INCORPORATED OF SAN ANTONIO AND BEXAR | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $22,710 |
| 2021 | CHILD INC. | 818 E 53RD ST | AUSTIN | TRAVIS | NON-COMPETING CONTINUATION | $15,638,266 |
| 2021 | Childcaregroup | 20 West Mockingbird Ln Ste 3 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $21,077 |
| 2021 | Parent/Child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | BCFS EDUCATION SERVICES | 1506 Bexar Crossing | San Antonio | BEXAR | NON-COMPETING CONTINUATION | $1,436,153 |

| | | TAGGS Grants By Location Metro Nonmetro Export | | | | |
|---|---|---|---|---|---|---|
| 2021 | HITCHCOCK INDEPENDENT SCHOOL DISTRICT | 7801 Neville Ave Bldg B | Hitchcock | GALVESTON | NON-COMPETING CONTINUATION | $819,272 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | NON-COMPETING CONTINUATION | $1,950,900 |
| 2021 | COUNTY OF SWISHER | 130 N ARMSTRONG AVE | TULIA | SWISHER | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Jumpstart Enrichment For Tomorrow'S Students, Incorporated | 4301 Avenue U | Snyder | SCURRY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | University Of Texas Health Science Center At Houston, The | 7000 Fannin St | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$1,660 |
| 2021 | AVANCE - Houston, Inc. | 4281 Dacoma St | Houston | HARRIS | NON-COMPETING CONTINUATION | $4,290,560 |
| 2021 | Community Action Corporation Of South Texas | 204 E 1st St | Alice | JIM WELLS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,707,064 |
| 2021 | Rolling Plains Management Corporation | 118 North 1st St | Crowell | FOARD | NEW | $131,222 |
| 2021 | DETROIT HEAD START | 3rd St SE | DETROIT | RED RIVER | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $179,939 |
| 2021 | SAN ANTONIO, CITY OF | 111 SOLEDAD ST STE 500 | SAN ANTONIO | BEXAR | NEW | $1,012,460 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $958,397 |
| 2021 | NEIGHBORS IN NEED OF SERVICES, INC., (NINOS) | 22887 State Highway 345 | Rio Hondo | CAMERON | NEW | $729,549 |
| 2021 | ChildCareGroup | 20 West Mockingbird Ln Ste 3 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,535,110 |
| 2021 | KERRVILLE INDEPENDENT SCHOOL DISTRICT | 1009 BARNETT ST | KERRVILLE | KERR | NEW | $26,184 |

| TAGGS Grants By Location Metro Nonmetro Export | | | | | |
|---|---|---|---|---|---|
| 2021 | GREATER OPPORTUNITIES OF THE PERMIAN BASIN INC | 206 W 5TH ST | ODESSA | ECTOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,007,453 |
| 2021 | AVANCE - HOUSTON, INC. | 4281 DACOMA ST | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,383,428 |
| 2021 | ABILENE INDEPENDENT SCHOOL DISTRICT | 241 PINE ST | ABILENE | TAYLOR | NEW | $156,805 |
| 2021 | Parent/child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | NEW | $370,794 |
| 2021 | ASCENSION DEPAUL SERVICES | 7607 SOMERSET RD | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $118,454 |
| 2021 | University Of Texas Rio Grande Valley, The | 1201 West University Dr | Edinburg | HIDALGO | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $445,098 |
| 2021 | Austin Independent School District (Inc) | 4000 S IH 35 Frontage Rd | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $244,086 |
| 2021 | Child Care Associates | 3000 E Belknap St | Fort Worth | TARRANT | NEW | $546,560 |
| 2021 | NUECES COUNTY COMMUNITY ACTION AGENCY | 101 SOUTH PADRE ISLAND DR | CORPUS CHRISTI | NUECES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,106,763 |
| 2021 | Community Action Corporation Of South Texas | 204 E 1st St | Alice | JIM WELLS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $185,647 |
| 2021 | COUNTY OF SWISHER | 130 N ARMSTRONG AVE | TULIA | SWISHER | NEW | $376,307 |
| 2021 | NEIGHBORS IN NEED OF SERVICES, INC., (NINOS) | 22887 State Highway 345 | Rio Hondo | CAMERON | NON-COMPETING CONTINUATION | $23,684,623 |
| 2021 | Cooper Independent School District | 440 SW 3rd St | Cooper | DELTA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $4,814 |
| 2021 | Terrell Independent School District | 700 N Catherine St | Terrell | KAUFMAN | NON-COMPETING CONTINUATION | $1,123,343 |
| 2021 | COMMUNITY SERVICES OF N E TEXAS INC | 304 E Houston St | Linden | CASS | NON-COMPETING CONTINUATION | $2,072,914 |
| 2021 | BRAZORIA COUNTY HEAD START EARLY LEARNING SCHOOLS, INC. | 651 W Miller St. | ANGLETON | BRAZORIA | NON-COMPETING CONTINUATION | $2,289,072 |

| | | | | | | |
|---|---|---|---|---|---|---|
| TAGGS Grants By Location Metro Nonmetro Export | | | | | | |
| 2021 | BakerRipley | 4450 Harrisburg Blvd Ste 200 | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $11,329,759 |
| 2021 | Austin Independent School District (Inc) | 4000 S IH 35 Frontage Rd | Austin | TRAVIS | NON-COMPETING CONTINUATION | $1,658,881 |
| 2021 | ECONOMIC OPPORTUNITIES ADVANCEMENT CORPORATION OF PLANNING REGION XI | 500 FRANKLIN AVE | WACO | MCLENNAN | NON-COMPETING CONTINUATION | $8,210,503 |
| 2021 | Pecos County Community Action Agency | 101 N Jackson St | Fort Stockton | PECOS | NON-COMPETING CONTINUATION | $924,234 |
| 2021 | Cen-Tex Family Services, Inc. | 2402 N Main St | Bastrop | BASTROP | NON-COMPETING CONTINUATION | $2,215,797 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | WEST TEXAS OPPORTUNITIES, INCORPORATED | 603 N 4TH | LAMESA | DAWSON | NON-COMPETING CONTINUATION | $2,343,356 |
| 2021 | Central Texas 4c, Inc | 504 N 5th St | Temple | BELL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Childcaregroup | 20 West Mockingbird Ln Ste 3( | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$11,058 |
| 2021 | REGION XIX EDUCATION SERVICE CENTER | 6611 BOEING DR | EL PASO | EL PASO | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Cen-Tex Family Services, Inc. | 2402 N Main St | Bastrop | BASTROP | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Motivation, Education & Training, Inc. | 22551 Gene Campbell Blvd | New Caney | MONTGOMERY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Motivation, Education & Training, Inc. | 22551 Gene Campbell Blvd | New Caney | MONTGOMERY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Central Texas Opportunities, Inc. | 114 Needham St | Coleman | COLEMAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $483,386 |

| | | | TAGGS Grants By Location Metro Nonmetro Export | | |
|---|---|---|---|---|---|
| 2021 | COMMUNITY SERVICES OF N E TEXAS INC | 304 E HOUSTON ST | LINDEN | CASS | NEW | $144,766 |
| 2021 | BakerRipley | 4450 Harrisburg Blvd Ste 200 | Houston | HARRIS | NEW | $879,131 |
| 2021 | Motivation, Education & Training, Inc. | 22551 Gene Campbell Blvd | New Caney | MONTGOMERY | NEW | $396,376 |
| 2021 | Education Service Center Region 20 | 1314 Hines Ave | San Antonio | BEXAR | NEW | $260,940 |
| 2021 | TEXAS NEIGHBORHOOD SERVICES | 522 PALO PINTO ST | WEATHERFORD | PARKER | NEW | $326,850 |
| 2021 | KIDS ARE FIRST, INC. | 2208 N 1ST ST | CARRIZO SPRINGS | DIMMIT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $3,533,440 |
| 2021 | GREATER EAST TEXAS COMMUNITY ACTION PROGRAM | 1716 South St | Nacogdoches | NACOGDOCHES | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $929,123 |
| 2021 | AVANCE - Houston, Inc. | 4281 Dacoma St | Houston | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $10,771,400 |
| 2021 | SAN ANTONIO, CITY OF | 111 SOLEDAD ST STE 500 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,058,947 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $16,913 |
| 2021 | TEXAS TECH UNIVERSITY SYSTEM | 2500 BROADWAY | LUBBOCK | LUBBOCK | NON-COMPETING CONTINUATION | $803,692 |
| 2021 | Parent/Child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $951,100 |
| 2021 | Parent/Child Incorporated Of San Antonio And Bexar | 7815 MAINLAND DR STE 101 | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Childcaregroup | 20 West Mockingbird Ln Ste 3 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | NON-COMPETING CONTINUATION | $4,608,708 |
| 2021 | Ascension Depaul Services | 7607 Somerset Rd | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $634,547 |

| | TAGGS Grants By Location Metro Nonmetro Export | | | | |
|---|---|---|---|---|---|
| 2021 | EDUCATION SERVICE CENTER REGION 10 | 400 E SPRING VALLEY RD | RICHARDSON | DALLAS | NON-COMPETING CONTINUATION | $10,250,930 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | NON-COMPETING CONTINUATION | $13,961,297 |
| 2021 | GREENVILLE INDEPENDENT SCHOOL DISTRICT | 2504 CARVER ST | GREENVILLE | HUNT | NON-COMPETING CONTINUATION | $1,267,574 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $2,569,089 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$146,726 |
| 2021 | University Of Texas Health Science Center At Houston, The | 7000 Fannin St | Houston | HARRIS | NON-COMPETING CONTINUATION | $225,000 |
| 2021 | Jumpstart Enrichment For Tomorrow'S Students, Incorporated | 4301 Avenue U | Snyder | SCURRY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | North Texas Parent And Child Development, Inc. | 500 Flood St | Wichita Falls | WICHITA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | NON-COMPETING CONTINUATION | $1,934,355 |
| 2021 | TEXARKANA SPECIAL EDUCATION CENTER, INC. | 6101 N STATE LINE AVE | TEXARKANA | BOWIE | NEW | $21,670 |
| 2021 | South San Antonio Independent School District | 1450 Gillette Blvd | San Antonio | BEXAR | NEW | $86,679 |
| 2021 | WEST ORANGE-COVE CONSOLIDATED INDEPENDENT SCHOOL | 801 CORDREY ST | ORANGE | ORANGE | NEW | $71,932 |
| 2021 | Cen-Tex Family Services, Inc. | 2402 N Main St | Bastrop | BASTROP | NEW | $145,970 |
| 2021 | CONCHO VALLEY COUNCIL OF GOVERNMENTS | 2801 W LOOP 306 STE A | SAN ANGELO | TOM GREEN | NEW | $170,048 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | NEW | $410,823 |
| 2021 | MOUNT PLEASANT INDEPENDENT SCHOOL DISTRICT | 1602 W Ferguson Rd | Mount Pleasant | TITUS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $400,828 |
| 2021 | Community Action, Inc. Of Central Texas | 215 REIMER AVE STE 130 | SAN MARCOS | HAYS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $637,735 |

| TAGGS Grants By Location Metro Nonmetro Export | | | | | |
|---|---|---|---|---|---|
| 2021 | WEST ORANGE-COVE CONSOLIDATED INDEPENDENT SCHOOL | 801 CORDREY ST | ORANGE | ORANGE | NON-COMPETING CONTINUATION | $1,752,651 |
| 2021 | Region Xvi Education Service Center | 5800 Bell St | Amarillo | RANDALL | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $168,968 |
| 2021 | EDUCATION AGENCY, TEXAS | 1850 STATE HWY 351 | ABILENE | TAYLOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | AVANCE, INC. | 118 N MEDINA ST | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $639,002 |
| 2021 | ChildCareGroup | 20 West Mockingbird Ln Ste 30 | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $561,313 |
| 2021 | Brazos Valley Community Action Programs | 3991 E 29th St | Bryan | BRAZOS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $2,564,001 |
| 2021 | BEAUMONT INDEPENDENT SCHOOL DISTRICT | 3395 HARRISON AVE | BEAUMONT | JEFFERSON | NON-COMPETING CONTINUATION | $3,535,265 |
| 2021 | HEAD START OF GREATER DALLAS INC | 3954 GANNON LN | DALLAS | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $404,572 |
| 2021 | DENTON INDEPENDENT SCHOOL DISTRICT | 1307 N Locust St | Denton | DENTON | NON-COMPETING CONTINUATION | $1,476,401 |
| 2021 | PARIS INDEPENDENT SCHOOL DISTRICT | 1920 CLARKSVILLE ST | PARIS | LAMAR | NON-COMPETING CONTINUATION | $1,599,957 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | GREATER OPPORTUNITIES OF THE PERMIAN BASIN INC | 206 W 5TH ST | ODESSA | ECTOR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$76,018 |
| 2021 | TEXAS MIGRANT COUNCIL INC | 5215 MCPHERSON RD | LAREDO | WEBB | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$620,335 |
| 2021 | Kickapoo Traditional Tribe of Texas | 2212 Rosita Valley Rd | Eagle Pass | MAVERICK | NEW | $10,233 |

Appx. 86

| | | | | TAGGS Grants By Location Metro Nonmetro Export | |
|---|---|---|---|---|---|
| 2021 | Center For Transforming Lives | 512 W 4th St | Fort Worth | TARRANT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$63,274 |
| 2021 | Texas City Independent School District | 1700 9th Ave N | Texas City | GALVESTON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $184,261 |
| 2021 | HARRIS COUNTY DEPARTMENT OF EDUCATION | 6300 IRVINGTON BLVD | HOUSTON | HARRIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,517,162 |
| 2021 | Community Council of South Central Texas, Inc. | 801 N Highway 123 Byp | Seguin | GUADALUPE | NEW | $79,155 |
| 2021 | GALENA PARK INDEPENDENT SCHOOL DISTRICT | 14705 WOODFOREST BLVD | HOUSTON | HARRIS | NEW | $19,262 |
| 2021 | AVANCE, INC. | 118 N MEDINA ST | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $914,126 |
| 2021 | San Felipe Del Rio Consolidated Independent School District | 315 Griner St | Del Rio | VAL VERDE | NEW | $104,135 |
| 2021 | BEAUMONT INDEPENDENT SCHOOL DISTRICT | 3395 HARRISON AVE | BEAUMONT | JEFFERSON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $610,215 |
| 2021 | Education Service Center Region 20 | 1314 Hines Ave | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,037,366 |
| 2021 | KIDS ARE FIRST, INC. | 2208 N 1ST ST | CARRIZO SPRINGS | DIMMIT | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $839,943 |
| 2021 | Jumpstart Enrichment For Tomorrow'S Students, Incorporated | 4301 Avenue U | Snyder | SCURRY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $148,366 |
| 2021 | Lubbock Independent School District | 1628 19th St | Lubbock | LUBBOCK | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $646,110 |
| 2021 | Central Texas 4C, Inc | 504 N 5th St | Temple | BELL | NEW | $164,931 |
| 2021 | North Texas Parent And Child Development, Inc. | 500 Flood St | Wichita Falls | WICHITA | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,320,969 |

| | | | TAGGS Grants By Location Metro Nonmetro Export | | |
|---|---|---|---|---|---|
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $40,266 |
| 2021 | NEIGHBORS IN NEED OF SERVICES, INC., (NINOS) | 22887 State Highway 345 | Rio Hondo | CAMERON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $318,883 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | NON-COMPETING CONTINUATION | $1,418,844 |
| 2021 | Central Texas 4C, Inc | 504 N 5th St | Temple | BELL | NON-COMPETING CONTINUATION | $1,738,763 |
| 2021 | Cooper Independent School District | 440 SW 3rd St | Cooper | DELTA | NON-COMPETING CONTINUATION | $405,529 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $43,725 |
| 2021 | AVANCE, INC. | 118 N MEDINA ST | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $654,264 |
| 2021 | PORT ARTHUR INDEPENDENT SCHOOL DISTRICT | 4801 9TH AVE | PORT ARTHUR | JEFFERSON | NON-COMPETING CONTINUATION | $2,804,619 |
| 2021 | REGION 9 ED SERVICE CENTER | 301 LOOP 11 | WICHITA FALLS | WICHITA | NON-COMPETING CONTINUATION | $2,281,651 |
| 2021 | HEAD START OF GREATER DALLAS INC | 3954 Gannon Ln | Dallas | DALLAS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | CONCHO VALLEY COUNCIL OF GOVERNMENTS | 2801 W LOOP 306 STE A | SAN ANGELO | TOM GREEN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $77,623 |
| 2021 | Lutheran Social Services Of The South, Inc. | 8305 Cross Park Dr | Austin | TRAVIS | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $594,494 |
| 2021 | Central Texas Opportunities, Inc. | 114 Needham St | Coleman | COLEMAN | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $55,316 |
| 2021 | SOUTH PLAINS COMMUNITY ACTION ASSOCIATION, INC. | 411 AUSTIN ST | LEVELLAND | HOCKLEY | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $28,776 |

| | | | | TAGGS Grants By Location Metro Nonmetro Export | | |
|---|---|---|---|---|---|
| 2021 | Cen-Tex Family Services, Inc. | 2402 N Main St | Bastrop | BASTROP | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | SOUTH SAN ANTONIO INDEPENDENT SCHOOL DISTRICT | 5622 RAY ELLISON BLVD | SAN ANTONIO | BEXAR | NON-COMPETING CONTINUATION | $1,266,061 |
| 2021 | Texas City Independent School District | 1700 9th Ave N | Texas City | GALVESTON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $681,090 |
| 2021 | BCFS EDUCATION SERVICES | 1506 BEXAR CROSSING | SAN ANTONIO | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $1,470,797 |
| 2021 | HITCHCOCK INDEPENDENT SCHOOL DISTRICT | 7801 Neville Ave Bldg B | Hitchcock | GALVESTON | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $839,041 |
| 2021 | AVANCE, INC. | 903 Billy Mitchell Blvd Ste 100 | San Antonio | BEXAR | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | $0 |
| 2021 | DETROIT HEAD START | 3rd St SE | DETROIT | RED RIVER | ADMINISTRATIVE SUPPLEMENT ( + OR - ) (DISCRETIONARY OR BLOCK AWARDS) | -$16,233 |
| Exported on 12 / 08 / 2021 from the HHS Tracking Accountability in Government Grants System (TAGGS), http://taggs.hhs.gov | | | | | | $842,280,184 |

| ACF<br>Administration for Children and Families | U.S. DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES |
|---|---|
| | 1. Log No. ACF-PI-HS-21-04    2. Issuance Date: 05/20/2021 |
| | 3. Originating Office: Office of Head Start |
| | 4. Key Words: ERSEA; Recruitment; Selection; Enrollment; Virtual and Remote Services; In-person Services |

**PROGRAM INSTRUCTION**

**TO:** Head Start and Early Head Start Grantees and Delegate Agencies

**SUBJECT:** Office of Head Start (OHS) Expectations for Head Start Programs in Program Year (PY) 2021–2022

**INSTRUCTION:**

Since the onset of the COVID-19 pandemic, Head Start programs — inclusive of Head Start, Early Head Start, Migrant and Seasonal Head Start, American Indian and Alaska Native Head Start, and Early Head Start-Child Care Partnership programs — have faced unprecedented challenges. Beginning in spring 2020 and throughout PY 2020–2021, all of our directors, staff, and families have demonstrated resiliency, innovation, and perseverance. To date, OHS has provided needed flexibilities and guidance that allowed programs to adapt services based on the changing health conditions in their communities. Now, as programs prepare for PY 2021–2022, OHS is providing updated guidance.

This Program Instruction (PI) outlines OHS's expectations for Head Start programs to begin working toward full enrollment and providing in-person comprehensive services for all enrolled children, regardless of program option. The PI also addresses whether virtual or remote services are an allowable, long-term, locally designed option (LDO).

By *virtual*, OHS means services for children provided through technology. *Remote* refers to services provided via the delivery of supports and resources, such as educational materials or food boxes.

**Operating Status and Enrollment**

OHS expects Head Start programs to provide comprehensive services in their approved program options beginning in PY 2021–2022, to the extent possible, as local health conditions allow.

OHS acknowledges programs are in different stages of fully returning to in-person services. Many programs continued to provide in-person services for children and families throughout the COVID-19 pandemic. These programs are expected to continue serving children in person, as local health conditions allow.

Other Head Start programs have been alternating between in-person services, virtual or remote services, or some combination of the two, due to community health conditions. These programs are expected to move to in-person services, as local health conditions allow.

OHS expects programs to work toward full enrollment and full comprehensive services, contingent upon U.S. Centers for Disease Control and Prevention (CDC) guidelines and state and local health department guidance and in consideration of local school districts' decisions.

In September 2021, OHS will begin reviewing monthly enrollment in the Head Start Enterprise System (HSES) and discuss program plans for moving to full enrollment. Programs should build toward full enrollment and provide comprehensive services for all enrolled children as soon as possible. Programs must communicate with their Regional Office and be able to demonstrate why they are unable to be fully enrolled or serve children in person in their approved programs options. All programs must have plans in place that allow for adaptation to changing guidance and to changes in community conditions, which may affect achieving full enrollment or cause programs to temporarily suspend in-person services.

Beginning January 2022, OHS will reinstate pre-pandemic practices for tracking and monitoring enrollment. OHS will also resume evaluating which programs enter into the Full Enrollment Initiative in January 2022. All programs will start fresh, including those participating in the Full Enrollment Initiative prior to the pandemic. Reported enrollment in January 2022 is the first month of enrollment that OHS will evaluate for the under-enrollment process.

**Virtual and Remote Services**

Virtual and remote services for children are considered an interim strategy in the presence of an emergency or disaster and will not be approved as an LDO.

OHS has supported the implementation of virtual and remote services over the past 13 months. However, they are not an acceptable replacement for in-person comprehensive services. For PY 2021–2022, it is unallowable to have a program option run entirely by technology or delivering educational material, for example. OHS may still support some portion of services to continue remotely, as necessary.

OHS also recognizes that programs have discovered new virtual strategies for engaging families and reinforcing early learning and development at home. Innovations in virtual practice should be used as enhancements rather than substitutes for previously approved program options and service delivery.

Given their increased capacity to conduct virtual and remote services, programs may establish policies and procedures for temporary, weather-related virtual and remote services.

Head Start grantees have significant one-time funds and layered mitigation strategies available to support a return to in-person services. This includes access to the COVID-19 vaccine for adults.

**Recruitment and Selection**

As grantees look to summer programming and PY 2021–2022, OHS expects programs to prioritize recruiting eligible children and families.

Almost one third of children served in Head Start programs before the pandemic — approximately 250,000 — have not received any services to date.

The pandemic has created and exacerbated long-standing disparities and inequities for families who have been marginalized for decades. The number of children and families in poverty has grown significantly. All grantees should update their community assessments to guide their intensive recruitment efforts and to ensure they are reaching families most in need of services. If a program determines that their pre-pandemic approved program option will not meet the needs of the community, they must submit an updated community assessment and request approval for a change in scope.

Programs should also revisit their established selection criteria based on findings from their updated community assessment. As always, programs must include specific efforts to actively locate and recruit all eligible children and, in particular, those whose families are English language learners, experiencing homelessness, or affected by substance misuse, as well as children with disabilities and children in foster care.

The funds grantees have received from the Coronavirus Aid, Relief, and Economic Security (CARES) and Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Acts, as well from the American Rescue Plan, can and should be used to support enhanced community partnerships and related recruitment efforts. Per OHS guidance in ACF-PI-HS-21-03 FY 2021 American Rescue Plan Funding Increase for Head Start Programs, grantees have flexibility to determine which one-time investments best support the needs of staff, children, and families, while adhering to federal, state, and local guidance. This includes using funds to purchase services, materials, and technology to ramp up recruitment efforts, as well as to provide vaccine outreach and support as one layer of mitigation and protection for staff, children, and families.

Program planning for a full return to in-person services should include new and returning families at every step. Clear communication with families and regular invitations for input ensure Head Start services are most responsive to families, children, and the community.

**Additional Information**

OHS will support grantees through webinars and guidance as programs continue and return fully to in-person services. Additional resources and information are available on the Early Childhood Learning and Knowledge Center (ECLKC) website.

Please direct any questions regarding this PI to your Regional Office.

Thank you for your work on behalf of children and families.

/ Dr. Bernadine Futrell /

Dr. Bernadine Futrell
Director
Office of Head Start

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

---

|  |  |  |
|---|---|---|
| STATE OF TEXAS and LUBBOCK INDEPENDENT SCHOOL DISTRICT, | ) ) ) ) | Civil Action No.: 5:21-CV-300 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| XAVIER BECERRA, *et al.* | ) ) | |
| Defendants. | ) ) | |

---

## CERTIFICATION

I, Shawna Pinckney, Acting Deputy Director, Office of Head Start, certify that, to the best of my knowledge, the materials listed in the accompanying index and attached constitute a true and accurate copy of the materials relevant to the promulgation of the November 30, 2021 Interim Final Rule with Comment Period entitled "Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs," 86 Fed. Reg. 68052 (Nov. 30, 2021), the rule challenged in this litigation. The Department will supplement to the extent additional records are discovered.

Dated: December 27, 2021

Shawna L. Pinckney -S

Digitally signed by Shawna L. Pinckney -S
DN: c=US, o=U.S. Government, ou=HHS,
ou=ACF, ou=People,
0.9.2342.19200300.100.1.1=2000118591,
cn=Shawna L. Pinckney -S
Date: 2021.12.27 12:33:03 -05'00'

Shawna Pinckney
Acting Deputy Director
Office of Head Start

**Index to the Administrative Record for Interim Final Rule with Comment Period entitled "Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs," 86 Fed. Reg. 68052 (Nov. 30, 2021)**

| Document Description | Beginning Bates No. |
|---|---|
| Interim Final Rule with Comment Period, "Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs," 86 Fed. Reg. 68052 (Nov. 30, 2021) | AR 00001 |
| Use Masks to Slow the Spread of COVID-19 (CDC Website) | AR 00051 |
| Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace (OSHA Website) | AR 00053 |
| Science Brief: COVID-19 Vaccines and Vaccination (CDC) | AR 00065 |
| Delta Variant: What We Know About the Science (CDC) | AR 00086 |
| Trends in COVID-19 Cases, Emergency Department Visits, and Hospital Admissions Among Children and Adolescents Aged 0-17 - United States, August 2020-August 2021 (Siegal, et al., MMWR) | AR 00089 |
| Rates of COVID-19 Cases and Deaths by Vaccination Status (CDC Website) | AR 00095 |
| Hospitalizations Associated with COVID-19 Among Children and Adolescents - COVID-NET, 14 States, March 1, 2020-August 14, 2021 (Delahoy, et al., MMWR) | AR 00099 |
| Rates of laboratory-confirmed COVID-19 hospitalizations by vaccination status (CDC Website) | AR 00105 |
| Virological and serological kinetics of SARS-CoV-2 Delta variant vaccine-breakthrough infections: a multi-center cohort study (Chia, et al., medRxiv) | AR 00108 |
| Virological characteristics of SARS-CoV-2 vaccine breakthrough infections in health care workers (Shamier, et al., medRxiv) | AR 00129 |
| Transmission dynamics and epidemiological characteristics of Delta variant infections in China (Kang, et al., medRxiv) | AR 00144 |
| Clinical and Virological Features of SARS-CoV-2 Variants of Concern: A Retrospective Cohort Study Comparing B.1.1.7 (Alpha), B.1.315 (Beta), and B.1.617.2 (Delta) (Ong, et al., Preprints with The Lancet) | AR 00170 |
| SARS-CoV-2 B.1.617.2 Delta variant emergence and vaccine breakthrough (MIcochova, et al., Research Square) | AR 00194 |
| Breaking the Cycle? Intergenerational Effects of an Anti-Poverty Program in Early Childhood (Barr & Gibbs, EdWorking Paper: 19-141) | AR 00223 |
| The Long-Term Impact of the Head Start Program (Bauer & Schanzenbach, The Hamilton Project) | AR 00297 |
| The Benefits and Costs of Head Start (Ludwig & Phillips, Social Policy Report) | AR 00305 |
| Quantifying the Life-Cycle Benefits of a Prototypical Early Childhood Program (Garcia, et al., National Bureau of Economic Research) | AR 00325 |
| Investing in Our Future: The Evidence Base on Preschool Education (Yoshikawa, et al., Society for Research in Child Development) | AR 00371 |
| Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory (CDC Website) | AR 00395 |

| | |
|---|---|
| COVID-19 Weekly Cases and Deaths per 100,000 Population by Age, Race/Ethnicity, and Sex (CDC Website) | AR 00397 |
| Overview of Testing for SARS-CoV-2 (COVID-19) (CDC) | AR 00399 |
| OHS COVID-19 Update (OHS ECLKC Website) | AR 00410 |
| COVID-NET Laboratory-confirmed COVID-19 hospitalizations (CDC Website) | AR 00415 |
| Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings - Barnstable County, Massachusetts, July 2021 (Brown, et al., MMWR) | AR 00420 |
| Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study (Singanayagam, et al., The Lancet Infectious Diseases) | AR 00424 |
| COVID-19 Guidance for Operating Early Care and Education/Child Care Programs (CDC Website) | AR 00444 |
| Monitoring Incidence of COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status - 13 U.S. Jurisdictions, April 4-July 17, 2021 (Scobie, et al., MMWR) | AR 00457 |
| Rates of laboratory-confirmed COVID-19 hospitalizations by vaccination status (CDC) | AR 00464 |
| Effectiveness of COVID-19 Vaccines in Preventing SARS-Cov-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance - Eight U.S. Locations, December 2020-August 2021 (Fowlkes, et al., MMWR) | AR 00467 |
| Effect of Vaccination on Transmission of SARS-CoV-2 (The New England Journal of Medicine) | AR 00470 |
| Community-level evidence for SARS-CoV-2 vaccine protection of unvaccinated individuals (Milman, et al., Nature Medicine) | AR 00474 |
| COVID Data Tracker: Pediatric Data (CDC Website) | AR 00487 |
| COVID Data Tracker Weekly Reviews, Sept. - Oct. 2021 (CDC Website) | AR 00492 |
| Transmission Dynamics of COVID-19 Outbreaks Associated with Child Care Facilities - Salt Lake City, Utah, April -July 2020 (Lopez, et al., MMWR) | AR 00549 |
| Introduction to COVID-19 Racial and Ethnic Health Disparities (CDC) | AR 00554 |
| Reductions in 2020 US life expectancy due to COVID-19 and the disproportionate impact on the Black and Latino population (Andrasfay & Goldman, National Academy of Sciences) | AR 00557 |
| Head Start Program Information Report - Services Snapshot National All Programs (2020-2021) | AR 00563 |
| COVID-19 Vaccine Uptake Among US Child Care Providers (Patel, et al., Pediatrics) | AR 00567 |
| Outbreak Associated with SARS-CoV-2 B.1.617.2 (Delta) Variant in an Elementary School - Marin County, California, May-June 2021 (Lam-Hine, et al., MMWR) | AR 00577 |

| | |
|---|---|
| Association Between K-12 School Mask Policies and School-Associated COVID-19 Outbreaks - Maricopa and Pima Counties, Arizona, July-August 2021 (Jehn, et al., MMWR) | AR 00583 |
| Pediatric COVID-19 Cases in Counties With and Without School Mask Requirements - United States, July 1 - September 4, 2021 (Budzyn, et al., MMWR) | AR 00585 |
| Implementing Mitigation Strategies in Early Care and Education Settings for Prevention of SARS-CoV-2 Transmission - Eight States, September-October 2020 (Coronado, et al., MMWR) | AR 00587 |
| After mandate, 91% of Tyson workers are vaccinated (Hirsch, New York Times) | AR 00592 |
| Nearly 600 United Airlines employees face termination for failing to comply with Vaccine Mandates (Josephs, CNBC) | AR 00595 |
| White House Report: Vaccination Requirements Are Helping Vaccinate More People, Protect Americans from COVID-19, and Strengthen the Economy | AR 00601 |
| Path Out of the Pandemic (White House) | AR 00628 |
| COVID-19 vaccinations increase in Washington following mandates, spike in cases (Mikkelsen, king5.com) | AR 00635 |
| Descriptive Data on Head Start Children and Families from FACES 2019 (Kopack Klein, et al.) | AR 00639 |
| The Impact of COVID-19 on Young Children, Families, and Teachers (Jones) | AR 00861 |
| Seven Impacts of the Pandemic on Young Children and their Parents: Initial Findings from NIEER's December 2020 Preschool Learning Activities Survey (Barnett & Jung) | AR 00877 |
| A Year in the Life of a Pandemic, What We've Learned Listening to Family Voices (Fisher, et al.) | AR 00889 |
| Homelessness, Children, and COVID-19: A Looming Crisis (Coughlin, et al., Pediatric Perspectives) | AR 00899 |
| Developmental Status and Social-Emotional Functioning of Young Children Experiencing Homelessness (Haskett, et al., Early Childhood Education Journal) | AR 00904 |
| Determinants of Health and Services Use Patterns in Homeless and Low-income Housed Children (Weinreb, et al., Pediatrics) | AR 00912 |
| The Perfect Storm: Hidden Risk of Child Maltreatment During the Covid-19 Pandemic (Rodriguez, et al., Child Maltreatment) | AR 00921 |
| Implementing Trauma-Informed Practices in Child Welfare (Klain & White) | AR 00938 |
| Mandated Reporting of Child Abuse and Neglect, ACF-IM-HS-15-04 | AR 00953 |
| How Early Head Start Prevents Child Maltreatment (Child Trends) | AR 00955 |
| Office of Head Start (OHS) Expectations for Head Start Programs in Program Year (PY) 2021-2022, ACF-PI-HS-21-04 | AR 00961 |
| Renewal of Determination that a Public Health Emergency Exists | AR 00964 |
| COVID Data Tracker (CDC Website) | AR 00965 |
| Background and Epidemiology (CDC) | AR 00972 |
| COVID-19 Vaccinations in the United States (CDC Website) | AR 00978 |

| | |
|---|---|
| Effectiveness of Covid-19 Vaccines against the B.1.617.2 (Delta) Variant (Lopez Bernal, et al., The New England Journal of Medicine) | AR 00983 |
| Do COVID-19 vaccines protect against the variants? (Mayo Clinic) | AR 00996 |
| Attachment in the Classroom (Bergin & Bergin, Educational Psychology Review) | AR 00999 |
| Childhood Attachment (Rees, British Journal of General Practice) | AR 01030 |
| Attachment and preschool teacher: An opportunity to develop a secure base (Sierra, International Journal of Early Childhood Special Education) | AR 01033 |
| When You've Been Fully Vaccinated (CDC) | AR 01045 |
| FY 2021 American Rescue Plan Funding Increase for Head Start Programs, ACF-PI-HS-21-03 | AR 01048 |
| Order: Wearing of face masks while on conveyances and at transportation hubs (CDC) | AR 01051 |
| Summary Document for Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Authorized or Approved in the United States (CDC) | AR 01054 |
| OSHA COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61402 (Nov. 5, 2021) | AR 01057 |
| Centers For Medicare & Medicaid Services, Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555 (Nov. 5, 2021) | AR 01211 |
| Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors (Sept. 9, 2021) | AR 01284 |
| Executive Order 14043, Requiring Coronavirus Disease 2019 Vaccination for Federal Employees (Sept. 9, 2021) | AR 01288 |
| Head Start Program Facts: Fiscal Year 2019 (OHS) | AR 01290 |
| COVID Tracker Weekly Review Nov. 19, 2021 (CDC Website) | AR 01298 |
| COVID-19: Estimating the historical time series of infections (IHME) | AR 01304 |
| National Notifiable Diseases Surveillance System Case Definition (CDC) | AR 01316 |
| COVID Data Tracker, Trends in Number of COVID-19 Cases and Deaths in the US (CDC Website) | AR 01321 |
| COVID-19 Associated Hospitalization by Age | AR 01338 |
| Census Data Table | AR 01341 |
| A Portrait of Head Start Classrooms and Programs in Spring 2020: FACES 2019 (Doran, et al.) | AR 01359 |
| Head Start Program Facts: Fiscal Year 2019 | AR 01666 |
| Guidelines for Regulatory Impact Analysis 2016 (HHS ASPE) | AR 01674 |
| Unvaccinated for COVID-19 but Willing (HHS ASPE) | AR 01769 |
| Valuing COVID-19 Mortality and Morbidity Risk Reductions in US Department of Health and Human Services Regulatory Impact Analyses (HHS ASPE) | AR 01788 |
| Pricing the global health risks of the COVID-19 pandemic (Viscusi, Journal of Risk and Uncertainty) | AR 01791 |
| Economic lessons for COVID-19 pandemic policies (Viscusi, Southern Economic Journal) | AR 01819 |
| Overview of COVID-19 Quarantine for K-12 Schools (CDC) | AR 01845 |

| | |
|---|---|
| Valuing Time in US Department of Health and Human Services Regulatory Impact Analyses (HHS ASPE) | AR 01848 |
| Usual Weekly Earnings of Wage and Salary Workers (DOL Bureau of Labor Statistics) | AR 01910 |
| The FRED Blog | AR 01920 |
| Excess mortality associated with the COVID-19 pandemic among Californians 18-65 years of age, by occupational sector and occupation: March through October 2020 (Chen, et al., medRxiv) | AR 01924 |
| Excess mortality associated with the COVID-19 pandemic among Californians 18-65 years of age, by occupational sector and occupation: March through November 2020 (Chen, et al., PLoS ONE) | AR 01934 |
| Occupational Employment and Wage Statistics NAICS 624400 - Child Day Care Services (DOL Bureau of Labor Statistics) | AR 01944 |
| The Cost of Frontline Turnover in Long-Term Care (Seavey, Better Jobs Better Care Report) | AR 01951 |
| Selected Adverse Events Reported after COVID-19 Vaccination (CDC) | AR 01984 |
| Occupational Employment and Wage Statistics 11-9031 Education and Childcare Administrators, Preschool and Daycare (DOL Bureau of Labor Statistics) | AR 01986 |
| Valuing Risk in the Workplace: Market Price, Willingness to Pay, and the Optimal Provision of Safety (Herzog & Schlottmann, The Review of Economics and Statistics) | AR 01993 |
| CDC Recommends Pediatric COVID-19 Vaccine for Children 5 to 11 Years (CDC) | AR 02002 |
| Table of Small Business Size Standards (SBA) | AR 02003 |
| Transcript: Update on COVID-19 Infections and Vaccines for Children and Adults | AR 02052 |
| Institute for Health Metrics and Evaluation (IHME) COVID-19 Mortality, Infection, Testing, Hospital Resource Use, and Social Distancing Projections (Nov. 4, 2021) | AR 02067 |

# Implementing Mitigation Strategies in Early Care and Education Settings for Prevention of SARS-CoV-2 Transmission — Eight States, September–October 2020

Fátima Coronado, MD[1]; Sara Blough, MPH[1]; Deborah Bergeron, PhD[2]; Krista Proia, MPH[1]; Erin Sauber-Schatz, PhD[1]; Marco Beltran, DrPH[2]; Katherine Troy Rau, MSW, MPP[2]; Andria McMichael, EdD[2]; Tracye Fortin, MA[2,3]; Mark Lackey[2]; Jovanna Rohs, PhD[2]; Tracey Sparrow, EdD[2,3]; Grant Baldwin, PhD[1]

*On December 7, 2020, this report was posted as an* MMWR *Early Release on the* MMWR *website (https://www.cdc.gov/mmwr).*

The Head Start program, including Head Start for children aged 3–5 years and Early Head Start for infants, toddlers, and pregnant women, promotes early learning and healthy development among children aged 0–5 years whose families meet the annually adjusted Federal Poverty Guidelines* throughout the United States.[†] These programs are funded by grants administered by the U.S. Department of Health and Human Services' Administration for Children and Families (ACF). In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act,[§] which appropriated $750 million for Head Start, equating to approximately $875 in CARES Act funds per enrolled child. In response to the coronavirus disease 2019 (COVID-19) pandemic, most states required all schools (K-12) to close or transition to virtual learning. The Office of Head Start gave its local programs that remained open the flexibility to use CARES Act funds to implement CDC-recommended guidance (*1*) and other ancillary measures to provide in-person services in the early phases of community transmission of SARS-CoV-2, the virus that causes COVID-19, in April and May 2020, when many similar programs remained closed. Guidance included information on masks, other personal protective equipment, physical setup, supplies necessary for maintaining healthy environments and operations, and the need for additional staff members to ensure small class sizes. Head Start programs successfully implemented CDC-recommended mitigation strategies and supported other practices that helped to prevent SARS-CoV-2 transmission among children and staff members. CDC conducted a mixed-methods analysis to document these approaches and inform implementation of mitigation strategies in other child care settings. Implementing and monitoring adherence to recommended mitigation strategies reduces risk for COVID-19 transmission in child care settings. These approaches could be applied to other early care and education settings that remain open for in-person learning and potentially reduce SARS-CoV-2 transmission.

In collaboration with ACF, CDC conducted a mixed-methods study during September–October 2020 in Head Start programs in eight states (Alaska, Georgia, Idaho, Maine, Missouri, Texas, Washington, and Wisconsin). Head Start programs, each with five to 17 centers and 500–2,500 children, were selected by the Office of Head Start. The four-phase study design included reviews of standard operating procedures (SOPs) for COVID-19 mitigation, deployment of an online survey for program directors to document mitigation strategies implemented and COVID-19 cases reported, in-depth interviews with staff members from five programs overall, and observation of mitigation strategy implementation during a virtual visit to one Head Start site. This activity was reviewed by CDC and was conducted consistent with applicable federal law and CDC policy.[¶]

All program sites closed for periods ranging from 2 weeks to 2 months after state-initiated mandates in April and May and upon reopening offered a hybrid** learning model (i.e., in-person and virtual). The Office of Head Start allowed administrative flexibility in how programs could use funding, encouraged innovation in implementing CDC guidance (*1*), and provided resources for implementing multiple concurrent preventive strategies (e.g., delivery of webinars to >240,000 staff members, parents, community members, and partners). All programs developed SOPs during March–April 2020 and began implementing these procedures in April. All SOPs covered multicomponent mitigation practices and promoted behaviors designed to reduce infection spread, create healthy environments, facilitate healthy operations, and explain procedures to follow in the event of identification of a COVID-19 case.

Seven of eight Head Start programs, representing 55 centers, responded to the survey. All reported implementing SOPs and adjusting them depending on guidance from the local public health authorities or education department, local level of transmission and related factors described below. Multiple strategies were implemented simultaneously, including training teachers and encouraging caretakers to adhere to SOPs and

---

* https://aspe.hhs.gov/poverty-guidelines.
[†] https://www.acf.hhs.gov/ohs/about/head-start.
[§] https://home.treasury.gov/policy-issues/cares.

[¶] 45 C.F.R. part 46, 21 C.F.R. part 56; 42 U.S.C. Sect. 241(d); 5 U.S.C. Sect. 552a; 44 U.S.C. Sect. 501 et seq.
** https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html.

Appx. 100

mitigation strategies; instituting flexible medical leave policies for staff members; providing and requiring use of masks for all staff members and children; and supervising handwashing and hand-sanitizing for children (Box). Variations regarding methods for screening the health of staff members and children were noted; among these methods, self-administered temperature checks upon arrival were most frequently reported for staff members. Screening for signs and symptoms[††] of illness upon arrival was most frequently reported for children. Mask policies for children varied, and exemptions for children

---

[††] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

**BOX. COVID`19 mitigation strategies implemented by Head Start and Early Head Start child care programs — eight states,\* September–October 2020**

**Everyday prevention actions**
- Reinforcement of hand hygiene behavior and respiratory etiquette
- Supervised handwashing and hand-sanitizing for children
- Intensified cleaning and disinfection efforts (e.g., with toys, frequently touched surfaces, and bedding)
- Required use of masks for staff members, visitors, and children aged >2 years
- Social distancing to the extent possible
- Daily health screening procedures on arrival for children and staff members
- Drop-off and pick-up procedures
- Monitoring for absenteeism
- Ability to monitor and restock supplies
- Steps to increase ventilation including installation of ion air purifiers
- Steps to decrease occupancy in areas without increased ventilation
- Use of outdoor space as much as possible
- Cohorting by classroom to minimize exposure between groups

**Actions when someone is ill**
- COVID-19 point of contact identified
- Staff members trained in COVID-19 safety protocols
- Requiring ill children and staff members to stay at home
- Vigilance for symptoms
- Daily screening of staff members and children for signs and symptoms before facility entry
- Standard operating procedures for when a child or staff member experiences symptoms
- Identification of isolation room
- Plan to notify local health official of COVID-19 cases
- Plan to distribute instructions for primary care referral, testing, or both
- Plan to distribute instructions or guidance for home isolation
- Plan to require close contacts to wait 14 days before returning
- Flexible COVID-19 medical leave policies for staff members

**Communications and support**
- Training and ongoing reinforcing of standard operating procedures and mitigation measures with caregivers, teachers, and other staff members
- Vigilance and training for the identification of COVID-19 related symptoms
- Masks and other personal protective equipment (e.g., face shields and gowns) provided to teachers and other staff members
- Incentives to adhere to mitigation strategies
- Flexible medical leave policies for staff members with emphasis on persons at higher risk for severe illness and those with caregiving responsibilities
- Flexible work hours and staggered shifts
- Telework options for staff members at higher risk for severe illness

**Abbreviation:** COVID-19 = coronavirus disease 2019.
\* Alaska, Georgia, Idaho, Maine, Missouri, Texas, Washington, and Wisconsin.

App x 101

aged <2 years and those with special health care and education needs were allowed. All programs reported increased cleaning and disinfecting or sanitizing of high-traffic areas, high-touch surfaces, and toys. Five programs reported increasing cleaning and disinfecting of bedding and improving ventilation. Guidance from public health or education agencies and state or local mandates were the factors most commonly reported to influence decisions about SOP adjustments. Other, less frequently reported, factors included concerns about transmission of SARS-CoV-2 within facilities and perceived pressure from the community.

All programs reported having plans in place for managing children and staff members experiencing COVID-19 symptoms. Three programs identified nine cases among children in three centers (range = one to four cases per center) during May and June. Administrators followed SOPs for notification, isolation, facility closure, and cleaning and disinfection. All three centers were closed for in-person operation for 14 days after identification of a case but offered virtual options to continue providing services. Respondents from all seven programs reported that centers had a designated isolation area. One program did not report whether a designated isolation area existed; however, this program reported ability to isolate a suspected case. All but one program had a protocol for working with the local health department if a positive case was identified; all indicated that the local health department would be contacted if a case was identified. All programs had established procedures for notifying parents or caregivers of close contacts.

Interviews were conducted in September and October with program directors identified by the Office of Head Start in five states (Alaska, Georgia, Maine, Missouri, and Wisconsin). A common theme identified was the flexibility offered for staffing and operations, including flexible medical leave, enhanced benefits during the pandemic (e.g., additional financial benefits to cover health care–associated costs), and remote working options. Staff members who were at increased risk for severe illness[§§] because of underlying medical conditions or age and those with caregiving responsibilities were offered virtual and hybrid teaching opportunities, flexible hours, and staggered shifts. Policies were put into place for staff members to stay at home without fear of job loss or other consequences. In addition to providing personal protective equipment (e.g., gloves and masks), staff members were furnished with cleaning and other supplies and were offered training, ongoing reinforcement of SOPs, and incentives to abide by mitigation strategies (e.g., a program provided a financial incentive for staff members to purchase additional supplies).

A second theme identified was ongoing communications among program administrators, parents and caregivers, and teachers and other staff members to ensure understanding of SOPs. Communications included updates on program websites, development of instructional videos, written information, virtual meetings, media coverage, social media postings, and posted signage at facilities.

Factors facilitating successful implementation of mitigation strategies included extensive communication with consistent messaging to staff members and parents; ongoing training and support to staff members; continuous engagement of community partners and parents; and collaboration with program nurses, local health departments, hospital systems, and community organizations (e.g., United Way and Boys & Girls Club). Challenges included maintaining recommended social distancing, ventilation, weather concerns during the fall and heading into winter, parental mental health concerns (e.g., chronic stress, depression, anxiety, and trauma related to losing a loved one to COVID-19), questions concerning effects of staff members wearing masks on infant and toddler psychosocial development, maintaining guidance vigilance, and concern that programs were being overly cautious.

A virtual visit to a Head Start site in Texas found that staff members and children observed social distancing. In rooms with children aged <2 years, mask use was only observed among staff members, per CDC guidelines. Physical dividers were observed, including an innovative playground divider purchased with CARES Act funding that allowed for more outdoor play time for children. Cleaning and disinfecting protocols were described, along with guidance for stocking and monitoring the supply room to ensure adequate supplies. Plans for responding to positive SARS-CoV-2 tests were reviewed, and all included a rapid notification system for all enrolled families. To continue enrollment for the fall, a contactless application system using quick-response codes on community flyers had been implemented.

## Discussion

Children can acquire and transmit SARS-CoV-2 in school and child care settings (*2*,*3*). Since the COVID-19 pandemic started, Head Start and Early Head Start programs successfully implemented CDC-recommended mitigation strategies and applied other innovative approaches to limit SARS-CoV-2 transmission among children, teachers, and other staff members by allowing maximum program flexibility and allocating financial and human resources. As CDC learned more about

[§§] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

1870    MMWR / December 11, 2020 / Vol. 69 / No. 49    US Department of Health and Human Services/Centers for Disease Control and Prevention

Appx. 102

### Summary

**What is already known about this topic?**

The benefits of in-person child care programs are myriad; however, SARS-CoV-2 transmission has been documented in child care facilities.

**What is added by this report?**

Head Start and Early Head Start programs successfully implemented CDC-recommended guidance and other ancillary measures for child care programs that remained open, allowing them to continue offering in-person learning. These approaches were documented to guide implementation of mitigation strategies in child care settings.

**What are the implications for public health practice?**

Implementing and monitoring adherence to recommended mitigation strategies can reduce risk for SARS-CoV-2 transmission in child care settings. These approaches could be applied to other early care and education settings that remain open for in-person learning and potentially reduce the spread of coronavirus disease 2019.

COVID-19, the agency provided updated guidance for various settings, including child care programs, with options for screening children upon arrival. This guidance helps to ensure that children who have a fever or other signs of illness are not admitted to the facility and offers additional options that can be considered if personal protective equipment is in short supply (1).

SARS-CoV-2 transmission investigations in Rhode Island and Utah indicated that implementation of CDC-recommended mitigation strategies contributed to limiting transmission of SARS-CoV-2 in child care facilities in both states (3,4). This report describes how a comprehensive, multipronged approach for SARS-CoV-2 mitigation strategies, used in early care and education settings, specifically Head Start programs, might have helped to slow transmission, as few cases occurred. Financial and staffing resources were allocated to prioritize mitigation strategies; support to staff members and parents were critical components for these programs to help minimize the potential for negative consequences that can be associated with child care center closure, including providers' loss of jobs and wages, parents' challenges when returning to work, and children's diminished educational, social, and nutritional opportunities (5).

Implementing and monitoring adherence to CDC-recommended mitigation strategies could play a crucial role in reducing SARS-CoV-2 transmission in child care settings.

CDC developed tools and resources for child care programs, including examples of evaluation questions, related qualitative and quantitative indicators, and suggested data sources to understand the impact of COVID-19 mitigation strategies in child care programs (6). For example, child care facilities can identify facilitators, barriers, and other factors affecting implementation of mitigation strategies. Baseline information can include characteristics of the child care program (e.g., number of children in the program, child-to-staff member ratio, parental or community attitudes and involvement, and rates of retention or attrition among staff members and volunteers). This can help identify gaps and areas where additional mitigation strategies can be implemented or strengthened.

The findings in this report are subject to at least two limitations. First, this qualitative descriptive analysis might not be generalizable beyond the participating Head Start programs; however, programs were geographically diverse and represented all four U.S. Census regions. Second, study outcomes could not be attributed to implemented mitigation strategies; however, these strategies and the merits of a multicomponent mitigation approach have been documented to reduce SARS-CoV-2 transmission (7,8). Additional evaluation is needed to understand how multicomponent mitigation strategies work in child care settings that remain open for in-person learning in areas with high community transmission.

The benefits of child care programs (e.g., helping to achieve developmental milestones, nutritional support, socialization, and improved mental health) are many. Understanding child care programs' capabilities for implementing COVID-19 mitigation strategies provides practical information that public health officials, child care setting administrators, and evaluators can use to implement and adjust strategies to reduce SARS-CoV-2 transmission. Child care settings should implement concurrent preventive measures and adjust these strategies based on community transmission data (9).

#### Acknowledgment

Jason M. Clemmons, Office of Head Start.

Corresponding author: Fátima Coronado, FCoronado@CDC.gov.

[1]CDC COVID-19 Response Team; [2]Office of Head Start, Washington, DC; [3]Educare Learning Network, Chicago, Illinois.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

*Morbidity and Mortality Weekly Report*

### References

1. CDC. Implementation of mitigation strategies for communities with local COVID-19 transmission. Atlanta, GA: US Department of Health and Human Services, CDC; 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html
2. Gilliam WS, Malik AA, Shafiq M, et al. COVID-19 transmission in US child care programs. Pediatrics 2020. Epub October 14, 2020. https://pediatrics.aappublications.org/content/pediatrics/early/2020/10/16/peds.2020-031971.full.pdf
3. Lopez AS, Hill M, Antezano J, et al. Transmission dynamics of COVID-19 outbreaks associated with child care facilities—Salt Lake City, Utah, April–July 2020. MMWR Morb Mortal Wkly Rep 2020;69:1319–23. PMID:32941418 https://doi.org/10.15585/mmwr.mm6937e3
4. Link-Gelles R, DellaGrotta AL, Molina C, et al. Limited secondary transmission of SARS-CoV-2 in child care programs—Rhode Island, June 1–July 31, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1170–2. PMID:32853185 https://doi.org/10.15585/mmwr.mm6934e2
5. Esposito S, Principi N. School closure during the coronavirus disease 2019 (COVID-19) pandemic: an effective intervention at the global level? JAMA Pediatr 2020;174:921–2. PMID:32401277 https://doi.org/10.1001/jamapediatrics.2020.1892
6. CDC. Coronavirus disease 2019 (COVID-19): monitoring and evaluating mitigation strategies in child care programs Atlanta, GA: US Department of Health and Human Services, CDC; 2020. https://www.cdc.gov/coronavirus/2019-ncov/php/monitoring-evaluating-community-mitigation-strategies/resources-by-setting/child-care-evaluation.html
7. Blaisdell LL, Cohn W, Pavell JR, Rubin DS, Vergales JE. Preventing and mitigating SARS-CoV-2 transmission—four overnight camps, Maine, June–August 2020. MMWR Morb Mortal Wkly Rep 2020;69:1216–20. PMID:32881850 https://doi.org/10.15585/mmwr.mm6935e1
8. Murray MT, Riggs MA, Engelthaler DM, et al. Mitigating a COVID-19 outbreak among major league baseball players—United States, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1542–6. PMID:33090983 https://doi.org/10.15585/mmwr.mm6942a4
9. Leeb RT, Price S, Sliwa S, et al. COVID-19 trends among school-aged children—United States, March 1–September 19, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1410–5. PMID:33001869 https://doi.org/10.15585/mmwr.mm6939e2

Appx. 104

```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
2                         LUBBOCK DIVISION

3    STATE OF TEXAS, et al.,         )
             PLAINTIFFS,             )
4                                    )
     VS.                             )
5                                    )  CAUSE NO. 5:21-CV-300-H
     XAVIER BECERRA, in his official )
6    capacity as Secretary of        )
     Health and Human Services,      )
7    et al.,                         )
             DEFENDANTS.             )
8

9

10       -------------------------------------------------

11                        MOTION HEARING
              BEFORE THE HONORABLE JAMES WESLEY HENDRIX,
12                  UNITED STATES DISTRICT JUDGE

13                      DECEMBER 30, 2021
                        LUBBOCK, TEXAS
14       -------------------------------------------------

15

16

17

18

19

20

21

22

23   FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
     AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

```
 1                    A P P E A R A N C E S

 2


 3    FOR PLAINTIFF STATE OF TEXAS:
      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 4    SPECIAL LITIGATION COUNSEL
      ADMINISTRATION LAW DIVISION
 5    PO BOX 12548
      CAPITOL STATION
 6    AUSTIN TEXAS 78711-2548
      BY:  CHARLES K. ELDRED
 7         AMY LYNNE KENNEDY WILLS

 8
      FOR PLAINTIFF LUBBOCK INDEPENDENT SCHOOL DISTRICT:
 9    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
      GENERAL LITIGATION DIVISION
10    PO BOX 12548
      CAPITOL STATION
11    AUSTIN TEXAS 78711-2548
      BY:  AMY S. HILTON

12
13    FOR DEFENDANTS:
      U.S. DEPARTMENT OF JUSTICE
14    1100 L STREET NW
      WASHINGTON, DC 20005
15    BY:  MADELINE MARIE McMAHON
           CHRISTOPHER DAVID EDELMAN
16

17

18

19

20                          *  *  *  *  *

21

22

23

24

25
```

```
 1                                    INDEX

 2

 3    ARGUMENT BY PLAINTIFF STATE OF TEXAS....................   13

 4    ARGUMENT BY PLAINTIFF
      LUBBOCK INDEPENDENT SCHOOL DISTRICT.....................   29
 5
      ARGUMENT BY DEFENDANTS..................................   37
 6
      REBUTTAL ARGUMENT BY PLAINTIFF STATE OF TEXAS...........   86
 7
      REBUTTAL ARGUMENT BY PLAINTIFF
 8    LUBBOCK INDEPENDENT SCHOOL DISTRICT.....................   92

 9

10

11    PLAINTIFFS' EXHIBITS
      NO.                                                ADMITTED
12    1-13, 15-18                                               6

13

14

15

16

17

18

19

20                          *  *  *  *  *

21

22

23

24

25
```

```
  1                  P R O C E E D I N G S
  2            THE COURT:  Good morning, everyone.  Welcome to the
  3   U.S. District Court for the Northern District of Texas.  The
  4   Court calls the State of Texas and Lubbock Independent School
  5   District vs. Becerra, in his official capacity as Secretary of
  6   Health and Human Services, et al.
  7            Who is here on behalf of the State of Texas?
  8            MR. ELDRED:  Charles Eldred and Amy Wills.
  9            THE COURT:  Thank you, Mr. Eldred and Ms. Wills.
 10            MS. HILTON:  Amy Hilton for Lubbock ISD.
 11            THE COURT:  Thank you.  Amy Hilton for LISD.
 12            And Amy Wills, is that you?
 13            MS. WILLS:  Yes, Your Honor, that's me.
 14            THE COURT:  Good morning.
 15            And who is here on behalf of the defense?
 16            MS. McMAHON:  Good morning, Your Honor.  Madeline
 17   McMahon.  I'm here from the U.S. Department of Justice, Federal
 18   Programs Branch.
 19            THE COURT:  Thank you, Ms. McMahon.
 20            MR. EDELMAN:  And Christopher Edelman, also from
 21   the U.S. Department of Justice for the government defendants.
 22            THE COURT:  Thank you, Mr. Edelman.
 23            All right.  Thank you-all for being here.  Thank
 24   you-all for being here on short notice.  I know the notice of
 25   the hearing was relatively short.  I know my briefing schedule
```

```
 1    has been relatively tight.  Not even relatively; it's been a
 2    tight briefing schedule.  And I know it's all been done over
 3    the holidays.  I appreciate all of your diligence and work.
 4    The briefing has been very helpful to the Court from both
 5    sides.  I appreciate that.
 6              It's important to me that I get both sides an
 7    answer and clarity before the effective dates of the mandates
 8    go into effect.  I know that both sides need that and deserve
 9    that, so I've been working over the holidays as well.  So
10    misery loves company, and I am with you.  I will also be
11    working tomorrow as well.  So I appreciate that.
12              Before we get to the parties' arguments, let me
13    make sure the record is clear as to the state of the evidence.
14    It's my understanding that neither side plans to present live
15    testimony today.  Mr. Eldred, is that right?
16              MR. ELDRED:  Yes, Your Honor.
17              THE COURT:  Ms. Hilton; is that correct?
18              MS. HILTON:  Yes, Your Honor.
19              THE COURT:  All right.  And how about from the
20    defense?  Any witnesses from the defense, Ms. McMahon?
21              MS. McMAHON:  No witnesses from us.
22              THE COURT:  Okay.  All right.  Let me turn to
23    exhibits then.  Plaintiffs plan to offer Exhibits 1 through 18;
24    is that correct?
25              MR. ELDRED:  Yes, Your Honor.
```

```
 1                   THE COURT:  And, Ms. McMahon, am I right that the
 2      defense will stipulate--other than Plaintiffs' Exhibit 14, you
 3      will stipulate to the admissibility of all exhibits.  I
 4      understand that you are planning to argue the limited relevance
 5      of the declarations, but otherwise, you stipulate to the
 6      admissibility of all, except Plaintiffs' 14; is that right?
 7                   MS. McMAHON:  Yes, Your Honor.  That's correct.
 8      And we object to the relevance of the exhibits, except for the
 9      irreparable harm.
10                   THE COURT:  The declarations?
11                   MS. McMAHON:  Sorry.  The declarations, that's
12      correct.
13                   THE COURT:  All right.  Well, then, let me start
14      here.  The Court will admit Plaintiffs' Exhibits 1 through 13,
15      and 15 through 18.
16                   Ms. McMahon, help me understand, what is your
17      objection to Plaintiffs' 14?  Or, if Ms. McMahon is not going
18      to address that, Mr. Edelman.  You object to the--you object to
19      the admissibility of the comments, is Plaintiffs' 14.
20                   MS. McMAHON:  Oh, that's correct, Your Honor.  The
21      comments were not before the agency when they were promulgating
22      the rule, so we don't believe that they can properly be relied
23      on in evaluating whether the agency was reasonable and within
24      its statutory authority in coming to its decision on this
25      Interim Final Rule.
```

```
 1                  THE COURT:  Mr. Eldred?

 2                  MR. ELDRED:  We believe they are relevant under the

 3       law, that you have to consider them if they are brought up.

 4       Furthermore, we think they show that there is a need for

 5       notice-and-comment in this case.  This goes to our

 6       notice-and-comment claim as well.

 7                  THE COURT:  Okay.  Ms. McMahon, would it be proper

 8       for the Court to consider them only as examples of what

 9       information might have been presented had the agency engaged in

10       the typical notice-and-comment procedures?

11                  MS. McMAHON:  Your Honor, we would argue that that

12       is not the case, because, since we think the good-cause

13       exception to notice-and-comment rule-making applies to the

14       Interim Final Rule in this case, it is not the case that the

15       agency necessarily needs to respond to comments that may be out

16       there that are post-promulgation comments and weren't properly

17       before the agency.

18                  THE COURT:  I understand that you are arguing good

19       cause and that you didn't have to do it in the first place.  I

20       understand that.  To me, that begs the question.  My question

21       is, is it appropriate or do you have any objection to the Court

22       considering the comments, and the declarations for that matter,

23       as just examples of categories of things that might have been

24       brought up or considered categorically had notice-and-comment

25       been provided?
```

```
 1          MS. McMAHON:  I still am not entirely clear on why
 2    that would be relevant.  Since we don't think that that--  That
 3    inquiry does not factor into whether notice-and-comment should
 4    have been provided here, so we just think it's outside the
 5    scope of both the good-cause exception and the actual merits of
 6    the argument as well, which is whether the Secretary was beyond
 7    his statutory authority.
 8          THE COURT:  Well, the categories--  It might be
 9    relevant--in addition to notice-and-comment, it could be
10    relevant to the arbitrary and capricious analysis possibly.
11    That's what I want to talk to you about.  Potential categories
12    of information that could have been considered but were not
13    considered in making the rule in the first place, or deciding
14    to ultimately go forward post-notice-and-comment.  I mean, I
15    know they're two separate things, but I just wanted to--I just
16    want your position on whether there's any objection to the
17    Court possibly considering the information for, also, these
18    other limited purposes.
19          MS. McMAHON:  Your Honor, I think we would argue
20    that we do still object to that, because there are many
21    different conceivable categories that the plaintiffs can try to
22    come up with that the agency either did consider or should have
23    considered, and we don't think the fact that these commenters
24    are posting online at this moment is relevant to the arbitrary
25    and capricious analysis.  Perhaps they would factor into
```

```
1    whether the agency properly considered them before promulgation
2    of the Final Rule, but for the Interim Final Rule, we still--we
3    don't totally see why broad categories of various parts of the
4    COVID-19 pandemic are relevant to what the agency should have
5    considered.
6            THE COURT:  Okay.  Mr. Eldred, would you like to
7    respond to that, or no?
8            MR. ELDRED:  No.  I think you've put the nail on
9    the head--hit the nail--
10           THE COURT:  Okay.
11           MR. ELDRED:  I think you've answered--I think what
12   you said is what I would say as well.
13           THE COURT:  Okay.  Well, I will take under
14   advisement the admissibility of Plaintiffs' 14.  To the extent
15   I end up relying on it, I will resolve your objection and
16   explain my basis for either sustaining it or overruling it.
17   But at this point, I will take it under advisement.
18           Any portions of the arguments from the plaintiffs'
19   side that rely on the comments in Plaintiffs' 14 will be
20   subject to that caveat.  So you're welcome to point them out to
21   me today if you'd like.  I have not decided yet whether I need
22   to and can consider them today.
23           And, Ms. Hilton, did you want to weigh in on this,
24   or no?
25           MS. HILTON:  No, Your Honor.  I defer to
```

```
1    Mr. Eldred.

2                THE COURT:  Okay.

3                Okay.  Any exhibits offered from the defense?

4                MS. McMAHON:  No, Your Honor.

5                THE COURT:  All right.  Then I think that takes

6    care of all the evidence before me, subject to any final

7    comments.  Okay.  Plaintiffs' 1 through 13, and 15 through 18,

8    are admitted, and I've taken under advisement the admissibility

9    of Plaintiffs' 14 and any relevance of the declarations beyond

10   their relevance to the irreparable harm analysis, because,

11   Ms. McMahon, you agree and stipulate that the declarations are

12   properly admissible and can be considered for irreparable

13   injury.  Correct?

14               MS. McMAHON:  Yes, we do.

15               THE COURT:  Okay.  All right.  Thank you.

16               Okay.  I'll hear argument from both sides.  If I'm

17   recalling correctly from our telephonic conference, the

18   plaintiffs wanted at least 20 minutes for arguments and wanted

19   to reserve 10 for rebuttal.  Is that right, Mr. Eldred?

20               MR. ELDRED:  Yes, Your Honor.  And just to clarify,

21   we had talked about an opening statement and then evidence and

22   then arguments, but since we're not having any evidence, is

23   that what we're going to do?  Thirty minutes a side?

24               THE COURT:  Yeah, you know, once I learned, after

25   our telephonic conference, that neither side planned on
```

```
 1   presenting witnesses, I didn't think an opening statement made
 2   much sense.  Had we had witnesses, then, you know, I'd want you
 3   to take them into account and then do an argument.  So I plan
 4   to go straight into argument.  I will give you--
 5              MR. ELDRED:  As we said beforehand, I think that
 6   we--that sounds good to us too, I believe.
 7              THE COURT:  Okay.  All right.  Well, I'll give you
 8   20 minutes opening, reserve 10 in rebuttal.  I will keep time,
 9   and to the extent you use less than 20, you can have that on
10   rebuttal.  And I'll let you know how much you have left.
11              The defense will also have 30 minutes.
12              Mr. Eldred, are you and Ms. Hilton splitting the
13   argument at all, or will I just be hearing from you?
14              MR. ELDRED:  Ms. Hilton is going to handle
15   irreparable harm.  I'm going to handle everything else.  There
16   may be some overlap, but that's the general plan.
17              THE COURT:  Okay.  No problem.  All right.
18   Mr. Eldred, at the podium, please, whenever you're ready.
19              MR. ELDRED:  Your Honor, before we start, can I do
20   one housekeeping matter?
21              THE COURT:  Sure.
22              MR. ELDRED:  We found some substantive typos in our
23   reply.  I'd like to point them out.
24              THE COURT:  Sure.  Give me one second.
25              Happens to the best of us on short briefing
```

```
 1    deadlines.

 2              MR. ELDRED:  Yes, Your Honor.

 3              THE COURT:  What's the first one?

 4              MR. ELDRED:  On page 19, at the very bottom, it

 5    says:  "Defendants argue those acts contain language that," and

 6    then it says, "but Defendants are not asking the Court to

 7    enforce those rules.  Defendants are asking the Court to

 8    enforce 706."

 9              Both the--the last two sentences should be

10    Plaintiffs are not asking the Court to enforce those acts, and

11    Plaintiffs are asking the Court to enforce 706.  I apologize.

12              THE COURT:  But Plaintiffs are not asking the Court

13    to enforce those, Plaintiffs are asking the Court.  Correct?

14              MR. ELDRED:  Yes, Your Honor.

15              THE COURT:  All right.

16              MR. ELDRED:  On the very next page, the spending

17    clause, fourth line from the bottom, it says:  "LISD could have

18    known."  That should be "could not have known."

19              THE COURT:  All right.  I have that one.  LISD

20    could not have known that Defendants would claim for themselves

21    a police power.  Correct?

22              MR. ELDRED:  Yes, Your Honor.

23              THE COURT:  All right.  Any others?

24              MR. ELDRED:  None that we saw.

25              THE COURT:  Okay.  All right.  Okay.  Take your
```

1    time getting to the podium.  Give me one second.

2              All right, Mr. Eldred.  Whenever you're ready.

3              MR. ELDRED:  And, Judge, I hope to use

4    approximately 13 minutes and then turn it over to Ms. Hilton.

5              THE COURT:  Great.

6              MR. ELDRED:  As everyone knows, in March 2020, the

7    COVID crisis hit this country, and the governments at all

8    levels have been trying to react to this crisis since then.

9    Cases have gone up.  Cases have gone down.  Hospitalizations

10   have gone up and down.  Variants have come and gone.

11             About a year ago, we have vaccines arriving on the

12   scene.  And at first, the federal government encouraged

13   everyone to get vaccinated.  Encouraged everyone to get

14   vaccinated.  Did not say they had the power to make people get

15   vaccinated.  Denied they had the power to make people get

16   vaccinated.

17             That changed on September 9th.  President Biden

18   announced that vaccinations were not happening as fast as he'd

19   like them to happen, and so he was going to do everything in

20   his power to make people get vaccinated.  And he directed his--

21   announced that he was going to direct his agencies to adopt

22   rules forcing people to get vaccinated to the extent that he

23   could.

24             There were several different mandates that he

25   announced, and the one, of course, we're talking about today is

1    the one for the Head Start program.  And on September 9th, he

2    announced that staff and contractors and volunteers were going

3    to be required to be vaccinated, and if they weren't

4    vaccinated, they could no longer work in Head Start programs.

5              This was a huge change.  Head Start has been around

6    since the sixties.  The program performance standards we're

7    talking about were first adopted in the seventies.  But the

8    entire time Head Start has been a program, matters of health of

9    the staff and health of the children in Head Start has always

10   been a matter of state and local and tribal law.  Federal

11   government has never had--never had or claimed to have the

12   power to direct people, either employees or volunteers or the

13   contractors or the children or their families in Head Start, to

14   do this or that health service, to take--to have this kind of--

15   they never directed health care to be mandatory.

16             Head Start has always provided health services to

17   children and their families.  One of the stated goals of

18   Head Start is to educate families on proper health care.

19   That's a very different thing than requiring people to get

20   health services.  I believe my opponents will make a big deal

21   out of the health services, but that's--the fact that they have

22   provided health service does not mean they have ever had the

23   power to require this or that health service be implemented, be

24   taken into account.

25             So on November 30th, the rule that President Biden

1    ordered came out.  It's called Interim Final Rule, of course.

2    It's supposedly a modification of program performance

3    standards.  Let me get to that in a second.  But just for the

4    record, they modified 45 CFR 1302.47 to require children to

5    wear masks.  And that was not announced by President Biden.

6    1302.47 is supposedly in the Health Services section of the

7    regulations.  So supposedly, it's a health service.  A health

8    service provided to children is, you have to wear a mask.

9             It's also--masks are also required anywhere where

10   Head Start services are provided.  Presumably, that means a

11   parent picking up their child has to wear a mask to pick them

12   up, or visiting Head Start has to wear a mask to pick them up.

13   If children go to the cafeteria, maybe they have to wear a mask

14   in the cafeteria.  That's unclear to me.  And that's in effect

15   right now.  There's no starting date for that.  It's in effect

16   since November 30th.

17             45 1302.93 and 45 1302.94 is the vaccination

18   mandate for staff, contractors, and volunteers.  The

19   regulations say that all these people have to be fully

20   vaccinated right now.  "Fully vaccinated" is a term of art the

21   federal government uses which means that you've had complete

22   shots, either one shot or two shots, and there's been a certain

23   amount of time since your last shot.  And it's unclear to me,

24   anyway, how boosters fit into that.  I don't know if--I have

25   two shots, but I don't have boosters, so I don't know if I'm

 1   fully vaccinated right now.  But the rule says fully vaccinated

 2   right now.  The commentary to the rule says that if you get

 3   your final shot by January 31st, then you've complied.  That's

 4   not what the Rule says.  That's what the commentary says.

 5          So we've asked for a temporary injunction--I'm

 6   sorry--preliminary injunction.  We are likely to succeed on the

 7   merits for many reasons.  The biggest reason, the first reason

 8   anyway, is, Defendants do not have the statutory authority to

 9   do these two mandates.  As stated, Head Start has never

10   regulated children or staff this way.  It's always been a

11   state, local, and tribal function.  They admit that in their

12   response.

13          It's an unprecedented, unauthorized power grab.

14   It's unauthorized by statute.  And the statute they claim is

15   42 U.S.C. Section 9836a, subsection (a) subsection (1).

16   (a)(1)(A) talks about program performance standards for health

17   services.  They're not--

18          THE COURT:  Mr. Eldred, before we--  Pardon the

19   interruption.  Before we get into your statutory construction

20   argument, let me ask you about the proper lens that I should

21   apply to the analysis.  You argue that I can stop at *Chevron's*

22   first step, and so I do not have to provide--I don't have to

23   ask whether this is just a permissible construction from the

24   agency.  And to do so, I would need to find that Congress has

25   directly spoken to the precise issue.  Do you agree with that,

1    that that's kind of the hurdle that I would need to clear if I

2    wanted to stop at Step One?  Has Congress spoken to the precise

3    issue at hand.  Is that right?

4              MR. ELDRED:  Only if there's an issue about what

5    the law is--whether the law's ambiguous or not.  The parties

6    agree the law is unambiguous.  They are not relying on *Chevron*

7    deference as far as I can tell, although their response is a

8    little bit confusing about that to me.

9              THE COURT:  Okay.  Where has Congress directly

10   spoken to the precise issue in the Act?

11             MR. ELDRED:  Well, there's no law that says

12   Head Start can't do this.  But that's not the rule.  The rule

13   is, they can only do what they are allowed to do.  They don't

14   have just general broad authority to do whatever they want.

15   They don't have general broad authority to implement the Act.

16   Unlike some of the other mandates, which are based on some of

17   those statutes, this mandate is based specifically, according

18   to their own rule, on 9836a, subsection (a)(1)(C), (D), and

19   (E).  Those are the three authorities they have.

20             None of those three authorities allow Head Start--

21   Defendants to require children or staff or volunteers or

22   contractors to be vaccinated or masked, or, frankly, do

23   anything else health-care related.  That's not their job.

24   That's the State's job, that's the local's job.

25             THE COURT:  Would it change the result if I did

 1   decide Congress hasn't spoken directly to the precise issue and

 2   so I'm going to go to *Chevron* Step Two, which asks whether it's

 3   a permissible construction. Would it change the result?

 4             MR. ELDRED: If you're going to Step Two, then you

 5   must feel that (C), (D), (E) are ambiguous about this question,

 6   which the parties say it is not.

 7             THE COURT: Okay.

 8             MR. ELDRED: But if you do think it's ambiguous,

 9   then I think that kicks in the major questions doctrine.

10             THE COURT: Well, you mentioned other mandates. I

11   mean, the health-care mandate that was addressed by my

12   colleague in Amarillo, also an Interim Final Rule, that Court

13   found that Congress had not spoken to the precise issue and

14   went on to Step Two. And I assume both parties said no, the

15   statute is perfectly clear; we win, we win.

16             But, nevertheless, went to Step Two, and it was

17   still an Interim Final Rule, and Congress hadn't spoken

18   directly to it. Both sides said, the statute authorizes it;

19   the statute doesn't authorize it. And so my concern is just

20   making sure I apply the right calculus.

21             MR. ELDRED: Well, I would say Congress has spoken

22   directly to it by not saying it, and by-- It's a background

23   assumption of the law. The background assumption is that the

24   federal government does not regulate staff and children health

25   care, that the state, local, and tribal governments regulate

```
 1    that.
 2                THE COURT:  I understand.  Okay.  Thank you.
 3                MR. ELDRED:  Sure.
 4          And I know you have read our briefs, and I'm not
 5    just going to read them to you.  But, you know, subsection (A)
 6    of 9836a(a)(1) talks about health services, program performance
 7    standards for health services.  And they are not relying on
 8    that.  So if--whenever they say that this is about health
 9    services, that's not correct.  They are not relying on the
10    authority over health services to adopt these rules.
11          They are relying over (C), which is administrative
12    and financial management standards.  I'm pretty sure everyone
13    agrees this isn't a financial management standard.  It's not an
14    administrative standard, because administration is different.
15    Administration is a big word.  It could mean anything.  But if
16    it means this, if it means--if administration is such a big
17    words that it includes the power to control people's
18    health-care decisions and families' decisions about masking,
19    then administration doesn't mean anything.  We believe that the
20    better reading of (C) is, administrative standards are
21    standards about administrations, and not this.
22          They also rely on (D), which is standards relating
23    to the condition and location of facilities.  This is not about
24    people; this is about facilities.  And subsection (i) and (ii)
25    of (D) further show that, if you read them.  They talk about
```

1    meeting--about the facilities being local--state and local

2    requirements, which, again, is another recognition that state

3    and local government has a role here.  And subsection (ii), it

4    says the facility shall be accessible by state and local

5    authorities.  This is about the physical space of the building.

6    This is not about people's health.

7            And then (E) is such other standards as Secretary

8    finds to be appropriate.  Such other is similar to, and similar

9    to.  So it has to be similar to (C) and (D), and this is not.

10           And that should stop--that's enough for us to win

11   right there.  They do not have authority to do this.  Of

12   course, the federal government only has the authority that is

13   allowed by statute.  They don't have police power.

14           THE COURT:  And let me ask you another question

15   since you say it's not (C), it's not (D), it's not (E).  Those

16   are the subsections on which they rely in the Interim Final

17   Rule, which is clear.  So it can't be (A), for example.

18           MR. ELDRED:  Correct.

19           THE COURT:  In your reply brief, you argue that

20   they cannot now rely on provisions outside of those the

21   Secretary cited in the rule.  And you cite *Chenery*, *Regents*,

22   and *State Farm*.  Do you recall that, in your reply brief?

23           MR. ELDRED:  Yes, Your Honor.

24           THE COURT:  Those cases involved courts

25   invalidating rules because they were arbitrary and capricious,

```
 1    not based on a lack of statutory authority.  So a different

 2    invalidation.

 3            Are you aware of any cases holding that an agency

 4    is bound to the source of authority on which it cites in

 5    defending it?  Because I understand your point.  Your point is,

 6    look, this is what they have told everyone.  And you cite

 7    Chenery and Regents and State Farm that, I think, obliquely

 8    make the point.  I'm not sure they directly make the point.

 9            MR. ELDRED:  I'm reading Chenery to say that you

10    have to make your decision based on the record that you have

11    before you.

12            THE COURT:  I would--I do have to make the decision

13    on arbitrary and capricious, and I guess everything, based on

14    the record before me.  The record includes the statute, the

15    congressional authorizing statute, which is more than (C), (D),

16    and (E).  I'm not suggesting it would be proper; I'm just--I

17    just wanted to know if you knew of any other cases that said,

18    in defending a statute, a federal agency is limited to only the

19    statutory authority that they cite.

20            MR. ELDRED:  Well, that's what I would say, that

21    that was the authority before them.  That's what they said they

22    looked at.  They didn't say they looked at anything else.  So I

23    don't agree that the entire U.S. Code was before them.  They

24    told us what was before them; that was (C), (D), (E).  I

25    thought Chenery was good enough for that.  If you'd like
```

1    supplemental briefing on that, I'd be happy to do that.

2              THE COURT:  I'll let you know if that's necessary.

3    I was just curious.  Okay.  Thank you for that answer.  I have

4    interrupted you--

5              MR. ELDRED:  How am I doing on time?

6              THE COURT:  Your thirteen minutes--  I'll keep

7    time.  You don't have to bother with that clock.  Your

8    13 minutes are up, but I've interrupted you, so--I mean, I told

9    both sides this is my only hearing today, and these are

10   important issues to both sides.  So I'll give you more time,

11   and I will for the defense as well.

12             Go ahead.

13             MR. ELDRED:  Well, be careful what you ask for.  I

14   could talk about this all day.  But I'm going to try to keep it

15   short.  If you don't mind, I'd like to move to arbitrary and

16   capricious.

17             THE COURT:  Sure.

18             MR. ELDRED:  This is a preliminary injunction

19   hearing.  This isn't a full-fledged trial.  We're not here to

20   tell you that their studies are right, our studies are wrong,

21   or vice versa.  We are here to tell you that, under the record

22   they filed, it shows an arbitrary and capricious--it shows that

23   they acted arbitrarily and capriciously in several ways.

24             They are required to consider both pros and cons of

25   their policies.  From our review of the record--and I know it's

 1   a long record and we may have missed something.  But from our

 2   review, we saw no record that shows they considered any cons.

 3   More like a collection of things that justify their rule.  They

 4   have to require--they have to consider both sides of the story,

 5   and both sides of the story are--

 6           THE COURT:  Give me your best case--give me your

 7   best case for the idea that if an agency doesn't consider a

 8   con, it's arbitrary and capricious.

 9           MR. ELDRED:  I am blanking, but many cases say

10   that.

11           THE COURT:  Okay.  Didn't they consider--  I

12   understand there are cons that--costs, I would call them--that

13   are very important to the plaintiffs that either weren't--and

14   I'm going to ask them that--or weren't significantly

15   considered.  But many costs were considered.  I mean, the rule

16   explicitly talks about and recognizes, we know people are going

17   to leave; we know teachers are going to leave; we know this is

18   going to be costly; might take them two weeks to hire.  I'm not

19   saying that's a valid assumption, but they did consider the

20   costs.  You might--you obviously disagree with the weighing of

21   those costs, but do you have a case that says, even if they

22   consider some costs, but not all costs, it's arbitrary and

23   capricious?

24           MR. ELDRED:  I may have mumbled.  I meant to say

25   cons, not costs.  I do agree they--

1          THE COURT:  I did hear you.  You didn't mumble.  I

2  said I would call them costs.  That's just how I think about

3  it.  But con--we can use con if you'd like.

4          MR. ELDRED:  No, I agree with you that they do--

5  they consider cost, but the cons I was referring to are the

6  cons of having--of requiring vaccinations and requiring

7  masking.  We didn't see any records in there that say I--I know

8  the World Health Organization, for instance, says that children

9  should not be masked.  I'm not saying they're right; I'm not

10  saying they're wrong.  I am saying that, as far as we can tell,

11  the government did not consider that kind of study, like is

12  vaccination actually required, is it a good idea, is it a bad

13  idea.  Some people think it's a bad idea obviously.  We don't

14  see any indication that they considered that in their record.

15          And even if they are dead-set on they're going to

16  do it no matter what people say, they still have to consider

17  it.  That's just the law.  And we don't see that they did, and

18  we think that makes it arbitrary and capricious.

19          They are also required to consult with people, and

20  they say they did consult with people.  And that gets into our

21  9836(a)(2) argument.  They didn't consult with the right kind

22  of people.  But on the arbitrary and capricious side, we didn't

23  see any record in the administrative record showing that they

24  had actually consulted with anybody.  If they consulted with

25  people, we would think it would be written down in the record.

```
 1    Maybe they're going to say it was all oral.  Okay.  But we
 2    don't see that they actually did consult with people, or, if
 3    they did, it's not in the record.
 4              And many of the documents provided were clearly
 5    created after November 30th.  I can give you some record cites
 6    if you'd like.  I know I'm short on time, but I can give them
 7    to you--
 8              THE COURT:  No, no, no.  That would be helpful.
 9    You said many of the records were created after November 30th?
10              MR. ELDRED:  Yes, Your Honor.  Page 978 to 82 was
11    data taken as of December 30th--I'm sorry--December 20th.
12    Administrative Record page 464-465, data were posted on
13    December 2nd.  Administrative Record 996-998 is dated
14    December 17th.
15              Now, for all I know, these documents didn't--were
16    the same thing before November 30th, but these are three
17    documents that are clearly created after November 30th, and
18    they can't do that.
19              And all I'm saying is, I don't think you should
20    give their record the benefit of the doubt.  There's some
21    problems with their record.  These problems may be solvable at
22    the end of the day.  If we have a trial next year, maybe this
23    record is fine.  But from what we can tell, this record is not
24    fine, and we don't think you should give it the benefit of the
25    doubt, and we think that's a reason to give us a preliminary
```

1    injunction.

2         THE COURT:  Okay.

3         MR. ELDRED:  We also think they should have used

4    notice-and-comment.  Good-cause exception doesn't apply,

5    because if the good-cause exception applied on November 30th,

6    then it just always applies as long as COVID is here, because

7    their justification is, well, COVID keeps changing.  That's

8    basically justification.  And that's true, it does keep

9    changing.  But that doesn't mean that they don't have to do

10   notice-and-comment.

11        It's not impractical, unnecessary, or contrary to

12   public interest.  Remember, has to be--notice-and-comment has

13   to be contrary to public interest, so they have to say that, by

14   doing notice-and-comment is actually hurting the public

15   interest, if they take the time to do notice-and-comment.  And

16   that gets into our argument about, you know, the timing of why

17   now, after--  They can't justify the timing.

18        And I'm going to try to speed it up so I can get

19   Ms. Hilton up here.

20        They didn't comply with 9836a(a)(2).  They

21   basically admit that.  I talked about that before.  They also

22   are required to consult with Indian authorities.  They did not

23   do that.  They did not comply with the Government

24   Appropriations Act of 1999 or the Congressional Review Act, and

25   they point out that both of those acts are not enforceable by

```
 1    their own standards.  But we're not saying that--we're not
 2    asking you to enforce those acts.  We're asking you to enforce
 3    704.
 4              They are required to do the congressional review
 5    process, and they're required to do the family--I'm blanking on
 6    what it's supposed to be, but the 1999 Appropriations Act
 7    requires them to submit a report.  And they say, well, we don't
 8    think we have to.  Well, they do have to.
 9              We don't think they have the authority to do this,
10    but if they did, that would bring up some constitutional
11    problems.  The spending clause does not allow this.  I think
12    the lesson of the Sebelius case with respect to Medicaid
13    expansion is, if state governments, local governments are
14    relying on a federal funding program for decades, feds can't
15    just--Congress cannot just suddenly change the program and say,
16    we're taking away all your money if you don't do it this way.
17    That's how I read the spending clause limitation.
18              Of course, that didn't happen here.  This is the
19    executive branch saying to comply or we're taking away your
20    grants.  They can't do this because of the reliance factors.
21    And that also gets into commandeering and Tenth Amendment.
22    They don't have this general power to order the states to do
23    things, or to have police power.
24              We don't think you need to get there, because if
25    they don't have the authority to do it in the first place, or
```

```
 1    if the rule is arbitrary and capricious, then you set it aside,

 2    and you can avoid those constitutional issues.

 3            THE COURT:  To go back to your arbitrary and

 4    capricious argument, have you or someone in your office

 5    reviewed the administrative record that was filed, and do you

 6    continue to assert that the categories of things that you say

 7    they have not considered at all, are those--do those remain

 8    true and do you continue with those assertions after you have

 9    now seen the administrative record?

10            MR. ELDRED:  I'll be honest.  One of my co--

11    Johnathan Stone is the other person on our signature block.  He

12    couldn't make it today.  He's been doing that work.

13            THE COURT:  Okay.

14            MR. ELDRED:  He sent me those record cites last

15    night.  So, yes, I think he has been.  He's very much into the

16    record.  I have not read the record myself.  It's 2,000 pages.

17    I haven't had time.  He has.  So that's my answer to that

18    question.  We have been looking at it.  We were looking at it

19    yesterday.

20            THE COURT:  Okay.  To the extent that changes and

21    you hear from Mr. Stone that, hey, I'm on page

22    eighteen-thousand-and-whatever and--

23            MR. ELDRED:  I think it's only 2,000 pages.

24            THE COURT:  --there is something--sorry, 1800--and

25    there is something, just update the Court.
```

```
 1                    MR. ELDRED:  I will.

 2                    THE COURT:  But otherwise, I will take your

 3       assertions that you stand behind them; the things you said they

 4       have not considered, they have not considered, despite the

 5       administrative record that came after.

 6                    MR. ELDRED:  Yes, Your Honor.  And I'm happy to

 7       answer any more questions or turn it over to Ms. Hilton.

 8                    THE COURT:  Okay.  All right.  Thank you,

 9       Mr. Eldred.

10                    Ms. Hilton?

11                    MS. HILTON:  Good morning, Your Honor.

12                    THE COURT:  Good morning.

13                    MS. HILTON:  May it please the Court.  Both the

14       State of Texas and Lubbock ISD have demonstrated that they are

15       likely to suffer irreparable harm in the absence of a

16       preliminary injunction.  Without injunctive relief, the State

17       of Texas is going to be forced to forego its police power to

18       enforce its own laws, and LISD, along with other Head Start

19       program providers, will be forced with the impossible of

20       choosing--making the impossible choice of ignoring the Interim

21       Final Rule and operating under the constant threat of having

22       their funding withdrawn or cancelled, and complying with the

23       Interim Final Rule but violating the governor's executive

24       orders GA38 and GA40 and incurring the inevitable loss of both

25       staff and students.
```

1                      So first with respect to LISD, if LISD enforces the

2     rule requiring masks and vaccines, as I said, they are

3     inevitably going to lose both staff and faculty.  The

4     Plaintiffs' Exhibit 8 is the declaration of Mr. David Gray, who

5     is an employee of LISD.  He's been an employee for 22 years.

6     And in those 22 years, he has always taught in the pre-K

7     program with Head Start students.  He has testified that if he

8     is required to get the COVID-19 vaccine, that he's either going

9     to resign or he's going to ask for an alternate assignment to

10    where he doesn't have to get the COVID-19 vaccine.

11                     That obviously hurts the Head Start program, the

12    pre-K program at LISD.  They operate in such a way that the

13    classrooms mix both state-funded pre-K kids, Head Start kids,

14    and tuition-based kids.  And so the loss of a teacher affects

15    them all.

16                     And this is also coming at a time where Lubbock

17    ISD, just like districts across the country, are really

18    struggling to fill vacancies and get qualified instructors and

19    teachers aides.  This is a fact that Dr. Rollo has testified to

20    in her declaration, and it's also something that the defendants

21    themselves considered in the rule.  They noted that education

22    providers are currently experiencing significant challenges in

23    recruiting and retaining staff.  And that's playing out here in

24    Texas.

25                     This loss of staff is also certain to occur in

1    Muleshoe ISD, Morton ISD, and Friona ISD.  I anticipate that my

2    friends here on the other side are going to say that the rule

3    contemplates that the vaccine and mask requirements are going

4    to provide a level of comfort to people who don't feel

5    comfortable working in these classrooms without the mandates

6    but, with the mandates, feel like, okay, I feel comfortable to

7    work; I can fill these vacancies.

8            But the problem here is that the evidence is

9    showing otherwise.  And, in fact, the National Head Start

10   Association--this is Plaintiffs' Exhibit 18--after the

11   plaintiffs filed their motion for temporary restraining order

12   and preliminary relief, the National Head Start Association

13   sent a letter to Secretary Becerra indicating that there would

14   be what they described as potentially devastating consequences

15   and up to 50-percent closure of Head Start classrooms based on

16   the enforcement of the rule.

17           And so we're seeing that play out here in Texas.

18   And, of course, this is just the preliminary stage here, and so

19   we haven't obviously marshaled all of our evidence.  But there

20   is evidence in the record to show that these ISD's are going to

21   lose staff.

22           They are also going to lose students.  Plaintiffs'

23   Exhibit 7 is the declaration of Allison Swafford.  She is an

24   employee of LISD.  She's also a parent of a tuition-based child

25   in Lubbock ISD's pre-K program.  She has testified that if the

1  Head Start mandate is enforced in such a way that all students,

2  regardless of their tuition status, whether they are Head Start

3  or not, are required to wear masks and that requires her child

4  to wear a mask, she's going to remove--she's going to unenroll

5  the child.  And same if her child's teacher is required to wear

6  a mask, which the rule would require that she do, because, as I

7  said, the classrooms are intermingled, and so the teacher would

8  have to wear a mask.

9           THE COURT:  And I believe that's a cost.  I know

10  this is an arbitrary and capricious point, and not an

11  irreparable injury point.  But I believe that's a cost that the

12  plaintiffs argue is entirely failed--was failed to be

13  considered by the agency in making the rule.  That's one of the

14  categories.  Is that right?

15           MS. HILTON:  I believe that's right, Your Honor.

16  And I can defer to Mr. Eldred, but as far as I can tell, that

17  wasn't considered by the agency.  They did consider the loss of

18  staff.  I have not seen that they considered the loss of

19  students.

20           THE COURT:  Students that pay?

21           MS. HILTON:  That's correct.

22           THE COURT:  Tuition-based students that would

23  withdraw, and that funding will be lost by the Head Start

24  program?

25           MS. HILTON:  That is correct, Your Honor, yes.

1    Yes.

2         As I mentioned, other districts anticipate similar

3    results.  Plaintiffs' Exhibits 15, 16, and 17 are declarations

4    of the superintendents of Friona ISD, Morton ISD, and Muleshoe

5    ISD, respectively.  And of particular significance for the

6    Court, I think, is, both Friona ISD and Muleshoe ISD, their

7    superintendents have testified that--  Well, I'll take them

8    separately.

9         Friona ISD, which is Exhibit 15, if they lose their

10    Head Start funding, they will not be able to absorb those costs

11    and provide services to Head Start students in the two Head

12    Start classrooms, and so those services will be forced to

13    close.

14         And with respect to Muleshoe ISD, that's

15    Plaintiffs' Exhibit 17.  They receive approximately $230,000 a

16    year from Head Start, which is also a price too high for them

17    to be able to fund, and they would actually have to close the

18    entire pre-K program, with loss of services to all 3- and

19    4-year-old kids.

20         And it's undisputed--the parties do not dispute

21    that closure of programs is harm.  The defendants, in their

22    response to the motion for TRO and PI, acknowledge that program

23    closure is harmful.  The Rule contemplates that program

24    closure--you know, the rule was purportedly promulgated to

25    remedy the effects of COVID-19 and closure of these programs,

 1    but as this is playing out, it's actually going to result in

 2    closure of more programs than was happening during COVID.

 3              And so it's undisputed that the closure of these

 4    programs is really going to harm not only the educational

 5    development of these kids, but, as Defendants outline in their

 6    rule, Head Start programs provide nutrition and different

 7    health services, check-ins, and so the closure of these

 8    programs is really detrimental.

 9              I think it's also--the defendants note in their

10    rule that program closures impede Head Start families from

11    participating in the work force, impose financial hardship on

12    low-wage workers, create instability for children and families

13    who depend on the program, and delay a full economic recovery

14    for the nation.

15              And, Your Honor, the disappearance of Head Start

16    programs is--you know, cannot be remedied by monetary damages.

17    I assume that's an argument that they are going to make, and I

18    just think the disappearance of these programs cannot be

19    remedied after the fact by monetary damages.

20              In addition to these districts, we also have

21    submitted the Plaintiffs' Exhibit 4, which is a declaration

22    from Eric Bentley at Texas Tech who has provided a copy of

23    email correspondence that he received from Head Start.  And I

24    want to note for the Court that not only is Head Start

25    threatening the employment of staff members who refuse to get

 1    vaccinated for one reason or the other, but also, they note in

 2    their email that staff who refuse to get the COVID-19 vaccine

 3    may actually be eligible for unemployment benefits.  And, of

 4    course, that is a financial burden on the State, and it's a

 5    causal chain here.  It's a direct effect of Defendants' actions

 6    that will--the direct effect of Defendants' actions will be to

 7    negatively affect the State of Texas financially in providing

 8    unemployment benefits.

 9              And finally, Your Honor--

10              THE COURT:  Let me interrupt since we're on

11    Mr. Bentley.  Other than Bentley's declaration, is there

12    evidence before the Court about the state or costs of

13    attempting to comply with the mandate, you know, bringing

14    together HR data with health data on some kind of platform for

15    people to comply?  Is there evidence before me about the cost

16    or burden of that?

17              MS. HILTON:  Is Your Honor talking about--is

18    referring to the costs of--

19              THE COURT:  Tracking vaccinations.

20              MS. HILTON:  Your Honor, we have not submitted

21    declarations that talk about the cost.  Certainly the rule does

22    contemplate that these ISD's will have to maintain some kind of

23    records that need to be available to be inspected by the

24    program to ensure compliance, and obviously there will be some

25    type of cost for that.

```
 1                    THE COURT:  Okay.

 2                    MS. HILTON:  And finally, Your Honor, the Fifth

 3      Circuit has been clear that when the State is blocked from

 4      enforcing its own laws, it necessarily suffers irreparable harm

 5      of denying the public interest in the enforcement of those

 6      laws.  And the Fifth Circuit confirmed this as recently as this

 7      month in E.T. vs. Paxton, which is a Fifth Circuit opinion that

 8      was issued, I believe, on the 1st of December of this year.

 9      And that--E.T. vs. Paxton specifically applied to the

10      governor's executive orders.

11                    And so there's been some clarity now from the Fifth

12      Circuit that, not only is the enforcement--prohibiting the

13      State from enforcing its own statute's irreparable harm, but

14      prohibiting the State from enforcing its executive orders is

15      also irreparable harm.

16                    And so for those reasons, Your Honor, I would

17      submit to you that the LISD and Texas have both demonstrated

18      likely irreparable harm in the absence of a preliminary

19      injunction.

20                    THE COURT:  Okay.  Thank you, Ms. Hilton.  One

21      final question.

22                    MS. HILTON:  Yes.

23                    THE COURT:  Do you know the current status of

24      processing exemption requests?

25                    MS. HILTON:  I do not, Your Honor, no.
```


```
1              THE COURT:  All right.  Thank you.

2              MS. HILTON:  Thank you.

3              THE COURT:  Okay.  Ms. McMahon?

4          I will do my best to limit my interruptions.  I see

5   that we have an AUSA in the audience today.  She can confirm to

6   you that I might have a hard time doing that.  But I will give

7   you back time that I take.  It's 9:45.  You have 30 minutes.

8   Go ahead, Ms. McMahon.

9              MS. McMAHON:  Your Honor, very quick, at the top, I

10  wanted to address some things that my colleagues said from the

11  other side.

12             First, they mentioned that some of the dates in the

13  administrative record are dated to after November 30th, so the

14  agency may have considered factors after that date.  We just

15  want to point out that we have double-checked those page

16  numbers, and that is not the case.  One of the parts that my

17  colleague cited to was a COVID data tracker that constantly

18  updates.  So while that is dated--the version in the

19  administrative record is dated to after November 30th, the only

20  COVID data that was considered was prior to November 30th.

21             And the other citation, I think, is a website that

22  was dated to December 17th, but it looks like that website

23  auto-updated on the date that it was pulled for the

24  administrative record, and the actual citation in the rule,

25  which is in Footnote 73, is to November--is to prior to
```

1    November 30th.  So we just wanted to clarify that quickly.

2              THE COURT:  Okay.

3              MS. McMAHON:  All right.  Your Honor, as you know,

4    a preliminary injunction is an extraordinary remedy that courts

5    should only award in rare circumstances when the plaintiffs

6    have clearly met their burden in showing a likelihood of

7    success on the merits, irreparable harm, and that the balance

8    of equities and public interest tips in their favor.  The

9    plaintiffs have failed to meet their burden on all fronts.

10             First, the Secretary clearly had the statutory

11   authority to issue the Interim Final Rule.  The statute gives

12   the Secretary the authority to issue performance standards that

13   are necessary, and courts have upheld this broad authority

14   repeatedly, as long as the regulation reasonably relates to the

15   purpose of the statute, which, here, in the context of the Head

16   Start Act, is to further development and improve school

17   readiness of low-income children.

18             As the Interim Final Rule clearly lays out, it

19   relates to this purpose, because it protects the health and

20   safety of children under the age of five in the Head Start

21   programs who are not vaccinated and who are more susceptible to

22   COVID-19 for that reason.  And it ensures the continuity of

23   operations so that the programs do not close and children don't

24   suffer the attending consequences, including that--ensuring

25   that--these programs ensure that the low-income children are

1   eating meals.  It provides them with diapers and basic everyday

2   needs, such as personal hygiene and brushing their teeth.

3           THE COURT:  When you mentioned the statutory

4   authority, I think you said other standards as necessary.  Is

5   that what you said?

6           MS. McMAHON:  That's correct.  That's the text in

7   9836a.

8           THE COURT:  Well, I believe you're referring to

9   (E), the catch-all?

10          MS. McMAHON:  There, I was referring to the

11  subprovision (1), which is Content of Standards.  The Secretary

12  shall modify as necessary program performance standards.

13          THE COURT:  Oh, modify as necessary.

14          MS. McMAHON:  Yes.

15          THE COURT:  But the agency has identified (C), (D)

16  and (E).  Correct?

17          MS. McMAHON:  That's correct.  Those are to further

18  clarify which performance standards the agency has promulgated

19  here.

20          THE COURT:  He can modify as necessary--

21          MS. McMAHON:  Right.

22          THE COURT:  --the program performance standards in

23  (C), (D), and (E).  That's what we're talking about; is that

24  right?

25          MS. McMAHON:  That's correct.

 1          THE COURT:  And am I right that the Secretary did

 2    not list subsection (A) as part of the statutory authority, and

 3    you don't rely on it to authorize this rule?  Is that right?

 4          MS. McMAHON:  That's correct.

 5          THE COURT:  Okay.

 6          MS. McMAHON:  And I want to speak to that briefly,

 7    as well, because I think my colleague brought that up.  The

 8    agency does not consider the vaccine and mask mandates to be a

 9    health service that it is providing, and that's because

10    Head Start programs provide a whole host of other health

11    services.

12          THE COURT:  You do not consider the vaccine

13    requirement to be a health service that's provided?

14          MS. McMAHON:  That's correct.  But we are relying

15    on references to health services throughout the statute, not

16    for--to derive our statutory authority, but to show that

17    regulating health and promulgating performance standards that

18    have to do with the health and safety of children, as well as

19    the Head Start personnel, is well within the Secretary's

20    statutory's authority.  And given the long history of

21    performance standards that have related to both health services

22    and other health programs more generally that's offered by the

23    Head Start program, just reenforces the idea that the Secretary

24    has the authority to regulate the health of its children and

25    its personnel.

```
 1              THE COURT:  Well, the Secretary could certainly
 2    provide services, including health, under (A), but you don't
 3    rely on (A), and the rule isn't based on (A).  The other--  I
 4    understand your point, that you're pointing out these other
 5    regulations that are health-related and health service-related,
 6    but don't those tie necessarily to (A), a program performance
 7    standard under (A)?
 8              MS. McMAHON:  Your Honor, some of them do, but
 9    others do not.
10              THE COURT:  Which do not?
11              MS. McMAHON:  So, for instance, I'll point you to--
12    I'll point you to CFR--45 CFR 1304.52, and that would be the
13    requirement that staff undergo an initial health examination
14    that includes screening for tuberculosis and other communicable
15    diseases.  That is not a health service that's provided by
16    Head Start.
17              THE COURT:  Okay.
18              MS. McMAHON:  But it does require that staff here
19    provide determination from a health-care provider that they
20    have undergone a health screening.  And this is for a very
21    similar purpose as the IFR here.
22              THE COURT:  And so that would be--  Where would you
23    put that one, if it's not under (A)?
24              MS. McMAHON:  Your Honor, I would have to
25    double-check with the agency exactly as to what statutory
```

```
 1    authority they had invoked for that performance standard.

 2              THE COURT:  Okay.  But it's not (A).  I understand.

 3              MS. McMAHON:  Yes.

 4              THE COURT:  Okay.  And were there other examples?

 5              MS. McMAHON:  Sure.  So another example would be

 6    45 CFR 1304.22, and that's the requirement that Head Start

 7    programs space cribs 3 feet apart to avoid the spread of

 8    contagious diseases.  So the purpose of that regulation, as

 9    well, is to--as by its own terms, to avoid the spread of a

10    contagious disease.  But again, that is not a health service

11    that's provided by a Head Start program.

12              THE COURT:  Okay.

13              MS. McMAHON:  If I may continue on?

14              THE COURT:  Yes, please.

15              MS. McMAHON:  Great.  So as I kind of--as I have

16    mentioned in the last couple of minutes, the agency has issued

17    performance standards that have related to the health and

18    safety of Head Start children, as well as the health and safety

19    of Head Start personnel, for decades, beginning in 1975 when

20    the Head Start Act was initially passed.

21              THE COURT:  So because they have things separate

22    from (A) that you've identified for me, required health

23    examinations or screenings for employees before they begin, or

24    periodically, and they have the authority to space cribs apart

25    to prevent disease, they can also do this?
```

```
1              MS. McMAHON:  Your Honor--

2              THE COURT:  Is that the point, that, look--

3              MS. McMAHON:  Yes.

4              THE COURT:  --here's some proof that we can do this

5    kind of thing; this is just another of the same kind?

6              MS. McMAHON:  That's correct.  And we believe that

7    the sheer number of regulations that have dealt with this type

8    of subject matter, which is, as I have mentioned, the health

9    and safety of the children, does give rise to the inference

10   that the area in which the agency has promulgated this

11   regulation with the IFR is not something that's outside of its

12   statutory authority.  It's been doing this type of regulation

13   for generations to--without any sort of issue, including from

14   Lubbock School District, as well as the State of Texas, to the

15   extent that any of their entities have agreed to participate in

16   the Head Start programs.

17             These two entities--  And the Lubbock School

18   District has been a part of the Head Start program and has

19   accepted Head Start funding since 1975.

20             THE COURT:  Has the agency ever mandated a health

21   treatment before?

22             MS. McMAHON:  The agency has not mandated a

23   specific health treatment, but I also would not--I'm not so

24   sure that a vaccination requirement or a mask requirement is a

25   health treatment as--
```

```
 1                 THE COURT:  What's a vaccination requirement?

 2                 MS. McMAHON:  A vaccination requirement, we

 3      believe, falls--

 4                 THE COURT:  You don't think that's a health

 5      treatment?

 6                 MS. McMAHON:  Well, I guess it depends on the

 7      definition of "treatment" here.

 8                 THE COURT:  It's more than diagnostic.  Screening

 9      is diagnostic.

10                 MS. McMAHON:  Right.

11                 THE COURT:  Would you agree that it's more than

12      diagnostic?

13                 MS. McMAHON:  Screening is diagnostic, that's

14      correct.  But it's also to prevent the spread of a communicable

15      disease.

16                 THE COURT:  I'm sorry.  My question was, is it--do

17      you just agree that it's more than diagnostic?  It's a

18      vaccination?

19                 MS. McMAHON:  Yes.  And--

20                 THE COURT:  So what is it?  If it's not--if it's

21      not a health treatment and it's not diagnostic, what is it, in

22      the agency's view?

23                 MS. McMAHON:  Well, a treatment, I believe, would

24      imply that there is--

25                 THE COURT:  Procedure?  Is that a better word?  A
```

```
1    health procedure?

2              MS. McMAHON:  Perhaps.

3              THE COURT:  Okay.  Has the agency mandated a health

4    procedure before?

5              MS. McMAHON:  So the agency--the regulations do

6    require that children shall be--shall be up-to-date on their

7    immunizations as well.

8              THE COURT:  If they're not, if parents withhold

9    consent, it's my understanding that they're still--they're not

10   going to get kicked out, that it's subject to consent.  It's

11   not a mandatory procedure.  It's, like, we're going to hold

12   your hand through this process, because I understand that's--

13   Trust me, I'm not debating the validity or the value of that

14   process.  But if, for example, someone says, we are

15   fill-in-the-blank and we don't want to do that, we will not do

16   that, it's not mandatory, is it?

17             MS. McMAHON:  The immunizations for children?

18             THE COURT:  Uh-huh.

19             MS. McMAHON:  The purpose--

20             THE COURT:  If a parent withholds consent, will the

21   child be kicked out?

22             MS. McMAHON:  If a--  Well, the purpose of this--of

23   the IFR, as well, is not meant to be punitive in the sense that

24   you're describing where someone would be kicked out of the

25   program if they don't comply.
```

 1              THE COURT:  Yeah, I don't mean it to be punitive.

 2    The services will not be offered or provided to them if the

 3    parents withhold consent.  I'm just--I'm trying to understand

 4    if there is a similar--following up on your representation that

 5    there's a similar mandated health procedure.  And I'm not

 6    trying to get into semantic arguments with you; I just want to

 7    understand the regulations.

 8              MS. McMAHON:  I understand.  The agency has in the

 9    past, through some of its regulations, strongly encouraged the

10    children to be vaccinated.  And I'll point you to the language

11    in one of its original regulations from 1975, which says that

12    the performance standards shall provide that the child enrolled

13    in the Head Start program, be--provide a record of its

14    immunizations.  And that same regulation goes on to say that

15    the plan shall provide for treatment and follow-up services,

16    including completion of all recommended immunizations.

17              So while that is not phrased in mandatory terms,

18    there is a strong encouragement there in which the--  And this

19    is also part of the Head Start program in general.  It is not

20    meant to be punitive, but, rather, it is intending to work with

21    families and its personnel to further the development of

22    children, which, here, includes keeping them safe.

23              And in the context of the COVID-19 pandemic, that

24    would include taking measures, such as vaccination and masking

25    requirements, in which--which have proven to be--and the

 1    Secretary has laid this out in--throughout the 50-page rule.

 2    They have proven to be the most effective way to reduce the

 3    spread of COVID-19.

 4         THE COURT:  So that's an example of something

 5    that's strongly encouraged.  Is there an example in

 6    Head Start's history of a health procedure that is mandated as

 7    a prerequisite or precondition to participation or employment?

 8         MS. McMAHON:  Not to my knowledge in the health

 9    segment.  But there are many other conditions and performance

10    standards that are mandatory that the agency requires

11    Head Start grantees to agree to in order to receive the funding

12    from the Head Start program.

13         THE COURT:  Okay.

14         MS. McMAHON:  I'll move on briefly to the--  Oh, I

15    also would like to note that this case does not address the

16    question of vast political and economic significance here.  As

17    I have laid out, the Head Start program is a relatively small

18    federal discretionary grant program, and it is not regulating a

19    large part of the economy.  Rather, the plaintiffs here have

20    challenged the conditions on the receipt of federal funds of

21    the small spending program that encompasses only about 800,000

22    children.  And since there are over 24 million children age

23    zero to five nationally in the country, this represents only

24    about 3 percent of that age group.

25         The rule is also not arbitrary and capricious.  It

1    is a well-reasoned--

2         THE COURT:  Before we go on to arbitrary and

3    capricious, I have a few questions about the statutory

4    construction piece, the authorization.  So as I understand your

5    argument that you just made, the Secretary can modify, as

6    necessary, program performance standards.  There are similar

7    strongly encouraged medical or health-related regulations.

8    This is just another one of those.

9         Where--  And you have made clear that you rely on

10   (C), (D), and (E).  Would you agree that it's not a financial

11   management standard?  I'm trying to narrow the field of

12   relevant language that I need to consider.  Would you

13   agree--and if you don't, that's fine, but we're not talking

14   about a financial management standard, are we?

15        MS. McMAHON:  No, Your Honor.  We believe it is an

16   administrative standard.

17        THE COURT:  Okay.

18        MS. McMAHON:  And that's because it does have to do

19   with the operation and ensuring that there is continuous

20   administration of the Head Start programs.  And that's the case

21   because the requirements here prevent the closures of these

22   in-person programs and ensure that there's continuity of

23   services provided to the Head Start children.

24        THE COURT:  Okay.

25        MS. McMAHON:  Also noted, it's administrative

```
1    standard as well, because part of the rule involves a
2    recordkeeping obligation to keep track of the various
3    vaccinated personnel involved in the Head Start program.  So
4    because it has this recordkeeping component, it is also an
5    administrative standard.
6              THE COURT:  Do you continue to argue that it's also
7    a standard relating to the condition of facilities?
8              MS. McMAHON:  That's correct, yes.  We believe
9    that's the case, because--
10             THE COURT:  Isn't a facility-- A facility is a
11   building?
12             MS. McMAHON:  I'm sorry?
13             THE COURT:  A facility is a building?
14             MS. McMAHON:  Yes.  Yes.  So here, it prevents the
15   spread of viral contagion among those facilities.  So relating
16   to the example that's laid out in the statute, including indoor
17   air quality assessment, we believe that this directly relates
18   to that, since COVID-19 is an airborne disease, and preventing
19   the spread of COVID-19 and lowering the risk that it
20   infiltrates these facilities relates directly to ensuring that
21   the facilities are in good condition so that, as--along with
22   the fact that they can stay open to provide services for the
23   Head Start children.
24             THE COURT:  Okay.  And how does it fit under (E)?
25             MS. McMAHON:  Your Honor, so (E) is the other
```

1   standards that the Secretary finds to be appropriate.  And I'll

2   point you back to--  First of all, that language--similar

3   language in other statutes has been construed broadly.  But it

4   does relate, again, to the purpose that's set forth expressly

5   in 9831, subsection (2), which is to promote the school

6   readiness of low-income children.

7          So here, ensuring--protecting the health and safety

8   of children and ensuring that these programs do not close is

9   essential to accomplishing that purpose and making sure that

10  they are school-ready just for--because these Head Start

11  programs provide not only educational benefits, but so many

12  more programs just beyond the educational sphere.

13         THE COURT:  If that's the case, if you can use--if

14  the agency can use the catch-all to do whatever is necessary to

15  keep classrooms open--  Classrooms close, students lose

16  instruction.  Students are absent, they lose instruction.  And

17  we have this catch-all provision.  What limiting principle can

18  you identify for me that would prevent the agency from passing

19  any manner of regulation related to health and mandating that

20  procedure because it will increase the likelihood that teachers

21  aren't sick and that teachers don't miss and that families are

22  healthier and students are healthier?  I'm looking for a

23  limiting principle there.

24         MS. McMAHON:  So the limiting principle, Your

25  Honor, is, not only the other subcomponents of that section of

```
 1   the statute, (A) through (D), which give content to what (E)
 2   should relate to, but it's also, again, the purpose of the
 3   statute.  And the agency must tie the regulations that it
 4   promulgates under as a performance standard to the statute's
 5   purpose.
 6            THE COURT:  Well, let's take the first answer
 7   first.  I agree with you that we--I--must define (E) in
 8   relation to (A) through (D).  You've relied on (C) and (D).  So
 9   (C) is administrative and financial; (D) is facilities.  (E) is
10   defined in relation to (C) and (D).  What language is there--or
11   what's the best language that you have, anyway, that supports
12   the idea that whatever (E) encompasses, as defined by its (C)
13   and (D) colleagues, it could include a mandatory health
14   procedure or universal masking?
15            MS. McMAHON:  So I think I have gone through (C)
16   and (D) and how we think it fits under those provisions before,
17   but I also want to point you to the purpose statement once
18   again, which, as we've explained here--and we think this is
19   essential to understanding why this regulation fits into the
20   statutory scheme, which is that--
21            THE COURT:  To promote school readiness through the
22   provision of health--
23            MS. McMAHON:  Right.  And this is about not only
24   ensuring that children don't catch COVID-19 and lowering the
25   risk that that might happen, but it is about keeping the
```

```
1    Head Start programs open.  And that, in itself, is--as the
2    Secretary puts forth, is essential to promoting the school
3    readiness and furthering the development of these children.
4            And like I said, because this isn't just about the
5    educational component--it is also about basic needs and meeting
6    the basic needs of these students.  It is essential that the
7    programs are open to provide mental health services or ensuring
8    that the children are furthering their social development in
9    other ways.
10           THE COURT:  The agency--  Okay.  I understand your
11   point.  The purpose is school readiness, development, we've got
12   to keep these things open.  And if the virus spreads, the
13   schools are going to close.
14           MS. McMAHON:  One other thing I want to add, as
15   well, with respect to the authority to promulgate any
16   regulation that promotes health, I just want to point out that
17   this is a very different scenario than any run-of-the-mill type
18   of health regulation.  This is a regulation that is being
19   promulgated in the midst of a global pandemic that is
20   unprecedented and in which we have seen repeatedly schools are
21   opening and, due to COVID-19 outbreaks, having to close again
22   over and over.  So it's not just about keeping the staff and
23   the children healthy as a general matter.  The stakes here are
24   far more dire, and that's why these regulations reflect that.
25           THE COURT:  The leading cause of death in America
```

```
 1   is heart disease.  So it's the leading cause of death, and

 2   related health issues.  Could the agency promulgate regulations

 3   mandating health procedures with the goal of reducing

 4   absenteeism, sickness, the health--the deleterious health

 5   effects of heart disease?

 6            MS. McMAHON:  The agency could not.  That is

 7   outside the scope of the authority, because--

 8            THE COURT:  Why not?  If it's--if the agency--in

 9   your argument, if the agency, under (C), (D), and (E), can do

10   what is necessary to keep schools open, to promote school

11   readiness, why can't it attack other and even larger problems?

12            MS. McMAHON:  Your Honor, the evidence that was

13   before the agency is not that one individual teacher who--

14            THE COURT:  I'm not talking about the evidence

15   here.  I'm talking about, in this hypothetical--and the

16   evidence would be--and I'll just stipulate for you--it's

17   leading cause of death; biggest problem; you know, there

18   are--it is treatable.  It's lifestyle.  It's nutrition.  There

19   are very simple procedures you can undergo to identify it.

20   There are widely available medicines to reduce it.  So we--it

21   would be a different record?  It would be different evidence?

22            MS. McMAHON:  So, first, I would just like to

23   point out that there--in your hypothetical, that is--whether

24   something would improve the health of one individual Head Start

25   personnel or one Head Start student is not relevant to this
```

1    case precisely because of how COVID-19 spreads.

2          THE COURT:  So then my hypothetical is not clear.

3    My hypothetical is not talking about one person.  The reason I

4    mention it's the leading cause of death is that it's

5    everywhere.  It's the leading cause.  It's the biggest health

6    problem, according to the CDC, that we have.  And so the

7    evidence before the agency would be endemic.  And what I'm

8    trying to understand is, if the agency's position is, you can

9    pass this regulation because of the general purpose of keeping

10   classrooms open is good, which no one would dispute--that is a

11   good thing--why can't it do other things that would help

12   increase the likelihood that classrooms remain open?

13         MS. McMAHON:  So correct me if I'm not totally

14   understanding your hypothetical, but I believe that if it were

15   under similar circumstances to here, which--in which we are

16   amidst a global pandemic; this health condition results in

17   intermittent closures that have severe disruptions in the

18   learning of children; and this condition is killing

19   800,000 people in the United States alone just over the past

20   two years; then perhaps the agency would, because that would

21   raise the stakes of the health crisis facing the Head Start

22   programs so high that perhaps it would be a real threat to the

23   health and safety of the Head Start children in a similar way

24   to the COVID-19 pandemic here.

25         But I would like to clarify, the general health

 1   measures is--that is far outside of the scope of what we are

 2   discussing here in this case.  These are extraordinary

 3   circumstances with a serious threat to both children--  And, as

 4   the Secretary explains, the newer variant before--the Delta

 5   variant before the Secretary has been more deadly and more

 6   serious for children under the age of five than prior variants

 7   as well.

 8          So if all of those factors were similarly in place,

 9   then perhaps the Secretary--then perhaps the Secretary would

10   have authority there.  But the significance here, as well, is

11   that it is--it's--there are many other instances--and I think I

12   want to just point this out as well--in which the authority of

13   the agency reflects its ability to strongly encourage

14   immunizations.  And also, I just want to point you to one more

15   statutory provision that I haven't discussed--

16          THE COURT:  Yeah, so I'm glad you're going to do

17   that, because I understand your--I understand your argument.

18   These are unprecedented times, and so we should be able to do

19   this.  There's just a need.  But the question before the Court

20   is, what statutory language authorizes the agency to do that.

21   I mean, I could take your word for it that, we won't do it in

22   other times.  But I have to--I have to find statutory language

23   that says Congress authorized the agency under circumstances

24   like this--because that's your argument.  Look, these are

25   extreme circumstances.  And there's not a provision that says--

1  of course; we wouldn't be here if there were--that says, or, if

2  there is an endemic--if something is--there's a pandemic or

3  it's endemic, then the agency has the authority to mandate

4  medical procedures.

5          That's not there.  I understand that.  You are

6  relying on other language.  But I think I need more than if the

7  circumstances justify it, if it's a good thing--  I don't think

8  that's what you're arguing.  I mean, you're not arguing that if

9  it's good, we can do it, are you?

10          MS. McMAHON:  No, no.

11          THE COURT:  Okay.  Yeah, so that's what I'm

12  struggling with, is, where in the language does it authorize

13  statute, under these kinds of extreme circumstances, to do

14  this?

15          MS. McMAHON:  Your Honor, you asked earlier about

16  whether the Secretary has promulgated a performance standard

17  that relates to immunization of participants in the Head Start

18  program in the past, or a mandated procedure.  But I also want

19  to point out, related to this argument is cases that we've

20  cited in our briefs that say that when the Secretary is granted

21  open-ended authority, such as modifying, as necessary, the

22  program performance standards, that is a rather open-ended

23  grant of authority, and the agency--  And Congress, in

24  promulgating--or in passing the statute, is not expected to

25  think of every single scenario that might arise, and that's

1    precisely why it grants the Secretary of these agencies broad

2    authority to promulgate regulations, so that the Secretary may

3    combat problems as they occur.

4              And related to the immunization question too, is, I

5    think it's important to remember that staff have not had an

6    immunization requirement, but there's also never been a

7    situation, since the Head Start Act was passed in 1975, in

8    which individuals have had to receive a vaccination under short

9    time line in the middle of their lives in order to prevent

10   against a novel virus spreading quickly throughout the world.

11             So most individuals get their immunizations when

12   they are children, and the Head Start regulations reflect that

13   by requiring the students to provide certification that they

14   have complied with those immunizations.

15             THE COURT:  And-- Sorry.  Say that again.  Make

16   that point again.

17             MS. McMAHON:  So the--

18             THE COURT:  This has never happened before; these

19   vaccinations that children get, they get when they're kids,

20   because we're past that disease; this is new; we've never had

21   this before, and so Congress couldn't have anticipated it?

22             MS. McMAHON:  Correct.  And the point being there

23   is that--

24             THE COURT:  Was that yes--

25             MS. McMAHON:  Yes.

```
 1            THE COURT:  --Congress could not have anticipated

 2    it?

 3            MS. McMAHON:  Yes.  So Congress--so the reason that

 4    I make that point is to show--and we have cited to cases saying

 5    as much in our papers--that the statutory authority is intended

 6    to give the Secretary broad authority to promulgate regulations

 7    that address certain problems as they encounter them and not

 8    foresee every single possible iteration of a regulation that

 9    could occur beforehand, so anticipating that problems could

10    arise four decades later, as they have here.

11            THE COURT:  Well, they anticipated five categories,

12    really, that would need to be changed.  I mean, you keep saying

13    the agency's--Secretary's grant of authority is broad.  I mean,

14    (A) through (D) are, I mean, I think incredibly specific,

15    aren't they?

16            MS. McMAHON:  They refer to specific--

17            THE COURT:  I know there's a catch-all as well.  I

18    mean, I know there's a catch-all.  But, I mean, we get pretty

19    far down in the weeds on facilities and air quality and

20    licensing.

21            MS. McMAHON:  Those are provided as examples of

22    ways in which those parts of the statute could be exercised.

23    But given the range of--and the breadth of Head Start

24    performance standards that we have cited to in our papers--but

25    there's also many, many more beyond this, regulating different
```

 1  aspects of children's mental health or different requirements

 2  for the programs--that these are--yes, these are examples, but

 3  it is not meant to be an exhaustive list by any means.  And the

 4  broader provision, as well, permits the Secretary to have the

 5  authority to--and the flexibility to respond to problems as

 6  they arise.

 7          And one other thing I want to mention briefly,

 8  earlier from the topic of immunizations, is a different part of

 9  the statute that requires that Head Start agencies comply with

10  state and local laws, and when--and these states and localities

11  have their own vaccination and mask requirements.  And

12  particularly, Texas in particular has a part of its

13  administrative code which requires child-care centers to

14  vaccinate its staff against vaccine-preventable diseases and

15  for--and this--these vaccine-preventable diseases are defined

16  by what's considered a required immunization by the CDC.  At

17  this moment, that also applies to the COVID-19 vaccine.  So

18  there's other parts of the statute that's referring to state

19  and local laws and their own health requirements as well.

20          If we may move on to the arbitrary and capricious

21  section--

22          THE COURT:  You're going to be shocked to know that

23  I have one more question, which will probably turn into three

24  more questions.  But I promise I'll let you make your arbitrary

25  and capricious argument.

```
 1              Do you agree that public and safety regulation

 2   belongs, in the first instance, to the states, just as a matter

 3   of law?

 4              MS. McMAHON:  We believe that under--under

 5   constitutional principles, the states--the Constitution gives

 6   the federal government a certain set of enumerated powers.  And

 7   under the Tenth Amendment, when a power is not enumerated

 8   specifically to the federal government, that power is reserved

 9   to the states.

10              THE COURT:  So the question is, is public health

11   and safety one of those categories that traditionally and

12   historically belongs to the states?  I'm referring to cases

13   like Jacobson vs. Massachusetts.  I mean, I think we have case

14   law that says that.  I mean, I might be paraphrasing.  But I

15   don't think that's in dispute, but I might be wrong, and I

16   didn't want to put words in your mouth.

17              MS. McMAHON:  I don't think it's incorrect to say

18   that it has been traditionally a power exercised by the states.

19              THE COURT:  Okay.  If that's the case, I--there's

20   other case law that indicates that when, therefore, a federal

21   executive branch or Congress begins to regulate in an area that

22   is traditionally reserved to the states, like health and

23   safety, it needs to use exceedingly clear language to justify

24   that mandate.  Agree?

25              MS. McMAHON:  In certain instances, I--there--that
```

```
 1    is true.  But here--
 2                THE COURT:  Is this one of them?  And if not, why
 3    not?  We have--  Well, first of all, do you agree that this
 4    relates to health and safety?  That this Interim Final Rule
 5    relates to health and safety?
 6                MS. McMAHON:  Yes, we agree with that.
 7                THE COURT:  Okay.  So it's something--so the agency
 8    has stepped into an arena that is traditionally, anyway,
 9    reserved for the states.  Agree?
10                MS. McMAHON:  We don't--I disagree with the
11    assertion that it's traditionally reserved for the states.  I
12    think that--
13                THE COURT:  Okay.  I thought we were--I thought we
14    were making progress.  I thought you had agreed that health and
15    safety is traditionally reserved for the states--
16                MS. McMAHON:  Well, there's--
17                THE COURT:  --some seconds ago, but I'll let you
18    clarify.  I mean, you know--  Look, I'm trying to make sure I
19    apply the right calculus.  That's all this question is about.
20    I have case law before me that says health and safety,
21    traditionally for the states.  It seems as though--and I think
22    you just agreed with me--that this Interim Final Rule relates
23    to health and safety nationwide.  Therefore, does the
24    proposition also in case law that, because a federal agency is
25    stepping into this traditional state arena, I need to find
```

1    exceedingly clear language to justify it?

2             MS. McMAHON:  So if you're referring to the Tenth

3    Amendment argument here, this is an area in which--which many

4    courts have also affirmed over time, both--there is overlapping

5    authority between both the federal government and the state

6    government.  And the reason--

7             THE COURT:  It's not really a Tenth Amendment

8    argument.  This is a statutory construction argument.  This is

9    the lens on which I would have to apply the statutory

10   construction argument.  Because this is a particular type of

11   regulation, in this instance, that starts to approach and move

12   into an area reserved traditionally for the states, case law

13   indicates Congress needs to be exceedingly clear when it does

14   that.  This is not the major questions doctrine.  This is

15   separate.  So, I mean, it's related to the Tenth Amendment

16   argument, but that's--I'm not talking about the Tenth Amendment

17   argument.

18            MS. McMAHON:  Thank you for clarifying.

19            THE COURT:  Yeah.

20            MS. McMAHON:  So, Your Honor, this is a federal

21   spending program that was promulgated under the authority of

22   the spending clause.  So while it does implicate the health and

23   safety of the Head Start participants and their personnel, it

24   is--  Well, I'll also say we do believe that Congress has

25   spoken clearly to this question, and the evidence for that is

1    not only the text of the statute in which, under your--the

2    argument that you're referring to, the clear statement doctrine

3    relating to affairs that regulate--statutes that regulate

4    affairs of the State, that--the statute repeatedly refers to

5    health services.

6            And as we have laid out and as we have discussed

7    here today, there are many instances in which the agency has

8    regulated parts of--elements of health of the Head Start

9    children and their participants as well.  So we believe it is

10   clear on that front.

11           But as to the clear statement canon that you're

12   referring to, this is also not an area--a situation in which

13   Congress has promulgated a statute that, under the commerce

14   clause powers, for instance, that relates to the health and

15   safety of citizens.  It's a fairly small federal discretionary

16   grant program that's promulgated under the spending clause.

17           So it is a voluntary set of conditions that

18   participants are free to agree to or not agree to.  And the

19   federal government is able to exercise that same spending

20   clause power among a whole host of different grant programs.

21           And so to the extent--as I mentioned earlier, to

22   the extent that the authority here is slightly overlapping

23   between the federal government's ability to offer money with

24   certain conditions and the purview of the State to regulate

25   generally the health and safety of its citizens, that

```
 1    overlapping authority does not make this statute or this

 2    regulation unconstitutional.  It doesn't warrant the

 3    application of the clear statement canon here.

 4                THE COURT:  Okay.  I promise I have no more

 5    questions on the statutory construction argument.  I think you

 6    want to talk about arbitrary and capricious.  I don't know why

 7    I think that.  But go ahead.

 8                MS. McMAHON:  Great.  So I can go through

 9    everything else briefly.  I know--I imagine we're running a

10    little short on time, so--

11                THE COURT:  I've interrupted you thoroughly, so go

12    ahead.  Make your argument.

13                MS. McMAHON:  So we believe that the regulation is

14    not arbitrary and capricious.  It's a well-reasoned nearly

15    50-page rule that has given a fulsome explanation, and it has

16    thoroughly considered alternative strategies at mitigating the

17    spread of COVID-19 and ultimately has drawn the conclusion that

18    the safest and most effective way to do so is to impose a

19    vaccine and mask requirement.

20                The Secretary consulted with the FDA experts in

21    child health and has examined the agency's past experience with

22    safety standards, and also, importantly, looked at the other

23    safety standards that are currently in place for Head Start

24    programs, including sanitary measures, as well as hand-washing

25    and other hygienic practices.
```

1          So ultimately this is--this falls well within the

2    zone of reasonableness, which is a highly deferential standard,

3    as Justice Kavanaugh has most recently said in his *FCC vs.*

4    *Prometheus* opinion.  So the Secretary thoroughly considered the

5    issues here.

6          I also want to briefly mention that the plaintiffs,

7    in their reply brief, brought up certain categories of

8    information such as natural immunity and have suggested that

9    the Secretary did not consider those factors.  But the

10   Secretary did consider those factors, and there are certain

11   studies cited to in the rule, and in the administrative record

12   as well.  I believe there is one at AR 65 that cites studies

13   that address prior infection.

14        THE COURT:  AR 65--

15        MS. McMAHON:  Yes.

16        THE COURT:  --addresses prior infection and natural

17   immunity?

18        MS. McMAHON:  That's correct.

19        THE COURT:  Okay.  Can you point me--  I'm sorry.

20   Was there another record cite on that point?

21        MS. McMAHON:  No, go ahead.

22        THE COURT:  Can you point me to the record where

23   the agency or the Secretary considered the costs of parents

24   pulling their children out of the program if the universal

25   masking requirement were to be imposed, and the resulted cost

1    or loss of revenue that would result?

2            MS. McMAHON:  The agency did not expressly consider

3    that cost, but that's because the agency doesn't really

4    consider that to be a cost.  Many of the Head Start programs,

5    including--including ones that are based in Texas, have

6    extremely long wait lists for the Head Start--for a child to be

7    in the Head Start program, and so the Secretary--and knowing

8    this, it's not necessarily a cost that one child would

9    withdraw, since it's the case that a child could fill into that

10   slot quickly.  So--

11           THE COURT:  Have you been to Friona, Texas?

12           MS. McMAHON:  I have not.

13           THE COURT:  Have you been to Muleshoe, Texas?

14           MS. McMAHON:  I have not.

15           THE COURT:  Okay.

16           MS. McMAHON:  So I'll bring those up later, but--

17           THE COURT:  So your point is, the agency didn't

18   consider it, but they didn't need to because it's not a cost,

19   because there's an endless supply of new children available to

20   take those spots.

21           MS. McMAHON:  We would--

22           THE COURT:  And if a new child came in, the tuition

23   money would be replaced?

24           MS. McMAHON:  So it's--

25           THE COURT:  So it's a balance?

```
 1                MS. McMAHON:  That's correct.  In terms of monetary

 2    cost, there is no--the enrollment would stay the same.  And

 3    that's, of course, a general--as generally--

 4                THE COURT:  Is that in the IFR?

 5                MS. McMAHON:  That is not in the IFR, but that's

 6    just giving you some background about how the Head Start

 7    program works.

 8                THE COURT:  Well, if it's not in the IFR, I can't

 9    consider it.  Right?  I mean, I understand the argument you're

10    making, but I think the rules say I have to do this to that.

11    Correct?

12                MS. McMAHON:  I understand.  That's right.

13                THE COURT:  Is that right?

14                MS. McMAHON:  That's right.

15                THE COURT:  Okay.  So the potential cost or loss of

16    revenue, it's just not considered in the IFR?

17                MS. McMAHON:  Yes.  And the other--one other thing

18    I'll bring up about that in terms of the non-Head Start

19    children, the tuition-based children, although there are,

20    especially in public schools, not so many of those, but the

21    other children who are not in the Head Start program, as

22    Lubbock--the Lubbock school district shows, there are about

23    500 students in their Head Start program, and there's about

24    1200 pre-K students total.

25                So if one parent of either a Head Start student or
```

```
 1   a non-Head Start student didn't want their child to be subject
 2   to the mask requirement, then the school district can take them
 3   out of a classroom that interacts with Head Start programs and
 4   put them in one that doesn't.  As I've just explained, the
 5   majority of children in Lubbock are not in the Head Start
 6   program.  So the school would be able to prevent the withdrawal
 7   of that student by kind of reorganizing the classrooms, and
 8   there are--
 9            THE COURT:  Is that in the IFR?
10            MS. McMAHON:  It is not, no, but--
11            THE COURT:  So do I have to do this?
12            MS. McMAHON:  The Secretary didn't consider that,
13   but--or the Secretary may have considered that for the record,
14   but it is--but the Secretary didn't expressly lay that out in
15   the IFR.
16            THE COURT:  Okay.
17            MS. McMAHON:  I need to double-check as to whether
18   that's in the administrative record, and I can get back to you
19   on that point.
20            THE COURT:  Okay.  Assuming that those aren't in
21   the IFR, they're not in the record, you can--if that's an
22   incorrect representation today, feel free to file a letter.
23            MS. McMAHON:  I will do so, thank you.
24            THE COURT:  But assuming they are not, assuming
25   you're right today--and I'm not aware that they are, so it's
```

1   confirming my understanding, but I'm not as close to it as

2   y'all are.  Why doesn't it--why doesn't it make it arbitrary

3   and capricious?  There is a category of revenue-producing

4   students that will be lost.  Nothing in the rule talks about

5   how, why, whether that can be balanced or whether it's

6   marginal.  It just wasn't considered.  Does that make this

7   arbitrary and capricious?

8           MS. McMAHON:  Your Honor, it is black-letter

9   arbitrary and capricious law--and this comes from the

10  *State Farm* case--that the Secretary doesn't need to consider

11  every single conceivable scenario--

12          THE COURT:  Understood.

13          MS. McMAHON:  --before it.

14          THE COURT:  Understood.

15          MS. McMAHON:  The Court needs to be able to

16  reasonably discern the path that the agency took in coming to

17  its conclusions.  And we believe that, even if this factor is

18  not expressly considered in the rule, this is something that

19  the Court--the Court can reasonably discern, through all the

20  other costs, that the agency does consider that--where the

21  agency is coming from.  And as I mentioned, this is a highly

22  deferential standard, and so as long as this action is

23  reasonable, the Court should uphold the agency's action as not

24  arbitrary--

25          THE COURT:  Well, I think the law also says that

1    there are certain categories or times where, if something is

2    completely ignored and it's a highly important thing and they

3    just close their eyes to it, it can make it arbitrary and

4    capricious.  I mean, do you agree with that?  So I think the

5    game that you would be playing is, it just doesn't fit into

6    that really important category.

7          MS. McMAHON:  Well, we would argue that the

8    Secretary's--the considerations that the Secretary did take

9    into account were reasonable, and the conclusions based on

10   those were within the zone of reasonableness.

11         So here, the Secretary took many costs into

12   account, including the withdrawal of teachers, including the

13   administrative cost, including the cost of how the Head Start

14   programs are going to be able to manage their weekly testing

15   requirements for the individuals who fall within the

16   exemptions.

17         And so given the numerous other factors that the

18   Secretary did consider, we do not believe that the action--and

19   the conclusion here that masks and vaccine requirements are

20   overall necessary to give the Head Start programs the most

21   benefits of preventing school closures, and also spreading and

22   slowing the spread of COVID-19, that the benefits do outweigh

23   the costs here.

24         I'll briefly move on, if that's okay with Your

25   Honor, to the invocation of the good-cause exception to the

```
 1    notice-and-comments requirement.  So the Court--as we cite to

 2    in our papers, the Alcaraz case out of the Ninth Circuit

 3    explains that the good-cause exception doesn't operate as

 4    narrowly as it typically does when the agency has voluntarily

 5    agreed to provide notice-and-comment requirements and comply

 6    with the dictates of the APA Section 553, when originally a

 7    grant program such as this would have been excepted from those

 8    notice-and-comment requirements.

 9              THE COURT:  In reviewing--I understand your--it's

10    Alvarez?  Is that right?

11              MS. McMAHON:  Yeah.

12              THE COURT:  The Ninth Circuit case?

13         The Fifth Circuit has not adopted Alvarez one way

14    or the other?  Has the Fifth Circuit spoken to Alvarez?

15              MS. McMAHON:  It has not, but I am not sure that

16    there has been on occasion to.

17              THE COURT:  Do you know whether the Fifth Circuit,

18    in reviewing challenged agency action from the HHS--because

19    there's been a few of those at the Fifth Circuit--applied the

20    traditional analysis to notice-and-comment, as opposed to

21    Alvarez?  Even if they didn't speak to it, have they applied

22    the traditional notice-and-comment rules?

23              MS. McMAHON:  Your Honor, I have to double-check on

24    that, because I'm not sure about all the--off the top of my

25    head, I'm not sure about--
```

 1                THE COURT:  That's okay.

 2                MS. McMAHON:  --specific instances with HHS.

 3                So it's also--it's not just an HHS--I'll just

 4     remind you, it's not just any HHS regulation.  It's

 5     specifically with the grant program.

 6                THE COURT:  Even better.  I was trying to limit it

 7     for your sake.  But my question--and "I don't know" is a

 8     perfectly fine answer, because this is a very refined question.

 9     But I understand your *Alvarez* argument.  I will look to see if

10     the Fifth Circuit has, despite *Alvarez*, and even without

11     mentioning it, applied traditional notice-and-comment--I'm

12     sorry--traditional rules of review even in the grant program

13     arena.  Go ahead.  But you would like me to apply *Alvarez*?

14                MS. McMAHON:  Well, we believe that, in any event--

15     we would, but--because we think it's sensible policy, as--or

16     it's a sensible holding, as the--this is ultimately an internal

17     agency policy that it has agreed to comply with

18     notice-and-comment requirements.  It's not statutorily

19     obligated.

20                But in any event, we think that the good-cause

21     waiver for notice-and-comment applies regardless, and this is

22     because this exception applies when delay could lead to serious

23     harm.  And this is the case here from, number one, the

24     emergence of the Delta variant over the summer of 2021 and its

25     dramatic spread in the fall of 2021.  And the Secretary also

```
1    cites to numerous studies in its rule in showing that the Delta
2    variant has an increased impact on children in terms of
3    deadliness and dangerousness and hospitalizations.
4              As well, the Secretary has dated January of 2022 as
5    an anticipated return to all in-person offerings for Head Start
6    programs.  And this is essential for the reasons that we have
7    been discussing throughout this argument.  It's important for
8    child development and learning that they be back in the
9    classroom in person.  And so this--the timing of this rule is
10   anticipating that they are hoping to be back in person fully
11   next year.
12             THE COURT:  You need to show that it was
13   impracticable, unnecessary, or contrary to the public interest.
14   Which of those do you rely on, setting Alvarez aside?
15             MS. McMAHON:  So we point you to the Jifry case out
16   of the DC Circuit, I believe which states expressly that when
17   delay would result in serious harm, the good-cause exception
18   applies.  And that would fall under, I believe, the
19   impracticability prong of that test.
20             THE COURT:  Okay.
21             MS. McMAHON:  But it was also essential that the
22   Secretary promulgate the rule immediately and have it go into
23   effect sooner because of the coming winter months as well.  And
24   there--evidence does show that influenzas and viruses, like the
25   COVID-19 virus, can spread more frequently and quickly in
```

```
1    winter months.  And given the COVID surge last winter, in

2    winter 2020, the Secretary thought it was essential to avoid

3    any more delay.

4           My colleague also briefly mentioned the statutory

5    provision of 9836a(2) and that the Secretary did not consider

6    the relevant considerations pursuant to that portion of the

7    statute.  But I want to point out that the Secretary did do

8    that and certified that the Secretary did so in the text of the

9    IFR itself.  And the statute is not an exhaustive list of

10   exclusive factors that the Secretary must consider--

11          THE COURT:  It's not exhaustive, but it does

12   mention experts in the field of child development.

13          MS. McMAHON:  Yes.

14          THE COURT:  And he certified that he did that, but

15   then it's my understanding that he listed particular people

16   that he did consult with, and they are all public health-

17   related people.  I don't see any of them being people in early

18   childhood education.

19          MS. McMAHON:  The Secretary considered various--and

20   this is--I do not have the AR cite for you, but I can get this

21   to you.  But the Secretary did consider studies that

22   specifically, for example, related to the needs of children who

23   have special needs, and disabled children, and also how the

24   intermittent closures would disrupt learning.  And that

25   evidence is not based on a public health measure, but,
```

```
 1    rather--or a public health expert, but, rather, studies from

 2    experts in childhood learning who can speak to that directly.

 3               I will move on briefly to the Treasury and General

 4    Government Appropriations Act.

 5               THE COURT:  One more question about

 6    notice-and-comment.

 7               MS. McMAHON:  Sure.

 8               THE COURT:  Does the Head Start Act require any

 9    particular length of comment period for the promulgation of a

10    new performance standard?

11               MS. McMAHON:  Does the Head Start Act require that?

12    Not to my knowledge specifically.

13               THE COURT:  What is the comment period, as you

14    understand it?  I mean, is it in the agency's discretion, that

15    you can--

16               MS. McMAHON:  For the Interim Final Rule?

17               THE COURT:  Uh-huh.  You could decide--if the

18    agency is passing--or wants to promulgate a new performance

19    standard, is it at the Secretary's discretion as to whether to

20    make it 15 days, 30 days, 60 days, 90 days, or is there a

21    requirement somewhere?  And if it's not the Head Start Act,

22    somewhere else.

23               MS. McMAHON:  Your Honor, I will check on that for

24    you to be sure, because I am not a hundred percent on this.

25    But I do believe, to the best of my knowledge, the format of
```

```
 1    the Interim Final Rule generally has a 30-day

 2    notice-and-comment period after its promulgation.  So I think

 3    that, in other instances in which HHS has specifically

 4    promulgated this format of rule, they have done the same thing

 5    as well.

 6                THE COURT:  Okay.  Thank you.

 7                MS. McMAHON:  But I will double-check on that for

 8    you.

 9                THE COURT:  Okay.

10                MS. McMAHON:  But to my knowledge, the Head Start

11    Act itself does not require it specifically.

12                THE COURT:  Okay.  Okay.  Anything else?

13                MS. McMAHON:  No.  So I just want to point out that

14    the Treasury and General Government Appropriations Act has a

15    provision in it that says that it is not judicially

16    enforceable.  And the Secretary also expressly determined that

17    the policies wouldn't affect family well-being, but left the

18    door open to public comments on that as well.

19                So moving on to the constitutional claims, the rule

20    does not violate the spending clause for a number of reasons.

21    Number one, it's important to note that Texas does not--as a

22    state, does not receive any Head Start funding.  They are not a

23    Head Start grantee, because the Head Start programs themselves

24    only apply to localities, and they do not apply to states.  And

25    they are not a grantee, to the knowledge of the agency, of any
```

```
 1   early Head Start programs themselves.

 2          And beyond that, even if a state were to accept

 3   Head Start funding, these conditions are not coercive in the

 4   sense of that they would violate the spending clause under

 5   NFIB.  These are discretionary grant funds, and they are a

 6   small--even--especially the amount of funding that goes to the

 7   states is a small, nominal amount in themselves.  And the

 8   states--it's a voluntary program, and the states are free to

 9   decline to--decline the funding if they don't want to comply

10   with any of the conditions.

11          Third, under Pennhurst, the requirements here are

12   unambiguous, and the IFR clearly lays out the requirements of

13   the rule, which is, number one, universal masking for those

14   over two years old, vaccination for Head Start personnel, and

15   weekly testing for those exempted from the vaccine requirement.

16          The rule also does not violate the Tenth Amendment.

17   As we have briefly touched on earlier, the spending clause is a

18   power that's expressly delegated to the federal government, and

19   the Head Start Act here is a grant program that the federal

20   government has developed pursuant to the spending clause

21   powers.

22          Just because--as I mentioned, just because the

23   states and the federal government regulate the same area

24   doesn't mean that there's a Tenth Amendment problem.  And

25   states have said--or cases have said that repeatedly, including
```

1    the *Hodel* case, as well as the recent Eleventh Circuit opinion

2    that touched on--called *Florida* that touched on the CMS vaccine

3    requirement, which was for the Medicaid and Medicare funding.

4         There's also no anti-commandeering violation.  As a

5    matter of doctrine, anti-commandeering is generally--generally

6    applies, as we saw in *New York*, *Printz*, and *Murphy*, to when the

7    federal government uses a state instrument--uses an

8    instrumentality of the State to effectuate its federal

9    policies.  And because this is a spending clause case, this

10   involves the exchange of money, and not any individual on the

11   state level who is administering a federal policy.

12        The plaintiffs have also not met their burden in

13   showing any irreparable harm.  First, as I just mentioned,

14   Texas has demonstrated no harm whatsoever to its state.  It is

15   not a Head Start grantee.  It doesn't accept any Head Start

16   funds.  And so it is not injured in any way whatsoever in this

17   litigation.

18        But to the extent that Texas is trying to assert

19   standing on behalf of its citizens and injury on their behalf,

20   it cannot do so, because this is considered *parens patriae*

21   standing against the federal government, and that's prohibited

22   by the *Alfred L. Snapp* case, which says that states cannot

23   assert injuries on behalf of their citizens specifically

24   against the federal government.

25        Texas has also alleged no independent sovereign

 1    injury that would give it standing, and as the Eleventh Circuit

 2    recently also said, the mere preemption of laws alone does not

 3    confer--does not automatically confer to give a state standing,

 4    and it does not demonstrate irreparable injury.

 5             In addition, here, the Head Start requirements only

 6    apply to a small subset of its citizens.  It is not broadly

 7    preemptive, so it can't assert injury on behalf of the broader

 8    population.  So since Texas has no *parens patriae* standing to

 9    bring claims on behalf of its citizens, and it hasn't asserted

10    any sovereign injury itself, it cannot do so to invoke

11    irreparable injury on those grounds.

12             As to Lubbock Independent School District, as we

13    set forth in our papers, this injury is speculative, and it is

14    far from certain that the--even the school district will suffer

15    any irreparable harm in the event that the rule goes into

16    effect.

17             So first, I'll point out the Rollo declaration, who

18    is, I believe, the--

19             THE COURT:  Is Texas Tech a grantee?  You said

20    Texas receives no funds.

21             MS. McMAHON:  Texas Tech--

22             THE COURT:  Is Texas Tech a grantee and does it

23    receive funds?

24             MS. McMAHON:  Texas Tech is a grantee, and it--

25    because it administers an early Head Start program, but--

1          THE COURT:  Isn't that receipt of funds to Texas?

2          MS. McMAHON:  Well, Texas--I believe that

3     Texas Tech receives funds from the State of Texas.  It is a

4     state-funded university.  And it also receives funds from the

5     federal government.  But we don't believe that Texas can assert

6     any injury on Texas Tech's behalf.  And it's also significant

7     that Texas Tech is not a plaintiff in this case.  The plaintiff

8     is Texas.

9          THE COURT:  Okay.  We have now gone way over your

10    time, but I'll give you--and I take some responsibility for

11    that as well.  But I'll give you five minutes to tell me

12    anything else you'd like to tell me.

13         MS. McMAHON:  So--  Okay.  I'll wrap this up

14    quickly.

15         So the school district has also put forth the

16    declaration of one teacher who says that he doesn't wish to

17    receive a vaccine, but the plaintiffs have provided no evidence

18    about whether he's applied for an exemption, would be eligible

19    for one, and what the status of that exemption is.  And the

20    agency itself anticipates that a fair number--a fair share of

21    teachers will be granted exemptions.  But--

22         THE COURT:  Is that in the rule?

23         MS. McMAHON:  That is in the rule, yes.

24         And I also want to mention, as we discussed

25    earlier, in terms of the school district's ability to organize

```
 1    its classrooms around the Head Start kids and non-Head Start
 2    kids, if a--it's not--it's far from certain that this teacher
 3    will actually lose his job and will, for instance, go on
 4    unemployment benefits if he--if the rule goes into effect.  And
 5    this is because, in the school district of Lubbock, there are
 6    many other--many non-Head Start students, and so it's entirely
 7    possible that, given that Lubbock has represented that a fair
 8    share of its teachers are already vaccinated, they could move
 9    him to a classroom that is not subject to the Head Start
10    requirements, and so he wouldn't have to be vaccinated.  He
11    could still work there.
12            I also want to move on quickly to the scope of
13    relief and--or I'll move on quickly to the balance of equities,
14    but I just want to remind you, of course, we are amidst a
15    global pandemic that has killed enumerable amount of people in
16    the U.S. alone.  And an injunction would harm the public
17    interest because the rule helps slow the spread of COVID-19,
18    especially among young and vaccinated children.  So the public
19    has an interest in ensuring that their children are able to
20    take advantage of the Head Start programs and all of its
21    offerings.
22            Lastly, I want to mention the scope of relief, and
23    if the Court is to award this extraordinary remedy, which,
24    again, we do not think it should, but if the Court were to
25    award an injunction here, we believe that it should be narrowly
```

```
 1    tailored to the harm that each individual plaintiff in this
 2    action has suffered.
 3              Most recently, just a couple weeks ago, the Fifth
 4    Circuit--
 5              THE COURT:  I'm familiar.
 6              MS. McMAHON:  You're familiar?
 7              THE COURT:  Yeah, I'm familiar.
 8              MS. McMAHON:  Okay.  Great.  But--
 9              THE COURT:  They limited it to the 14 plaintiff
10    states.  You're referring to the nationwide injunction out of
11    Louisiana.
12              MS. McMAHON:  That's correct.
13              THE COURT:  They limited it to the 14 plaintiff
14    states.
15              MS. McMAHON:  That's correct.
16              THE COURT:  Correct?  Yeah.  Okay.  I'm familiar
17    with that case, yeah.
18              MS. McMAHON:  Great.  But we believe, regardless--
19    we agree with the reasoning that Justice Thomas has put forth
20    in Trump vs. Hawaii that, based on long-standing equitable
21    principles of the United States courts, as well as English
22    courts, the Court can only vindicate the rights of the
23    plaintiffs appearing before it.  And for uniformity sake, as
24    well, it makes sense to limit the injunction only to the
25    plaintiffs, given that many states would welcome these
```

```
 1    requirements and would want them themselves.

 2              And I'll also point out to the Court, there's two

 3    other cases challenging the Head Start regulations that have

 4    been filed, and--

 5              THE COURT:  Are those both in Louisiana?

 6              MS. McMAHON:  They are, yes.  They are both in

 7    Louisiana.

 8              THE COURT:  Yeah, I'm familiar with those as well.

 9              MS. McMAHON:  Great.

10              THE COURT:  What's the current--I saw the initial

11    briefing schedule, which pushed it into mid-January.  That was

12    the first case.  And then I think a second case, some teachers

13    filed.  Is there an expedited briefing in the second case?

14              MS. McMAHON:  The second--

15              THE COURT:  Is a decision imminent, as far as you

16    know, or a hearing imminent, as far as you know, in Louisiana?

17              MS. McMAHON:  We believe that a decision is

18    imminent.  And the briefing schedule--I believe this is on the

19    public docket, but the briefing schedule in the second case has

20    been paused so that the Court can resolve the claims in the

21    first case.

22              THE COURT:  Is briefing ripe in the first case?  Is

23    briefing complete, I mean?

24              MS. McMAHON:  Briefing will be complete tomorrow.

25              THE COURT:  Okay.  So after tomorrow, a decision
```

```
 1    could--

 2              MS. McMAHON:  I think--

 3              THE COURT:  --a decision could come at any moment?

 4              MS. McMAHON:  That's correct.

 5              THE COURT:  Is the government's briefing deadline

 6    tomorrow?

 7              MS. McMAHON:  Our briefing deadline was yesterday.

 8              THE COURT:  Okay.  Is it a particular time

 9    tomorrow, or--

10              MS. McMAHON:  May I confer with my colleague?

11              THE COURT:  Sure.

12         (PAUSE)

13              MS. McMAHON:  It is 5:00 p.m. Central time tomorrow

14    when the reply will come in, and the judge, Judge Doty in that

15    case, also has said that he will issue a ruling by January 2nd.

16              THE COURT:  Okay.  All right.  That's helpful.

17    Okay.  Thank you for letting me know.

18              Regarding the scope of the relief, do the--I think

19    it's 24 states, 25 states?

20              MS. McMAHON:  It is twenty--

21              THE COURT:  Ish?  I won't hold you to it.  But are

22    they seeking a TRO and preliminary injunction limited to those

23    states, or nationwide?

24              MS. McMAHON:  They have not specified the type of

25    relief that they are seeking in that case.  So we have argued,
```

```
 1    similar to here--
 2                 THE COURT:  Sure.
 3                 MS. McMAHON:  --that it should be limited, but
 4    perhaps will clarify it in the reply; we're not sure.
 5                 THE COURT:  Okay.  All right.
 6                 MS. McMAHON:  So I also just wanted to lastly say
 7    that the injunction should only apply to the aspects of the
 8    rule on which the Court thinks the plaintiffs have met their
 9    burden, and the Court should uphold the other parts of the rule
10    that the Court thinks the plaintiffs have not met their burden
11    on.
12                 The regulation contains a severability clause, so a
13    presumption exists that the validity of the entire regulation
14    isn't dependent on either of the provisions here, and severance
15    will not impair the function of the regulation as a whole.
16                 THE COURT:  Okay.  All right.
17                 MS. McMAHON:  That's all for me, Your Honor.
18                 THE COURT:  Okay.  As you take a deep breath.  Give
19    me one second.
20                 The defendants stipulated to the admissibility of
21    the declarations for consideration of the irreparable harm, but
22    not for the balance of equities and public interest.  Was that
23    purposeful?
24                 MS. McMAHON:  We believe that they--we fail to see
25    the relevance in terms of the general public interest.
```

```
 1                THE COURT:  If I believed it was relevant to just
 2    the balance of the equities, do you have any objection to me
 3    considering it for that?
 4                MS. McMAHON:  We don't have objection to that.
 5                THE COURT:  All right.  Thank you for that.
 6                Okay, Ms. McMahon, thank you for your argument--
 7                MS. McMAHON:  Thank you.
 8                THE COURT:  --and your patience with my questions.
 9    I appreciate it.
10                Okay.  Mr. Eldred, rebuttal?  Or Ms. Hilton?
11                MR. ELDRED:  May we have just a moment to consult
12    with our client?
13                THE COURT:  Sure.
14         (PAUSE)
15                MR. ELDRED:  I can tell you I'm going to try to
16    do--  I'm sorry.  If you're ready?
17                THE COURT:  I'm ready.
18                MR. ELDRED:  I'm going to try to do about three
19    minutes, and Ms. Hilton, about two minutes, if that's okay.
20                THE COURT:  Sure.  Yeah, you have ten total, but--
21                MR. ELDRED:  Oh, okay.
22                THE COURT:  --so divide it up however you'd like.
23                MR. ELDRED:  I will try to be brief.  There is no
24    open-ended authority applicable in this case.  There's no
25    open-ended authority in the Head Start Act.  There's none cited
```

 1   by Defendants.  Subsection (a)(1)(A) through (D) are not

 2   open-ended authority.  So that's a red herring.

 3          My second point is, they talk about the purpose of

 4   the statute.  The purpose of the statute cannot increase their

 5   powers.  And the purpose of a statute is a different question

 6   than how the purpose is implemented.  The criminal law has lots

 7   of purposes too.  That doesn't mean that the prosecutor can do

 8   whatever they want.  They have to follow the law.

 9          Three, there has never been a requirement that

10   anyone be vaccinated.  I guess there's one little exception.

11   They talk about pets being vaccinated in the program that

12   existed previously.  I'm not sure what they think is the score

13   of that.  That's in their response brief, that there used to be

14   a program where you could have group services at a home, and if

15   there was a pet in the home, the pet had to be kept away from

16   the children and had to be vaccinated.  I'm not sure why they

17   brought that up, because, to me, that just almost emphasizes

18   the fact that they don't have the power generally to order

19   vaccinations.  That the one example I saw of them claiming a

20   power to order anyone to be vaccinated.

21          They say that vaccination is a health service, but

22   they also say it's not a health service because it's not

23   implemented under Section (1)--I'm sorry--(a)(1)(A)--

24          THE COURT:  I think Ms. McMahon told me that it was

25   not a health service today.

```
1              MR. ELDRED:  I heard her say both, Your Honor.  I
2    heard her say it's not, and then--but then she would come back
3    and say, but we've been regulating health services for decades,
4    as if it is a health service.
5              And I would again remind people that health service
6    and mandatory health care are different things.  I provide
7    legal services, but I can't force you to take my legal
8    services.  That's a different--it's just a different story.
9    And it doesn't--health services are just not relevant to this
10   case.
11             There is no overlapping authority between the
12   federal government and the state government in this area of
13   law.  And that's admitted--in my mind, that's admitted by
14   their--it's admitted in their response on page 23 and 24.  They
15   talk about, governments have always done this.  Governments.
16   Well, they mean local governments and state governments.  If
17   you read the rest of the section, they talk about local and
18   state governments doing vaccination policy.
19             It's true this is a spending clause power case.
20   However, they can't just--they can't just do anything under the
21   spending clause.  They have to--it still has to be authorized
22   by statute.  There is no authorization of statute, so spending
23   clause does not expand their powers to do anything, other
24   than--that's not in the statute.
25             The Alcaraz case from the Ninth Circuit, I'm going
```

1    to do a little statement against interest, I think, here.  In

2    the CMS case--I believe it's Section--I want to say 1395cc, and

3    I might have that wrong.  But I believe Medicare does have to

4    comply with notice-and-comment.  They changed the law, I want

5    to say in '87, on that.  So unlike this program, the Medicare

6    Act itself requires them to comply with this.  So I do not

7    believe many courts, since '87, have thought about that issue.

8            THE COURT:  Okay.

9            MR. ELDRED:  That may or may not be helpful to you.

10   But in any event, if you look at our Exhibit 13, we pulled the

11   regulation that they adopted in 1971 where they said, we are

12   going to comply with notice-and-comment, and they have--I read

13   it as, we're very serious about this; we are going to

14   notice-and-comment unless there's a really bad emergency.  So

15   they're not adopting a weaker version of notice-and-comment

16   that--  The *Alcaraz* case, when I read it, it seemed like--I

17   think it was--I can't remember what department was involved.

18   It wasn't the HHS or HEW.  But whatever department it was, they

19   just kind of said, well, we're going to do a

20   notice-and-comment.  And this agency said, we're going to do it

21   and we mean it.  That's the way I read it.  It's not very long.

22   It's Exhibit 13, if you'd like to read what they said about

23   that.

24            About the universal injunction, of course, we do

25   think you have authority to enjoin it in the State of Texas.

```
 1                THE COURT:  You have asked for a nationwide
 2      injunction.
 3                MR. ELDRED:  Nationwide.  I said universal.  I
 4      apologize.
 5                THE COURT:  No, it's--
 6                MR. ELDRED:  Nationwide injunction.
 7                THE COURT:  Oh, no, no, no.  I wasn't making--you
 8      know, I wasn't fussing at you logistically.  I just wanted to
 9      make clear, you have asked for a nationwide injunction.
10                MR. ELDRED:  Yes, because we think the APA requires
11      you to set aside the rule.  Unlike--and this is the point made
12      in Texas v. Biden, the Fifth Circuit case, which I think got
13      revised on the 21st.  I think it came out on the 13th.  The APA
14      requires you--requires the Court to set aside a rule, as
15      opposed to, when you--when the Court supposedly finds a statute
16      unconstitutional, the Court is not erasing the statute from the
17      books.  The Court is--it's preventing people from enjoining--
18      from--is enjoining the government from enforcing the statute.
19                THE COURT:  Didn't Louisiana--
20                MR. ELDRED:  So Texas's abortion statute is still
21      on the books, for instance.
22                THE COURT:  Didn't the Louisiana court and the
23      health-care mandate--I mean, that's an Interim Final Rule.
24      That rule was set aside.  It was a nationwide injunction, and
25      the Fifth Circuit rolled it back.
```

1          MR. ELDRED:  Yes, they did.  I do not understand

2     when a nationwide injunction is appropriate or not.  I don't

3     think the appellate courts--I don't think those principles--I

4     think those principles are being developed as we speak.

5          THE COURT:  So I agree with you, and I, of course,

6     am subject to Fifth Circuit authority.  And I did have on my

7     list of questions--so I'm glad you brought it up--why this

8     should be nationwide.  We have one plaintiff state and a school

9     district.  Nearly all--correct me if I'm wrong, but nearly all

10    of the evidence that's been presented to me is Texas-specific.

11    We have the--so, yeah, I mean, it's hard to put a percentage on

12    it, but it would be over 90 percent of the evidence before me

13    is Texas-specific.  It's not one of the traditional areas where

14    nationwide injunctions have been imposed, as far as I know.  I

15    mean, immigration, national security, more understandable.

16    Here, we're, at the very least, in uncharted territory.  So

17    what is your best argument as to why--if I were to grant you an

18    injunction, why it needs to be nationwide?

19          MR. ELDRED:  Just because that's what the APA says.

20          THE COURT:  Okay.  It's just a--this is what the--

21    the APA says set it aside, and the only way to do that is to do

22    it everywhere?

23          MR. ELDRED:  Yes.  I think the Fifth Circuit did

24    make that point in the other case.  But again, the Fifth

25    Circuit is--in one case, they say--  My question is, how do

1    they not justify a nationwide injunction when the law says set

2    it aside.  I know--

3              THE COURT:  Okay.  I understand your argument.

4              MR. ELDRED:  Okay.

5              THE COURT:  Okay.

6              MR. ELDRED:  And I'd like to turn it over to

7    Ms. Hilton, unless you have other questions.

8              THE COURT:  All right.  Thank you, Mr. Eldred.

9              All right.  Ms. Hilton, you have five minutes.

10             MS. HILTON:  Thank you, Your Honor.  I'm going to

11   address first Ms. McMahon's argument about Texas demonstrating

12   irreparable harm.  As Your Honor may be aware, Judge Kacsmaryk

13   in Amarillo found that the State of Texas--in the CMS mandate

14   case, the State of Texas had shown that they had standing

15   because there was pressure to change state law, the

16   interference with the governor's executive orders.  And Judge

17   Kacsmaryk cited *Texas vs. EEOC,* which is a Fifth Circuit case

18   from 2019, for that proposition, and also noted that the

19   pressure to change state law interferes with the State's

20   quasi-sovereign interest in law-making.

21             And so for that reason, Ms. McMahon's argument

22   about, well, the State can't bring a cause of action here

23   because it's really interested in protecting the citizens who

24   don't want to be vaccinated, that's not actually what the State

25   has alleged here.  They are bringing this quasi-sovereign

```
 1    interest argument as Judge Kacsmaryk noted in the CMS case.

 2              Secondly, Your Honor, as my colleague, Ms. Wills,

 3    who is counsel on that case, noted, 42 U.S.C. Section 9832

 4    talks about delegate programs to run the Head Start programs--

 5    delegate agencies, excuse me, to run the Head Start programs.

 6    In Texas, those are ISD's, public entities, and so funds do

 7    flow to Texas public entities to operate the--

 8              THE COURT:  Like Texas Tech?

 9              MS. HILTON:  Exactly, Your Honor.

10              And--  I'm sorry, Your Honor.  I'm looking at my

11    notes here.  Let me make sure that I've covered this.

12              With respect to teachers who--the argument that

13    it's far from certain about teachers losing their jobs, my

14    understanding of the rule, Your Honor, is that it's either

15    mandatory and has effect or it doesn't.  There is a regulation

16    that authorizes Head Start to cancel funding without notice,

17    and so these districts, without a preliminary injunction, are--

18    you know, even if they are not terminated now, or even if they,

19    you know, don't have some--what I'm trying to say, Your Honor,

20    is, there is no safe harbor for them.  They are operating these

21    programs under the constant threat of defunding, which is a

22    direct cost to the districts.  And the price, as Your Honor

23    brought up, of complying with these mandates is borne by the

24    districts.

25              And I believe, Your Honor, that I have addressed
```

```
 1   everything in my notes.  I'm sure I will sit down and think of

 2   something else, but thank you very much.

 3              THE COURT:  Okay.  I only have one more question--

 4              MS. HILTON:  Yes.

 5              THE COURT:  --and if you don't know the answer,

 6   then Mr. Eldred or Ms. McMahon can weigh in.  But does anyone

 7   know the total number of comments that have been received--

 8              MS. HILTON:  Yes, Your Honor.

 9              THE COURT:  --as of today?

10              MR. ELDRED:  2,699.

11              THE COURT:  2,699.  Okay.  All right.

12              All right.  Thank you so much.

13              MS. HILTON:  Thank you.

14              THE COURT:  All right.  Again, I want to end how I

15   began, which was just a statement of gratitude.  Thank you-all

16   for being here on short notice, especially over the holidays.

17   This hearing was helpful to the Court.  Your briefing has been

18   helpful to the Court.

19              I know that this will not end here no matter what

20   happens here, so I'm going to act as quickly as I possibly can,

21   within reason.  So hopefully, I can get you a decision by the

22   end of the day tomorrow, no later than, you know, first thing

23   Monday morning, because I understand that is the effective

24   date.  So you will know my answer as soon as I possibly can,

25   and know that we are working as diligently as we can, because
```

```
1   we know you're waiting on us.

2            All right.  Anything else from either side?

3   Ms. McMahon?

4            MS. MCMAHON:  No, Your Honor.

5            THE COURT:  Mr. Eldred?  Ms. Hilton?

6            MR. ELDRED:  No, Your Honor.

7            THE COURT:  All right.  Thank you.  We're

8   adjourned.

9        (END OF HEARING)

10

11       I, Mechelle Daniel, Federal Official Court Reporter in and
    for the United States District Court for the Northern District
12  of Texas, do hereby certify pursuant to Section 753,
    Title 28, United States Code, that the foregoing is a true and
13  correct transcript of the stenographically reported proceedings
    held in the above-entitled matter and that the transcript page
14  format is in conformance with the regulations of the Judicial
    Conference of the United States.

15

16   /s/ Mechelle Daniel                 DATE  DECEMBER 30, 2021

17  MECHELLE DANIEL, CSR #3549
    FEDERAL OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25
```