IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

_____

STATE OF TEXAS, *et al.*,

                  Plaintiffs,

                  v.

XAVIER BECERRA, in his official capacity
as Secretary of the United States Department
of Health and Human Services, *et al.*,

                  Defendants.
_____)

Civil Action No. 5:21-CV-00300-H

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

SUMMARY..................................................................................................................................1

STANDARD OF REVIEW ......................................................................................................1

ARGUMENT............................................................................................................................2

I.      The State of Texas Has Not Established Standing. ...............................................2

II.     The Secretary Had the Authority to Promulgate the Rule. ................................2

      A.      The Rule Does Not Violate the Major Questions Doctrine. .................2

      B.      The Plain Language of the Statute Authorizes the Rule. .......................4

      C.      HHS's History of Regulating Health and Safety Demonstrates Its Authority to Promulgate the Rule..................................................................7

III.    The Rule Does Not Violate Any Other Provision of the Statute........................9

IV.     The Secretary Had Good Cause to Issue the Interim Rule Without Advance Notice and Comment. ..............................................................................................10

V.      The Rule Complies with the Treasury and General Government Appropriations Act of 1999. ..................................................................................11

VI.     The Rule Is Not Arbitrary and Capricious.........................................................12

VII.    The Rule Complies with the Spending Clause. ...................................................13

VIII.   The Rule Does Not Violate the Tenth Amendment. .........................................15

IX.     The Rule Does Not Violate the Anti-Commandeering Doctrine. .....................15

X.      Any Relief Granted to Plaintiffs Should Be Limited in Scope. ........................16

CONCLUSION......................................................................................................................18

## TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ........................................................................................................... 16

*Alabama Ass'n of Realtors v. Department of Health & Human Services.,*
  141 S. Ct. 2485 (2021) ......................................................................................................... 5

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987) ........................................................................................................... 18

*Berry v. Esper,*
  322 F. Supp. 3d 88 (D.D.C. 2018) ...................................................................................... 1

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) ................................................................................................. *passim*

*Brackeen v. Haaland,*
  994 F.3d 249 (5th Cir. 2021), *cert. granted,* 142 S. Ct. 1205 (2022) ........................... 15

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ............................................................................................. 16

*Croft v. Governor of Texas,*
  562 F.3d 735 (5th Cir. 2009) ............................................................................................... 2

*Daimler Chrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ........................................................................................................... 17

*eBay Inc. v. MercExchange, LLC,*
  547 U.S. 388 (2006) ........................................................................................................... 16

*FCC v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021) ....................................................................................................... 13

*Garcia v. San Antonio Metro. Transit Auth.,*
  469 U.S. 528 (1985) ........................................................................................................... 15

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ................................................................................................. 16, 17

*Grunewald v. Jarvis,*
  924 F. Supp. 2d 355 (D.D.C. 2013) .................................................................................. 13

*Haw. Helicopter Operators Ass'n v. FAA,*
  51 F.3d 212 (9th Cir. 1995) ............................................................................................... 10

*Holland v. Nat'l Mining Ass'n,*
    309 F.3d 808 (D.C. Cir. 2002)............................................................................................17

*Jifry v. FAA,*
    370 F.3d 1174 (D.C. Cir. 2004)........................................................................................10

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ........................................................................................................18

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019)...................................................................................................8, 9

*Lee Mem'l Hosp. v. Burwell,*
    109 F. Supp. 3d 40 (D.D.C. 2015)...................................................................................13

*Lewis v. Alexander,*
    685 F.3d 325 (3d Cir. 2012) ...........................................................................................14

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    140 S. Ct. 2367 (2020)....................................................................................................12

*Livingston Educ. Serv. Agency v. Becerra,*
    22-cv-10127, 2022 WL 660793 (E.D. Mich. Mar. 4, 2022), *appeal filed*
    No. 22-1257 (6th Cir. Mar. 30, 2022)......................................................................*passim*

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021)............................................................................................17

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ........................................................................................................17

*Marshall v. Goodyear Tire & Rubber Co.,*
    554 F.2d 730 (5th Cir. 1977) ...........................................................................................18

*Montanans for Multiple Use v. Barbouletos,*
    568 F.3d 225 (D.C. Cir. 2009).........................................................................................11

*Mourning v. Family Publ'ns Serv., Inc.,*
    411 U.S. 356 (1973) ..........................................................................................................5

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018)....................................................................................................15

*N.C. Fisheries Ass'n v. Gutierrez,*
    518 F. Supp. 2d 62 (D.D.C. 2007)...................................................................................13

*National Federation of Independent Businesses v. Department of Labor,*
    142 S. Ct. 661 (2022) ...................................................................................................2, 3

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ...................................................................................................14

*New York v. U.S. Dep't of Just.,*
    951 F.3d 84 (2d Cir. 2020), *cert. dismissed*, 141 S. Ct. 1291 (2021) ....................................15, 16

*New York v. United States,*
    505 U.S. 144 (1992) ...................................................................................................15

*Pinnacle Armor, Inc. v. United States,*
    923 F. Supp. 2d 1226 (E.D. Cal. 2013)..........................................................................1

*Printz v. United States,*
    521 U.S. 898 (1997) ...................................................................................................15

*S. Dakota v. Dole,*
    483 U.S. 203 (1987) ...................................................................................................14

*Smirnov v. Clinton,*
    806 F. Supp. 2d 1 (D.D.C. 2011), *aff'd*, 487 F. App'x 582 (D.C. Cir. 2012)..........................1

*Texas v. United States,*
    14 F.4th 332 (5th Cir. 2021) .................................................................................17, 18

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018)..........................................................................................16, 17

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) .....................................................................................................7

*Utility Air Regulatory Grp. v. EPA,*
    573 U.S. 302 (2014) .....................................................................................................2

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ...................................................................................................16

*WildEarth Guardians v. Salazar,*
    670 F. Supp. 2d 1 (D.D.C. 2009)..................................................................................13

**STATUTES**

5 U.S.C. § 553......................................................................................................................10

5 U.S.C. § 601 note...............................................................................................................12

5 U.S.C. § 706......................................................................................................................16

5 U.S.C. § 805......................................................................................................................11

42 U.S.C. § 264......................................................................................................................5

42 U.S.C. § 1395x ..................................................................................................................3

42 U.S.C. § 9831 ................................................................................................................5, 11

42 U.S.C. § 9832 ..................................................................................................................6

42 U.S.C. § 9836 ................................................................................................................14

42 U.S.C. § 9836a ..........................................................................................................*passim*

Omnibus Consolidated & Emergency Supplemental Appropriations Act, 1999,
Pub. L. No. 105-277, 112 Stat. 2681 (1998)..................................................................12

**RULES**

Fed. R. Civ. P. 56 ..................................................................................................................1

**REGULATIONS**

45 C.F.R. § 1302.42 ..........................................................................................................8, 9

45 C.F.R. § 1302.47 ..........................................................................................................6, 8

45 C.F.R. § 1302.93 ..............................................................................................................3

45 C.F.R. § 1303.12 ..............................................................................................................7

45 C.F.R. § 1306.35 ..............................................................................................................6

Head Start Performance Standards,
81 Fed. Reg. 61,294 (Sept. 6, 2016) ................................................................................3

Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs,
86 Fed. Reg. 68,052 (Nov. 30, 2021)........................................................................*passim*

**SUMMARY**

Plaintiffs, the State of Texas and Lubbock Independent School District ("LISD"), challenge the Interim Final Rule, Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs, 86 Fed. Reg. 68,052 (Nov. 30, 2021) (the "Rule"), requiring that those interacting with Head Start students wear a mask and be vaccinated against COVID-19 or otherwise qualify for an exemption. The Rule also requires masking for all Head Start participants over the age of two.

Plaintiffs challenge the Rule on statutory and constitutional grounds. But since this Court issued its ruling on Plaintiffs' motion for preliminary injunction ("PI Op. & Order"), ECF No. 42, the Supreme Court upheld a similar requirement to vaccinate participants in another federal spending program against COVID-19. *See Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam) (upholding vaccination requirement for certain Medicare and Medicaid providers). Another district court upheld the Rule challenged here based on a straightforward application of that binding precedent. *Livingston Educ. Serv. Agency v. Becerra*, 22-cv-10127, 2022 WL 660793 (E.D. Mich. Mar. 4, 2022), *appeal filed*, No. 22-1257 (6th Cir. Mar. 30, 2022). For the reasons set forth in Defendants' Brief in Support of Their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment ("Defs.' Br."), ECF No. 52, Plaintiffs' challenges to the Rule can no longer prevail. The Court should accordingly deny Plaintiffs' Motion for Summary Judgment, ECF No. 54.

**STANDARD OF REVIEW**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Challenges to agency decisions under the APA are properly resolved on motions for summary judgment . . . ." *Berry v. Esper*, 322 F. Supp. 3d 88, 90 (D.D.C. 2018); *see also Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1245 (E.D. Cal. 2013) ("Normally, APA cases are resolved on cross-motions for summary judgment . . . ."); *Smirnov v. Clinton*, 806 F. Supp. 2d 1, 21 n.16 (D.D.C. 2011) ("[M]ost APA cases [are resolved] through the consideration of cross motions for summary judgment . . . ."), *aff'd*, 487 F. App'x 582 (D.C. Cir. 2012).

1

## ARGUMENT

I.   **The State of Texas Has Not Established Standing.**

As an initial matter, the State of Texas has not established that it has standing as a plaintiff in this lawsuit. Defendants explained in their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, that Texas has not suffered an injury in fact as a result of the Rule. Defs.' Br. at 11-14. Nowhere do Plaintiffs address standing in their Motion for Summary Judgment. Plaintiffs bear the burden of establishing that the Court has jurisdiction over their claims, including that the Plaintiffs have standing. *See, e.g.*, *Croft v. Governor of Texas*, 562 F.3d 735, 746 (5th Cir. 2009). Consequently, the State of Texas should be dismissed from this case.

II.   **The Secretary Had the Authority to Promulgate the Rule.**

As Defendants explained in their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, Congress has unambiguously permitted the Secretary to promulgate the Rule. Defs.' Br. at 14-17. In 42 U.S.C. § 9836a(a)(1)(C), (D), and (E), Congress delegated to the Secretary the authority to protect Head Start participants from a deadly, airborne virus and to ensure participants can continue to take advantage of the program's offerings without interruption. *See Livingston*, 2022 WL 660793, at *4-8. And the Supreme Court in *Missouri* confirmed HHS' statutory authority to enact a similar COVID-19 vaccination requirement. *See Missouri*, 142 S. Ct. at 652.

### A.   The Rule Does Not Violate the Major Questions Doctrine.

Plaintiffs' reliance on what they call the "major questions doctrine," *see* Plaintiffs' Brief in Support of Their Motion for Summary Judgment ("Pls.' Br."), ECF No. 54-1, is misplaced. For the reasons discussed in Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, *see* Defs.' Br. at 14-28, the Rule was not an "enormous and transformative expansion" of an agency's "regulatory authority." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). Plaintiffs lean heavily on *National Federation of Independent Businesses v. Department of Labor*, 142 S. Ct. 661 (2022) (per curiam) ("*NFIB*"), to argue that because the Rule applies to a "vast number" of people, Congress must "speak clearly" to authorize the Rule. *Id.* at 665. But the Rule is far smaller in scope.

The OSHA requirement at issue in *NFIB* applied to 84 million people, *id.*, while the Rule's vaccination requirement only applies to approximately 273,000 Head Start personnel, 86 Fed. Reg. at 68,077. And this is a small fraction of the millions of workers affected by the vaccination rule upheld in *Missouri*. *See* 142 S. Ct. at 655 (Thomas, J., dissenting). Moreover, while the *NFIB* Court recognized that OSHA's authority was limited to workplace safety, the Secretary "has a history of addressing 'staff health and wellness' including modifying conditions to prevent health threats that are not necessarily confined to the classroom." *Livingston*, 2022 WL 660793, at *7 (citing 45 C.F.R. § 1302.93; Head Start Performance Standards, 81 Fed. Reg. 61,294, 61,357, 61,433 (Sept. 6, 2016)). The Rule is specifically tailored to the Head Start classroom context, where COVID-19 "poses a special danger because of the particular features of an employee's job or workplace" such as "particularly crowded or cramped environments." *NFIB*, 142 S. Ct. at 665-66. Head Start classrooms involve children who are too young to be vaccinated against COVID-19, so the disease poses a "special danger" to a vulnerable population in these settings. And in these classrooms containing children of a very young age, "physical distancing is not always feasible." 86 Fed. Reg. at 68,054. Therefore, unlike the OSHA rule, the Rule here does take into account the "occupational risk" of working in a Head Start classroom, and is tailored to those specific characteristics. *NFIB*, 142 S. Ct. at 666; *id.* (noting that "targeted regulations are plainly permissible").

Plaintiffs also point to two statutes requiring immunizations to show that Congress did not plainly authorize them in the Head Start Act. Pls.' Br. at 14. "The Supreme Court effectively rejected this argument in *Missouri*." *Livingston*, 2022 WL 660793, at *7 (citing *Missouri*, 142 S. Ct. at 652). The statute at issue in *Missouri* also did not expressly require immunizations, yet the Supreme Court found that the Secretary's statutory charge to promulgate regulations "as [he] finds necessary in the interest of the health and safety of individuals who are furnished services in the institution" sufficed to authorize the similar vaccination requirement in that case. *Missouri*, 142 S. Ct. at 650 (quoting 42 U.S.C. § 1395x(e)(9)). Here, the Secretary's authority to "promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development . . . through the provision to low-income children and their families of health, educational, nutritional, social, and other services

3

that are determined, based on family needs assessments, to be necessary" similarly empowers him to impose requirements that ensure the health and safety of Head Start students are protected and that they may participate in Head Start programs without interruption. And even if the Rule is "unprecedented," PI Op. & Order at 1, the Supreme Court specifically explained that the "unprecedented circumstances" of the COVID-19 pandemic "provide no grounds for limiting the exercise of authorities the agency has long been recognized to have." *Missouri*, 142 S. Ct. at 654. The Secretary has long issued Head Start standards that addressed the most pressing health threats of the times, including HIV and tuberculosis. *See* Defs.' Br. at 21-22. "Of course the vaccine mandate goes further than what the Secretary has done in the past," the *Missouri* Court reasoned, because "he has never had to address an infection problem of this scale and scope before." *Missouri*, 142 S. Ct at 653. So, too, here—the Head Start program has never encountered a deadly airborne disease that threatens the ability of children to participate in the program, so the Secretary lawfully modified the program's requirements to adapt to these circumstances in order to protect its participants and ensure their development continues unimpeded.

### B. The Plain Language of the Statute Authorizes the Rule.

The Rule falls within the Secretary's express statutory authority. Congress authorized the Secretary to establish and modify performance standards for Head Start programs, including "administrative . . . standards," 42 U.S.C. § 9836a(a)(1)(C), "standards relating to the condition . . . of [Head Start] facilities," *id.* § 9836a(a)(1)(D), and "such other standards as the Secretary finds to be appropriate," *id.* § 9836a(a)(1)(E). The Rule addresses the administration of Head Start programs because the virus caused more than 90 percent of Head Start programs to close in-person operations for varying lengths of time. 86 Fed. Reg. at 68,058; *see also Livingston*, 2022 WL 660793, at *4 (holding the Rule is an "administrative" standard because the Secretary is "trying to 'keep the doors open' at Head Start, and the Rule seeks to accomplish that goal after nearly two years of program closures and staff shortages due to COVID-19"). Further, a significant part of the Rule involves a requirement that Head Start programs "track and securely document the vaccination status of each staff member,"

as well as "exemption requests and outcomes." 86 Fed. Reg. at 68,061.

The Rule also addresses the condition of Head Start facilities, including indoor air quality, because the virus that causes COVID-19 is an airborne pathogen. "COVID-19 is a highly contagious, dangerous, and . . . deadly disease," *Missouri*, 142 S. Ct. at 652, that is "transmissible through exposure to respiratory droplets," 86 Fed. Reg. at 68,052. And the Rule was "appropriate" for similar reasons: it was designed to prevent significant disruptions to Head Start programs—and, by extension, Head Start participants and their families—by minimizing the risk of COVID-19 outbreaks in classrooms. The purpose of the Head Start Act is "to promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development . . . in a learning environment." 42 U.S.C. § 9831(1) (emphasis added). Head Start programs cannot accomplish these goals when COVID-19 outbreaks continue to interrupt in-person learning, close classrooms for weeks at a time, and render vital services unavailable to its participants. Accordingly, implementing two "of the most effective mitigation strategies available to reduce transmission" of COVID-19 is "appropriate" to guide Head Start programs to further these purposes. And contrary to Plaintiffs' representations, *see* Pls.' Br. at 20, because any modification must be "reasonably related to the purposes of the enabling legislation," *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973) (citation omitted), subparagraph (E) does not give the Secretary standardless discretion.

This case is thus plainly distinguishable from *Alabama Ass'n of Realtors v. Department of Health & Human Services.*, 141 S. Ct. 2485 (2021) (per curiam). There, the Supreme Court held that an eviction moratorium imposed by the CDC exceeded the agency's authority to "prevent the [interstate] introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). Reading that language in context, the Court held that its scope was informed by the next sentence "illustrating the kinds of measures that could be necessary," such as "fumigation" or "pest extermination." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488. Those measures "directly relate to preventing the interstate spread of disease," whereas the eviction moratorium "relate[d] to interstate infection" only "indirectly," through the "downstream connection between eviction" and possible spread of COVID-19 by evicted individuals who move "from one State to another." *Id.* Here, the connection between the vaccine

and masking requirements and student and employee health and safety is clear and direct: By requiring program personnel and participants to take the measures that most effectively reduce the risk that they contract and spread the virus that causes COVID-19, the Secretary sought to reduce the risk that students and workers would contract the virus. Moreover, should Head Start personnel and students become infected with COVID-19, all students' ability to learn is hampered. *See Livingston*, 2022 WL 660793, at *5 ("Program closures, the unavailability of in-person programming, and staff shortages due to COVID-19 infection or exposure prevent Head Start participants from being surrounded by a learning environment.").

Contrary to Plaintiffs' argument, *see* Pls.' Br. at 15, the Rule does "modify" existing performance standards. As the Rule explains, "Head Start programs have a broad set of program performance standards that already include requirements for infection control, exclusion policies, cleaning, sanitizing and disinfecting." 86 Fed. Reg. at 68,066. And in arguing that the Rule is not a "performance standard," *see* Pls.' Br. at 15, Plaintiffs ignore the Head Start Act itself. In fact, although Plaintiffs are correct that the Act does not explicitly define "program performance standards," the Secretary is charged with issuing deficiencies when programs fail to follow "program performance standards." 42 U.S.C. § 9836a(e)(1). The Act defines a "deficiency" as "a systemic or substantial material failure of an agency in an area of performance that the Secretary determines involves—(i) a threat to the health, safety, or civil rights of children or staff; [or] (iii) a failure to comply with standards related to early childhood development and health services." *Id.* § 9832(2)(A). By its plain language, then, the Secretary can certainly establish "standards related to early childhood development and health services" and "the health . . . of children or staff" because he can issue deficiencies on failures to follow standards that are a threat to health and safety. *Id.*

Further, Plaintiffs' definition of "performance standard" as exclusively a means to measure the quality of the Head Start program ignores the extensive number of existing performance standards that do more than simply "measure quality" of a given Head Start program. *See, e.g.*, 45 C.F.R. § 1306.35(b)(2)(ix) (2015) (performance standard mandating vaccinations for pets of families with children enrolled in home-based Head Start programs); *id.* § 1302.47(A)(5)(i) (performance standard

requiring Head Start staff to report child abuse); *id.* § 1303.12 (performance standard stating that a Head Start program must have insurance coverage). And even by its own terms, the Rule falls within Plaintiffs' definition of "performance standard." The Rule is a "criterion to measure . . . acceptability of a required or contractual action," Pls.' Br. at 16, because it is a condition with which Head Start programs must comply in order to be receive federal funding.

### C. HHS's History of Regulating Health and Safety Demonstrates Its Authority to Promulgate the Rule.

Plaintiffs construe Defendants' argument to mean that, because regulations with similar requirements existed before the Secretary issued the Rule, "those various requirements themselves justify" the Rule. Pls.' Br. at 25. But Plaintiffs fundamentally misunderstand both *Missouri* and the relevance of HHS's longstanding practice of imposing standards designed to prevent the spread of communicable disease in Head Start programs.

In *Missouri*, the Supreme Court held that the CMS rule it upheld fit "neatly within the language of the statute." 142 S. Ct. at 652. Then, to confirm that the scope of the Secretary's authority included imposing a vaccination requirement to protect the health and safety of Medicare and Medicaid patients, the Court pointed to the "the longstanding practice of Health and Human Services in implementing the relevant statutory authorities." *Id.* It explained that "healthcare facilities that wish to participate in Medicare and Medicaid have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare, not simply sound accounting." *Id.*

Likewise, the Rule fits neatly within the Secretary's statutory authority, which is confirmed by a similar lengthy history of regulations that are substantially similar to the Rule. *See United States v. Mead Corp.*, 533 U.S. 218, 2828, 235 (2001) (considering factors including the agency's "consistency with earlier and later pronouncements" and its "fit with prior interpretations" in ruling on agency action); Defs.' Br. at 18-24. "Head Start's history of past health and safety regulations also confirms the reasonableness of the Secretary's construction of his own authority." *Livingston*, 2022 WL 660793, at \*7. And like in *Missouri*, as participants in a discretionary grant program, Head Start programs "have always been obligated to satisfy" these regulations directly relating to health and safety. 142 S. Ct. at

652.

Plaintiffs also argue that the regulations cited in the section of the Rule entitled "Alternatives Considered" do not justify the Rule. But those regulations are mentioned to explain why ACF adopted a vaccine and mask requirement over other mitigation strategies, including "staying home if sick; handwashing; improving ventilation; screening and diagnostic testing; cleaning and disinfecting; keeping physical distance; and cohorting." 86 Fed. Reg. at 68,066. The Rule explains that the vaccine and mask requirements were chosen for two reasons. *Id.* One is that these are "two of the most effective mitigation strategies available to reduce transmission of COVID-19." *Id.* The other is that those requirements align with the program performance standards already in place for the Head Start program. *Id.* This paragraph merely states that ACF already has a variety of program performance standards on health-related requirements, and a vaccine and mask requirement is not unusual given these existing standards. Plaintiffs go on to contend that the agency's description of the regulations cited in this paragraph are not the best interpretation of the text of those regulations. Pls.' Br. at 24-25. These arguments are beside the point because HHS does not seek deference to these interpretations of 45 C.F.R. § 1302.47 under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

Plaintiffs also point to a statement in the background section of the Rule, which states that the "Head Start Performance Standards require children to be up to date on immunizations and their state's Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) schedule" (45 CFR 1302.42(b)(1)(i)). When children are behind on immunizations or other care, Head Start programs are required to ensure they get on a schedule to catch up." 86 Fed. Reg. at 68,059. Plaintiffs state that this is an incorrect interpretation of 45 C.F.R. § 1302.42. But that regulation clearly states that a Head Start program must "[o]btain determinations from health care and oral health care professionals as to whether or not the child is up-to-date on a schedule of age appropriate preventative and primary medical and oral health care," including "immunization recommendations issued by the Centers for Disease Control and Prevention," and must "[a]ssist parents with making arrangements to bring the

child up-to-date as quickly as possible." 45 C.F.R. § 1302.42(b)(1)(i), (ii);[1] *see also Kisor*, 139 S. Ct. at 2414 (affirming that an agency's interpretation of its own regulation is accorded deference). Regardless, the immunization requirements are discussed as background information in the economic analysis section. And no part of the Rule furnishes a health service to children without parental consent. The only part of the Rule that applies to children is the masking requirement for children over two years old.

## III.  The Rule Does Not Violate Any Other Provision of the Statute.

Plaintiffs' arguments that Defendants did not engage in adequate consultation with certain experts, *see* 42 U.S.C. § 9836a(a)(2)(A), and that they did not properly take into account various factors in promulgating the Rule, *see id.* § 9836a(a)(2)(B), have no merit. *See* Pls.' Br. at 31-32. The Supreme Court squarely rejected a similar argument in *Missouri*, explaining that "[c]onsistent with the existence of the good cause exception, which was properly invoked here, consultation during the deferred notice-and-comment period is permissible." 142 S. Ct. at 654; *see also Livingston*, 2022 WL 660793, at *9 ("The Court also follows Missouri in finding that the Secretary was not required to consult with the required experts in advance of issuing the Rule."). Further, the Rule does in fact certify that the Secretary did consult with these experts and consider the relevant factors—it expressly states that, "[i]n developing these modifications, the Secretary included relevant considerations pursuant to . . . 42 U.S.C. 9836a(a)(2)." 86 Fed. Reg. at 68,053-54. Regardless, the statutory text imposes no requirement that the Secretary document these considerations in the Rule itself.

The Rule also does not run afoul of 42 U.S.C. § 9836a(a)(2)(C)(ii), which requires that the Secretary "ensure that [the] revisions in the [program performance] standards will not result in the elimination of or any reduction in quality, scope, or types of health, educational, parental involvement, nutritional, social, or other services required to be provided under such standards as in effect on December 12, 2007." *See* Pls.' Br. at 33 (quoting 42 U.S.C. § 9836a(a)(2)(C)(2)). Plaintiffs wrongly

---

[1] The regulation also provides that "if necessary," the Head Start program should "directly facilitate provision of health services to bring the child up-to-date with parent consent." 45 C.F.R. § 1302.42(b)(1)(ii). Contrary to Plaintiffs' assertion, Pls.' Br. at 29, the "parent consent" phrase only applies to the direct provision of health services by a Head Start program.

assert that "no such analysis appears" in the Rule—in fact, the Rule was expressly enacted to limit the closures of Head Start classrooms due to COVID-19 outbreaks, *see, e.g.*, 86 Fed. Reg. at 68,055, and to ensure that there was no "elimination of or any reduction in quality" or "scope" of Head Start services offered.

Finally, it is perplexing how Plaintiffs can argue that the Secretary violated the statutory requirement that he "consult with Indian tribes . . . on the review and promulgation of [program performance] standards," *see* Pls.' Br. at 33, when the Rule contains a lengthy "Tribal Consultation Statement" indicating that the Administration for Children and Families did in fact consult with the tribes, 86 Fed. Reg. at 68,053. Regardless, as the Supreme Court has said, "consultation during the deferred notice-and-comment period is permissible." *Missouri*, 142 S. Ct. at 654. Accordingly, Defendants did not violate any other statutory provision.

## IV.   The Secretary Had Good Cause to Issue the Interim Rule Without Advance Notice and Comment.

An agency may issue a rule without advance notice and comment when the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). This exception can be invoked when "delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see also Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995) (good cause waiver properly invoked when there existed a "concern about [a] threat to public safety"). Even though this Court previously found that the Secretary had not properly invoked the good cause exception, PI Op. & Order at 26, since then, the Supreme Court has issued binding guidance demonstrating that good cause can be properly shown in the COVID-19 vaccination context when "something specific" justifies it. *Missouri*, 142 S. Ct. at 654 (citation omitted).

In *Missouri*, the Supreme Court held that "the Secretary's finding that accelerated promulgation of the rule in advance of the winter flu season would significantly reduce COVID-19 infections, hospitalizations, and deaths" constituted the "something specific" that is "required to forgo notice and comment." *Id.* (citation omitted). The Secretary found good cause here for similar reasons, *see*

10

86 Fed. Reg. at 68,058-59, including the prospect of flu season and returning to fully in-person programs in January 2022, *id.* at 68,059. While Plaintiffs contend that the stated reasons justifying the good cause exception relate to public health and are "outside Defendants' sphere of expertise," Pls.' Br. at 35, they fail to explain why that is even relevant to the good cause analysis or how the Secretary of Health and Human Services lacks expertise in formulating policy to protect the health and safety of Head Start participants, a duty he is statutorily obligated to carry out. *See* 42 U.S.C. § 9831(2) ("It is the purpose of this subchapter to promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development . . . through the provision to low-income children and their families of health, educational, nutritional, social, and other services that are determined, based on family needs assessments, to be necessary.").

Contrary to Plaintiffs' assertion, and like in *Missouri*, the Secretary gave ample reasons demonstrating an "immediate need" to adopt the Rule. Pls.' Br. at 35-36. Recognizing the "potential for the rapid and unexpected development and spread of additional new and more transmissible variants," 86 Fed. Reg. at 68,053, the Secretary found that any delay in issuing the Rule would "endanger the health and safety of staff, children and families, and be contrary to the public interest," *id.* at 68,059. The emergence of the highly transmissible Delta variant, which had already "resulted in greater rates of cases and hospitalizations among children," heightened the urgency of the Rule as well. *Id.* at 68,053.

For similar reasons, the Secretary was also justified in forgoing notice and comment under the Congressional Review Act. But even so, Plaintiffs refuse to address that the Congressional Review Act is not reviewable. *See Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.) (observing that 5 U.S.C. § 805 "denies courts the power to void rules on the basis of agency noncompliance with the" Congressional Review Act).

## V.    The Rule Complies with the Treasury and General Government Appropriations Act of 1999.

The Treasury and General Government Appropriations Act of 1999 is not enforceable by this Court. It expressly states that "[t]his section is not intended to create any right or benefit, substantive

or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person." Omnibus Consolidated & Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681 (1998); 5 U.S.C. § 601 note (f). Instead of acknowledging this, Plaintiffs take parts of the statute out of context and argue that the Secretary has violated that section.

The Secretary carefully followed the statutory requirements. Section 654 of that Act requires agencies to first determine whether a policy or regulation "may affect family well-being" and then, only if the policy or regulation may do so, to "assess such actions with respect to" seven different criteria. Taking this requirement into account, the Secretary found that "it is not necessary to prepare a family policymaking assessment . . . because the action it takes in this interim final rule will not have any impact on the autonomy or integrity of the family as an institution." 86 Fed. Reg. at 68,062. But it left open the opportunity for public comment on this issue and "whether the actions set forth in this interim final rule would have a negative effect on family well-being." *Id.* Plaintiffs have pointed to nothing suggesting the agency is required to redo this assessment prior to the deferred notice-and-comment period. *See Missouri*, 142 S. Ct. at 654.

## VI.   The Rule Is Not Arbitrary and Capricious.

Plaintiffs' arbitrary-and-capricious claims also fail. Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (citation omitted). As explained in Defendants' motion, the Rule satisfies this deferential standard. Defs.' Br. at 28-42.

Plaintiffs assert that the Rule is arbitrary and capricious because it applies uniformly to all Head Start programs, without accounting for potential differences in local transmission rates. *See* Pls.' Br. at 40-41. The Rule explains that, given the number of Head Start grant recipients and the fact that many serve entire states or cross state lines, "[t]ransmission rates could be significantly different across service areas." 86 Fed. Reg. 68,066. "It would be burdensome for" a grant recipient covering an entire state "to change its mask guidance for different centers through the state as transmission rates

change." *Id.* As such, "in the case of mask use, ACF is prioritizing a clear and transparent policy that is easy for grantees to follow across their service areas." *Id.* This reasoning satisfactorily explains the agency's decision, even if Plaintiffs would prefer a different rule. *See N.C. Fisheries Ass'n v. Gutierrez,* 518 F. Supp. 2d 62, 95 (D.D.C. 2007) ("[M]ere policy disagreement is not a basis for a reviewing court to declare agency action unlawful.").

Plaintiffs also claim that the Rule is arbitrary and capricious because it does not include an end date. *See* Pls.' Br. at 41. As the Rule explains, "children benefit from routine and predictability. ACF determined that the best course of action was not to provide an end date on the" masking requirement and testing requirement for vaccine-exempt adults at this time. 86 Fed. Reg. at 68,066; *see FCC v. Prometheus Radio Project,* 141 S. Ct. 1150, 1158 (2021) (stating that the agency only needs to have "reasonably considered the relevant issues and reasonably explained the decision"). Additionally, the agency invited comments on this decision regarding an end date. The agency is free to rescind or amend the Rule if circumstances change. Plaintiffs cite to no authority that an interim final rule is arbitrary and capricious merely because it does not self-terminate at a particular date.

Finally, Plaintiffs claim that the Rule is invalid because the administrative record lacks "evidence contrary to [Defendants'] position." Pls.' Br. at 41. They point to statements by the World Health Organization (WHO) and the United Nations Children's Fund (UNICEF) that young children should not wear masks. *Id.* But, as Plaintiffs acknowledge, the administrative record "consists of all documents and materials directly or indirectly considered by agency decision-makers." *Id.* (quoting *Lee Mem'l Hosp. v. Burwell,* 109 F. Supp. 3d 40, 46-47 (D.D.C. 2015)). The agency did not consider the WHO and UNICEF statements, which explains their absence from the administrative record. *See Grunewald v. Jarvis,* 924 F. Supp. 2d 355, 357 (D.D.C. 2013) ("[A]bsent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity, that it properly designated the administrative record." (quoting *WildEarth Guardians v. Salazar,* 670 F. Supp. 2d 1, 5 (D.D.C. 2009))).

## VII.    The Rule Complies with the Spending Clause.

Plaintiffs first argue that only Congress, and not the executive branch, can impose conditions

on spending. Pls.' Br. at 42. But as discussed in *supra* Section II, 42 U.S.C. § 9836a(a)(1) delegates to the Secretary the authority to promulgate performance standards. These performance standards are conditions of participation in the Head Start program. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) ("*Sebelius*") (Congress "may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds."). Because Congress passed the Head Start Act under its spending power and delegated to the Secretary the ability to issue performance standards, the Secretary's lawful exercise of that authority in issuing the Rule does not violate the Spending Clause.

Plaintiffs next claim that because the Rule preempts state law, it is somehow invalid under the Spending Clause. Pls.' Br. at 42-43. But they offer no support for this proposition. *See, e.g., Lewis v. Alexander*, 685 F.3d 325, 346 (3d Cir. 2012) (discussing preemption analysis in the Spending Clause context).[2] Plaintiffs cite only to *Sebelius*, which said nothing about preemption. *Sebelius* held that Congress had violated the Spending Clause because "[i]nstead of simply refusing to grant the new funds to States that will not accept the new conditions, Congress has also threatened to withhold those States' existing Medicaid funds," which amounted to over ten percent of a state's entire budget. *Sebelius*, 567 U.S. at 579-82. The Head Start program funding going to states is a far cry from the funding at issue in *Sebelius*. The Head Start program makes up a minute amount of a state's budget— indeed, states do not even receive the bulk of Head Start funding because only local entities are eligible for Head Start grants. *See* 42 U.S.C. § 9836a(a)(1) (noting that Head Start program applies to "*local* public or private" entities (emphasis added)). And Head Start is a discretionary grant program, so if a state objects to certain conditions required by the program, that state is free to "defend their prerogatives" by choosing not to accept the funding. *Sebelius*, 567 U.S. at 579; *see also S. Dakota v. Dole*, 483 U.S. 203, 205-11 (1987) (upholding Spending Clause legislation that imposed conditions displacing states' ability to set their own minimum drinking age).

---

[2] The Rule does not preempt state law in all of its applications, but only as to entities that accept Head Start funds.

## VIII.   The Rule Does Not Violate the Tenth Amendment.

"If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." *New York v. United States*, 505 U.S. 144, 156 (1992). Congress passed 42 U.S.C. § 9836a(a)(1) pursuant to its Spending Clause authority. *See supra* Section VII. The Secretary issued the Rule pursuant to the authority that Congress delegated to him in that statutory provision. *See supra* Section II. "With rare exceptions, . . . the Constitution does not carve out express elements of state sovereignty that Congress may not employ its delegated powers to displace." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985). Because the Rule rests on authority specifically delegated to the federal government, it does not run afoul of the Tenth Amendment. *See Brackeen v. Haaland*, 994 F.3d 249, 310 (5th Cir. 2021) ("[T]he Federal Government, when acting within a delegated power, may override countervailing state interests, whether those interests are labeled traditional, fundamental, or otherwise." (citation omitted)), *cert. granted*, 142 S. Ct. 1205 (2022). For similar reasons—because the Head Start program is a discretionary federal spending program—the Defendants do not interfere with the federal-state balance, and no "exceedingly clear" language is necessary.

## IX.   The Rule Does Not Violate the Anti-Commandeering Doctrine.

The Rule does not violate the anti-commandeering doctrine because it does not "use the States as [an] implement[] of [federal] regulation." *New York*, 505 U.S. at 161. It is a federal discretionary grant program that administers funding, not one that uses state officials to enforce federal policy. *Contra id.* at 175 (federal statute required state legislative and executive officials to enact a state regulation defined by the federal statute); *Printz v. United States*, 521 U.S. 898, 935 (1997) (federal statute that required local law enforcement officials to perform background checks); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478-79 (2018) (federal statute prevented state legislatures from enacting certain laws).

The Rule is not a "gun to the head" because it only applies to entities that voluntarily and freely agree to participate in the Head Start grant program. *See* Pls.' Br. at 44. And it is a spending program that does not require anything of state officials, let alone coerced action. *See New York v. U.S.*

*Dep't of Just.*, 951 F.3d 84, 115 (2d Cir. 2020), *cert. dismissed*, 141 S. Ct. 1291 (2021).  Accordingly, Plaintiffs have not shown that the Rule violates the anti-commandeering doctrine.

## X.    Any Relief Granted to Plaintiffs Should Be Limited in Scope.

Finally, if the Court finds that Plaintiffs are entitled to summary judgment, the relief granted should be limited in scope.  Plaintiffs do not request a permanent injunction.  The only relief they request is for the Court to "set[] aside" the Rule under the APA.  Pls.' Br. at 45.  They have not attempted to demonstrate that the requirements for a permanent injunction have been satisfied.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (explaining that a plaintiff is entitled to a permanent injunction only if it can satisfy three factors in addition to success on the merits).  Because Plaintiffs have not met their burden of establishing that these requirements are met, the Court should not enter a permanent injunction.[3]

If the Court decides to set aside the Rule or any part of the Rule under the APA, that relief should be no broader than necessary to remedy any demonstrated irreparable harms of the specific Plaintiffs in this case.  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).  Plaintiffs' decision to bring APA claims does not necessitate a nationwide remedy. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (vacating nationwide scope of injunction in facial challenge under the APA).  A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and the APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), is insufficient to mandate such a departure. The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967).  Accordingly, the Court should construe the "set aside" language in Section 706(2) as applying only to the named Plaintiffs, especially as no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter, *see Trump v. Hawaii*, 138 S. Ct.

---

[3] If the Court enters final judgment for Plaintiffs and sets aside the Rule or any part of the Rule, it should also vacate the preliminary injunction previously entered in this case.

2392, 2426 (2018) (Thomas, J., concurring).

Any relief granted should be limited, at most, to Head Start programs operated by Plaintiffs. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill*, 138 S. Ct. at 1933; *see also id.* at 1934 (citing *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Indeed, Plaintiffs have no interest in whether Head Start programs in other States or operated by other grantees are subject to the Rule nor standing to assert claims on behalf of programs in Texas that Plaintiffs do not operate. Plaintiffs' claims would be fully redressed by an order setting aside the Rule as to only those programs that Plaintiffs themselves operate. Moreover, any relief should be limited only to LISD because the State of Texas has not established that it has standing to pursue these claims. *See supra* Section I.

Nationwide relief would be particularly harmful here given that other district courts have already considered similar challenges to the Rule, with differing outcomes. *See Livingston*, 2022 WL 660793, at *11 (denying motion for preliminary injunction); *Louisiana v. Becerra*, No. 3:21-cv-4370, ECF No. 15 (W.D. La. Jan. 1, 2022) (entering a preliminary injunction as to twenty-four states); *see also Brick v. Biden*, No. 2:21-cv-4386 (W.D. La.); *Etherton v. Biden*, No. 1:22-cv-195 (E.D. Va.). Nationwide relief would render the decisions by these district courts meaningless as a practical matter. Moreover, nationwide relief "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring); *see also Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit" would "squelch the circuit disagreements that can lead to Supreme Court review."). Consistent with those equitable principles, the Fifth Circuit has repeatedly vacated or stayed universal relief that applies to nonparties. *See Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) ("This vaccine rule is an issue of great significance currently being litigated throughout the country. Its ultimate resolution will benefit from 'the airing of competing views' in our sister circuits.") (citation omitted); *see also Texas v. United*

*States*, 14 F.4th 332, 341 (5th Cir. 2021); *Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730, 735 (5th Cir. 1977). There is no reason why Plaintiffs' disagreement with the Rule should govern the rest of the country.

Additionally, the Court should only set aside those aspects of the Rule, if any, for which the Court finds that Plaintiffs are entitled to relief. The Supreme Court has held a regulation severable where severance would "not impair the function of the statute as a whole, and there is no indication that the regulation would not have been passed but for its inclusion." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (invalidating only the provision of a regulation that exceeded the agency's statutory authority). Severability clauses, such as the one in the Rule, *see* 86 Fed. Reg. at 68,060, create a presumption that the validity of the entire regulation is not dependent on the validity of any specific unlawful provision if that unlawful provision would not impair the function of the regulation as a whole. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment.

Dated: May 4, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director
Federal Programs Branch

*/s/ Madeline M. McMahon*
MADELINE M. MCMAHON (DC Bar No. 1720813)
MICHAEL P. CLENDENEN (DC Bar No. 1660091)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Phone: (202) 305-1953
Fax: (202) 616-8460

madeline.m.mcmahon@usdoj.gov

*Attorneys for Defendants*

19