UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS, et al.,

     Plaintiffs,

v.                                                                      No. 5:21-CV-300-H

XAVIER BECERRA, Secretary of Health
and Human Services, et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER

In response to the President's plan to increase COVID-19 vaccinations, the Department of Health and Human Services created two unprecedented conditions on funding for Head Start programs, which provide education-related services to needy children. HHS's new rule mandated COVID-19 vaccination for staff and near-universal masking. Because there was a substantial likelihood that the agency's action was unauthorized and procedurally improper, the Court preliminarily enjoined implementation and enforcement of the rule. HHS did not appeal, and it has since removed the masking requirement, but the vaccine mandate remains. Now, both sides seek summary judgment. The parties largely restate arguments made during the preliminary-injunction stage, in addition to briefing the effect of *Biden v. Missouri*, which issued after the Court's injunction and upheld HHS's healthcare-worker vaccine mandate. After careful consideration—and because *Biden v. Missouri* involved materially different statutory text and context—the Court reaches the same conclusion it did earlier. The Court grants summary judgment for the plaintiffs because (1) no permissible construction of the Head Start Act could authorize the rule; (2) HHS failed to follow proper rulemaking procedures; and (3) the rule is arbitrary and capricious. Thus, the Court vacates the rule, and binding precedent makes clear that vacatur should not be limited to the parties but is rather universal.

The wisdom of Head Start's rule is not before the Court—only its legality.  If the people, through Congress, wish to impose a vaccine mandate on Head Start programs, they may do so by passing a law.  But an agency can do only what Congress authorizes it to do. Regardless of how well intentioned, HHS's attempt here to shoehorn the vaccine mandate into statutory language authorizing modification of Head Start's administrative, financial, and facility-management standards goes too far.  Equally fatal to the rule is the agency's decision to implement it without the necessary public notice and comment, consultation with stakeholders, and reasonable explanation.  Under these circumstances, the law requires the Court to vacate the rule and remand the matter to HHS.

1.    **Factual and Procedural Background**

    A.    **Head Start**

    The Department of Health and Human Services (HHS) offers grants to schools, nonprofits, and other local organizations to run Head Start programs.  Those programs "promote the school readiness of low-income children" by creating supportive learning environments and providing educational, nutritional, social, health, and other services to young children and their families.  42 U.S.C. § 9831.  Many Head Start programs are operated through local school districts, like Lubbock Independent School District (LISD), in the form of pre-K classes.  *See, e.g.*, Dkt. No. 1-3 at 3.  Texas Tech operates an Early Head Start program, which is offered for children under age three.  Dkt. No. 1-4 at 2; *see* 42 U.S.C. § 9840a.  In 2021, HHS awarded $842,280,184 in grants to Texas Head Start programs.  Dkt. No. 1-2 at 35.  LISD and Texas Tech University received a portion of this funding for their programs.  *Id.* at 2, 9–10, 17, 20, 26, 30, 33.

In response to the COVID-19 pandemic, the Office of Head Start (OHS) allowed local providers to adjust their services as necessary depending on community conditions and needs.  Dkt. Nos. 5-9 at 2–3; 27 at 4 (listing the OHS May 2021 guidance in the administrative record); 86 Fed. Reg. at 68,058 n.66 (citing the guidance in the interim final rule).  In its May 2021 guidance, the agency recognized that "[t]o date, OHS [has] provided needed flexibilities and guidance that allowed programs to adapt services based on the changing health conditions in their communities."  Dkt. No. 56 at 91.  As a result, while some Head Start programs offered virtual and remote services, "[m]any programs continued to provide in-person services for children and families throughout the COVID-19 pandemic."  *Id.*  OHS knew, however, that "virtual and remote services . . . are not an acceptable replacement for in-person comprehensive services."  *Id.* at 92.  In fact, OHS reported that "[a]lmost one third of children served in Head Start programs before the pandemic—approximately 250,000—ha[d] not received services to date."  *Id.* at 93.  Thus, OHS's May 2021 guidance instructed its in-person programs "to continue serving children in person, as local health conditions allow."  *Id.* at 91.  OHS also made clear that the virtual programs "[we]re expected to move to in-person services, as local health conditions allow."  *Id.* at 92.

According to the CDC, OHS's flexible, community-level approach to early childhood education during the pandemic was successful.  As the CDC stated in its report, "[s]ince the COVID-19 pandemic started, Head Start and Early Head Start programs successfully implemented CDC-recommended mitigation strategies and applied other innovative approaches to limit SARS-CoV-2 transmission among children, teachers, and

other staff members by allowing maximum program flexibility and allocating financial and human resources."[1]

In the 2020–21 school year, LISD implemented a mask mandate in line with Governor Abbott's Executive Order and Texas Education Agency public-health guidance. Dkt. 1-3 at ¶ 4.  Masks were required for students in fourth grade and above.  *Id.*  In the 2021–22 school year, however, LISD decided that masks would be welcome and vaccinations encouraged, but neither would be mandatory.  *Id.* at ¶ 5–6.  Before the school year began, 84% of LISD's staff reported having received at least one vaccine dose.  *Id.* at ¶ 6.  Of 1,847 active cases since August 18, 2021, 26 were pre-K students and none were pre-K staff.  *Id.* at ¶ 5.

### B.    The Vaccine Mandate

On September 9, 2021, the President announced "a new plan to require more Americans to be vaccinated."[2]  Stating that "our patience is wearing thin" with the unvaccinated, the President asserted that "we must increase vaccinations among the unvaccinated with new vaccination requirements."  *Id.*  Those requirements would apply to employers with 100 or more employees, healthcare workers, executive branch federal employees, and "all of nearly 300,000 educators" in the Head Start program.  *Id.*  The President did not hide the fact that his school-related mandate "takes on elected officials and states," explaining that "if these governors won't help us beat the pandemic, I'll use my power as President to get them out of the way."  *Id.*

---

[1] *CDC Morbidity and Mortality Weekly Report* (Dec. 11, 2020), https://www.cdc.gov/mmwr/ volumes/69/wr/mm6949e3.htm [https://perma.cc/LY6K-ZS7Y] (available at Dkt. No. 29-9).
[2] Joseph Biden, *Remarks by President Biden on Fighting the COVID-19 Pandemic* (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by- president-biden-on-fighting-the-covid-19-pandemic-3/ [https://perma.cc/VW2F-3Z47].

On November 30, 2021, the Administration for Children and Families (ACF)—a division of HHS—issued an Interim Final Rule with Comment (Rule) imposing mask and COVID-19 vaccine mandates in Head Start programs.  *See* Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs, 86 Fed. Reg. 68,052 (Nov. 30, 2021) (to be codified at 45 C.F.R. pt. 1302).  As its name suggests, the Rule's stated purpose is "to protect the health and safety of Head Start staff, children, and families and to mitigate the spread of SARS–CoV–2 in Head Start programs."  *Id.* at 68,053.

ACF promulgated the Rule by adding the mandates to existing "Head Start Program Performance Standards."  *Id.* at 68,052.  Specifically, the Rule required "universal masking for all individuals aged 2 years and older," with limited exceptions, in all indoor settings where Head Start services are provided and in Head Start vehicles.  *Id.* at 68,060.  And "for those not fully vaccinated," masks were required "outdoors in crowded settings or during activities that involve sustained close contact with other people."  *Id.*

The Rule also requires "all Head Start staff, certain contractors, and volunteers in classrooms or working directly with children to be fully vaccinated," with certain exemptions.[4]  *Id.*  For those granted an exemption from the vaccine requirement, weekly COVID-19 testing is required.  *Id.* at 68,061.

The Rule took effect immediately—November 30, 2021—before public notice-and-comment procedures were followed.  Citing the threat posed by rising COVID-19 cases and the hope to return fully to in-person instruction in 2022, the Secretary found that there was

---

[4] Exemptions are available "for those (i) for whom a vaccine is medically contraindicated, (ii) for whom medical necessity requires a delay in vaccination, or (iii) who are legally entitled to an accommodation with regard to the COVID–19 vaccination requirement based on an applicable Federal law."  *Id.* at 68,061 (footnotes omitted).  Accommodations based on federal law may be granted for "a disability under the ADA, medical condition, or sincerely held religious beliefs, practice, or observance."  *Id.*

"good cause" to waive the notice-and-comment procedures normally required when an agency promulgates a regulation. *See id.* at 68,059 (finding good cause to waive notice-and-comment procedures). The mask requirement was effective immediately, while the vaccine mandate required compliance by January 31, 2022. *Id.* at 68,060–62. Programs that refused to implement the Rule's dual mandates risked losing their Head Start funding entirely. *See* 42 U.S.C. § 9836a(e)(1)(C); 45 C.F.R. § 1304.5 (2023) ("Termination and denial of refunding").

### C.    This Litigation

Plaintiffs—the State of Texas and LISD—filed this action on December 10, 2021, seeking a Court order enjoining the Rule's enforcement and setting aside the Rule. Dkt. No. 1. The plaintiffs allege that several statutory and constitutional defects render the Rule procedurally and substantively invalid. *Id.* Just a few days later, the plaintiffs filed a motion seeking a temporary restraining order and a preliminary injunction. Dkt. Nos. 6; 8. The defendants then appeared through counsel. Dkt. No. 14. The Court set an expedited briefing schedule (Dkt. No. 15) and held an evidentiary hearing to allow the parties to offer evidence and argument (Dkt. Nos. 40; 41).

During the evidentiary hearing, the defendants made several relevant concessions. First, they noted that the vaccine and mask mandates are not "health services" within the meaning of the Head Start Act. Dkt. No. 41 at 40. Second, they explained that the agency did not assert that the Rule was or could be authorized under 42 U.S.C. § 9836a(a)(1)(A), which are "performance standards with respect to services required to be provided, including health . . . services." *Id.* at 40–41. Third, although the defendants did argue that the Rule could be authorized as an "administrative" standard under subsection (C), they

– 6 –

admitted that it could not qualify as a "financial management standard." *Id.* at 48.  And finally, the defendants conceded that, while other health services made available to children by Head Start are "strongly encouraged," this is the first time that Head Start has ever mandated a "health procedure" as a precondition to new or ongoing employment. *Id.* at 45–47.  The defendants admitted that the Rule is unprecedented, although they asserted that it is justified by an unprecedented pandemic. *Id.* at 52, 55–58.

Following the evidentiary hearing, the Court granted the plaintiffs' motion for a preliminary injunction in a 56-page order and preliminarily enjoined the defendants from implementing and enforcing the Rule.[6]  Dkt. No. 42.  The Court concluded that "there is a substantial likelihood that the mandates do not fit within the Head Start Act's authorizing text, [] HHS failed to follow the APA in promulgating the mandates, and [] the mandates are arbitrary and capricious." *Id.* at 1.

Notably, the deadline to appeal the preliminary injunction came and passed, and the defendants did not appeal.  Dkt. No. 45.  Thereafter, the Court ordered a joint status report (*id.*), and the parties informed the Court that they intended to forego discovery and proceed to the summary judgment stage (Dkt. No. 46).

The defendants subsequently filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Dkt. No. 48), a Motion for Summary Judgment (Dkt. No. 49), and their Brief in Support of Their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Dkt. No. 52).  The defendants assert that Texas does not have standing because it has not suffered an injury in fact.  Dkt. No. 52 at 24–27.  They also

---

[6] The plaintiffs' motion for a TRO was denied as moot in light of the preliminary injunction.  Dkt. No. 42 at 56.

allege that the plaintiffs have failed to state a claim or, alternatively, that the defendants are entitled to summary judgment. *Id.* at 27–68. In their view, the Secretary had statutory authority to issue the Rule (*id.* at 27–41), the Rule is not arbitrary and capricious (*id.* at 41–54), and the Secretary had good cause to issue the Rule before the typical advance notice-and-comment period occurred (*id.* at 58). Furthermore, the defendants claim that the Rule does not violate other constitutional or statutory provisions. *Id.* at 63–68. Thus, they request that the Court "dismiss the [c]omplaint, or in the alternative, enter summary judgment in favor of the [d]efendants." *Id.* at 68.

The plaintiffs also filed a Motion for Summary Judgment and an accompanying brief. Dkt. Nos. 54; 54-1. They assert that the Rule lacks statutory authority and is arbitrary and capricious in violation of the APA. Dkt. No. 54-1 at 11–38, 47–49. In addition, the Secretary did not follow proper rulemaking procedures when promulgating the Rule. *Id.* at 38–41. According to the plaintiffs, the Secretary did not follow the procedures set forth by the Head Start Act for modifying standards. *Id.* Furthermore, because the Secretary lacked good cause, the Rule was adopted in violation of the notice-and-comment requirement. *Id.* at 41–44. Moreover, the plaintiffs allege that the Rule violates other statutes and various constitutional doctrines. *Id.* at 44–47, 49–52. For these reasons, they ask that the Court hold the Rule unlawful, set it aside under the APA, and enjoin enforcement of the Rule. *Id.* at 52–53. The motions have been fully briefed and are ripe for review. Dkt. Nos. 58; 59; 60; 61; 63; 64.

In January 2023, however, after the motions had been filed, the defendants filed a Notice of Final Rule Addressing Masking Requirement, informing the Court that HHS had published the Final Rule, which "modifies portions of the interim final rule challenged in

this litigation."  Dkt. No. 68 at 1; *see* Mitigating the Spread of COVID-19 in Head Start Programs, 88 Fed. Reg. 993 (Jan. 6, 2021) (to be codified at 45 C.F.R. pt. 1302).  The Final Rule "removes the requirement for universal masking for all individuals ages 2 and older." 88 Fed. Reg. at 993.  It also requires that Head Start Programs "have an evidence-based COVID-19 mitigation policy" that takes "local conditions," among other factors, into consideration.  *Id.* at 994–95.  This "allows the rule to continue to be relevant and up to date as the level of COVID-19 impact in communities changes." *Id.* at 995.  Nevertheless, the Final Rule does not "address the vaccination and testing requirement, which is still under review." *Id.* at 993.  And while the Final Rule discusses comments relating to the mask mandate, it does not address any of the comments pertaining to the vaccine requirement. *See id.* at 996–99.

Instead, the Final Rule states that "[t]he vaccine requirement" imposed by the Rule continues to "remain[] in effect." *Id.* at 993, 1001; *see also* 45 C.F.R. §§ 1302.93, 1302.94. Under the Rule, Head Start staff continue to remain subject to the vaccine mandate, and programs that do not enforce the vaccine requirement are still at risk of losing funding. *See* 86 Fed. Reg. at 68,060; 42 U.S.C. § 9836a(e)(1)(C); 45 C.F.R. § 1304.5 (2023) ("Termination and denial of refunding").  The parties do not dispute that the Rule's vaccine mandate remains in effect and is ripe for the Court's decision. *See* Dkt. No. 68 at 1.

## 2. Standards of Review

### A. 12(b)(1) Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(1), a party may file a motion challenging the Court's subject matter jurisdiction to hear a case. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  A court must dismiss the case if it "lacks the statutory or

constitutional power to adjudicate the case." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citation omitted).  Federal courts have jurisdiction over cases or controversies only, and standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).  To demonstrate that federal court is the proper forum for resolving a dispute, the party invoking the federal forum—here, the plaintiffs—must show

> (1) [they] ha[ve] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Gilbert v. Donahoe*, 751 F.3d 303, 312 (5th Cir. 2014).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.  Accordingly, the plaintiffs constantly bear the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161 (internal citations omitted).  To have standing, the plaintiffs need not demonstrate actual entitlement to relief; they "need only provide sufficient facts, which, if taken as true, establish an injury . . . that could be redressed by an order of th[e] court." *Id.*  The plaintiffs must "support [each element of standing] in the same way as any other matter on which the plaintiff[s] bear[] the burden of proof." *Lujan*, 504 U.S. at 561.  "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the [C]ourt should consider the Rule 12(b)(1) jurisdictional attack before

addressing any attack on the merits." *Ramming*, 281 F.3d at 161 (citing *Hitt v. City of Pasadena*, 561 F.3d 606, 608 (5th Cir. 1977)).

### B.      12(b)(6) Motion to Dismiss

A party may also bring a Rule 12(b)(6) motion to dismiss for "failure to state a claim upon which relief can be granted."   "To survive a motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states 'a claim to relief that is plausible on its face.'" *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Thus, the plaintiffs must plead facts "that allow[] [the] court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Innova Hosp. San Antonio, Ltd. P'ship*, 892 F.3d at 726 (quoting *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011)) (internal citations and quotation marks omitted).

A motion to dismiss pursuant to Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (internal citation omitted). The Court must "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff[s]." *White v. U.S. Corrections, LLC*, 996 F.3d 302, 306–07 (5th Cir. 2021).  Dismissing the complaint "is not appropriate unless the plaintiff[s'] pleadings on their face show, beyond a doubt, that the plaintiff[s] cannot prove any set of facts sufficient to entitle [them] to relief." *Motient Corp. v. Dondero*, 529 F.3d 532, 535 (5th Cir. 2008).

**C.    Summary Judgment**

"A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  Movants must support their assertion that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record[] . . . or showing that the materials cited do not establish the . . . presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(A).  Courts must consider "only the cited materials [] but . . . may consider other materials in the record."  *Id.*  In evaluating a motion under Rule 56, the Court must determine whether, after considering the evidence in the light most favorable to the nonmoving party, a rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

**3.    The plaintiffs have standing.**

The defendants argue that the Court should dismiss Texas's claims under Rule 12(b)(1), alleging that Texas does not have standing because it has not suffered an injury in fact.  Dkt. No. 52 at 24–27.  The defendants, however, do not challenge LISD's standing.  *See id.*; *see also* Dkt. Nos. 59 at 8; 63 at 5–8.  This is important because only one party must have standing for the Court to reach the remaining plaintiffs' claims.  *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).  Therefore, if LISD has standing, then the Court may reach Texas's claims, too, which in any event are identical to LISD's.  Even so, Texas has independently established that it has standing because it, too, satisfies the injury-in-fact

requirement.  As explained below, Texas's sovereign policy-making and enforcement powers have been inhibited, Texas has *parens patriae* standing, and Texas's procedural rights have been violated.

To demonstrate that the Court has jurisdiction, the plaintiffs must demonstrate that they suffered an "injury in fact." *Lujan*, 504 U.S. at 560.  An injury is "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).  A concrete injury is one that must "actually exist"—it must be "real, and not abstract." *Id.* at 340 (internal quotation marks omitted).  As for particularity, the plaintiff must be affected in a "personal and individual way." *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  "Tangible" and "concrete" are not synonyms; the former is broader than the latter, which encompasses intangible injuries within "injuries in fact." *See TransUnion*, 141 S. Ct. at 2204.

Similarly, under Article III, an injury in law is not an injury in fact.  "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 2205 (emphasis omitted). Therefore, a plaintiff who "is merely seeking to ensure a defendant's 'compliance with regulatory law'" does not have "grounds for Article III standing" absent some "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American Courts." *Id.* at 2206 (quoting *Spokeo*, 578 U.S. at 345).  An increased regulatory burden, however, typically satisfies the injury-in-fact-requirement. *See Ass'n of Am. R.R.s v. Dep't of Transp.,* 38 F.3d 582, 586 (D.C. Cir. 1994).

#### A.     LISD has standing to challenge the Rule.

At the outset, the Court notes that the defendants do not challenge LISD's standing. *See* Dkt. Nos. 52 at 24–27; 59 at 8; 63 at 5–8.  In fact, the defendants expressly state that "any relief granted should be limited to LISD."  Dkt. No. 63 at 8.  And as explained in the Court's preliminary order, LISD satisfies the requirements for standing.  Dkt. No. 42 at 39–44, 50–52.  LISD has demonstrated that it faces various harms by complying with the Rule, which are sufficient to satisfy injury in fact.  *Id.* at 39–44.  LISD also satisfies the traceability and redressability requirements.  *Id.* at 50–52.

#### B.     Because LISD has standing, the Court may reach Texas's claims.

Because LISD indisputably has standing, the Court may reach Texas's claims.  As both the Supreme Court and the Fifth Circuit have made clear, "it is not necessary for all [p]laintiffs to demonstrate standing; rather 'one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'"  *Texas*, 809 F.3d at 151 (quoting *Rumsfeld*, 547 U.S. at 52 n.2); *see also Bracken v. Haaland*, 994 F.2d 249, 291 (5th Cir. 2021) ("[W]e . . . need conclude only that one plaintiff in the present case satisfies standing with respect to each claim.").  Because LISD has standing, Article III's case-or-controversy requirement has been satisfied, and the Court has jurisdiction to resolve Texas's identical claims, too. *See Texas*, 809 F.3d at 151–62 (finding that because one of the state plaintiffs had standing, the remaining state plaintiffs also had standing without additional analysis); *Bracken*, 994 F.3d 290–97 (analyzing whether at least one plaintiff had standing for each of the claims that the plaintiffs raised before moving forward to address those claims).  As a result, the Court denies the defendants' motion to dismiss for lack of jurisdiction.

– 14 –

**C.      In any event, Texas has also suffered an injury in fact.**

In the interest of judicial efficiency and out of an abundance of caution, the Court also concludes that Texas independently satisfies the injury-in-fact requirement sufficient to provide it with standing.  First, Texas's sovereign policy-making and enforcement powers have been impeded.  *See supra* Section 3.C.i.  Second, Texas has *parens patriae* standing.  *See supra* Section 3.C.ii.  And third, Texas's procedural rights have been violated. *See supra* Section 3.C.iii.

**i.      Texas has standing because the Rule inhibits Texas's sovereign policy-making and enforcement powers.**

The defendants seek dismissal because, in their view, Texas has not suffered a sovereign injury.  Dkt. Nos. 48; 52 at 25.  The record and binding precedent prove otherwise.

"[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'" *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)).  Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where "the state statute at issue regulate[s] behavior or provide[s] for the administration of a state program" and does not "simply purport [ ] to immunize [state] citizens from federal law."  *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269–70 (4th Cir. 2011); *see, e.g.*, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443–44 (D.C. Cir. 1989); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985); *cf. Diamond v. Charles*, 476 U.S. 54, 62 (1986) (commenting that "a State has standing to defend

– 15 –

the constitutionality of its statute" but not relying on that principle).  Such intrusions amount to pressure to change state law.  *Texas*, 809 F.3d at 153.  And as the Fifth Circuit has repeatedly made clear, substantial pressure on states to change their laws affects those states' quasi-sovereign interests, particularly where that pressure ultimately pushes the state "to abandon its laws and policies."  *Texas v. EEOC*, 933 F.3d 433, 446–47 (5th Cir. 2019); *Texas v. United States*, 787 F.3d 733, 752 n.38 (5th Cir. 2015); *State v. Biden*, 10 F.4th 538, 549 (5th Cir. 2021).

Here, the Rule inhibits Texas's sovereign policy-making and enforcement powers. Texas has elected to prohibit governmental entities from requiring vaccines, and it did so before issuance of the Rule.[7]  Texas EO GA-40 (Oct. 11, 2021).  But in light of the Rule, Texas officials who are obliged to enforce Texas law will be forced to decide whether to fine school districts and officials who choose to deviate from state law and comply with the regulations simply to avoid losing Head Start funding.  This situation is analogous to *Texas v. EEOC*, where the Fifth Circuit concluded that Texas had standing to assert its claims against the EEOC, noting that the guidance at issue encouraged employers "to deviate from state law when it conflict[ed] with the [g]uidance" for the purpose of avoiding liability.  933 F.3d at 447.

The defendants' argument that Texas's sovereignty interests have not been invaded because the Rule is not broadly preemptive fails.  Dkt. No. 52 at 25.  As they concede,

---

[7] The distinction between a statute and an executive order is not material to this analysis.  As explained in Texas Government Code § 418.012, the Governor's "[e]xecutive orders, proclamations, and regulations have the force and effect of law."  *See also E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) ("While this case centers on an executive order issued by the Governor under his emergency authority rather than enforcement of a statute enacted by the plenary legislative authority of the people, the same reasoning applies.").  In any event, the defendants do not argue that this distinction is material.  *See* Dkt. No. 52 at 25–26.

– 16 –

"courts have recognized a cognizable Article III harm when a state's own enforcement efforts have been hampered." *Id.* (emphasis omitted).  The net effect of the Rule is a substantial pressure upon Texas to change, or at least cease enforcing and abandon, its own laws.  Texas therefore suffers an injury in fact because its sovereign policy-making and enforcement powers have been impeded by the Rule.

### ii.   Texas has *parens patriae* standing.

The defendants once again challenge Texas's assertion that it has *parens patriae* standing (*Id.* at 26–27), but as the Court previously explained in its preliminary-injunction order (Dkt. No. 42 at 46–49), that argument fails.

"To have [*parens patriae*], standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest, which is a judicial construct that does not lend itself to a simple or exact definition." *Alfred L. Snapp*, 458 U.S. at 601.  Three cases guide the Court's understanding of a state's *parens patriae* interests.

First, in *Massachusetts v. Mellon*, the Supreme Court made clear that states do not have *parens patriae* standing to protect their citizens from the operation of federal law.  262 U.S. 447, 485 (1923).  *Mellon* involved a challenge to the Sheppard-Towner Maternity and Infancy Act, a federal law enacted under President Harding to reduce infant and maternal mortality.  *Id.* at 479.  The Act operated by providing funds—with strings—to state health agencies.  *Id.*  States that did not restructure their operations in accordance with the federal government's conditions lost federal funding.  *Id.* at 479–82.  Massachusetts sued then-Treasury Secretary Andrew Mellon, the official responsible for disbursing the funds, arguing that the Act unconstitutionally legislated "for purposes not national, but local to the states." *Id.* at 479.  The Supreme Court rejected Massachusetts's challenge.  *Id.* at 488–89.  The

court concluded that Massachusetts sought the court's decision as to an "abstract question[] of political power"—not a case or controversy. *Id.* at 485. The court also concluded that Massachusetts could not bring suit "as the representative of its citizens"—as *parens patriae*. *Id.* Because "the citizens of Massachusetts are also citizens of the United States," Massachusetts had no "duty or power to enforce their rights in respect of their relations with the federal government." *Id.* at 485–86. Instead, it was the United States—whose laws are supreme under the Constitution—who was the citizens' *parens patriae*. *Id.* at 486.

Six decades later, in *Alfred L. Snapp*, the Supreme Court refined the so-called *Mellon* bar. 458 U.S. 592. While reaffirming *Mellon*'s core rule, the court restricted it: a state *does* have standing to assert its "quasi-sovereign interests" against the federal government. *Id.* at 607–08, 610 n.16. The Court defined quasi-sovereign interests as a state's interests "in the health and well-being—both physical and economic—of its residents in general," as well as a state's "interest in not being discriminatorily denied its rightful status within the federal system."[8] *Id.* at 607. The Court went on to explain that "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address its sovereign lawmaking powers." *Id.*

In 2007, the Supreme Court once again took up the question of *parens patriae* standing. In *Massachusetts v. EPA*, it held that Massachusetts had standing to challenge the EPA's failure to regulate greenhouse gasses under the authority granted to it by the Clean

---

[8] The Court notes, as others have, that the language in *Alfred L. Snapp* that "[a] State does not have standing as *parens patriae* to bring an action against the federal government" is technically dictum but, like others, takes the statement at face value for the purposes of this analysis. 458 U.S. at 610 n.16.

Air Act. 549 U.S. 497, 526 (2007). The majority stated that *Mellon* did not adopt a broad

bar on a state's *parens patriae* standing against the federal government because the *Mellon*

court was not "called upon to adjudicate . . . *quasi-sovereign rights actually invaded or*

*threatened*." *Id.* at 520 n.17 (emphasis in original). The majority continued that there was a

"critical difference between allowing a State 'to protect her citizens from the operation of

federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights

under federal law (which it has standing to do)." *Id.* (citing *Georgia v. Pa. R. Co.*, 324 U.S.

439, 447 (1945)). Accordingly, the court concluded that since Massachusetts sought to

invoke its own rights under the Clean Air Act rather than its citizens', it had standing. *See*

*id.* at 522–23, 526.

  The law today is clear that a state has *parens patriae* standing when a state "assert[s]

its rights under federal law" but lacks standing when it seeks only to "protect her citizens

from the operation of federal statutes." *Id.* at 520 n.17. And the "rights" under federal law

a state may protect encompass two general categories of "quasi-sovereign" interests: those

"in the health and well-being—both physical and economic—of its residents in general,"

and those "in not being discriminatorily denied its rightful status within the federal system."

*Alfred L. Snapp*, 458 U.S. at 607.

  With that understanding, the Court concludes that Texas has *parens patriae* standing.

Again, an indicator of *parens patriae* standing is when a state alleges an injury to the health

and welfare of its citizens that the "State, if it could, would likely attempt to address through

its sovereign lawmaking powers." *Id.* That is precisely the situation at hand. Texas

attempted to—and did, in fact—address this injury to its citizens. Dkt. No. 61 at 9–10.

Texas issued Executive Orders GA-38, GA-39, and GA-40, which prohibit state agencies,

political subdivisions, and any public or private entity in Texas from requiring a person to receive a COVID-19 vaccine.  Texas EO GA-38 (July 29, 2021); Texas EO GA-39 (Aug. 25, 2021); Texas EO GA-40 (Oct. 11, 2021) All of these were promulgated before the defendants even issued the Rule.  *See* 86 Fed. Reg. 68,052.

In addition, Texas alleges that the Rule's enforcement will lead to dramatic declines in Head Start offerings, adversely impacting students and their families.  Dkt. No. 1 at ¶ 81–85.  As the plaintiffs explain, "[a] natural and predictable consequence of the [v]accine [m]andate is that numerous Head Start faculty, staff, contractors, and volunteers may be fired, retire or quit," which will lead to staffing shortages and even program closures.  *Id.* at ¶ 82–83.  The plaintiffs support these concerns with declarations from school officials in metropolitan and rural areas alike (*see, e.g.*, Dkt. No. 1-3), along with evidence of the millions of dollars in funding that are at stake in this dispute (Dkt. No. 1-2).  The Rule itself acknowledges that "program closures [] create instability and stress for children and families.  They disrupt children's opportunities for learning, socialization, nutrition, and continuity and routine." 86 Fed. Reg. at 68057.

It is difficult to imagine what could qualify as interests "in the health and well-being—both physical and economic—of its residents in general" sufficient to provide Texas with *parens patriae* standing if not the adverse impact on needy children across the state.  *See Alfred L. Snapp*, 458 U.S. at 607.  Thus, the Court concludes it has a *parens patriae* interest in protecting the welfare of its neediest children.  As such, the Court need not and does not address the issue of whether Texas has standing as *parens patriae* for Head Start staff.

### iii.  Texas suffered injury in fact because it was denied its procedural right to comment on the Rule pursuant to the APA.

In addition, Texas suffers another form of injury by being denied its procedural right to comment on the Rule as the APA requires.  "A plaintiff can show a cognizable injury if it has been deprived of 'a procedural right to protect [its] concrete interests.'" *EEOC*, 933 F.3d at 447 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).  "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *Id*.  In *EEOC*, the Fifth Circuit considered whether Texas had standing to challenge an agency action for violating the APA's notice-and-comment requirement. *Id*.  The Fifth Circuit assumed, for purposes of standing only, that Texas was correct on the merits of its claim and found that Texas had standing because such a violation "undercut[] Texas's concrete interest, as a sovereign state, in maintaining compliance with its laws." *Id*.

The Rule here similarly undercuts Texas's interest in ensuring compliance with its laws—specifically, its laws prohibiting state entities from requiring vaccines. *See supra* Section 3.C.i; *see also* Dkt. No. 1 at ¶¶ 75, 79 (noting that the "Governor of Texas has issued an executive order prohibiting mandatory vaccination requirements by entities in Texas" and that "Head Start Programs at Texas schools have district employees who monitor compliance with Head Start program requirements").  Head Start programs within Texas will be encouraged to deviate from Texas's state law, affecting Texas's ability to enforce its own laws. *See* Dkt. No. 1 at ¶ 78 (noting that the Rule impedes Texas's ability to "enforce a legal code" (internal quotation marks omitted)).  Only by preventing the Rule's enforcement—with the expectation that the Secretary may try again, this time allowing for notice and comment before promulgation—will Texas's procedural rights under the APA be

protected.  Thus, the denial of Texas's opportunity to participate in the rulemaking process through notice and comment presents another form of injury in fact.

In sum, Texas satisfies the injury-in-fact requirement to establish standing. Therefore, the Court denies the defendants' motion to dismiss for lack of jurisdiction.[9]

### 4.    The Secretary issued the Rule without statutory authority.

The plaintiffs argue that the Secretary lacks statutory authority to impose the Rule (Dkt No. 54-1 at 18–38), while the plaintiffs allege that the Rule fits neatly within the Act's grant of authority (Dkt. No. 52 at 28–41).  For the reasons explained below, the Court finds that the Rule exceeds statutory authority and that no permissible construction of the statute could justify it.

A federal agency cannot act without Congressional authorization.  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  It cannot confer power upon itself.  *Id.*  "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress."  *Id.* at 374–75. Therefore, under the Administrative Procedure Act (APA), courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

When reviewing an agency's construction of a statute, courts must use the ordinary tools of statutory interpretation.  First, under the *Chevron* two-step framework, the Court

---

[9] Texas also asserts that it has suffered an injury in fact in the form of costs.  Specifically, the "choice Texas faces—either spending, at a minimum, hundreds of thousands of dollars, to absorb school districts' loss of federal funding or changing its laws—establishes that Texas has standing to bring these claims."  Dkt. No. 61 at 11.  The defendants argue, however, that Texas itself is not a recipient of Head Start grants and "fails to show how it has suffered a concrete injury from the Rule because it has appropriated funds to an entity that also receives Head Start funds."  Dkt. No. 52 at 25.  Because Texas satisfies the injury-in-fact requirement on other grounds, the Court does not reach this argument.

must consider "whether Congress has directly spoken to the precise question as issue."

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If Congress has directly spoken on the precise issue, the Court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the Court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.[10]

A.   **The plain language of the statutory provisions on which the Secretary relies does not authorize the vaccine mandate, and the Secretary's proposed construction is impermissible.**

The Court begins with the text of the Rule's cited authority. HHS claims that Section 9836a(a)(1)(C), (D), and (E) of the Head Start Act[11] authorize the Rule. 86 Fed. Reg. at 68,053 (citing 42 U.S.C. § 9836a(a)(1)(C)–(E)). The relevant language appears as follows:

---

[10] The Court recognizes that the *Chevron* framework may have fallen out of favor. The Supreme Court recently decided two cases where *Chevron* could have applied, but it received no reference, let alone deference. *See Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 142 S. Ct. 2354, 2362 (2022); *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1904 (2022). By contrast, in another recent case, the Supreme Court crystalized the long-developing major-questions doctrine. *See West Virginia. v. EPA*, 142 S. Ct. 2587, 2607–14 (2022). There, the majority again made no mention of *Chevron*. Here, the Court refrains from evaluating *Chevron*'s vitality and applies its framework out of an abundance of caution and in light of fairly recent Fifth Circuit precedent applying *Chevron*. *See W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 233–34 (5th Cir. 2019). If *Chevron*'s framework did not apply, however, the Court's conclusions here would stand on even firmer ground. In any event, HHS's interpretation of the Head Start Act is impermissible.

[11] Defendants cite 42 U.S.C. § 9836a(a)(1)(C)–(E), as amended by the Improving Head Start for School Readiness Act of 2007, Pub. L. No. 110–34, § 8, 121 Stat. 1385–96 (2007). For simplicity, the Court refers to the current, amended version of this statute as the "Head Start Act."

### § 9836a. Standards; monitoring of Head Start agencies and programs

#### (A)(a) Standards

##### (A)(1) Content of standards

The Secretary shall modify, as necessary, program performance standards by regulation applicable to Head Start agencies and programs under this subchapter, including—
. . .

(C) administrative and financial management standards;

(D) standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate)
. . .

(E) such other standards as the Secretary finds to be appropriate.

Applying *Chevron*'s first step, both the plaintiffs and the defendants argue that Congress has spoken to the precise question at issue, but the Court disagrees. The statutory subsections on which the defendants rely do not mention "vaccinations" or "immunization," which is especially telling. *See* 42 U.S.C. § 9836a(a)(1)(C)–(E). State laws and regulations have long required—and explicitly stated—that at least children be vaccinated against many communicable diseases. *See, e.g.*, 25 Tex. Admin. Code § 97.63(2)(A) (requiring that "[c]hildren enrolled in child-care facilities, pre-kindergarten, or early childhood programs" be immunized against a host of diseases). But that is not the case here.

Congress could have spoken directly to the issue of vaccinations, including post-COVID-19, but it did not and has not.[12]  Rather than amend the Head Start Act, Congress only granted funds "for carrying out" the existing "Head Start Act."  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116–260, 134 Stat. 1181, 1583–84 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117–103, 136 Stat. 49, 458–59 (2022).  In addition, the subsections on which the defendants rely do not mention broader health and safety precautions that Head Start staff, volunteers, and contractors must take.  *See* 42 U.S.C. § 9836a(a)(1)(C)–(E).  Thus, contrary to the defendants' assertion that the provisions unambiguously provide statutory authority (Dkt. No. 52 at 28–31), subsections (a)(1)(C), (D) and (E) are silent as to the "precise question at issue."  *Chevron*, 467 U.S. at 843.

Even under subsection (A)—a provision that the Secretary did not cite as authority for the Rule—Congress did not speak to the precise question at issue.  Although this subsection allows the Secretary to "modify performance standards" for "services required to be provided, including health," it concerns providing services to children, including health services.  42 U.S.C. § 9836a(a)(1)(A).  It does not condition employment on vaccination requirements.  *Id.*

For their part, the plaintiffs argue that the silence of the provisions on the issue of vaccinations unambiguously shows that the defendants do not have statutory authority; therefore, the Court can end its analysis at *Chevron*'s first step.  Dkt. No. 61 at 17–20.  The plaintiffs cite *Texas v. United States*, 497 F.3d 491, 502–03 (5th Cir. 2007), where the agency

---

[12] As counsel for the defendants conceded at the evidentiary hearing, Congress could not have foreseen the COVID-19 pandemic when it enacted the Head Start Act.  Dkt. No. 41 at 57–58.  That argument does not help the defendants, though.  Rather, it underscores the need to reach *Chevron*'s second step.

argued that the statute's silence granted the agency implicit authority.  Here, however, the defendants do not raise a similar argument.  Rather, they argue that more general authorizations justify the vaccine mandate.  See Dkt. No. 52 at 27–31.  The plaintiffs also cite *American Bus Ass'n v. Slater*, 231 F.3d 1, 6 (D.C. Cir. 2000), but the language at issue there expressly and unambiguously limited the agency's power, which is not the case here. Instead, each side points to broad statutory language that they assert supports their respective positions.  See Dkt. Nos. 52 at 27–31; 54-1 at 18–21.  The Court agrees with the plaintiffs that the statutory language does not authorize the Rule but does so—out of an abundance of caution—in *Chevron*'s second step.

Under step two, the Court must decide whether "the agency's [interpretation] is based on a permissible construction of the statute."  467 U.S. at 843.  The plain language of the defendants' cited authority, the statutory context, and the existing regulations all confirm that the Secretary's interpretation of "performance standards" is not a permissible construction.  Thus, the defendants exceeded their statutory authority.

As mentioned, the Secretary invokes subsections (a)(1)(C), (D), and (E) of the Head Start Act to claim the broad authority for issuing this Rule.  86 Fed. Reg. at 68,052.  Those subsections authorize the Secretary to "modify, as necessary, program performance standards by regulation . . . including—(C) administrative and financial management standards; (D) standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate) . . . [and] (E) such other standards as the Secretary finds to be appropriate."  42 U.S.C. § 9836a(a)(1)(C)–(E).

At the outset, Congress appears to have limited the scope of the Secretary's power. As stated in the Act, the Secretary may only "modify" program performance standards.  *Id.*

This is not a broad grant of rulemaking power like the defendants argue.  *See* Dkt. No. 52 at 28.  Rather, by enabling the Secretary to only "modify" program performance standards, Congress conferred modest authority.  To "modify" means to "make somewhat different; to make small changes to (something) by way of improvement, suitability, or effectiveness . . . [t]o make more moderate or less sweeping; to reduce in degree or extent; to limit, qualify, or moderate."  *Modify*, Black's Law Dictionary (11th ed. 2019); *see also MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994) ("[V]irtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion.").

With the power to "modify," the Secretary may only make moderate changes to Head Start performance standards.  Against this backdrop, the Court finds that enacting an unprecedented vaccine mandate is not a moderate change to the specific standards the defendants try to leverage.  Furthermore, even assuming the "modify" language within the Act does not cabin the Secretary's power, the identified sources of authority cannot fairly be construed so broadly as to include an unprecedented, nationwide requirement of a medical procedure.  *See* 42 U.S.C. § 9836a(a)(1)(C)–(E).  The Court addresses each of the defendants' cited provisions in turn.

First, the vaccine mandate is not authorized by subsection (C), which allows the Secretary to modify "administrative and financial management standards."  *See id.* § 9836a(a)(1)(C).  "Financial management standards" plainly do not encompass a vaccine mandate—they relate to how money is handled.  The defendants previously admitted that the mandates are not financial management standards (Dkt. No. 41 at 48), and they do not argue otherwise here (*see* Dkt. No. 52 at 29).

Likewise, the Secretary may not impose these mandates by purporting to modify administrative standards. "Administrative" is not defined by the statute but generally refers to "of or relating to administration," and "administration" is the "performance of executive duties: management." *Administrative*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014); *Administration*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014). By placing the vaccine mandate in the "Human Resources Management" section of the regulations, the defendants seem to interpret "administrative" standards to include requiring its employees to undergo a mandatory offsite medical procedure or be fired if they are not granted an exemption. *See* 86 Fed. Reg. at 68,060 (noting that the Rule adds four new provisions to "part 1302, subpart I—Human Resources Management" in 45 C.F.R. §§ 1302.93–94). Such a requirement, however, would not typically be characterized as relating to executive duties or management. If it were, there would be no limit to the scope of administrative standards. The defendants could then impose any requirement on Head Start staff, contractors, and volunteers by modifying "administrative standards."

Rather, the scope of "administrative standards" is informed by the term to which it is joined: "financial management standards." 42 U.S.C. § 9836a(a)(1)(C). Congress grouped the two together—not only in the same list, but in the same subsection. *See id.* Statutory terms are often known by the "company they keep." *See Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018) (Breyer, J., writing for a unanimous Court) (citing *Yates v. United States*, 574 U.S. 528, 542 (2015)) (finding "both the presence of company that suggests limitation and the absence of company that suggests breadth"). The agency concedes that the company that the term "administrative" keeps—"financial management"—obviously cannot authorize the Rule. Dkt. No. 41 at 48. Read together, the term "financial

– 28 –

management standards" "suggests limitation" on the scope of the term "administrative standards." The terms appear to contemplate management standards like those found in 45 C.F.R. § 1302.101(a)(1), which requires programs to use effective "fiscal[] and human resource management structure[s]." Those standards are entirely different from a mandatory vaccine requirement. Given that the vaccine mandate is aimed at children's health, it defies logic to assert that such standards would be characterized as administrative or financial.

Second, the plain language of subsection (D) suggests that the Secretary may not impose the vaccine mandate. Subsection (D) enables the Secretary to modify "standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate)." 42 U.S.C. § 9836a(a)(1)(D). "Facility" is defined as "a structure, such as a building or modular unit, appropriate for use in carrying out a Head Start program and used primarily to provide Head Start services." 45 C.F.R. § 1305.2 (2021). Subsection (D) specifies that the condition and location of facilities must "meet or exceed State and local requirements concerning licensing for such facilities" and "be accessible by State and local authorities for purposes of monitoring and ensuring compliance." 42 U.S.C. § 9836a(a)(1)(D)(i) & (ii). The "condition" of facilities—as the references to "indoor air quality assessment standards," licensing, and accessibility make clear—thus relates to the physical conditions of buildings and equipment. The language does not refer to adults' employment or volunteer eligibility. Mandating facility standards is a far cry from mandating a medical procedure for all staff under the threat of termination.

The Rule contains a lone sentence aimed at explaining how the mask and vaccine mandates are "standards relating to the condition . . . of facilities." 42 U.S.C.

§ 9836a(a)(1)(D). "The Secretary finds it necessary and appropriate to set health and safety standards for the condition of Head Start facilities that ensure the reduction in transmission of the SARS–CoV–2 and to avoid severe illness, hospitalization, and death among program participants." 86 Fed. Reg. at 68,054. But the Rule governs the conditions of people, not buildings. *See* Dkt. No. 41 at 49 (defendants acknowledging that "facilities" refer to buildings).

The last subsection—"such other standards as the Secretary finds to be appropriate"—cannot support the vaccine mandate, either. 42 U.S.C. § 9836a(a)(1)(E). The defendants allege that this subsection provides the Secretary with broad authority (Dkt. No. 28), but they overlook how that authority has been cabined. Though seemingly expansive, "such other" standards fall under the banner of "performance standards," so it must be defined in relation to subsections (A)–(D). 42 U.S.C. § 9836a(a)(1) (stating that "[t]he Secretary shall modify, as necessary program performance standards"). Generally, "performance standards" are criteria that measure the quality of Head Start programs. *See Standard*, Black's Law Dictionary (11th ed. 2019) ("A criterion for measuring acceptability, quality, or accuracy"). Here, "quality" corresponds to Head Start programs' ability to achieve their purpose. Under the Act, that purpose is to "promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development" through providing a host of services—including health services to the children and their families. 42 U.S.C. § 9831(2). Therefore, the Secretary may modify "such other" performance standards, which are criteria that measure Head Start programs' ability to achieve their purpose.

The vaccine mandate, however, does not measure a staff's, volunteers', or contractors' ability to enhance children's development; it determines whether they will be hired, kept on, or fired in the first place. The mandate does not operate as a performance standard and provide a method for measuring quality. Instead, the mandate is a prerequisite to performance. As such, the defendants' construction of their cited authorities is impermissible for this fundamental reason.

Furthermore, if "such other performance standards" could include mandates such as the vaccine requirement at issue here, there would be no genuine limiting principle to the Secretary's authority to regulate in the name of "health and safety standards." In *Alabama Ass'n of Realtors v. Department of Health and Human Services*, the Supreme Court invalidated a federal agency's attempt to pass COVID-19 restrictions, and it did so, in part, due to the lack of any limit to the asserted authority. 141 S. Ct. 2485, 2489 (2021). There, the Supreme Court held that it was "virtually certain" that the CDC did not have authority to issue an eviction moratorium based on the Surgeon General's statutory authority to make and enforce regulations to prevent the spread of communicable diseases. *Id.* at 2486. The statute at issue had a catch-all provision, similar to the one in this case—"other measures, as in his judgment may be necessary." *Id.* at 2487 (quoting 42 U.S.C. § 264). But the Court explained that "the sheer scope of the CDC's claimed authority . . . would counsel against" the CDC's interpretation, because it was "hard to see what measures [it] would place outside the CDC's reach." *Id.* at 2489.

Although, this case, of course, deals with different statutory language, the agency's similar claim to expansive authority based on generalized and catch-all language undermines its position. *See* Dkt. No. 52 at 28–29. Here, the defendants argue that the

– 31 –

Secretary can leverage "such other standards as the Secretary finds to be appropriate" to pass any health and safety regulation that furthers the general purpose of the statute— keeping Head Start programs open to promote the school readiness of children.  *Id.*  Even this reading, however, appears to allow the Secretary to pass any health-related mandate that would reduce staff and volunteer absenteeism, not require Head Start staff to undergo a medical procedure or face termination.  Even if the plain language of "program performance standards" authorized the Rule—which it does not—adopting the remote and manipulable reading urged by the Secretary counsels against the defendants' interpretation.  *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

### B.  Other statutory provisions and existing regulations confirm that the vaccine mandate is unprecedented and unauthorized.

Attempting to show that the Secretary had statutory authority to issue the mandate, the defendants point to various other statutory provisions and administrative regulations involving health and safety.  Dkt. No. 52 at 31–37.  Thus, citing *Biden v. Missouri*, the defendants claim that HHS's history of health-and-safety regulations supports its reading of the statute.  *Id.*  But unlike *Biden v. Missouri*, HHS does not have a "longstanding practice" of implementing its statutory authority under the Head Start Act in a way consistent with the vaccine mandate here.  *See* 142 S. Ct. 647, 653–54 (2022).  And the Secretary expressly disavowed reliance on the one statutory provision addressing health services.  *Id.* at 40–41.

Specifically, the defendants point to the Secretary's authority to issue "deficiencies."  Dkt. No. 52 at 30–31.  Congress has authorized the Secretary to issue "deficiencies" when programs fail to follow "performance standards."  42 U.S.C. § 9836a(e)(1)(A).  The Act defines a "deficiency" as "a systematic or substantial material failure of an agency in an area of performance that the Secretary determines involves—(i) a threat to the health, safety, or

civil rights of children or staff; . . . [or] (iii) a failure to comply with standards related to early childhood development and health services . . . ." *Id.* § 9832(2)(A).  The defendants argue that the Secretary can establish "standards related to early childhood development and health services" and "the health . . . of children or staff" because he can issue deficiencies for failures to follow such standards, urging the Court to work backwards from the definition of "deficiency."  Dkt. No. 52 at 30 (quoting § 9832(2)(A) and citing § 9836a(e)(1)).  The defendants also point previous and current standards and regulations, along with other statutory provisions.  Dkt. No. 42 at 32–36.  Some center on Head Start staff, contractors, and volunteers and deal with subjects such as training, professional development, and health screenings.  *Id.* (citing 42 U.S.C. §§ 9832(21)(G)(i), 9837(C)(1)(E)(iii), 9843(b)(2)(D), (d)(1)(G); 45 C.F.R. §§ 1302.47(b)(4)(i)(A), 1302.93(a); 61 Fed. Reg. 57,186 (Nov. 5, 1996); 81 Fed. Reg. 61,294 (Sept. 6, 2016)).  Others focus on participants and cover areas such as health screenings, medical records, and program assistance in arranging and facilitating health services.  *Id.* (citing 42 U.S.C. §§ 9835(m)(2), 9843(a)(3)(B)(xii)(VI); 45 C.F.R. §§ 1306.35(b)(2)(ix), 1302.42(b)(1)(i)–(ii)), (e)(2), 1304.3-3(b)(4)–(6), (8) (1975), 1304.3-4(2) (1975); 1304.22(b), (e)(7) (2015), 1308 App'x (2015)).  But the defendants' arguments fall short.

    First, the Court does not doubt that the Secretary can establish certain performance standards related to "health services."  Subsection (A) of program performance standards specifically allows the Secretary to modify "performance standards with respect to services required to be provided, including health."  42 U.S.C. § 9836a(a)(1)(A).  But the Secretary did not rely on this subsection as his statutory authority for the vaccine mandate.  *See* 86 Fed. Reg. 68,052.  Subsection (A) does not appear in the Rule even once.  *Id.*  Instead, he

relies solely and specifically on subsections (C) ("administrative and financial"), (D) ("facilities"), and (E) ("other") of "program performance standards."  86 Fed. Reg. at 68,052–53 (citing 42 U.S.C. § 9836a(a)(1)(C)–(E)).  The defendants previously conceded that the vaccine mandate is not a health service (Dkt. No. 41 at 40) and do not argue otherwise now (Dkt. No. 52 at 28–31).

In any event, Head Start is not providing "health services" to children nor establishing related "performance standards" by requiring that employees, volunteers, and contractors get vaccinated.  Current performance standards related to health services include examinations and screenings for children, for instance.  *See* 45 C.F.R. § 1302.42 (2021).  These standards even include assisting children in getting up to date on immunizations.  *Id.* § 1302.42(b)(1).

But these existing regulations differ from the vaccine requirement in several critical ways.  Initially, the Court notes that all of the regulations that the defendants cite regarding immunization opportunities only require that they be made available to children; they say nothing regarding staff or volunteers.  *See, e.g.*, *id.*  Moreover, since the first of these regulations were promulgated, they have never mandated a medical procedure; to the contrary, they have always been conditioned upon parental consent.  *See* Program Performance Standards for Operation of Head Start Programs by Grantees and Delegate Agencies, 40 Fed. Reg. 27,562, 27,565 (June 30, 1975) (codified in 45 C.F.R. § 1304.3-3(a)) (requiring "advance parent or guardian authorization" for all screenings and examinations); 45 C.F.R. § 1302.41 (2021) (requiring Head Start programs to "collaborate with parents as partners in the health and well-being of their children" and "[a]t a minimum" to "[o]btain advance authorization from the parent or other person with legal authority for all health and

developmental procedures administered through the program"); 45 C.F.R. § 1302.42(b)(ii) (2021) (authorizing Head Start staff to assist parents with scheduling immunizations but saying nothing about enforced masking or vaccinations).  Additionally, as the defendants concede, the vaccine mandate is the first time in Head Start's history that such a procedure is mandated as a prerequisite to employment with Head Start programs.  Dkt. No. 41 at 46–47.  As such, staff, contractors, and volunteers have never faced the requirement of a vaccine under the threat of termination.  And the cited regulations applicable to staff focus primarily on training and professional development or initial and periodic health examinations and screenings as recommended by the staff's health care providers.  45 C.F.R. §§ 1302.93(a); 1302.47(b)(4)(i)(A).  Thus, these regulations are materially different from one requiring that staff undergo an invasive, irreversible medical procedure as a condition to employment or participation.  All of these distinctions highlight why the vaccine mandate is not a "performance standard[]" in the first place.[14]

Second, that the "deficiencies" for which the Secretary can impose sanctions contemplate threats to "health and safety" does not widen the scope of what "performance standards" comprises.  Based on the listed "performance standards" in Section 9836a(a)(1), the Secretary has limited power to provide for the health and safety of Head Start programs. That was never in doubt.  But again, that limited power does not authorize the vaccine mandate.  For instance, Congress expressly granted the Secretary authority to regulate the

---

[14] *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 666 (2022) ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind—addressing a threat that is untethered, in any causal sense, from the workplace. This 'lack of historical precedent,' coupled with the breadth of authority that the Secretary now claims, is a 'telling indication' that the mandate extends beyond the agency's legitimate reach.").

conditions of "facilities."  42 U.S.C. § 9836a(a)(1)(D).  And here, the Secretary's own explanation of his statutory authority focused on "facilities."  86 Fed. Reg. at 68,054. Facility conditions, such as poor "ventilation" systems, can directly impact the health and safety of children and staff.  *Id.* at 68,054, 68,066.  Thus, it is no surprise that the Secretary could issue deficiencies based on "threat[s] [to] the health or safety" of staff and children resulting from facility conditions.  42 U.S.C. § 9836a(a)(1)(D), (e)(1)(B)(i).  But, as explained above, the Act says nothing about conditioning participation and employment eligibility on health and safety requirements as vast as the vaccine mandate here.

Furthermore, that Congress mentions standards related to "health" services in subsection (A) cuts against the defendants' claim that the catch-all provision in subsection (E) includes any health-related standards.  Reading "other standards" as broadly as the defendants suggest would render subsection (A) surplusage as it pertains to "health" related standards.  The catch-all provision cannot be read so broadly as to eclipse the meaning of subsections (A)–(D).  The Court "must give effect to every word that Congress used in the statute." *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985).

Third, unlike *Biden*, HHS does not have a "longstanding practice . . . [of] implementing the relevant statutory authorities" here similar to the vaccine mandate.  *See* 142 S. Ct. at 652.  In *Biden*, after concluding that the CMS mandate fit within the language of the statute, the Supreme Court explained that the Secretary's history of relying on the same statutory language in imposing other conditions on healthcare facilities and healthcare workers supported its finding.  *Id.* at 652–53.  Citing examples of such conditions, the Court stated that "the Secretary has always justified these sorts of requirements by citing his authorities to protect patient health and safety."  *Id.* at 653.  Here, however, although the

defendants cite several standards and regulations relating to health generally, the defendants do not identify which, if any, rely specifically on the same statutory language—Section 1986a. *See* Dkt. No. 52 at 32–36. Instead, the defendants broadly state that HHS has taken similar measures in the past and, over the years, has implemented regulations pertaining to program participants and staff. *Id.* at 32–35. As noted above, the Court does not doubt that the Secretary can establish certain performance standards related to "health services" or that he has done so before. But unlike *Biden*, the defendants here fail to point to any specific conditions in which the Secretary relied solely and specifically on same statutory authority as the Rule. *See id.* at 32–36. Thus, *Biden* does not support the defendants' argument. And the defendants' admission that the vaccine mandate marks the first time that Head Start has ever mandated a health procedure as a precondition to new or ongoing employment only cuts against their argument that a longstanding practice exists here. *See* Dkt. No. 41 at 46–47.

Fourth, the other statutory provisions that the defendants cite—none of which the Secretary cited in promulgating the Rule—only demonstrate that the Rule is unprecedented and unauthorized. Several of the provisions that the plaintiffs mention focus on the training and professional development of Head Start staff. *Id.* at 32 (citing 42 U.S.C. §§ 9832(21)(G)(i); 9843(b)(2)(D), (d)(1)(G)). Others discuss providing easier access for students to attend Head Start and obtain services, such as allowing families of homeless children to apply to, enroll in, and attend Head Start so long as immunization and other records are obtained within a reasonable time frame or removing barriers so that Head Start participants in rural communities can obtain health screenings. *Id.* (citing 42 U.S.C. §§ 9835(m)(2); 9843(a)(3)(B)(xii)(VI)). And one provision explains that the Secretary must

– 37 –

consider the effects of any revisions on the quality, scope, or types of health services required to be provided. *Id.* (citing 42 U.S.C. § 9836a(a)(2)(C)(ii)). Nevertheless, none of these provisions discuss vaccination mandates, much less grant authority to condition employment on a vaccine under the threat of termination. In any event, the Secretary did not rely on any of these in promulgating the Rule. *See* 86 Fed. Reg. at 68,052. Thus, contrary to the defendants' argument, these provisions only lend additional support to the Court's conclusion that the Rule is unprecedented and unauthorized.

### C.   Vaccination requirements for Head Start staff and volunteers involve state-government—not federal agency—matters.

Moreover, to the extent the regulations governing Head Start staff and volunteers shed light on the scope of the Secretary's authority under the statute, they do not authorize this Rule's mandate. Rather, they imply that conducting an initial health examination and periodically screening or testing workers may be permissible when done in "accordance with state, tribal, or local requirements." *See* 45 C.F.R. §§ 1302.93–94 (2021) (requiring staff and volunteers to test for communicable diseases "in accordance with state, tribal[,] or local" laws and requirements).[15] These provisions suggest two ideas, neither of which support the defendants' arguments.

First, testing employees for communicable diseases may, in some circumstances, be permissible. But the Rule does not require merely periodic testing. It mandates a vaccine,

---

[15] The defendants also rely on regulations that require staff to clean play areas and wash their hands after restroom use or changing diapers. Dkt. No. 52 at 55 (citing 45 C.F.R. § 1302.47(b)(6)(i) (2021) (hand hygiene); 45 C.F.R. § 1302.47(b)(2)(i) (cleaning and disinfecting play areas and equipment)). Such basic hygiene practices fall well short of demonstrating that the Head Start Act authorizes mandatory vaccination for staff under a threat of termination. And the staff-training provisions that the defendants cite also refer to state and local requirements, indicating that federal rules do not solely govern. Dkt. No. 52 at 55 (citing 45 C.F.R. § 1302.47(b)(4)).

which requires an invasive medical procedure.  Nothing in the regulations contemplate that the federal government can require staff, volunteers, and contractors to be immunized.

Second, testing only occurs when conducted consistent with "state, tribal, and local" laws and requirements.  *Id.*  This confirms what the Supreme Court has recognized for over a century: public health and safety regulation belongs, in the first instance, to the States. *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 38 (1905) (recognizing that the "safety and the health of the people of" states are for States to "guard and protect" through their general "police power[s]").

In this respect, the defendants demonstrate the shortcomings of their arguments. They repeatedly affirm the notion that vaccine requirements "have had particular prominence in the education context."  Dkt. No. 52 at 40 (citing *Klaassen v. Trs. Of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) (upholding a state university's vaccination requirement)).  But for "centuries," *states*—not federal agencies—have compelled vaccine requirements in the education context.  *See, e.g.*, 25 Tex. Admin. Code § 97.63(2)(A) (requiring that "[c]hildren enrolled in child-care facilities, pre-kindergarten, or early childhood programs" be immunized against a host of diseases); Ark. Code Ann. § 6-18-702 (West) (outlining immunization requirements for school children). [16]

---

[16] The defendants also cite 42 U.S.C. § 9837(c)(1)(E)(iii), which requires that Head Start programs comply with "applicable State, tribal, and local laws," and allege that all Head Start personnel must therefore meet the child-care standards of the states in which they operate.  The defendants then argue that Texas's Minimum Standards for Child-Care Centers require child-care programs to develop a policy mandating staff vaccination, meaning that all Head Start personnel should be vaccinated.  Dkt. No. 52 at 33 (citing 26 Tex. Admin. Code § 746.3611).  First, this argument also evidences that state and local requirements govern.  Second, contrary to the defendants' assertion, the language states that a child-care program must "[s]pecify any vaccines that [they] have determined an employee must have for vaccine-preventable diseases," indicating that the program has the authority to make that determination.  Admin. § 746.3611(1).

The vaccine mandate at issue here comes from a federal agency, not a state.

Congress must use "exceedingly clear language if it wishes to significantly alter the balance

between federal and state power." *U.S. Forest Serv. V. Cowpasture River Pres. Ass'n*, 140 S. Ct.

1837, 1849–50 (2020) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).   Congress's

failure to use "exceedingly clear language" in any part of the statute further supports what

the plain language of "performance standards" indicates: the defendants do not have

authority to issue the vaccine mandate.[17]

### D.   The Supreme Court addressed a different statute in *Biden v. Missouri*, and nothing about its analysis requires a different result here.

The defendants cite *Biden v. Missouri*'s allowance of the Medicare and Medicaid

vaccine mandate as support for their assertion that HHS likewise had statutory authority for

the Head Start mandate.  Dkt. No. 52 at 27–40.  The Court recognizes, of course, that the

Supreme Court held in *Biden v. Missouri* that the Secretary did not exceed his statutory

authority in conditioning funding on healthcare workers receiving a COVID-19 vaccine.

---

[17] This conclusion is especially apparent if the "major questions doctrine" applied.  The Supreme Court recently reaffirmed that it "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'"  *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  Several factors here favor applying this additional level of scrutiny, such as the Office of Management and Budget's declaration that the Rule is a "major rule" because it will "have an annual effect on the economy of $100 billion or more" (86 Fed. Reg. at 68,063), the $10 billion in grants to Head Start programs" that ACF awards (*id.* at 68,100), and the 273,000 staff and a share of the one million volunteers who will be affected (*id.* at 68,068–69).  But at least one circuit court has recently held that the doctrine did not apply to rules with much larger economic effects and arguably equivalent political significance because the rules at issue were not "an enormous and transformative expansion in [the agencies'] regulatory authority."  *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1287 (11th Cir. 2021) (order denying injunction pending appeal of the CMS mandate) (quoting *Utility Air*, 573 U.S. at 324).  Nevertheless, here, the Court need not evaluate whether the major question doctrine applies. Under traditional principles of statutory interpretation, and even without the major-questions doctrine's more exacting standard, the defendants' construction is impermissible.  If the doctrine did apply, however, the plaintiffs would prevail even more easily because Congress has not spoken clearly in authorizing HHS to impose the expansive and unprecedented mandates on Head Start programs.

142 S. Ct. at 653.  And the Court understands the defendants' attempt to leverage an

authorized vaccine mandate, which stems from the same agency, to justify the mandate

here.  *See* Dkt. No. 52 at 27–40.  The Court, however, is reminded of Justice Holmes's

famous admonition: "We must think things not words, or at least we must constantly

translate our words into the facts for which they stand, if we are to keep to the real and the

true."  Oliver W. Holmes, *Law in Science and Science in Law,* 12 Harv. L. Rev. 443, 460

(1889).  Here, *Biden v. Missouri*'s holding does not change the fact that the Head Start

mandate relies on materially different statutory language for authorization, does not involve

a tradition of similar practices, and involves a materially different statutory context.  For

these reasons, *Biden v. Missouri* does not compel the Court to alter its prior analysis and

conclude that the Head Start mandate is authorized.

In *Biden*, the Supreme Court held that the Secretary had not exceeded his statutory

authority in issuing an interim final rule requiring that employees in facilities participating

in Medicare and Medicaid be vaccinated.  142 S. Ct. at 653; *see also* 86 Fed. Reg. 61,555

(2021).  The Supreme Court relied first on the language of the statute itself, concluding that

the CMS mandate fit neatly within it.  *Id.* at 652.  The statute expressly grants the Secretary

with the power to impose conditions "necessary in the interest of the health and safety of

individuals who are furnished services."  *Id.* (quoting 42 U.S.C. § 1395x(e)(9)).  Similarly,

the CMS mandate states that the Secretary "concluded that a vaccine mandate is 'necessary

to promote and protect patient health and safety' in the face of the ongoing pandemic."  *Id.*

(quoting 86 Fed. Reg. at 61,613).  The Supreme Court went on to discuss the longstanding

practices of CMS that were similar to the vaccine mandate, noting that "healthcare facilities

that wish to participate in Medicare and Medicaid have always been obligated to satisfy a

host of conditions that address the safe and effective provision of healthcare" and that the Secretary "routinely imposes conditions of participation that relate to the qualifications and duties of healthcare workers themselves." *Id.* at 652–53. And third, the Supreme Court relied on the healthcare context, noting that a vaccine mandate is consistent with the medical profession and its purpose of restoring patients back to health. *Id.* at 652. Here, in contrast, none of those rationales support the Head Start mandate.

First, the healthcare-worker mandate and the Head Start mandate rest on materially different statutory language. The CMS mandate stems from a different statute than the one that the Secretary claims gave it authority here, the Head Start Act. *Id.* at 650; *compare* 42 U.S.C. § 1395x(e)(9), *with* 42 U.S.C. § 9836a(a)(1)(C)–(E). Specifically, the authorizing text for the CMS mandate provides that the Secretary may promulgate such "requirements as [he] finds necessary in the interest of the health and safety." 42 U.S.C. § 1395x(e)(9). Here, however, the Secretary has expressly disclaimed any reliance on the Head Start Act's subsection (A), which allows the Secretary to "modify performance standards" for "services required to be provided, including health." Dkt. No. 41 at 40–41; *see also* 42 U.S.C. § 9836a(a)(1)(A). Thus, contrary to the Secretary's reliance on "health and safety" language in promulgating the CMS mandate, the Secretary argues that the Rule here qualifies as an administrative standard, a standard relating to the condition of facilities, or "such other" similar standards. As detailed above, however, this language cannot authorize Head Start's vaccine mandate. *See supra* Section 4.A. Thus, *Biden* does not foreclose the Court's interpretation of the statute.

Moreover, the CMS mandate fits naturally into the statute's health-and-safety language, but the Rule here does not. See 42 CFR §§ 416.25–416.54. As the Supreme

Court explained, the Secretary relied on the authority conferred upon him by 42 U.S.C. § 1395x(e)(9) and other similar provisions. *Biden*, 142 S. Ct. at 650, 652 (comparing Section 1395x(e)(9) with 86 Fed. Reg. at 61,613). Thus, in that case, the mandate "fit[] neatly within the language of the statute." *Biden*, 142 S. Ct. at 652. Here, however, the Rule does not directly fit within the non-health-related language of the Head Start Act on which the Secretary relied. As previously discussed, those subsections cannot be reasonably read to provide the Secretary with authority, much less explicitly spell out, that the Secretary could promulgate a vaccine mandate.

Second, unlike *Biden*, there is no "longstanding practice of Health and Human Services in implementing the relevant statutory authorities." *Id.* at 652. As detailed above, the defendants attempt to establish that various Head Start regulations support the vaccine mandate, but the examples miss the mark. *See supra* Section 4.B. Understandably, in the context of hospitals and the provision of healthcare, HHS has implemented health regulations and conditions on participation showing that the Secretary has exercised broad authority in administering Medicare and Medicaid. *Biden*, 142 S. Ct. at 652–53. The same is not true in the realm of pre-K education for low-income children. *See supra* Section 4.B.

Third, the analysis in *Biden* springs from a materially different context than pre-K education. As the Supreme Court noted, "ensuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm. It would be the very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick with COVID-19." *Biden*, 142 S. Ct. at 652. The CMS mandate governs hospitals, doctors, and other healthcare workers. *See id.* at 652–53. These are individuals directly concerned

with providing healthcare to vulnerable patients in the medical field. *Id.* Thus, the Supreme Court explained that the Secretary's "response [to COVID-19 by implementing the mandate] is not a surprising one" because "[v]accination requirements are a common feature of the provision of healthcare in America." *Id.* At 653. Here, in contrast, vaccination requirements are not a common feature of the provision of education, as the defendants recognize. *See* Dkt. No. 41 at 46–47 (defendants acknowledging that this is the first time that Head Start has ever mandated a medical procedure as a precondition to new or ongoing employment). Head Start's Rule applies to employees, volunteers, and contractors—educators—whose main purpose is to promote the school-readiness of needy children. *See* 42 U.S.C. § 9831. Thus, the broader context—the provision healthcare in hospitals—lent great support for the CMS mandate, but the broader context weighs against the defendants here.

In sum, the statutory language, related agency practices, and context all supported the Secretary's position in *Biden* that the CMS mandate did not lack statutory authorization. But because the same is not true here, and this Court is faced with materially different language, practices, and context, the Court reaches the opposite conclusion.

**5.    The Rule does not follow proper rulemaking procedures.**

Even if the Head Start Act allowed the Secretary to impose the vaccine mandate under the guise of modifying "performance standards"—which it does not—the Rule cannot stand for another fundamental reason: it violates proper rulemaking procedures. Under the APA, the Court shall "hold unlawful and set aside agency action" that is "not in accordance with law," "without observance of procedure required by law," or "in excess of statutory . . . limitations." 5 U.S.C. § 706(2)(A), (C)–(D). Because the Secretary issued the Rule without

notice and comment in violation of the APA—and without consultation with certain

stakeholders as required by the Head Start Act—the Rule is unlawful.

> **A.    The Secretary did not have good cause to issue the Rule without notice and comment.**

Under the APA, an agency typically must first publish notice of a proposed rule and

give the public opportunity to comment before adopting a final rule.  5 U.S.C. § 553(b), (c).

The agency also must publish such rules at least thirty days before its effective date.

*Id.* § 553(d).  These procedures are "designed to assure due deliberation."  *Smiley v. Citibank*

*(S.D.), N.A.*, 517 U.S. 735, 741 (1996) (citing 5 U.S.C. § 553 and *Thompson v. Clark*, 741 F.2d

401, 409 (D.C. Cir. 1984)).  But, on rare occasions, "both of these requirements may be

bypassed if 'good cause' exists."  *United States v. Johnson*, 632 F.3d 912, 927 (5th Cir. 2011)

(quoting 5 U.S.C. § 553(b)(3)(B)).

Notice-and-comment procedures do not apply "when the agency for good cause"

finds those procedures are "impracticable, unnecessary, or contrary to the public interest."

5 U.S.C. § 553(b)(3)(B).  Typically, the government's "burden to show that good cause

exists is a heavy one."  *United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009).  Indeed, the

exception is to be "narrowly construed and only reluctantly countenanced."  *N.J., Dep't of*

*Env't Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).  Nor can it provide agencies with

an "'escape clause' from the requirements Congress prescribed."  *Johnson*, 632 F.3d at 928

(quoting *United States v. Garner*, 767 F.2d 104, 120 (5th Cir. 1985)).  "Its use 'should be

limited to emergency situations.'"  *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754

(D.C. Cir. 2001) (quoting *Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir.

1981)).  To determine whether "good cause" exists, the Court must "rely only on the 'basis

articulated by the agency itself' at the time of the rulemaking." *Johnson*, 632 F.3d at 928 (quoting *Garner*, 767 F.2d at 116–17).

The defendants argue that "good cause" existed to skip notice and comment because it would be "impracticable and contrary to the public interest." 86 Fed. Reg. at 68,059. The Secretary cites several concerning factors, including "failure to achieve sufficiently high levels of vaccination based on voluntary efforts and patchwork requirements, potential harm to children from unvaccinated staff, continuing strain on the health care system, and known efficacy and safety of available vaccines." *Id.* Specifically, delaying the vaccine mandate "would endanger the health and safety of staff, children[,] and families" as programs prepared to return to fully in-person services. *Id.* The Court does not question the authenticity of these concerns. The only issue for the Court is whether HHS can show that notice and comment was "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). It cannot.

First, the Secretary gave staff and volunteers 62 days to get vaccinated after the Rule's effective date, requiring compliance by January 31, 2022. With that amount of time, however, the Court does not see how providing notice and comment was "impracticable." Notice and comment would not have forced HHS to push back the vaccination-compliance date. Even if public participation did not affect the substance of the final rule, HHS could have received comment and not sacrificed even one day in addressing the concerns it outlines.

The Court recognizes that "reasoned policy determination[s]" take time and do not necessarily "undermine the state of emergency." *See Florida*, 19 F.4th 1271 (holding that the district court did not abuse its discretion in finding that the Secretary of HHS set forth a

– 46 –

sufficient basis of good cause for waiving notice and comment). But the Head Start Rule, substantially shorter and less complex, was issued 25 days after the OSHA vaccine-or-test rule and the CMS vaccine mandate were issued. *See* COVID–19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021) (154-page OSHA ETS mandate); Medicare and Medicaid Programs; Omnibus COVID–19 Health Care Staff Vaccination, 86 Fed. Reg. 61,555 (Nov. 5, 2021) (73-page CMS rule with an analysis of over 200 cited sources). The Court does not expect agencies to issue "emergency" rules in mere days, or even a few weeks, after the President announces his intent to impose new rules. But this 82-day timeline combined with the 62-day vaccination-compliance period strongly disfavors finding this degree of federal involvement in pre-K programs to be an emergency that rendered notice and comment "impracticable."

And the defendants' data arguably casts further doubt on the emergency nature of their concerns in this specific context. The Secretary found that "uptake of vaccination among Head Start staff has not been as robust as hoped for." 86 Fed. Reg. at 68,054. In the defendants' cited survey, however, vaccination rates among childcare providers "significantly exceeded [rates among] the general population." *Id.* at 68,078. In fact, the defendants themselves estimate that Head Start staff are 12% more likely to be vaccinated. *Id.* at 68,069.

In light of the vaccine-compliance period, the defendants' lengthy delay, and the relatively high vaccination rates of their instructors, the Court finds that notice and comment was not impracticable. *See Mid-Tex Elec. Coop., Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987) (recognizing that "the 'good cause' inquiry is inevitably fact- or context-dependent").

Rather than working against the public interest, notice and comment would have served the public interest by ensuring "due deliberation" with the important stakeholders. *Smiley*, 517 U.S. at 741 (citing 5 U.S.C. § 553 and *Thompson*, 741 F.2d at 409). "The public interest prong of the good cause exception is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012). Notice and comment would have involved important stakeholders, many of whom were excluded from the rulemaking process in violation of the Head Start Act itself. 42 U.S.C. § 9836a(a)(2)(A); *see infra* Section 5.B (outlining the Secretary's failure to consult with experts in the fields of early childhood education, family services, administration and financial management, and persons with experience operating Head Start programs). The Secretary's decision silenced Head Start teachers, contractors, and volunteers—the very people who would face the requirement of an invasive medical procedure under the threat of termination.

Furthermore, public feedback seems particularly important here given the diversity of local health conditions across the country and the wide reach of the mandate. 86 Fed. Reg. at 68,058; *see American Federation*, 655 F.2d at 1156 ("The more expansive the regulatory reach . . . [,] the greater the necessity for public comment."). Rather than guessing that it would be burdensome for large agencies to administer different policies for areas with disparate COVID-19 transmission rates, HHS could have solicited their input through notice and comment.

To be sure, HHS accepted comments until December 30, 2021. 86 Fed. Reg. 68,052. But "accepting post-promulgation comments" after the Rule's effective date does not "excuse compliance with APA procedures." *Johnson*, 632 F.3d at 929. This, too, is not an

– 48 –

escape hatch.  "Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way."  *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979) (quoting *City of New York v. Diamond*, 379 F. Supp. 503, 517 (S.D.N.Y. 1974)).  To allow otherwise would make the provisions of Section 553 "virtually unenforceable."  *Id.* at 215.

And although the Supreme Court found that the Secretary had good cause to forego notice and comment in *Biden*, several salient differences exist here.  *See* 142 S. Ct. at 654. For instance, here, the Rule was issued nearly 25 days later than the CMS mandate, was nearly 25 pages shorter, and was less complex.  *See* 86 Fed. Reg. 68,052.  In addition, the CMS mandate dealt with healthcare providers and patients and sought to get ahead of the spread of illness inside of medical facilities themselves.  *See Biden*, 142 S. Ct. at 651–52. That connection is direct and clear, so it is understandable that the delay that notice and comment would have caused could be viewed as "impracticable" or "contrary to public interest" in that situation.  *See* 5 U.S.C. § 553(b)(3)(B).  But here, the Rule applies a vaccine mandate to teachers, volunteers, and other staff members working in an educational environment.  42 U.S.C. § 9831.  That connection is far more attenuated, which only emphasizes the need for the notice-and-comment period that existed here.

Moreover, the defendants did not appeal the Court's preliminary-injunction order, choosing instead to allow the deadline to pass and the preliminary injunction to remain in place.  *See* Dkt. No. 45.  The defendants' lack of action cuts against any argument that the defendants were acting in response to a state of emergency constituting good cause.

"The essential purpose of according § 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980). Here, the Secretary deprived the public and important stakeholders of this opportunity. Ultimately, HHS did not have good cause to forgo the notice-and-comment period.

**B.    The Secretary did not follow the procedures required to modify performance standards under the Head Start Act.**

In addition, the Secretary did not follow the procedures set forth in the Head Start Act. The statute requires the Secretary to comply with several requirements prior to modifying "any" performance standards. 42 U.S.C. § 9836a(a)(2)(A).

Under the statute, the Secretary must:

[C]onsult with experts in the fields of child development, early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs.

*Id.* Here, "[t]he Secretary consulted with experts in child health, including pediatricians, a pediatric infectious disease specialist, and the recommendations of the CDC and FDA." 86 Fed. Reg. at 68,054.

The Secretary failed, however, to consult with many of the required stakeholders. Notable absentees from his list include experts in the fields of (1) "early childhood education," (2) "family services (including linguistically and culturally appropriate services to non-English speaking children and their families)," and (3) "administration[] and financial management." 42 U.S.C. § 9836a(a)(2)(A). The failure to consult with "persons with experience in the operation of Head Start programs" is even more striking. *Id.*

The defendants state tha51ertifyRule "certif[ies]" that the Secretary did consult with those experts, repeating the general assertion that the Secretary "included relevant considerations" under Section 9836a(a)(2) when issuing the Rule.  Dkt. No. 59 at 15 (quoting 86 Fed. Reg. at 68,053–54) (emphasis added).  The defendants also argue that "the statutory text imposes no requirement that the Secretary document these considerations into the Rule itself."  *Id.*  Nevertheless, the Secretary went out of his way to list in the Rule the experts with whom he consulted and, in doing so, he omitted several required by the statute. The inclusion of those listed implies the exclusion of those not.  *Cf. Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (finding that the expression of one thing implies the exclusion of others "when the items expressed are members of an 'associated group or series'") (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)).

Additionally, the Head Start Act also requires that "the Secretary [] consult with Indian tribes, including Alaska natives, experts in Indian, including Alaska Native, early childhood education and development, linguists, and the National Indian Head Start Directors Association on the review and promulgation of [program performance standards]," which the Secretary failed to do.  42 U.S.C. § 9836a(a)(2)(D).  The defendants point to the Tribal Consultation Statement included in the Rule, arguing that it indicates that the Secretary "did in fact consult with the tribes."  Dkt. No. 59 at 16.

But the Tribal Consultation Statement merely provides general information on tribal consultations, such as the average number of tribal consultations per year, the geographic location where these consultations take place, and the process through which ACF completes reports for these consultations and submits a final report to the Secretary.  86 Fed. Reg. at 68,052.  Nowhere does it state that the defendants did, in fact, consult with the

proper tribes, natives, and representatives before promulgating the review, like the statute explicitly requires. *See id*. Instead, the Tribal Consultation Statement merely concludes, "We invite public comment on this [Rule] if there are concerns specific to Native communities and programs." *Id*. As noted above, the inclusion of specific parties that the Secretary actually consulted with implies the exclusion of those not listed. *See Barnhart*, 537 U.S. at 168.

The defendants also claim that *Biden* forecloses this argument because, there, the Supreme Court explained that, "[c]onsistent with the existence of the good cause exception, which was properly invoked here, consultation during the deferred notice-and-comment period is permissible." Dkt. No. 59 at 15 (quoting *Biden*, 142 S. Ct. at 654). But because the Court finds that good cause did not exist to defer the notice-and-comment period (*see supra* Section 5.A), the Court finds that the Secretary was required to consult with the appropriate parties as required by the statute but did not.

Furthermore, the plaintiffs argue that the Secretary also failed to follow 42 U.S.C. § 1986a(a)(2)(C)(ii), which requires that he "ensure that any such revisions in the standards will not result in the elimination of or any reduction in quality, scope, or types of health, educational, parental involvement, nutritional, social, or other services required to be provided under such standards as in effect on December 12, 2007." In response, the defendants argue that the Rule itself evidences that the Secretary made these considerations. Dkt. No. 59 at 15–16. They cite a portion of the Rule which states that the Secretary "considered the circumstances and challenges typically facing children and families served by Head Start agencies including the disproportionate effect of COVID-19 on low-income communities . . . and the potential for devastating consequences for children and families of

program closures and service interruptions due to SARS-CoV-2 exposures." Dkt. Nos. 52 at 61–62; 59 at 15–16 (quoting 86 Fed. Reg. at 68,054).

Nevertheless, the Head Start Act explicitly requires that the Secretary consider the quality, scope, and type of services required by the standards as they were in December 2007 in ensuring that any revisions to standards—such as the Rule here—do not eliminate or reduce any of that quality or scope, which the Secretary did not do. 42 U.S.C. § 1986(a)(2)(C)(ii). The Rule contains no discussion comparing the quality, scope, and type of services required to be provided in December 2007 to the quality, scope, and type of services that might result after promulgation of the Rule. *See* 86 Fed. Reg. 68,052. And the defendants do not cite any other document in the administrative record showing that the Secretary complied with this provision. *See* Dkt. Nos. 52 at 60–62; 59 at 15–16. Thus, while the Court does not deny that the Secretary did consider the general, potential effects of the Rule, the defendants fail to show that the Secretary did, in fact, meet the requirement set forth in 42 U.S.C. § 1986a(a)(2)(C)(ii).

*          *          *

The Secretary's failure to provide a notice-and-comment period in the absence of good cause and to follow the requirements set forth by the Head Start Act is not in accordance with the "procedure required by law" and is "in excess of statutory . . . limitations." 5 U.S.C. § 706(2)(C), (D). Thus, the Rule violates the APA and the Head Start Act on these grounds.

**6.    The Rule is arbitrary and capricious.**

In addition, the Court finds that the Rule is arbitrary and capricious because it is unreasonably overbroad without a reasonable explanation. It imposes a one-size-fits-all

– 53 –

approach with no end date, failing to establish a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The lack of a reasoned explanation is especially concerning given that the Rule constitutes a drastic change from Head Start's tradition of local flexibility, CDC-reported success in navigating the pandemic through flexibility, and the local programs' reliance interest on that flexibility. *See* Dkt. No. 39-19 at 1–2.

A court must "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court recently rearticulated what this standard requires:

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.

*FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) and *State Farm*, 463 U.S. at 43). "Put simply, [courts] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Wages & White Lion Invs., L.L.C.* 16 F.4th 1130, 1136 (5th Cir. 2021). In applying this standard, the Court is limited to "the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. Accordingly, this Court's review is deferential and limited., but "it is by no means a rubber stamp." *Garner*, 767 F.2d at 116.

Here, the Rule fails even under this deferential review.  First, the Secretary made no distinctions in the Rule based on size, location, or transmission rates.  The Head Start Rule's requirements are universal.  *Contra In re MCP*, 21 F.4th 357, 367 (2022) (upholding OSHA standard applying only to employers of a certain size); *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490 (vacating stay of CDC eviction moratorium, which applied only in counties with high transmission rates).  Notably, the Secretary acknowledged regional differences in COVID-19 transmission,[21] but he did not "reasonably explain" his failure to accommodate such differences.  *Prometheus Radio Project*, 141 S. Ct. at 1158.  The Secretary found that "cases are trending downward" in some states.  86 Fed. Reg. at 68,058.  But "there are emerging indications of potential increase in others—particularly northern states where the weather has begun to turn colder."  *Id.*

An agency is "not required to identify the optimal threshold" of rule distinctions based on size, location, or transmission rates "with pinpoint precision."  *In re MCP*, 21 F.4th at 383.  And "[c]ourts are 'generally unwilling to review line-drawing performed by the [agency] unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem."  *Id.* (alteration in original) (quoting *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998)).  But the Rule does not account for any of the previously mentioned differences.  Without reasonably considering the relevant issues or reasonably explaining the decision, it imposed a novel, universal approach.

Contrary to this approach, Head Start has a documented history of success from flexible practices depending on local needs.  Dkt. Nos. 56 at 91–92; 27 at 4 (OHS May 2021

---

[21] *See* 86 Fed. Reg. at 68,058.

guidance listed in the administrative record); 29-9 (CDC report included in the administrative record).  In its May 2021 guidance, the agency recognized that "[t]o date, OHS provided needed flexibilities and guidance that allowed programs to adapt services *based on the changing health conditions in their communities*."  Dkt. No. 56 at 91 (emphasis added).  As a result, some Head Start programs offered virtual and remote services, but "[m]any programs continued to provide in-person services for children and families throughout the COVID-19 pandemic."  *Id*.  The guidance instructed its in-person programs "to continue serving children in person, *as local health conditions allow*" and encouraged programs to "move to in-person services, *as local health conditions allow*."  *Id.* at 91–92 (emphasis added).  During the pandemic, local programs decided to close, operate remotely or hybrid, or offer fully in-person services, depending on their circumstances.  86 Fed. Reg. at 68,058.  In September 2021, 73% of centers were open for in-person services, 14% operated in a hybrid model, and 4% were virtual.  *Id*.  Only 2% were entirely closed due to COVID-19.  *Id*.  This history makes clear that the defendants recognized the importance of tailoring COVID-19 policy for months and that local centers were able to navigate the pandemic successfully.

There is no doubt that Head Start's traditional local-flexibility approach worked and that this data of success was before the agency when it nevertheless imposed the one-size-fits-all Rule.  A December 2020 report from the CDC studied the implementation of mitigation strategies in early childhood education settings.  Dkt. No. 29-9.  The CDC reported that, while "most states required all schools (K-12) to close or transition to virtual learning," the Office of Head Start "gave its local programs that remained open the flexibility to use CARES Act funds to implement CDC-recommended guidance."  *Id.* at 1.

The result?  "Head Start programs successfully implemented CDC-recommended mitigation strategies and supported other practices that helped to prevent SARS-CoV-2 transmission among children and staff members."  *Id.*  The CDC stressed that the flexibility provided to local Head Start programs was key to the success: "Since the COVID-19 pandemic started, Head Start and Early Head Start programs successfully implemented CDC-recommended mitigation strategies and applied other innovative approaches to limit SARS-CoV-2 transmission among children, teachers, and other staff members by allowing maximum program flexibility and allocating financial and human resources."  *Id.* at 3.  The report concludes that "[c]hild care settings should implement concurrent preventive measures and adjust these strategies based on community transmission data."  *Id.* at 4.

Most recently, the Secretary even withdrew the previously imposed, universal mask requirement in favor of local flexibility.  88 Fed. Reg. at 993–94.  Initially, the Rule required all Head Start students and staff to wear masks in almost all situations.  The updated Final Rule, however, explains that "[r]emoving the universal mask requirement and replacing it with the requirement of an evidence-based COVID-19 mitigation strategy allows Head Start programs to adapt to changing circumstances, to consider the unique challenges and needs faced by individual programs, and still supports the safest environments for the workforce, and the children and families Head Start serves."  *Id.* at 994.  The Secretary persists, however, in the Rule's vaccine mandate—again without explanation.  *See id.* at 993.

Despite the longstanding practice of local flexibility and its documented success, the defendants attempt to justify their one-size-fits-all approach by stating that it would be "burdensome" for grant recipients that cover large geographic areas to issue different guidance to programs in different locations.  86 Fed. Reg. at 68,066.  But such a conclusory

allegation constitutes willful ignorance of the facts and issues in a rushed attempt to achieve its goals.  Head Start agencies covered large areas and adjusted as necessary prior to the Rule, and the defendants cite no evidence indicating that it was burdensome to do so then or now.[22]  To the contrary, ACF admits that it has "relied on the importance of local health conditions in issuing guidance to Head Start programs" before and acknowledges the diversity in transmission rates.  *Id*; *see also id.* at 68,058.  Moreover, the Rule ignores CDC guidance "that localities should monitor community transmission in making decisions" and the CDC's report that Head Start had successfully navigated the pandemic through "maximum program flexibility."  *Id.* at 68,066; Dkt. No. 29-9 at 3.

Rejecting or ignoring this guidance and data—and failing to articulate why local conditions are no longer vital policy tools—ACF simply states that it is prioritizing an easy-to-follow "clear and transparent policy" and that "children benefit from routine and predictability."  86 Fed. Reg. 68,066.  Again, ACF cites no evidence supporting these conclusory statements in relation to the Rule and does not provide any reasonable, meaningful explanation of the Rule.  Instead, it implements a one-size-fits-all approach without articulating "a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington*, 371 U.S. at 168).  Therefore, the Court does "not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562–63 (D.C. Cir. 2010) (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

---

[22] Because the defendants precluded pre-promulgation comment, they appear to be guessing at the exact "burden[]" this will cause local agencies.  *See id.* at 68,066.

The validity of this conclusion is especially apparent in light of the Rule's drastic change from past practice.  Although an agency need not always provide a detailed explanation for a new policy, "[s]ometimes it must."  *Fox Television Stations, Inc.*, 556 U.S. at 515.  Supreme Court precedent makes clear that when a new policy "rests upon factual findings that contradict those which underlay its prior policy," or when an agency's "prior policy has engendered serious reliance interests," it is "arbitrary or capricious to ignore such matters."  *Id.*  As explained above, the Rule rests on a one-size-fits-all finding that contradicts its prior approach, and the agency's prior flexibility engendered serious reliance interests.  Thus, "further justification [was] demanded" but not provided, rendering the Rule arbitrary and capricious.  *See id.* at 516.

The plaintiffs also argue that ACF's failure to establish an end date is arbitrary and capricious.  Dkt. No. 54-1 at 48.  In the Rule, ACF offered no explanation for its choice. *See* 86 Fed. Reg. at 68,066.  Rather, it only "invites comment" on whether to establish a "finite end date."  *Id.*  The defendants counter that ACF decided not to include an end date because "children benefit from routine and predictability."  Dkt. No. 26 at 31 (quoting 86 Fed. Reg. at 68,066).  Under a fair reading of the Rule, ACF likely did not offer that reason to explain its choice.  But even if it did, it would not support omitting an end date.

ACF asserts that "children benefit from routine and predictability" not to explain its choice to omit an end date but to partially explain its decision to impose universal mandates without regard to regional transmission rates.  Dkt. No. 52 at 48 (quoting 86 Fed. Reg. at 68,066).  But if children benefit from predictability, then imposing an end date would serve that purpose.  By failing to include an end date, ACF made the rule's application unpredictable. In any event, that justification has little to no relevance upon the Head Start

– 59 –

staff members facing the vaccine mandate—a concern entirely separate from whether children have routine and predictability.  Therefore, to the extent ACF actually included an explanation for this choice, it is certainly not reasonable in the context of the vaccine requirement.  *See generally Prometheus Radio Project*, 141 S. Ct. at 1158.  Though this is not a stand-alone basis to invalidate the Rule, when viewed together with the Rule's overbreadth and change in policy, it takes the Secretary's decision outside "the zone of reasonableness." *Id.* at 1160.

And although the defendants point to *Biden* in arguing that the Rule is not arbitrary or capricious (Dkt. No. 52 at 42), the Supreme Court reached its conclusion regarding the CMS mandate on different grounds in a different context.  The rule-making record in *Biden* demonstrated that the agency examined the relevant data and articulated a satisfactory explanation.  142 S. Ct. at 653–54.  As explained above, however, the administrative record in this case proves the opposite.  Furthermore, *Biden* did not involve the Secretary's sudden shift from a long-standing and successful practice of local flexibility to a one-size-fits-all approach, which is what occurred here.  *See id.*  Therefore, because the Rule is unreasonably overbroad without a rational explanation, *Biden* is distinguishable.  The Court finds that the Rule is arbitrary and capricious in violation of the APA.

Ultimately, for the reasons stated above, the Court finds that summary judgment should be granted in favor of the plaintiffs.  The defendants' motion to dismiss for failure to

state a claim and motion for summary judgment are denied.[23]  The Court now turns to the issue of remedy.[24]

### 7.    The Court sets aside the Rule and holds it unlawful.

The plaintiffs ask the Court to hold unlawful and set aside the Rule.[25]  Dkt. No. 54-1 at 52.  For the reasons explained below, the Court grants that relief.

### A.    The Rule is vacated and remanded.

Pursuant to the APA, a court "shall . . . hold unlawful and set aside agency action" that is in excess of statutory authority, arbitrary and capricious, or without observance of procedure.  5 U.S.C. § 706(2).  Section 706(2) goes "beyond the mere non-enforcement remedies available to courts" and "empowers courts to set aside—*i.e.*, formally nullify and revoke—an unlawful agency action."  *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th

---

[23] Where one party moves for dismissal under Rule 12 and summary judgment under Rule 56, the Court may treat the "hybrid" motion as "a summary judgment motion when a district court considers materials beyond the pleadings."  *Moore v. Burlington Northern Santa Fe Railway Company*, No. 21-20103, 2022 WL 16860550, at *2 (5th Cir. Nov. 11, 2022) (citing *Isquith ex rel. Isquith v. Middle S. Utils. Inc.*, 847 F.2d 186, 193–95 (5th Cir. 1988)); *see also Letcher v. Turner*, 968 F.2d 508, 509 (5th Cir. 1992).

[24] The Court is aware that other courts have reached divergent conclusions regarding the Rule.  *See* Dkt. Nos. 65; 67 (notifying the Court of supplemental authority); *Livingston Educational Service Agency v. Becerra*, 35 F.4th 489, 491–93 (6th Cir. 2022) (denying a motion for an injunction pending appeal based on a holding that HHS likely had statutory authority and likely did not violate the APA); *Louisiana v. Becerra*, No. 3:21-CV-04370, 2022 WL 4370448, at *7–12 (W.D. La. Sept. 21, 2022) (permanently enjoining the Rule in twenty-four states because the Secretary lacked statutory authority).  The Court has reviewed these nonbinding cases but notes that the issues remain open in the Fifth Circuit.  And for the reasons previously discussed, the Court is not persuaded by a contrary authority that the Rule is authorized or does not violate the APA.

[25] The plaintiffs also request a permanent injunction.  Dkt. No. 54-1 at 52–53.  However, they seek this request based on arguments that the Court does not and need not reach.  *See id.*  If vacatur is "sufficient to redress [the plaintiffs'] injury," an injunction is not warranted.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

846, 859 (5th Cir. 2022) (internal quotation marks omitted).  "Agency action" encompasses "an agency rule," such as the Rule at issue here. [26]  *See* 5 U.S.C. § 551(13).

When awarding relief under Section 706(2), the Court may fashion the remedy in one of two ways: remand the Rule with vacatur or remand the Rule without vacatur.  *See Texas v. United States*, 50 F.4th 498, 529–30 (5th Cir. 2022).  As the Fifth Circuit has explained, the default rule is to vacate and remand the unlawful agency action.  *Data Mktg. P'ship, LP*, 45 F.4th at 859.  Remand without vacatur, on the other hand, is an "exceptional remedy" that courts may provide in exercising their discretion.  *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020); *Brown v. U.S. Dep't of Educ.*, No. 4:22-CV-0908, 2022 WL 16858525, at *14 (N.D. Tex. Nov. 10, 2022).  Remand with vacatur "re-establish[es] the status quo" before the unlawful agency action took place.  *Texas*, 40 F.4th at 220.  Remand without vacatur, however, "leaves the rule in place during remand."  *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 43 (D.D.C. 2013).  Consequently, "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule."  *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015).  As such, remand without vacatur is appropriate only "when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so."  *State v. Biden*, 10 F.4th at 560 (quoting *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021)).

When deciding whether vacatur is appropriate, a federal court considers two factors.  First, the Court evaluates "the seriousness of the deficiencies of the action," or in other words, "how likely it is the agency will be able to justify its decision on remand."  *Texas*, 50

---

[26] The parties do not contest that the Rule constitutes "agency action."  *See* Dkt. Nos. 52; 54-1.

F.4th at 529.  Second, the Court assesses "the disruptive consequences of the vacatur."  *Id*.

"A strong showing of one factor may obviate the need to find a similar showing of the

other."  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019).

      As to the first factor, the Rule is deficient on several grounds.  As previously

discussed, the Rule is not supported by statutory authority (*see supra* Section 4), fails to

observe procedural requirements (*see supra* Section 5), and is arbitrary and capricious (*see*

*supra* Section 6).  Additionally, the defendants have failed to explain how they would be

able to substantiate the Rule if given the opportunity to do so; in fact, they make no attempt

to address this issue in their briefing.  *See* Dkt. No. 59 at 22–24; *see also State*, 10 F.4th at 560

(noting that the agency had not explained, or even suggested, how it could substantiate its

decision in its motion or reply).  Without any such explanation, and in light of the severity

of the Rule's deficiencies, which weighs against remanding without vacatur, the Court finds

it unlikely that HHS will be able to justify its decision on remand.

      The second factor—disruptive consequences—also does not support remand without

vacatur.  At the outset, the defendants do not raise any arguments as to this question, except

to state that setting aside the Rule will affect other court decisions made or currently

pending across the country.  Dkt. No. 59 at 23–24.  That argument is more relevant to the

question of the scope of relief, discussed in greater detail below.  *See infra* Section 7.B.  The

Court notes, however, that a preliminary injunction has been in effect in Texas since

December 31, 2021.  Dkt. No. 42.  And now, the Rule has been permanently enjoined in at

least twenty-four other states.  *Louisiana v. Becerra*, No. 3:21-CV-04370, 2022 WL 4370448,

at *14 (W.D. La Sept. 21, 2022).  Thus, any disruptive effect has already been limited by

these decisions.  In addition, the "uncertainty that typically attends vacatur of any rule" is

not sufficient for the second factor to weigh in favor of remanding without vacatur. *Nat. Res. Defense Council v. Wheeler*, 955 F.3d 68, 85 (5th Cir. 2020). Moreover, the strong showing of deficiencies noted above counsels against remanding the Rule without vacatur. *See Am. Bankers Ass'n*, 934 F.3d at 674. Both factors, then, lead the Court to conclude that remanding the Rule with vacatur is appropriate. Accordingly, the Court vacates the Rule.

### B. The relief granted here—vacating the Rule—cannot be limited to the plaintiffs.

The Court next considers the scope of the relief. The defendants urge the Court to limit relief, stating that the agency action should be set aside only as to the named plaintiffs. Dkt. No. 59 at 22–24. The defendants assert that "the APA's general instruction that unlawful agency action 'shall' be 'set aside' [] is insufficient" to vacate an agency action nationwide. *See id.* But they fail to point to any Supreme Court or Fifth Circuit precedent in support. *See* Dkt. No. 59 at 22–24. Instead, the defendants rely on cases addressing injunctive relief. *See id.* at 22–23 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021); *Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021); and *Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730, 735 (5th Cir. 1977)). Here, however, the Court is vacating the Rule under the APA.

Precedent undermines the defendants' position that vacatur should be limited to the plaintiffs. In fact, the Supreme Court has affirmed lower court decisions universally vacating an agency action. *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1901, 1916 & n.7 (2020). Fifth Circuit precedent interpreting Section 706(2) also establishes a practice of vacating an agency action universally, not limiting vacatur to the named plaintiffs. For instance, in *Community Financial Services Ass'n of America, Ltd. v. Consumer Financial Protection Bureau*, two trade associations challenged a rule that the Consumer

Financial Protection Bureau had promulgated.  51 F.4th 616, 623 (5th Cir. 2022).  The Fifth Circuit concluded that the rule violated the Appropriations Clause and separation of powers; therefore, the rule violated the APA because the agency action was "not in accordance with law."  *Id.* at 635–43 (quoting 5 U.S.C. § 706(2)(A)).  The Fifth Circuit vacated the rule universally in accordance with the APA; it did not limit the scope of the vacatur to the named plaintiffs in that case.  *Id.* at 643–44.

Likewise, in *Southwestern Electric Power Co. v. EPA*, various environmental groups challenged two portions of a rule that the EPA had promulgated.  920 F.3d 999, 1012 (5th Cir. 2019).  Concluding that a portion of the rule was arbitrary and capricious, the Fifth Circuit vacated that portion and remanded it to the agency for reconsideration.  *Id.* at 1019, 1021–22.  Again, the Fifth Circuit did not limit the remedy to the plaintiffs.  *See id.*

Finally, in *Texas v. United States*, the Fifth Circuit conducted an extensive discussion of vacatur under the APA before ultimately affirming that DACA should be vacated and remanded.  50 F.4th at 529–30.  The Fifth Circuit also affirmed the district court's decision to temporarily stay the order of immediate vacatur as to current DACA recipients pending the outcome of a rulemaking proceeding, but the Fifth Circuit did not limit the scope of vacatur to only Texas and the other plaintiff states.  *Id.*[27]

---

[27] Other Fifth Circuit cases demonstrate the same practice of vacating an agency action without limiting the remedy to the plaintiffs.  *See, e.g.*, *Data Mktg. P'ship, LP*, 45 F.4th at 859–60; *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 245–46 (5th Cir. 2023); *Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 885 F.3d 360, 388 (5th Cir. 2018).  Courts across the country reach the same conclusion.  *See, e.g.*, *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 66–72 (D.D.C. 2019) (Jackson, J.), *rev'd and remanded on other grounds*, 962 F.3d 612 (D.C. Cir. 2020); *New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 672 (S.D.N.Y. 2019), *aff'd in part, rev'd in part on other grounds*, 139 S. Ct. 2551 (2019).

In light of this precedent and the Court's findings and conclusion, following the precedent before the Court, the relief is not limited to the State of Texas and LISD. Rather, the Rule shall be universally set aside.[28]

### C.    The entirety of the Rule is vacated.

The defendants ask the Court to apply severability principles and consider setting aside only the portion of the Rule that violates the APA. Dkt. No. 59 at 24. An "[a]gency action" includes "the whole or a part of an agency rule." 5 U.S.C. § 551(13). And as explained in Section 706(2), agency action that is in excess of statutory authority, is arbitrary or capricious, or fails to follow procedural requirements must be "set aside." Therefore, a court may set aside "only the part of a rule found to be invalid." *Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928, 945 n.7 (N.D. Tex. Oct. 15, 2019). Accordingly, in applying Section 706(2), the Fifth Circuit has previously vacated agency rules both in whole and in part. *See, e.g.*, *Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 388 (5th Cir. 2018); *Sw. Elec. Power Co.*, 920 F.3d at 1022. A court exceeds its statutory scope of review in vacating an agency rule in whole if "only a part is invalid" and "the remaining

---

[28] The Court is aware that the Supreme Court is currently considering what "set aside" under the APA means. *See United States v. Texas*, 143 S. Ct. 51 (2022) (granting certiorari and instructing the parties to address whether an immigration statute prevents courts from setting aside administrative guidelines under the APA); Transcript of Oral Argument at 36, *United States v. Texas* (No. 22-58) ("Your position on vacatur, that sounded to me to be fairly radical and inconsistent with, for example, you know, with those of us who were on the D.C. Circuit, you know, five times before breakfast, and that's what you do in an APA case.") (Roberts, C.J.). In addition, there is ongoing scholarly debate on the subject, with some arguing that vacatur under the APA is universal and others claiming that any relief should be limited in scope to only the plaintiffs. *Compare* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020), *with* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. On Reg. Bull. 37, 41 (2020), *and* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017). However, because the Supreme Court has not yet reached a decision, the Court follows Fifth Circuit precedent in vacating the Rule without limitation to the named plaintiffs. *See, e.g.*, *Sw. Elec. Power Co.*, 920 F.3d at 1022; *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th at 643; *Texas*, 50 F.4th at 529–30.

portion may sensibly be given independent life." *Franciscan Alliance, Inc.*, 414 F. Supp. 3d at 945 n.7.  Here, the plaintiffs challenge the Rule as a whole.  Dkt. No. 1 at 65–69.

As explained in Sections 5 and 6, the Rule as a whole violates the APA because the Secretary did not follow proper rulemaking procedures in promulgating the Rule, and the Rule is arbitrary and capricious.  These violations do not encompass merely portions of the Rule.  The Rule also exceeds statutory authority.  *See supra* Section 4.  Therefore, the entire rule is invalid.  *See Franciscan Alliance, Inc.*, 414 F. Supp. 3d at 945 n.7.  In any event, the vaccine requirement and other portions of the Rule still in force are intertwined with and connected to one another.[29]  86 Fed. Reg. 68,052.  Therefore, the Rule is "not amenable to severance."  *Chamber of Com. of U.S.*, 885 F.3d 360 at 388.  Ultimately, then, the Rule in its entirety must be set aside.

In an attempt to avoid this conclusion, the defendants cite a severability clause within the Rule, which states that, "[t]o the extent a court may enjoin any part of the rule, the Department intends that other provisions or parts of provisions should remain in effect."  86 Fed. Reg. at 68,059–60.  Nevertheless, "the ultimate determination of severability will rarely turn on the presence or absence of a severability clause."  *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022) (internal quotation marks omitted).  Instead, courts must look to whether any remaining valid portions can still function absent the

---

[29] The masking requirement constituted a major portion of the Rule, as well.  *See* 86 Fed. Reg. at 68,058.  However, as explained above, the Secretary has since removed that requirement in its Final Rule.  *See supra* Section 1.  The Court does not explicitly address the masking requirement but notes that, in any event, it would have violated the APA, too, for reasons discussed in Sections 4, 5, and 6.

invalid portions. *Id.* Here, because the Rule in its entirety violates the APA and is not amenable to severance, the Court sets aside the Rule in whole.[30]

## 8.   Conclusion

Approximately three years have passed since the start of the COVID-19 pandemic in the United States. *See* 85 Fed. Reg. 15337 (Mar. 18, 2020). Schools both in Texas and across the country have returned to in-person classes and dropped vaccine and masking requirements.[31] Numerous vaccine mandates have since been repealed or removed.[32] And President Biden has announced that the U.S. will be ending the COVID-19 national emergency and public health emergency declarations in May 2023.[33] HHS has since removed the Rule's masking requirement and even implemented a local-level, COVID-19 mitigation strategy in its Final Rule, returning once again to community-wide flexibility. 88 Fed. Reg. 993. Yet, the Rule's vaccine mandate for Head Start staff, contractors, and volunteers remains in force. *Id.* And although HHS stated that the vaccine mandate was

---

[30] The Court notes that the plaintiffs are not challenging the Final Rule. *See* Dkt. No. 54-1. In any event, the Final Rule clearly states that it "does not address the vaccination and testing requirement, which is still under review." 88 Fed. Reg. at 993.

[31] *See* Ariel Gilreath, *For Head Start, Masks and Vaccine Mandates are Still in Place—For Now* (Sept. 7, 2022), https://hechingerreport.org/for-head-start-masks-and-vaccine-mandates-are-still-in-place-for-now/ [https://perma.cc/A5C4-KZDC]; Dana Goldstein, *At Head Start, Masks Remain On, Despite C.D.C. Guidelines*, https://www.nytimes.com/2022/09/07/us/head-start-masks-toddlers.html?partner=IFTTT (last modified Sept. 9, 2022) [https://perma.cc/ET42-7A58].

[32] *See, e.g.*, United States Department of Defense, *DOD Rescinds COVID-19 Vaccination Mandate* (Jan. 10, 2023), https://www.defense.gov/News/Releases/Release/Article/3264323/dod-rescinds-covid-19-vaccination-mandate/ [https://perma.cc/RTB2-6K7T]; Guidance for Executive Order 14042, Office of Management and Budget (Oct. 19, 2022), https://www.saferfederalworkforce.gov/downloads/OMB%20Guidance%20for%20Agencies_EO%2014042_20221019.pdf [https://perma.cc/7J3R-Y9CL] (suspending enforcement of Executive Order 14042, which required certain federal-contractor employees to obtain COVID-19 vaccines).

[33] Zeke Miller & Amanda Seitz, *President Biden to End COVID-19 Emergencies on May 11* (Jan. 20, 2023), https://apnews.com/article/biden-united-states-government-district-of-columbia-covid-public-health-2a80b547f6d55706a6986debc343b9fe [https://perma.cc/KE23-7PKV].

"under review" in its Final Rule, HHS did not provide a deadline or clear answer as to the status of that review—only that Head Start staff are still subject to the requirement. *Id.* Thus, while other mandates and organizations adjust and move forward, Head Start's vaccine mandate and this dispute remain.

Because LISD and Texas have standing, the Secretary did not have statutory authority to promulgate the Rule, the Rule violates procedural requirements, and the Rule is arbitrary and capricious, the Court grants the plaintiffs' motion for summary judgment (Dkt. No. 54). The defendants' motion to dismiss (Dkt. No. 48) and motion for summary judgment (Dkt. No. 49) are denied. The Court sets aside and vacates the Interim Final Rule. The Court either does not reach or denies all other requested relief. The Court will enter a final judgment, including a seven-day administrative stay, by separate order.

So ordered on March 31, 2023.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE